1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT
9                        WESTERN DISTRICT OF WASHINGTON
10                                   AT SEATTLE
11
12   CAROLYN SIOUX GREEN                    CASE NO. 2:21-cv-01276–RAJ– DWC
13
14                Plaintiff,                PLAINTIFF'S FIRST
15                                          AMENDED COMPLAINT FOR
16   v.                                     INJUNCTIVE AND DECLARATORY
17                                          RELIEF AND DAMAGES
18   UNITED STATES OF AMERICA,              (CORRECTED PER DKT 29)
19   UNITED STATES COAST GUARD,
20   UNITED STATES DEPARTMENT OF            JURY DEMAND
21   VETERANS AFFAIRS, [DOE'S 1–155],
22   ET AL.                                 EQUITABLE TOLLING
23                                          (Fairness)
24                Defendants.
25   _____    **Noting Date: November 25, 2021**
26
27

28        Plaintiff Carolyn Sioux Green (Carolyn) has *legal standing*, in all cases.

29

30   This Court has jurisdiction over the parties and the federal claims herein pursuant

31   to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) and (4), and to grant relief against

32   Defendant United States of America [United States], United States Veterans

33   Affairs (VA Puget Sound, Dept of Veterans), and the United States Coast Guard

34   (USCG). In sum, the [United States].

1     Good afternoon Your Honor. The tort claims response time of six month

2    lapsed as of June 30, 2021. Accordingly, Plaintiff proceeds with civil actions in

3    accordance with 28 C.F.R. § 801.4(c).

4     The Federal Tort Claims Act (FTCA) considers a no response after 6 months

5    a denial to the tort claims pursuant to 28 C.F.R. § 801.4(c). United States tort claim

6    with no response is presumed a denial because of the United States' inaction.

7    Plaintiff has further exhausted her administrative remedies in complete totality

8    (See Case No. 3:20-cv-06112–BHS Dkt 45 p. 122 at 12–22 through p. 125 at 1–11).

9       [United States], U.S. Dept of Veterans Affairs, the U.S. Coast Guard

10   tort claim forms with the attachments list with printed records and documents, plus

11   the flash drives contents that were included in the tort claims mailed on December

12   28, 2020 with USPS certified delivery date of December 31, 2020 @ 10:21 am for

13   #7020129000002866 for U.S. Dept of Veterans Affairs, and #7020129000002873 @

14   10:34 am for the U.S. Coast Guard.

15    The U.S. Department of Justice Civil Division Torts Branch Federal Tort

16   Claims Act Staff with a second confirmation of the tort claim filings and were in

17   receipt of on January 14, 2021. (See Exh–99). Plaintiff proceeds with civil actions in

18   pursuant to 28 C.F.R. § 801.4(c).

19    The [United States] was negligent in their duty to provide adequate and

20   individualized medical care, who fell below the standard of care with medical

21   malpractice and with gross negligence who also denied her medical care, with

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  retaliation, who then honorably discharged her in her severe physically injured

2  condition

3       Then the [United States] unlawfully imprisoned Carolyn and chemically

4  lobotomized her in 2001 as well as prescribing excessive medication (drugs)

5  masking her physical injury.

6

7                    <u>JURISDICTION AND VENUE</u>

8       This action arises under federal law, including the United States

9  Constitution and federal statutes.  This Court has jurisdiction and authority to

10  enter declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1331(a), 1343(3) &

11  (4), 1367, 2201, 2202, 42 U.S.C. §§ 1983, 1988, 12205, and Rules 57 and 65 of the

12  Federal Rules of Civil Procedure.

13       Venue is appropriate under 28 U.S.C. § 1391, as most all of the acts and

14  omissions of all defendants occurred in the State of Washington to include the

15  previous older case that was heard in this Court in 1995. Plaintiffs' claims for relief

16  arise within the state of Washington. Each cause of action arises at least in part in

17  this district. This district provides the most convenient forum for the litigation of

18  these issues.

19

20       Plaintiff has subject matter jurisdiction in both United States District Courts

21  Western District of Washington; Seattle and Tacoma.

22  ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

# TABLE OF CONTENTS

A. Introduction & Brief History the of [United States] Coast Guard (USCG)............7

B. USCG Drug Regimen with excerpts....................................................17

C. Background of the VA Puget Sound Healthcare System:

    Poly Drugged Carolyn with Excessive Drugs From 1996–2018.....................19

D. UNITED STATES DRUG REGIMEN:

    1) Drug Regimen 1994–1995 USCG..................................................24

    2) Drug Regimen 1996–2018 DEPT OF VETERANS....................................24

E. <u>Medical Malpractice [United States]</u> ..........................................30–196

    1) While Active Duty ............................................................36

    2) Prior to the USCGC Mellon (WHEC 717), was Station Chetco River.........42

    3)Prior to the Avalanche of 2001.......................................55

    4) Welcome to the Avalanche..............................................56

    5) The U.S. *Chemically* Lobotomized Carolyn in 2001...................63

    6) 2001 Unlawful Imprisonment & Forced Drugged.............................67–132

    7) Breach of Standard of Care ........................................133

    8) Active Duty.........................................................139

    9) Uniform Code of Military Justice (UCMJ) ............................144

    10) Carolyn's Injuries Briefly, Exhibit Excerpts...........................145

///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    F. <u>EXHIBITS referenced with a description</u>:

2        USCG. (<u>Exhibits 1–31</u>) ..................................................................159

3        VA Puget Sound (<u>Exhibits 32–58</u>) ...............................................p. 19

4        VA Puget Sound <u>Exhibits 1–61</u> (va + w estern) ...........................167

5        <u>Exhibits 62–103</u> .......................................................................175

6        <u>Exhibits 104–120</u> pertain to Providence.......................................178

7        <u>Exhibits 121–135</u> .....................................................................180

8        (*State of Washington–Western et al., Court of Appeals No. 557908*)

9        Legal Authorities .......................................................................191

10

11

12    G. <u>Prayer for Relief sought to be Granted</u>: an apology..............................196

13            1) Drugs ........................................................................198

14            2)  Military Modifications & Reductions.............................200

15            3) Superior Court System Modifications & Justices.........................208

16            4) U.S. Department of Veterans Modifications .................216

17            5) Prayer for Relief sought to be granted ...........................228

18            6) Miscellaneous relief requested .......................................233

19            7) U.S. Senate Committee on Veterans Affairs Modifications ..........234

20    ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  H. EQUITABLE TOLLING (Fairness) TABLE OF CONTENTS: ..........................235

2     1)  Argument for Equitable Tolling (Fairness)....................................236

3     2)  U.S. Coast Guard Drug Regimen.....................................................255

4     3)  U.S. Department of Veterans (VA Puget Sound) Drug Regimen.................259

5     4)  Identified Damaging Effects of a Frontal Lobotomy–*chemical*......................263

6     5)  U.S. Dept of Veterans (VA Puget Sound) Drug Regimen *continued*.............268

7     6)  *Morphine*: Federal & State Drug Violations for Distribution & Refilling.....279

8     7)  Drug Interaction Overview and Drug Interactions.........................................291

9     8)  How Long it Took..............................................................................298

10    9)  Incapacity.........................................................................................305

11    10) Drug Side Effects...............................................................................316

12    11) Affidavits by 3-Medical-Experts for Damaging Drug Effects (Exh. 66)........329

13    12) The 6.7 Year Process. The Short Version....................................................330

14    13) Exhibit Excerpts of Carolyn's Injuries....................................................145, 338

15

16  I. In Conclusion..............................................................................................352

17  J. References..................................................................................................353

18

19  EXHIBITS: Exhibits redacted in compliance pursuant to: Federal Rule Civil
20  Procedure 5.2(a), Local Civil Rule 5.2, General Rule (GR) 15 and GR 31.

21  ///

22  ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

# A:        INTRODUCTION & BRIEF HISTORY OF

# THE [UNITED STATES] COAST GUARD (USCG)

Plaintiff was stationed onboard a ship in 1994 while serving active duty in the United States Coast Guard (USCG). While underway her boot heel slipped on the log office steel ladder causing her to fall landing five consecutive times on her right buttocks as her right hind-end made contact with the steel ladder landing on the same spot on her right buttocks where a type of severing occurred.

On February 21, 1994 she blacked out for a moment after receiving a response from back from her complaint about her first unit, Station Chetco River, she slipped on the stainless-steel log office ladder, the steepest ladder onboard the USCG CUTTER MELLON (WHEC 717): Her boot started at the top step of the ladder, her hind-end bounced and landed five consecutive times on steel ladder rungs on her right buttocks, direct hits to the same spot where a type of severing occurred.

Thankfully, she was able to stop prior to her crotch being rammed into the mid-side rail as she ended up lying on the deck below. A couple of crewmembers checked on her after they heard the loud noise. Then she picked herself up and went to go lay down in her rack.  She was seriously injured, internally bleeding from the bruise, she went downhill from that point forward.

She notes here by stating the fact that "treatment" was physical therapy for the buttocks/hip injury, the injections were lower neck and upper back treatments for the neck pain. Tests were performed as well as many drugs were prescribed. Other than that, there was no treatment for the injury. She does not in any way

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES (CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    consider the treatment was exhausted as the Medical Officer stated. When in fact

2    treatment had barely started. In fact, physical therapy was the only "treatment" for

3    the hip/buttocks injury to speak of, a shot in the right glute, too. Have someone

4    massage torn and injured areas of your glute with nerve pain to only increase the

5    pain and discomfort, possibly creating more harm. That was the "treatment plan".

6         Her medical board was a joke. One sided too. The [United States] Coast Guard

7    honorably and medically discharged her Christmas week of 1995 with a combined

8    percentage rate of 28% and rounded to 30% total. The rating listed everything as

9    "possible" except for cervical pain and right hip pyriformis syndrome: Intervertebral

10   disc syndrome: Moderate; reoccurring attacks at 20%, PTSD; Occupational and

11   social impairment due to mild or transient symptoms at 10%, and Muscle Injuries;

12   Group XVIII; pelvic girdle "slight" at ZERO percent. Yep, a big fat zero! She went

13   into the Military a very fit woman and came out to where she could barely walk.

14        She was becoming internally mangled while gradually splitting apart at the

15   seams at her right sacroiliitis joint, along with an injured neck that greatly affects

16   my right shoulder, even today.

17        Plaintiff was even reprimanded with three bad Page-7's from medical. The first

18   reprimand was after walking around 464 days (1 year 3 months and 10 days) due to

19   the assigned primary care provider. Carolyn knew them to be unqualified to

20   manage her injury care. The second reprimand was for asking for medical help

21   without an appointment. This reprimand was after walking around for

22   652 days (1 year 9 months and 14 days) after being catastrophically injured,

1   without any meaningful care.

2      Will a high-ranking Military member explain to her how an active-duty member

3   can be physically injured, have medical reports–documentation with witnesses,

4   have their duty station solely changed due to the physical injury, yet honorably

5   medically discharged with no treatment or realistic care, then just calling it post-

6   traumatic stress?

7      A death sentence is what she was given, prior to being kicked to the curb

8   (honorable discharged severely injured) at Pier 36 with a bottle containing (200)

9   Naproxen 500mg tablets Rx#45744 for the refill she requested, a few days prior to

10   Christmas. Four days. Four days before Christmas with no treatment help or plan.

11

12      Carolyn has had to learned what digging herself out of an early grave looks like,

13   that has taken beyond 22 years that includes a life of incalculable carnage. It isn't

14   pretty. Carolyn was honorably discharged while still severely injured.

15      All the things necessary to function in life, was stolen; her health, her family, her

16   special and dear friends, a marriage, pets, etcetera, etcetera, etcetera. She was not

17   able to get back to most people since before she joined the Military in 1991; her

18   other special friends whom she had work relationships with, too.

19      Carolyn lost many important cherished and valued relationships, some have

20   died, some ruined due to no procedural care and from being saturated with

21   excessive drugs from [United States] Veterans deadly drug cocktails. Then in 2001

22   with "The Avalanche" being a push over and beyond the edge. Her health, and all

1    those necessary and important things in LIFE, those things that make the world go

2    around; relationships, laughter, adventure, celebrations, fun, travel... were all

3    taken, destroyed, including robbing her of her reproductive rights as a woman of

4    child bearing age.

5

6    <u>1994 February 21</u>:  Her initial injury date for her physical injury that was

7    mismanaged as it was treated inappropriately with masking and mind-altering

8    drugs instead of adequate medical care.

9    <u>1994 September 20</u>: [Carolyn] was assigned a land unit due to her physical injury

10    sustained onboard the USCGC Mellon (WHEC 717).

11    **<u>1995 December 21</u>**: Plaintiff was honorably medically discharged while severely

12    physically injured to only be given Naproxen tablets with no other medical care and

13    without a treatment plan. This was 22 months (668 days) of the Plaintiff walking

14    around on her not completely attached right leg. The USCG, after their retaliation

15    and sexual harassment treated her well-documented physical injury as an

16    adjustment disorder and post-traumatic stress at USCG Support Center Seattle.

17    The erroneous label of adjustment disorder came about at her first unit when

18    Plaintiff was stationed at Station Chetco River (Chetco), in the same district,

19    District 13 (D13).

20         Chetco, her first hostile work environment where she lived a portion of her

21    tour of duty. Chetco who, trapped and then confined her on purpose where she was

22    forced to stay in a void (a lower water sealed tightly confined compartment of this

1  vessel) of a moored search and rescue boat while forced to paint using lead death

2  paint after wiping the surface area down with the solvent Toluene without a

3  respirator. She was denied a respirator. She requested a respirator after the denial.

4  She was denied a respirator. In addition, her supervisor used his body to block the

5  Plaintiff from exiting the void to breath fresh air instead of toxic harmful chemicals

6  that were suffocating her.

7

8      As will later be seen in Exhibit 132: FEDERAL RECORDS CENTER

9  RETRIEVAL request 07/26/21 for COURT RECORDS, received 08/3/2021: CASE

10  C95–748Z aka 2:20-cv-00748–TSZ; with partial court records filed in (CASE No.

11  2:20-cv-01804, Dkt 16–5 and 16–6). Under the Fifth Amendment for Retaliation and

12  Sexual Harassment in Case No. C95–748Z relief can be granted.

13  Listed are a few excerpts from these Court Records;

14      p. 8 ¶¶ 17–19 "it was her goal to make the Coast Guard her career and to

15  become an Aviation Survialman (ASM)";

16      p. 10 ¶¶ 10–14 "... referred to as "the new wench on board...";

17      p. 10 ¶¶15–17 "...."cunt" was programmed in the telephone display..." prior to

18  radio communications watch and a "...derogatory comment...on her mirror";

19      p. 10 ¶¶21–23 "...called a "douche bag" in front of superior ..."

20      p. 70 ¶¶2–9 "In plaintiff [Carolyn's] case, the facts, as stated in her complaint

21  and sworn to in her affidavit, Appendix A hereto, include being called a "cunt", a

22  "wench" and a "douche bag". She was subjected to men urinating in front of her,

1  discussions of ejaculation, and simulated sexual acts involving the groins of her

2  superiors. She was menaced with a screwdriver, subjected to an illegal car prowl,

3  and forced to sleep on a living room couch, in violation of Coast Guard regulations.

4  These, and the numerous acts of harassment named in her complaint, are not acts

5  "incident to military service"."

6        p. 163 ¶¶4–9 "Due to the egregious and physically threatening nature of the

7  incidents (for example, complainant was ordered to paint in the messdeck void on a

8  44' MLB and forced to breath intoxicating fumes without a respirator), complainant

9  suffered from suppressed memory of one or more of the incidents...." (See Exhibit

10 128 p. 144–147);

11       p. 181 "... committed an act of illegal menacing toward complainant...

12 apparently angered by complainant's desire to help put up a "pull-up bar",

13 encountered complainant in the boathouse, picked up a screwdriver from the

14 boatswain hole, and in from of complainant repeatedly stabbed the screwdriver into

15 a counter top while screaming at her. He yelled, "You're not helping. You're

16 hindering. This is the straw that broke the camel's back. This is going to bit you in

17 the ass."

18       p. 317 Mr. Guarnero U.S. Attorney: "..Your Honor. And again, that particular

19 incident regarding-----an investigation. And the Coast Guard investigation found –

20 they could not validate---- that incident had ever occurred...."

21       The trapping then confining in the void as she was prevented from exiting to

22 breath, and screwdriver incident at Chetco are not sexual harassment.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    The Executive Officer, second in command was the one menacing Carolyn with a

2    screwdriver stabbing it repetitively in the wooden counter while angerly screaming

3    at her over a pull-up bar installation. The void trapping was by her immediate

4    supervisor, for that time period.

5         Menacing and reckless endangerment. _Menacing_: "is a crime governed by

6    state laws, which vary by state, but typically involves displaying a weapon or a

7    course of conduct that intentionally places another person in reasonable fear of

8    physical injury." _Reckless Endangerment_: is a crime consisting of acts that crat a

9    substantial risk of serious physical injury to another person.

10

11        Today, in 2021, Plaintiff addresses this *Court regarding Mr. Guarnero's*

12   *statement in this matter. Verification was intentionally concealed by the USCG and*

13   *easily verifiable by Chief Mark Poulson (now CWO Poulson) as it was reported and*

14   *recorded by him of the hostile incident.*

15

16        Plus the fact that, in Exhibit 130 p. 148 Carolyn left the Military Entrance

17   Processing Station (MEPS) original papers out, on purpose. This is what occurred

18   prior to my first unit: Station Chetco River. The pass by my genitalia on my first

19   pap smear in the Military at MEPS. Welcome to violations and abuse that started

20   on April 04, 1991.... ..Reverse of Standard Form 93." A true copy of the original

21   document Standard Form 93 will be provided upon request.

22        p. 42 "...with the specific intent to cause grievous bodily harm for

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    intentionally trapping me in a void while ordering me to paint lead death paint

2    without a respirator for an extended period of time. This was directly after using

3    the solvent Toluene to prep the surface.... I was starting to suffocate from being

4    trapped while painting lead death paint in a void of a boat without using a

5    respirator after using Toluene prior to painting.”

6         Listed are a few excerpts from these Court Records in Exhibit 133;

7         p. 153 ¶¶13–19“... committed an act of illegal menacing toward complainant...

8    apparently angered by complainant's desire to help put up a “pull-up bar”,

9    encountered complainant in the boathouse, picked up a screwdriver from the

10   boatswain hole, and in from of complainant repeatedly stabbed the screwdriver

11   into a counter top while screaming at her. He yelled, “You're not helping. You're

12   hindering. This is the straw that broke the camel's back. This is going to bit you

13   in the ass.”

14        FOR THE RECORD: “The United States Coast Guard has the worst record

15   for sexual harassment of any federal agency.” The Executive Officer (XO), was the

16   second in command. “When interview groups were asked if the chain of command

17   worked in redress of grievances, a frequent reply was “the chain of command is the

18   problem.” The new XO due to a tour of duty rotation, said “regarding the sexual

19   harassment, “It's the worst I've seen in thirteen years. They're like a pack of wolves,

20   three or four.” With emphasis.

21

22        Also seen in Exhibit 132;

1    CASE NO. C95–748Z <u>COURT RECORD</u> excerpts:

2        <u>p. 24</u> "The Coast Guard had the highest rate of reported sexual harassment

3    of women."

4        "In sum, the Coast Guard's own review of the problem of sexual harassment

5    reveals that [Carolyn's] experience is not unique. The United States Coast Guard

6    has the <u>worst</u> record for sexual harassment of any federal agency. Compared to the

7    Army, Navy, and Air Force, the Coast Guard acknowledges that it has the poorest

8    record of attracting women recruits. It should not be the law of this Circuit that

9    there is nothing a District Court can do to provide a remedy to that class of federal

10   employees who suffer the highest rate of sexual harassment." (Exh–133 p. 28)

11

12       <u>p. 27</u> "<u>Report</u>, at VIII-54.

13       Finally, women employed by the Coast Guard reported a lack of confidence

14   that the making of a complaint would do any good, and are of the opinion that it

15   often makes things much worse for them:

16       Victims also had limited expectations concerning the effectiveness of formal
17       actions. As indicated in Table VIII.I-12, the percentage of victims who
18       believed that formal complaints would stop the harassment was much
19       smaller than the percentage who believed that nothing would be done or it
20       would make their work situation more unpleasant. Moreover, since both the
21       chain of command and the designated Civil Rights counselors are frequently
22       male, many women feel uncomfortable or intimidated about discussing these
23       issues.
24
25       During interviews, some Coast Guard women expressed the belief that
26       women who filed formal grievances did not get promoted. At places such as
27       the Academy, there is also a peer group "code of silence" or loyalty which the

1   victim would be breaking if she pursued a grievance or complained. This
2   might well subject her to even worse forms of harassment and ostracism.
3   Interviews revealed another reason for not reporting. When interview groups
4   were asked if the chain of command worked in redress of grievances, a
5   frequent reply was "the chain of command is the problem."
6
7   The United States Coast Guard has the <u>worst</u> record for sexual harassment of any

8   federal agency." The Executive Officer (XO), the second in command was the one

9   menacing Plaintiff with the screwdriver stabbing it repetitively in the wooden

10  counter while angerly screaming at Plaintiff over a pull-up bar installation.

11  Although this menacing is not considered sexual harassment, it does show

12  more abuse in the chain of command with abusing authority creating a hostile work

13  environment, lacking proper order.

14  Tour of duty XO rotation stated **<u>regarding the sexual harassment, "It's</u>**

15  **<u>the worst I've seen in thirteen years. They're like a pack of wolves, three or</u>**

16  **<u>four</u>.**"

17  Emphasis added. The screwdriver menacing could easily be verified had the

18  Defendant United States chose to not conceal matter.

19  <u>Exhibit 132 p. 181</u> "... committed an act of illegal menacing toward

20  complainant... apparently angered by complainant's desire to help put up a "pull-up

21  bar", encountered complainant in the boathouse, picked up a screwdriver from the

22  boatswain hole, and in from of complainant repeatedly stabbed the screwdriver into

23  a counter top while screaming at her. He yelled, "You're not helping. You're

24  hindering. This is the straw that broke the camel's back. This is going to bit you in

25  the ass."

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

B:                 **U.S. COAST GUARD DRUG REGIMEN 1994–1995**:

1) <u>**1994**</u>: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. The USCG prescribed drugs 6 (six) brain impairment and anesthetizing drugs inappropriately to treat her *physical injury* instead of procedural care.

2) <u>**1995**</u>: **Ten (10) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by U.S. Coast Guard 10 (ten) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

 

USCG failed to provide medical care who then in fact denied her adequate medical care, and refused to provide the recommended tests ordered by a specialist. The USCG <u>reprimanded</u> her for seeking to speak with a medical provider outside of a medical appointment. She was also denied a second opinion by the medical officer who created a hostile medical environment. This was prior to and after being <u>reprimanded</u> by the Commanding Officer.

The Command through a By direction labeled her <u>well-documented physical injury</u> a mental disorder instead of the known diagnosed physical injury by a specialist as well as a second opinion outside of the Military by a pain specialist.

To further the inhumane negligent treatment by the [United States],

1     USCG, she was honorably discharged after she was still catastrophically

2     physically injured and cold turkey off Valium in which the USCG recklessly

3     used this drug to treat her physical injury and a "mild" case of post traumatic

4     stress. She was left without medical care or treatment after the USCG

5     basically kicked her to the curb giving her a death sentence.

6

7     Exhibit 19 excerpt from 26 OCT 95: Letter from Yvonne Fee to LCDR Henry

8     Reed, Supervisor D13 Regarding the local Medical Officer, Dr. Castro and

9     Mr. Tate.

10          In-part; "She [Carolyn] also stated her Neurologist and had finally

11    been diagnosed. It appears she has a very serious injury....neglected.....by Dr.

12    Castro..." Dr. Castro was really upset, stated he was going to enter an AMA,

13    and told her to see Mr. Tate. "....and he proceeded to chastise her for

14    something. He told her he would have to go speak with the XO, CDR

15    BRECKINRIDGE, and he disappeared..." "...however, I can tell you the

16    COAST GUARD is going to be blamed from something they have no control

17    over, (our local medical officer, Dr. Castro and Mr. Tate) who shot themselves

18    in the foot yesterday." Not everyone who see Dr. Castro is a malingerer or

19    whiner when they see him.....Not everyone who seeks medical care will

20    recover on Motrin/Valium/or pain medication. (cited Exh–63 pp. 9–10; p. 6);

21    (Exh–130).

22    ///

1  **C:**              **BACKGROUND**
2                  **OF THE UNITED STATES**
3       **VA PUGET SOUND HEALTHCARE SYSTEM**:
4       <u>**POLY DRUGGED CAROLYN WITH**</u>
5              <u>**EXCESSIVE DRUGS FROM**</u>
6                  <u>**1996–2018**</u>:

7
8
9  <u>**[United States] VA Puget Sound Healthcare Patient Rights**</u> excerpts

10     2). "...prompt and appropriate treatment for physical and emotional disorders

11 or disabilities in the least restrictive environment....treatment free from

12 unnecessary or excessive medication."

13     11). " You have a rights to be informed of any human experimentation or

14 other research/educational projects affecting your care or treatment." (Exh–64);

15 32.   <u>12 JAN 96</u>: First appointment, VA Puget Sound Health Care Systems

16     **1996 January 12**: Carolyn entered VA Puget Sound Healthcare Systems,

17     Department of Veterans Administration (Dept of VA). During her first

18     appointment the record shows she reported her injury as it is recorded "she

19     was filed VA claims for <u>a muscle condition affecting her back</u>...." emphasis

20     added. There was no adequate care or treatments for her physical injury.

21 33.   <u>09 SEP 96</u>: Rating Decision. Department of Veterans Affairs Salt Lake City

22     Regional Office. From a low-mild 10% in 1994/95 to 100% rating of post-

23     traumatic stress in 1996. Make sense? I didn't think so. Still no adequate

24     treatment for the physical injury.

1   34.   <u>18 JUL 96</u>: - Orthopedic 15-minute appt. VA Puget Sound (not attached)

2   35.   <u>15 JAN **1997**</u>: Dr. Mark A. Tomski – Physiatrist (Physical) Medicine

3   36.   <u>17 JAN 97</u>: Dr. Mark A. Tomski – Physiatrist (Physical) Medicine

4   37.   <u>20 JAN 97</u>: Dr. Mark A. Tomski- Physiatrist (Physical) Medicine

5   38.   <u>22 JAN 97</u>: Dr. Mark A. Toms/ii – Physiatrist (Physical) Medicine

6   39.   <u>27 FEB 97</u>: Dr. Mark A. Tomski- Physiatrist (Physical) Medicine

7   40.   <u>02 APR 97</u>: Dr. Mark A. Tomski- Physiatrist (Physical) Medicine

8   41.   <u>20 MAY 97</u>: Urgent Care no-records @ VA Puget Sound Health Care System

9   42.   <u>25 JUN 97</u>: Urgent Care no-records @ VA Puget Sound Health Care System

10   43.   <u>28 JUN 97</u>: Urgent Care no-records @ VA Puget Sound Health Care System

11   44.   <u>05 AUG 97</u>: VA Puget Sound Health Care System Progress Note

12   "Expresses multiple concerns about pain related to orthopedic problems." Etc.

13   45.   <u>08 AUG 97</u>: General Medical Examination for Compensation and Pension

14   PROBLEM LIST:

15   1) Low back pain

16   2) Pain in the pelvic area

17   1997 AXIS I: Rule out delusional disorder, AXIS II: Rule out personality

18   disorder, AXIS III: Multiple musculoskeletal complaints, etc,

19   (*2001 Made it to *disheveled looking* (with an eye roll, "disheveled"

20   looking at Western State, an asylum, yes, an asylum, in-part due to the

21   failures to treat Plaintiff's well-documented *physical injury*)). Her injury was

22   still untreated in 1997

1    46.    <u>24 DEC 97</u>: "... reports onset of neck pain and LBP after a fall down a ladder

2           well aboard a Coast Guard vessel in February 94. She received various

3           medical and physical treatments since then, at times seeking private

4           practioners and paying for treatment out of pocket."

5    47.    <u>24 Oct **1998**</u>: VA Puget Sound Health Care System Urgent Care -no records

6    48.    <u>25 Oct 98</u>: VA Puget Sound Health Care System Urgent Care -no records

7    49.    <u>08 MAY 98</u>: Permanent Retirement; Removal from Temporary Disability

8    50.    <u>22 DEC 98</u>: Rating Decision. Department of Veterans Affairs Salt Lake City

9           Regional Office. "Veteran currently has a total service-connected disability,

10          permanent in nature." 100% PTSD rating. Low back 20%. Greater trochanter

11          bursitis and iliotibial band syndrome 10%. Cervical pain consistent with

12          degenerative joint disease 10%.

13   51.    <u>16 FEB **2000**</u>: "She has been advised many times to seek care from PTSD and

14          she doesn't do it. She no shows for appt and doesn't call."

15   52.    <u>08 MAY 00</u>: VA Puget Sound Health Care Systems Progress Note

16          1) Chronic fibromyalgia Ultram 6-8 tabs a day working well along with

17          Elavil 30- 60 mg qd (daily).

18          2) R hip pain unchanged still says it feels like R hip "slips up"

19          3) R shoulder pain old problem but new to me ... etc.

20   53.    **28 JUN 00**: Dr. Charlie Paxon, HER FIRST MEDICAL DOCTOR

21          <u>2000 June 28</u>: It took **85–appointments before her first qualified doctor**

22          at VA Puget Sound, Dr. Charles Paxon in Rheumatology. Yes, well over six-

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1     years (6) years at this point in time. Dept of VA grossly neglected and

2     mismanaged Carolyn's well-documented physical injury attributing it to post-

3     traumatic stress then grossly neglected her well documented physical injury.

4     (Dr. Paxon noted on this first visit, "***This has never been treated directly***

5     ***except by massage and physical therapy****. Low back pain is constantly*

6     *present but not a major issue until she feels the hip is out. The **hips seems to***

7     ***develop this malfunction*** *at times for no apparent reason. She has never*

8     *worn a belt to try to hold the iliac wings together. In part, this is maybe*

9     *because she does not like any pressure there from any tight waistband of any*

10    *sort...") emphasis added* (2000 JUN 28) (Exh–63 H)

11   54.   <u>2001 May 21</u>: Dept of VA further neglected her injury by *cancelling* Carolyn's

12     Arthritis appointment with Dr. Weeks, the referring doctor to Dr. Paxon.

13     VA Puget Sound Health Care System cancelled her needed Rheumatology

14     appointment May 21, 2001, to care for her 02/21/1994 physical injury. Even

15     though her physical injury is well documented, the United States saturated

16     Carolyn in an inappropriate and unnecessary excessive medication drug

17     regimen instead of procedural care for her physical injury.

18   55.   <u>10 APR **2002**</u>: Dr. Charles S. Paxon Progress Note; VA Puget Sound Health

19     Care Robbie L. Robertson (counselor -a non-drug person) noted about 2001.

20   56.   <u>13 AUG 2003</u>: VA Puget Sound Health Care System Progress Note

21   57.   (<u>25 FEB 2005</u>): USCG response to [Carolyn] filing for Hazardous Service (DD

22     Form 2860), in regards to Chetco River. "I was ordered and supervised above

1       deck to paint with "Lead Death" paint in a void of a vessel w/o a respirator. I

2       was ordered to hold my breath and when I needed air to come up for it. The

3       void was also wiped down with Toluene prior to painting." This -the void,

4       along with the Marks appeal received prior to the slip on the log office ladder,

5       undeniably connects Chetco River to the ladder injury while stationed

6       onboard USCGC Mellon 21 FEB 94. (See #6 Northwest Pain Specialist)

7

8       58.     Carolyn making a notation here in regards to the MEPS violations regarding

9       the gliding over her genitalia during her first pap smear in the Military. The cost of

10      failing to follow standards and procedures set out in federal laws, state statutes and

11      regulations, the Constitution, and the rule of law with defendants creating their

12      own skewed version and by weaponizing the litigation process and twisting case

13      law, including active-duty, Carolyns' damages are insurmountable. TO INCLUDE:

14      a) Loss of my reproductive rights; b) Maimed (there are no words for the pain of

15      being maimed), however, the Bible calls this a "light affliction" 2 Corth 4:17; *For our

16      light affliction which is but for a moment, is working for us a far more exceeding and

17      eternal weight of glory*; c) Brain damaged, chemically lobotomized drug-induced, still

18      recovering; d) Cost a frozen cookie business (2001); e) Cost a marriage; f) Cost my

19      entire family who abandoned me; g) Cost two dogs, other pets, a house, property, a

20      car; h) Cost Life adventures for 20+ years in the prime of my life; i) Cost of other

21      normal Life span experiences for 20+ years; j) Cost my community; k) Cost a

22      photography business (2014); l) Cost a camera; m) Cost a real estate license (1994),

23      let it go (2018/2019; n) Cost ALL of my freedoms in 2001, and beyond.

24

25      ALL Preventable. Preventable.

# D:                              DRUG REGIMEN

(*Drug prescriptions see* Exh 67, 68, 69, 70, 71, 72, 92) (Exh–64) (Exh–66)

---

## 1).            U.S. COAST GUARD DRUG REGIMEN
## 1994–1995:

3) **1994**: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. The USCG prescribed drugs 6 (six) brain impairment and anesthetizing drugs inappropriately to treat her *physical injury* instead of procedural care.
4) **1995**: **Ten (10) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by U.S. Coast Guard 10 (ten) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

## 2).          DEPT OF VETERANS DRUG REGIMEN
## 1996–2018:

[United States] VA Patient Rights excerpt; 2). "...prompt and appropriate treatment for physical and emotional disorders...disabilities.... ...treatment free from unnecessary or excessive medication." (Exh–64 p. 6)

**1996 January 12**:

(Exh 64 p. 6) According to [United States] Dept of Veterans Code of Patient Concern in-part states: 2). "You will receive to the extent that you are eligible, prompt, and appropriate treatment for physical or emotional disorders, or disabilities in the least restrictive environment necessary for that treatment free from unnecessary or excessive medication." VA Form 1989 10-7991: with emphasis.

5) **1996**: **Four (4) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 4 (four) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

6) **1997**: **Five (5) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 5 (five) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

7) **1998: Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 6 (six) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

8) **1999: Seven (7) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 7 (seven) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

9) **2000**: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 6 (six) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

10) **2001: Welcome to the Avalanche**:

Force Drugged by these establishments: Providence, Western, Mason General, Central Fire Medic, [United States] VA Puget Sound twice (VA-1, VA-2): (Exh–64) (Exh–87) (Exh 1–61 va + western)

| | |
|---|---|
| Acetaminophen | Navane (threat) |
| Ativan/Lorazepam | Olanzapine/Zyprexa** |
| Azirthromycin | Paxil |
| Denzapine/Clozapine | Pseudoephedrine HCL |
| Depakote | Restoril/Temazepam |
| Droperidol | Seroquel/Quetiapine |
| Etodolac | Tramadol/Ultram |
| Haldol | Trazodone |
| Hydroxyzine HCL | Trifluoperazine (threat) |
| Ibuprofen | Valproic acid/ Depakene |
| Klonopin/Clonazepam** | Vistaril |
| (**Contains Aspartame) | |

That is what Pharmaceutical Rape looks like.

///

///

*Pharmaceutical rape involves suffering physical, emotional, mental, social, and spiritual damage at the hands of those holding power who deny any wrongdoing and remain free to do the same to others.*

**2001**: (**21 drugs**). The supposed antidote (Cogentin) for the assaults of forced injections of HALDOL was intentionally withheld by Providence (and an additional 2-drugs were used as threats of forced injections as enforcement to ingest –a form of retaliation and punishment from [United States] VA Puget Sound. (**21 drugs**). (Exh–63) (Exh–64) (Exh–87) (Exh–66)

FX's Trauma: "Injured her R buttock, hips, neck and back. Patient will be put on mood stabilizers and antidepressants." (June 12, 2001). With emphasis.

Department of Veterans Affairs double and tripled drug doses as a result of Plaintiff's non-compliance to take their drugs. Considered a form of punishment in case law.

JAMA Internal Medicine stated in 2016 that off-label drug uses account for more than 44% more adverse effects.[1] (Exh–67 O).

[United States] VA Patient Rights excerpt; 2). "...prompt and appropriate treatment for physical and emotional disorders...disabilities.... ...treatment free from unnecessary or excessive medication." (Exh–64 p. 6).

11) **2002**: **Ten (10) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 10 (ten) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

12) **2003**: **Eleven (11) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 11 (eleven) brain impairment and anesthetizing drugs and inappropriate off-label drugs. I voluntarily (pursued) entered a 30-day Women's Trauma Recovery

1    Program in Palo, Alto seeking help to recover from traumatic events that
2    occurred during her active-service time while leaving out the horrors of 2001.
3
4    "... last time I had a brisk walk around the (apartment) compound without the
5    sense that I am dragging my right leg–the first time since my injury"
6    (Injured Feb. 21, 1994) (January 8, 2003). With emphasis.
7
8
9    13) **2004**: **Nine (9) drugs** contributed to Plaintiffs excessive delay in filing within
10   the statute of limitations [Carolyn] was prescribed by VA Puget Sound 9 (nine)
11   brain impairment and anesthetizing drugs and inappropriate off-label drugs.
12
13
14
15              **CHRONIC OPIOID THERAPY STARTED IN 2005**
16
17
18   14) **2005**: **Twelve (12)** drugs contributed to Plaintiffs excessive delay in filing
19   within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 12
20   (twelve) brain impairment and anesthetizing drugs to include chronic *opioid*
21   therapy and other inappropriate off-label drugs. CHRONIC OPIOID THERAPY.
22
23   15) **2006**: **Eleven (11) drugs** contributed to Plaintiffs excessive delay in filing
24   within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 11
25   (eleven) brain impairment and anesthetizing drugs to include chronic *opioid*
26   therapy and other inappropriate off-label drugs. CHRONIC OPIOID THERAPY.
27
28   16) **2007**: **Nine (9) drugs** contributed to Plaintiffs excessive delay in filing within
29   the statute of limitations [Carolyn] was prescribed by VA Puget Sound 9 (nine)
30   brain impairment and anesthetizing drugs to include chronic *opioid* therapy and
31   other inappropriate off-label drugs. CHRONIC OPIOID THERAPY.
32
33   17) **2008**: **Eight (8) drugs** contributed to Plaintiffs excessive delay in filing within
34   the statute of limitations [Carolyn] was prescribed by VA Puget Sound 8 (eight)
35   brain impairment and anesthetizing drugs to include chronic *opioid* therapy and
36   other inappropriate off-label drugs. CHRONIC OPIOID THERAPY.
37
38   18) **2009**: **Eight (8) drugs** contributed to Plaintiffs excessive delay in filing within
39   the statute of limitations [Carolyn] was prescribed by VA Puget Sound 8 (eight)

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   brain impairment and anesthetizing drugs to include chronic *opioid* therapy and
2   other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

3   19)<u>**2010**</u>: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the
4   statute of limitations [Carolyn] was prescribed by VA Puget Sound 6 (six) brain
5   impairment and anesthetizing drugs to include chronic *opioid* therapy and other
6   inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

7

8   20)<u>**2011**</u>: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the
9   statute of limitations [Carolyn] was prescribed by VA Puget Sound 6 (six) brain
10  impairment and anesthetizing drugs to include chronic *opioid* therapy and other
11  inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

12  ///

13  21)<u>**2012**</u>: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the
14  statute of limitations [Carolyn] was prescribed by VA Puget Sound 6 (six) brain
15  impairment and anesthetizing drugs to include chronic *opioid* therapy and other
16  inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

17
18
19  (*Drug prescriptions see* Exh 67, 68, 69, 70, 71, 72, 92) (Exh–64) (Exh–66)
20
21

22  22)<u>**2013**</u>: **Seven (7) drugs** contributed to Plaintiffs excessive delay in filing within
23  the statute of limitations [Carolyn] was prescribed by VA Puget Sound 7 (seven)
24  brain impairment and anesthetizing drugs to include chronic *opioid* therapy and
25  other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

26

27  23)<u>**2014**</u>: **Nine (9) drugs** contributed to Plaintiffs excessive delay in filing within
28  the statute of limitations [Carolyn] was prescribed by VA Puget Sound 9 (nine)
29  brain impairment and anesthetizing drugs to include chronic *opioid* therapy and
30  other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

31

32  24)<u>**2015**</u>: **Seven (7) drugs** contributed to Plaintiffs excessive delay in filing within
33  the statute of limitations [Carolyn] was prescribed by VA Puget Sound 7 (seven)
34  brain impairment and anesthetizing drugs to include chronic *opioid* therapy and
35  other inappropriate off-label drugs. (Exh–92) <u>CHRONIC OPIOID THERAPY</u>.

36

37  25)<u>**2016**</u>: **Eight (8) drugs**. The chronic *opioid* therapy continued. On December
38  20th, Carolyn self–discontinued the *daily* brain impairment and anesthetizing
39  drugs prescribed by the Dept of VA. Prior to that date, she was on eight **(8)**

1    **drugs** that contributed to Plaintiffs excessive extraordinary delay in filing
2    within the statute of limitations. (Exh–92) <u>CHRONIC OPIOID THERAPY</u>.
3    26)<u>**2017**</u>: **One (1)** drug until June 9th the <u>13 YEARS OF CHRONIC OPIOID</u>
4    <u>THERAPY ENDED</u> due to Carolyn's self-discontinuance (Exh–67).
5
6
7                    <u>2017: END OF 13 YEARS OF CHRONIC OPIOID THERAPY</u>
8                           <u>DUE TO SELF-DISCONTINUANCE</u>.
9
10
11               THE STATUTE OF LIMITATIONS SHOULD BE TOLLED (Fairness)
12                  Carolyn Sioux Green has *legal standing* in all cases.
13
14
15   (*Drug prescriptions see* Exh 67, 68, 69, 70, 71, 72, 92) (Exh–64) (Exh–66)
16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

# E:     MEDICAL MALPRACTICE
# THE UNITED STATES
## (USCG), (DEPT OF VETERANS)

*See Exhibits 1–57 uscg + va; Exhibits 1–61 va + western; Exhibit 63; Exhibit 64;*
*Exhibit 130; plus the unnecessary excessive drug regimen.*

1. **Standard of Care** aka
   **Treatment Guideline** aka
   **Formal Guidelines**

Certain specialties have certain standards that apply. The facts and circumstances

apply to each case 1) What happened 2) Accurately prove the Standard of Care was

not followed 3) That it caused injury to the patient;

    **A.** Active-duty Military are entitled to receive adequate medical care.

    **B.** Brief excerpt; VA PUGET SOUND PATIENT RIGHTS (Exh–64);

2). "...prompt and appropriate treatment for physical and emotional disorders or

disabilities in the least restrictive environment.... treatment free from unnecessary

or excessive medication."

4). "You have the right to communicate freely and privately with persons outside

the facility and have... visitors.... reasonable access to public telephones ..."

11). " You have a rights to be informed of any human experimentation or other

research/educational projects affecting your care or treatment."

Prove the health care provider establishment fell below the Standard of Care:

    <u>USCG</u>: Failed to provide adequate medical treatment. Denied medical care.

<u>Reprimanded</u> for seeking medical care outside of a medical appointment.

1  Denied a second opinion. Retaliated against. Honorably discharged severely

2  physically injured.

3

4  **VA 1996–2018**: Failed to provide adequate medical treatment for the

5  physically injured veteran. Excessively medicated her masking her physical injury.

6

7  **2000 June 28**: It took **85–Appointments Before her FIRST DOCTOR** at

8  VA Puget Sound, Dr. Charles Paxon in Rheumatology. Yes, well over six-years (6)

9  years at this point in time. Dept of VA grossly neglected and mismanaged Carolyn's

10  well-documented physical injury attributing it to post-traumatic stress then grossly

11  neglected her well documented physical injury.

12  (Dr. Paxon noted on this first visit, "***This has never been treated directly***

13  ***except by massage and physical therapy****. Low back pain is constantly present*

14  *but not a major issue until she feels the hip is out. The **hips seems to develop this***

15  ***malfunction** at times for no apparent reason. She has never worn a belt to try to*

16  *hold the iliac wings together. In part, this is maybe because she does not like any*

17  *pressure there from any tight waistband of any sort...") emphasis added* (2000 JUN

18  28) (Exh–63 H)

19

20  **VA 2001**: Failed the rights of the patient who refused to ingest drugs.

21  [United States] violated patients' rights and Constitutional rights to refuse

22  neuroleptic antipsychotic drugs then forced Carolyn to ingest the same harmful

1   inappropriate drugs for her physical injury and threatened her with forced

2   injections if she did not ingest the drugs. **<u>Drug doses doubled and tripled prior</u>**

3   **<u>to and after court hearing and filings, daily and repetitively</u>**. All against her

4   will, against her patient rights, against many Federal and State laws to include the

5   U.S. Constitution.

6       *Failed to rule of medical side first.* Denied Plaintiff her legal and

7   constitutional right to refuse neuroleptic "seize the brain" antipsychotic drugs,

8   confined her without due process.

9       The [United States] premeditated a 90-day unlawful imprisonment within

10   (6-hrs-5-min), premeditated solidified three-times in the record.

11

12

13   **<u>BREACH OF STANDARD OF CARE</u>: Medical Screening Exam.**

14       **<u>USCG:</u>** Denied medical care. <u>Reprimanded</u> for asking a medical provider for

15   help outside of an appointment. Denied medical care and treatment. Treatment was

16   not adequate nor effective. Drugs. Treatment was inappropriate drugs and physical

17   therapy. Retaliated against. Drugs.

18

19       **<u>VA 2001</u>: Failed to Rule Out Medical Side First And Denied Right to**

20   **Refuse antipsychotic "seize the brain" drugs**. *Veteran was not physically*

21   *"examined and evaluated...".* [United States] failed to give Carolyn adequate

22   medical attention for her physical injury by initially failing to give her a physical

1    "examination and evaluation", instead caused additional injuries as well as

2    administered drugs–forced causing brain damage. [United States], against

3    <u>competent</u> Carolyn's will, was given a forced *chemical lobotomy*. One from June 12–

4    26 and, with the second more damaging July 5–27. (one by Western and one by

5    Providence who initiated the forced drugging). Plaintiff was left physically injured

6    without adequate medical care. In fact, Carolyn had to ask [United States], Dept of

7    VA, for a *walking cane* after her near annihilation.

8

9    Q.    <u>**2001 WHEN WAS THE MEDICAL SCREENING EXAM?**</u>

10    **A**.    There was no physical examination and evaluation in 2001. In fact,

11    VA: FX's Trauma: "<u>Injured her R buttock, hips, neck and back. Patient will be put</u>

12    <u>on mood stabilizers and antidepressants</u>." (June 12, 2001). With emphasis.

13

14    **2.**      <u>**PROVE CAUSATION**</u>, that is the medical negligence directly caused

15       injury or damage to the patient; forced to ingest or be forcibly injected off-label

16       drugs that caused brain-damage while ignoring the patient's physical injury is

17       gross negligence.

18    Q.    <u>**2001 RIGHT TO REFUSE**</u>:

19    How many times was Carolyn required to ingest off-label potent mind-altering

20    drugs <u>332 drugs in pill form</u> and threatened to be force injected for not ingesting

21    harmful inappropriate drugs due to unlawful mandatory standing orders of forced

22    and threats for her refusals?? (Exh–30)

1    VA: FX's Trauma: "Injured her R buttock, hips, neck and back. Patient will

2    be put on mood stabilizers and antidepressants." (June 12, 2001). And so they did,

3    continue, including an antipsychotic for the drug induced insomnia from Paxil.

4    **A**. Unlawful Mandatory Standing Orders for Forced injections for her refusals to

5    ingest harmful drugs. Required to ingest

6    In furtherance, RCW 71.05.380 (1973 1st ex.s c 142 § 43) specifically 42 (9):

7    "Not to have a lobotomy performed on him under any circumstances."

8    I [Carolyn] endured these forced *chemical lobotomies*, still recovering in 2021.

9    "... <u>last time I had a brisk walk around the (apartment) compound without
10   the sense that I am dragging my right leg–the first time since my injury"</u>
11   <u>(Injured Feb. 21, 1994) (January 8, 2003)</u>.
12

13   "<u>Injured her R buttock, hips, neck and back. Patient will be put on mood
14   stabilizers and antidepressants</u>." VA Puget Sound's complete incompetence
15   recorded June 12, 2001. With emphasis.
16

17   Plaintiff was forced to ingest *neuroleptic–antipsychotic–psychotropic* "seize

18   the brain" drugs against her will and Constitutional right with *no-right to refuse* at

19   any time, further violating her **Right to Refuse** pursuant to numerous RCW codes

20   starting with, briefly;

21   RCW 71.05.200 (1997 c 112 § 14) "That the person has the <u>right to refuse</u>

22   medications, including <u>antipsychotic</u> medication beginning twenty-four hours

23   prior to the probable cause hearing. RCW 71.05.215 (1997 c 112 § 16); RCW

24   71.05.250 (1989 c 120  § 7); RCW 71.05.280 (1999 c 13  § 8); RCW 71.05.370

25   (1997 c 112 § 31).

1   Beginning twenty-four hours prior to a trial or hearing pursuant to RCW 71.05.215,

2   71.05.240, 71.05.310, 71.05.320, 71.05.340, or 71.05.370, <u>the individual may refuse</u>

3   <u>psychiatric medications</u>.

4

5   In addition, [United States] failed to file a Petition for Forced Injections to a

6   non-consenting <u>competent</u> person. Undeniably, Defendant United States, (*and*

7   *State*), created their own *mandatory standing orders for forced injections*

8   *<u>bypassing</u> ALL judicial processes*, *<u>bypassing</u> ALL judicial processes* at least

9   SIXTY-FIVE TIMES for a 72 hour release with a 90-day premeditated.

10

11       *See* **Exhibit 90 CASE LAW and RCW's.**

12       *See* **Exhibit 102 RCW's**.

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    **1).**          <u>**WHILE ACTIVE DUTY**</u>:

2

3       These claims is hereby submitted to the United States pursuant to the Civil

4    Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e,

5    et seq .. and accompanying regulations, the Privacy Act, the Federal Ton Claims

6    Act, 28 U.S.C. § 2674, and 28 C.F.R. § 14.2, et seq., the Military Claims Act, 10

7    U.S.C. § 2733, the Fifth Amendment to the United States Constitution.

8       This is a formal complaint for administrative relief and damages for sexual

9    harassment, gender-based employment discrimination, retaliation and reprisal,

10   violation of the right to privacy, intentional infliction of emotional distress,

11   negligent hiring and retention, defamation, libel and slander, tortious interference

12   with contracts, outrage, the common law tort of sexual harassment, and conspiracy

13   to violate complainant's rights to equal employment opportunity and due process

14   under the color of law.

15      Additionally, United States District Court <u>CASE NO. 2:20-cv-00748</u> where

16   Plaintiff has *legal standing*. This case further states the Government cannot raise

17   the issue of Administrative Remedy Exhausting on Appeal due to they Failed to File

18   a Cross–Appeal.

19

20      <u>Exhibit 132</u>: <u>FEDERAL RECORDS CENTER RETRIEVAL request 07/26/21</u>

21   <u>for COURT RECORDS, received 08/3/2021</u>: CASE C95–748Z aka 2:20-cv-00748–

22   TSZ; with partial court records filed in (CASE No. 2:20-cv-01804, Dkt 16–5 and 16–

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

6). Under the Fifth Amendment for Retaliation and Sexual Harassment in Case No.

C95–748Z where relief can be granted.

Listed are a few excerpts from these Court Records;

p. 8 ¶¶ 17–19 "it was her goal to make the Coast Guard her career and to

become an Aviation Survialman (ASM)";

p. 10 ¶¶ 10–14 "... referred to as "the new wench on board...";

p. 10 ¶¶15–17 "...."cunt" was programmed in the telephone display..." prior to

radio communications watch and a "...derogatory comment...on her mirror";

p. 10 ¶¶21–23 "...called a "douche bag" in front of superior ..."

p. 70 ¶¶2–9 "In plaintiff [Carolyn's] case, the facts, as stated in her complaint

and sworn to in her affidavit, Appendix A hereto, include being called a "cunt", a

"wench" and a "douche bag". She was subjected to men urinating in front of her,

discussions of ejaculation, and simulated sexual acts involving the groins of her

superiors. She was menaced with a screwdriver, subjected to an illegal car prowl,

and forced to sleep on a living room couch, in violation of Coast Guard regulations.

These, and the numerous acts of harassment named in her complaint, are not acts

"incident to military service"."

p. 163 ¶¶4–9 "Due to the egregious and physically threatening nature of the

incidents (for example, complainant was ordered to paint in the messdeck void on a

44' MLB and forced to breath intoxicating fumes without a respirator), complainant

suffered from suppressed memory of one or more of the incidents...." (See Exhibit

1    <u>128</u> p. 144–147);

2        <u>p. 181</u> "... committed an act of illegal menacing toward complainant...

3    apparently angered by complainant's desire to help put up a "pull-up bar",

4    encountered complainant in the boathouse, picked up a screwdriver from the

5    boatswain hole, and in from of complainant repeatedly stabbed the screwdriver into

6    a counter top while screaming at her. He yelled, "You're not helping. You're

7    hindering. This is the straw that broke the camel's back. This is going to bit you in

8    the ass."

9        <u>p. 317</u> Mr. Guarnero U.S. Attorney: "She is, Your Honor. And again, that

10    particular incident regarding---- was itself a subject of an investigation. And the

11    Coast Guard investigation found that they could not validate that that incident had

12    ever occurred...."

13        Today, in 2021, Plaintiff addresses this *Court regarding Mr. Guarnero's*
14    *statement in this matter. Verification was intentionally concealed by the USCG and*
15    *easily verifiable by Chief Mark Poulson (now CWO Poulson) as it was reported and*
16    *recorded by him of the hostile incident.*
17

18        The trapping then confining in the void prevented from exiting to breath, and

19    the screwdriver incident (considered a felony)at Chetco are not sexual harassment

20    according to the law. The Executive Officer, second in command was the one

21    menacing Carolyn with a screwdriver stabbing it repetitively in the wooden counter

22    top while angerly screaming at her over a pull-up bar installation.

23    The void trapping was by her immediate supervisor, during that time period.

1       Menacing and reckless endangerment. _Menacing_: "is a crime governed by

2   state laws, which vary by state, but typically involves displaying a weapon or a

3   course of conduct that intentionally places another person in reasonable fear of

4   physical injury." _Reckless Endangerment_: is a crime consisting of acts that crat a

5   substantial risk of serious physical injury to another person.

6       Furthermore, Exhibit 130 p. 148 Carolyn left the Military Entrance

7   Processing Station (MEPS) original papers out, on purpose. This is what occurred

8   prior to my first unit: Station Chetco River. The pass by my genitalia on my first

9   pap smear in the Military at MEPS. Welcome to violations and abuse that started

10  on April 04, 1991.... ..Reverse of Standard Form 93." A true copy of the original

11  document Standard Form 93 will be provided upon request.

12      p. 42 "...with the specific intent to cause grievous bodily harm for

13  intentionally trapping me in a void while ordering me to paint lead death paint

14  without a respirator for an extended period of time. This was directly after using

15  the solvent Toluene to prep the surface.... I was starting to suffocate from being

16  trapped while painting lead death paint in a void of a boat without using a

17  respirator after using Toluene prior to painting."

18

19      Listed are a few excerpts from these Court Records in Exhibit 133;

20      p. 153 ¶¶13–19"... committed an act of illegal menacing toward complainant...

21  apparently angered by complainant's desire to help put up a "pull-up bar",

22  encountered complainant in the boathouse, picked up a screwdriver from the

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    boatswain hole, and in from of complainant repeatedly stabbed the screwdriver

2    into a counter top while screaming at her. He yelled, "You're not helping. You're

3    hindering. This is the straw that broke the camel's back. This is going to bit you

4    in the ass."

5        FOR THE RECORD: "The United States Coast Guard has the worst record

6    for sexual harassment of any federal agency." The Executive Officer (XO), the

7    second in command. "When interview groups were asked if the chain of command

8    worked in redress of grievances, a frequent reply was "the chain of command is the

9    problem." The new XO due to a tour of duty rotation, XO said "regarding the sexual

10   harassment, "It's the worst I've seen in thirteen years. They're like a pack of wolves,

11   three or four." With emphasis.

12

13   ***Deliberate indifference****. For example, intentionally refusing to respond to*
14   *an inmate's complaints has been acknowledged as constituting deliberate*
15   *indifference. [Gutierrez v. Peters, 111 F.3d 1364, 1366 (7th Cir. Ill. 1997)];*
16   *Intentionally delaying medical care for a known injury (i.e., a broken wrist)*
17   *has been held to constitute deliberate indifference. [Farmer v. Brennan, 511*
18   *U.S. 825 (U.S. 1994).]*
19

20   Noteworthy, in *Carlson v. Green*, 446, U.S. 14, 19 (1980), allowing a damages

21   remedy for an Eight Amendment violation for failure to provide adequate medical

22   treatment. *Davis v. Passman*, 442 U.S.  228, 248–49 (1979), permitting damages

23   remedy for gender discrimination under the Fifth Amendment Due Process Clause.

24   *Gutierrez v. Peters*, 111 F.3d. 1364, 1366 (1997), intentionally delaying medical care

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   for a known injury (i.e. broken wrist) has been held to constitute deliberate

2   indifference. [*Farmer v. Brennan*, 511 U.S. (U.S. 1994).

3   ///

4   ///

5   ///

6   ///

7   ///

8   ///

9   ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

1
2
3
4

## 2).              PRIOR TO
## THE USCGC MELLON (WHEC 717)
## was STATION CHETCO RIVER (<u>FACTS</u>)

5      <u>Exhibit 132</u>:

6              <u>p. 10</u> at 10–14 "... referred to as "the new wench on board...";

7              <u>p. 10</u> at 15–17 "...."cunt" was programmed in the telephone display..." prior to

8      radio communications watch and a "...derogatory comment...on her mirror";

9              <u>p. 10</u> at 21–23 "...called a "douche bag" in front of superior ..."

10             <u>p. 70</u> at 2–9 "In plaintiff [Carolyn's] case, being called a "cunt", a "wench" and

11     a "douche bag". She was subjected to men urinating in front of her, discussions of

12     ejaculation, and simulated sexual acts involving the groins of her superiors. She

13     was menaced with a screwdriver, subjected to an illegal car prowl, and forced to

14     sleep on a living room couch, in violation of Coast Guard regulations. These, and the

15     numerous acts of harassment named in her complaint, are not acts "incident to

16     military service"."

17             <u>p. 163</u> at 4–9 "Due to the egregious and physically threatening nature of the

18     incidents (for example, complainant was ordered to paint in the messdeck void on a

19     44' MLB and forced to breath intoxicating fumes without a respirator), complainant

20     suffered from suppressed memory of one or more of the incidents...." (See <u>Exhibit</u>

21     <u>128</u> p. 144–147);

22             <u>p. 181</u> "... committed an act of illegal menacing toward complainant...

23     apparently angered by complainant's desire to help put up a "pull-up bar",

1  encountered complainant in the boathouse, picked up a screwdriver from the

2  boatswain hole, and in from of complainant repeatedly stabbed the screwdriver into

3  a counter top while screaming at her. He yelled, "You're not helping. You're

4  hindering. This is the straw that broke the camel's back. This is going to bit you in

5  the ass."

6      "The United States Coast Guard has the <u>worst</u> record for sexual harassment

7  of any federal agency." The Executive Officer (XO), the second in command, along

8  with some of the other rank in file. "When interview groups were asked if the chain

9  of command worked in redress of grievances, a frequent reply was "<u>the chain of</u>

10  <u>command is the problem</u>." The new XO due to a tour of duty rotation, said

11  "<u>regarding the sexual harassment, "It's the worst I've seen in thirteen years.</u>

12  <u>They're like a pack of wolves, three or four.</u>" Emphasis added.

13      In <u>Docket 7</u> p. 19 ¶¶23–24; p. 20 ¶¶1–3 the new Executive Officer (XO) of

14  Station Chetco River stated, "... <u>said regarding the sexual harassment, "It's the</u>

15  <u>worst I've seen in thirteen years. They're like a pack of wolves, three or four. They</u>

16  <u>just want to see how much you can take, see how far they can push you. Don't sweat</u>

17  <u>the small stuff. It will kill you.</u>" (emphasis added)

18

19      Plaintiff has *legal standing*. The United States District Court <u>CASE NO.</u>

20  <u>2:20-cv-00748</u> states the United States cannot raise the issue of Administrative

21  Remedy Exhausting on Appeal due to they Failed to File a Cross–Appeal. Just for

22  starters <u>Dkt 7</u> p. 10 lines 17–19; <u>Dkt 7</u> p. 19 lines 23–24 p. 20 lines 1–3 "... said

1  regarding the sexual harassment, "It's the worst I've seen in thirteen years. They're

2  like a pack of wolves, three or four..."

3       Plaintiff *also* does sue the United States in <u>Case No. C95–748Z</u>; 2:20-cv-

4  00748 under her First through Sixth Causes of Action of Retaliation and Sexual

5  Harassment in Violation for constitutional claims of the <u>Fifth Amendment</u> of where

6  she knows relief can be granted.

7

8       Menacing and reckless endangerment. <u>*Menacing*</u>: "is a crime governed by

9  state laws, which vary by state, but typically involves displaying a weapon or a

10  course of conduct that intentionally places another person in reasonable fear of

11  physical injury." <u>*Reckless Endangerment*</u>: is a crime consisting of acts that crat a

12  substantial risk of serious physical injury to another person.

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

# FIRST THROUGH SIX CAUSES
# OF ACTIONS FROM 1995

Due to computer software interfacing issues, the contents for paragraphs 1 through 67 from Exhibit 132 p. 1 at 17–24 through p. 28 to line 13 are hereby incorporated and considered part of this Court docket filing. Plaintiff, at this time, has removed Title VII violations, Bivens claims, as well as the eleventh cause of action. (See Exhibit 132 p. 300): "The Court dismissed all claims except the first six causes of action and the eleventh cause of action, limited solely to the constitutional claims." (See Exh–132).

The Government cannot raise the issue of Administrative Remedy Exhausting on Appeal due to they Failed to File a Cross–Appeal in CASE NO. 2:20-cv-00748,

### FIRST CAUSE OF ACTION:
### UNLAWFUL SEX DISCRIMINATION IN VIOLATION OF THE
### CIVIL RIGHTS ACT OF 1964 AND 1991 AND THE FIFTH AMENDMENT

68. Plaintiff realleges paragraphs 1 through 67 and incorporates them herein by reference.

69. By virtue of [United States], Pefia and Kramek's management and control of the USCG, the conduct of Blanford, Bankson and Shipman constituted the

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  actions of Pefia and Kramek. At all times, Blanford, Bankson and Shipman were

2  acting within the scope of their employment with

3  Pena and Kramek. Management-level employees, RADM Lockwood, YNCS Zittle,

4  LT. Billiter, LT. Ortiz, MCPO Pond, BMC Meyrick, CEA Poulson, ETC Alexander,

5  EMC Butler, BMC Roberts, CWO Thompson, CWO Dobney, Blanford, Bankson and

6  Shipman, .... and CWO Tate, knew or should have known of the intentional sex

7  discrimination and failed to remedy or prevent such intentional sex discrimination.

8      70. The actions, omissions and statements of Pena, Kramek,

9  Blanford, Bankson and Shipman constitute intentional discrimination against

10  plaintiff on the basis of her sex in violation of the Civil Rights Act of 1964, as

11  amended, including the Civil Rights Act of 1991, and in violation of the Fifth

12  Amendment to the United States Constitution.

13      71. Punitive Damages Allegation: Defendants [United States], Pefia, Kramek,

14  Blanford, Bankson and Shipman engaged in a discriminatory practice or

15  discriminatory practices with malice or with reckless indifference to the federally

16  protected rights of plaintiff.

17      72. As a proximate result of the acts and omissions of the above-named

18  [United States] and deprivation of plaintiff's constitutional rights, plaintiff suffered

19  personal injuries including, but not limited to, lost wages and benefits, deprivation

20  of employment and career opportunities, physical injury, and severe emotional

21  distress and anxiety. She has incurred economic and non-economic damages.

22  ///

SECOND CAUSE OF ACTION:
SEXUAL HARASSMENT IN VIOLATION OF THE FIFTH AMENDMENT,
CHETCO RIVER STATION

73. Plaintiff realleges each and every allegation contained in paragraphs 1 through 72 of this Complaint, as if set forth herein.

74. By virtue of [United States], Pefia and Kramek's management and control of the USCG, the conduct of CWO Thompson, CWO Dobney, and BMC Meyrick constitute the actions of [United States], Pefia and Kramek. By virtue of BMC Meyrick's, and [United States], Pefia, Kramek, Bankson and Shipman's management and control over the Chetco River Station, the conduct of MKC-CEA Poulson, BMl Moore, BMl Hupf, MKl Flood, BM2 Schuch, BM2 Remer, SK2 Silverman, BM3 Strunk, BM3 Carpenter, BM3 Sasser, SNBM Winters and SNBM Gilchrist, constituted the actions of [United States], Pefia, Kramek, Bankson and Shipman. At all times, the above-named individuals were acting within the scope of their employment with [United States], Pefia and Kramek. Management-level employees RADM Lockwood, "YNCS Zittle, LT. Ortiz, MCPO Pond, MKC-CEA Poulson, ETC Alexander, EMC Butler, BMC Roberts, CWO Thompson, CWO Dobney, and [United States], Blanford, Bankson and Shipman knew or should have known of the hostile or offensive work environment and failed to remedy or prevent such hostile or offensive work environment.

75. The [United States], and their agents and employees named, in paragraph 74 above have discriminated against plaintiff in the terms and

1   conditions of her employment on the basis of sex in violation of the United States

2   Constitution by engaging in verbal and physical conduct of sexual and/or gender-

3   based nature which had the purpose and effect of unreasonably interfering with

4   plaintiff's work performance and creating an intimidating, hostile and offensive

5   working environment.

6       76. <u>Punitive Damages Allegation</u>: The [United States], and their agents and

7   employees named, in paragraph 74, above, engaged in a discriminatory practice or

8   discriminatory practices with malice or with reckless indifference to the federally

9    protected rights of plaintiff.

10      77. As a proximate result of the acts and omissions of the above-named,

11   [United States], and deprivation of plaintiff's constitutional rights, plaintiff suffered

12   personal injuries including, but not limited to, lost wages and benefits, deprivation

13   of employment and career opportunities, physical injury, and severe emotional

14   distress and anxiety. She has incurred economic and non-economic damages.

15
16
17               <u>THIRD CAUSE OF ACTION:</u>
18   <u>SEXUAL HARASSMENT IN VIOLATION OF THE FIFTH AMENDMENT,</u>
19               <u>ROGUE RIVER SAR DETACHMENT</u>
20
21      78. Plaintiff realleges each and every allegation contained in paragraphs 1

22   through 77 of this Complaint, as though fully set forth.

23      79. By virtue of [United States], Pefia and Kramek's management and control

24   of the USCG, the conduct of CWO Thompson, BMC Meyrick, and [United States],

25   Shipman and Bankson, constitute the actions of [United States], Pena and Kramek.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1     At all times, CWO Thompson, and [United States], Shipman and Bankson, were

2     acting within the scope of their employment with [United States], Pena and

3     Kramek. Management-level employees RADM Lockwood, ETC Alexander, EMC

4     Butler, BMC Roberts, CWO Thompson, BMC Meyrick, and [United States],

5     Blanford, Bankson and Shipman knew or should have known of the intimidating,

6     hostile and offensive work environment at the Rogue River SAR detachment and

7     failed to remedy or prevent such hostile or offensive work environment.

8     80. The [United States], and their agents and employees named, in

9     paragraph 79 above have discriminated against plaintiff in the terms and

10     conditions of her employment on the basis of sex in violation of the Fifth

11     Amendment to the United · States Constitution by engaging in verbal and physical

12     conduct of sexual and/or gender-based nature which had the purpose and effect of

13     unreasonably interfering with plaintiff's work performance and creating an

14     intimidating, hostile and offensive working environment.

15     81. <u>Punitive Damages Allegation</u>: The [United States], and their agents and

16     employees named, in paragraph 79, above, engaged in a discriminatory practice or

17     discriminatory practices with malice or with reckless indifference to the federally

18     protected rights of plaintiff.

19     82. As a proximate result of the acts and omissions of [United States] and

20     deprivation of plaintiff's constitutional rights, plaintiff suffered personal injuries

21     including, but not limited to, lost wages and benefits, deprivation of employment

22     and career opportunities, physical injury, and severe emotional distress and

1    anxiety. She has incurred economic and non-economic damages.

2
3
4                          FOURTH CAUSE OF ACTION:
5        RETALIATION IN VIOLATION OF THE UNITED STATES CONSTITUTION-
6    CHETCO RIVER, ROGUE RIVER, THE INVESTIGATION, THE MARKS APPEAL
7
8        83. Plaintiff hereby incorporates and realleges as though fully set forth

9    herein each and every allegation of paragraphs 1 through 82.

10       84. By virtue of [United States], Pefia and Kramek's control over the USCG,

11   the conduct of [United States], Blanford, Shipman, Bankson, RADM J. W.

12   Lockwood, CWO Dobney, CWO Thompson, BMC Meyrick, BM2 Remer, BM3

13   Carpenter, MK3 DelGreco, constituted the actions of [United States], Pefia and

14   Kramek. At all times, the above-named individuals were acting within the scope of

15   their employment with [United States], Pefia and Kramek. Management-level

16   employees RADM J.W Lockwood, CWO Dobney, CWO Thompson, BMC Meyrick,

17   and [United States], management-level employees Blanford, Bankson and Shipman

18   knew or should have known of the hostile or offensive work environment and

19   retaliation against plaintiff for complaining of such, and failed to remedy or prevent

20   such hostile or offensive work environment or retaliation.

21       85. [United States], Pefia, Kramek, Blanford, Bankson and Shipman and

22   their agents and employees named in paragraph 84, above, have retaliated against

23   plaintiff and have denied her opportunities for employment because she complained

24   about sexual harassment and sex discrimination in the workplace, all in violation of

25   the Fifth Amendment to the United States Constitution.

1    86. <u>Punitive Damages Allegation</u>: The [United States], and their agents and

2    employees named, in paragraph 84, above, engaged in a discriminatory practice or

3    discriminatory practices with malice or with reckless indifference to the federally

4    protected rights of plaintiff.

5        87. As a proximate result of the statements, acts and omissions of the

6    abovenamed, [United States], and their above-named agents and employees and as

7    a proximate result of the deprivation of plaintiff's constitutional rights, plaintiff

8    suffered personal injuries including, but not limited to, lost wages and benefits,

9    deprivation of employment and career opportunities, physical injury, and severe

10   emotional distress and anxiety. She has incurred economic and non-economic

11   damages.

12
13                    <u>FIFTH CAUSE OF ACTION:</u>
14   <u>SEXUAL HARASSMENT AND RETALIATION. IN VIOLATION OF THE</u>
15            <u>FIFTH AMENDMENT-SEATTLE, WASHINGTON</u>
16
17       88. Plaintiff realleges each and every allegation contained in paragraphs 1

18   through 87 of this Complaint.

19       89. By virtue of [United States], Pena and Kramek's management and control

20   of the USCG, the conduct of ......, CWO Tate, and GMC Walton, constituted the

21   actions of [United States], Pena and Kramek. At all times, ......., CWO Tate and

22   GMC Walton were acting within the scope of their employment with [United

23   States], Pefia and Kramek. Management-level employees ......, CWO Tate, GMC

24   Walton, ETC Alexander and EMC Butler knew or should have known of the hostile

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   or offensive work environment and retaliation and failed to remedy or prevent such

2   hostile or offensive work environment or retaliation.

3       90. [United States], Pena and Kramek, and their agents and employees, ......,

4   CWO Tate and GMC Walton have discriminated against plaintiff in the terms and

5   conditions of her employment on the basis of sex in violation of the Fifth

6   Amendment to the United States Constitution by engaging in written, verbal and/or

7   physical conduct of a sexual or gender-based nature which had the purpose or effect

8   of unreasonably interfering with plaintiff's work performance and creating an

9   intimidating, hostile and offensive working environment.

10      91. [United States], Pefia, Kramek and their agents and employees, ..., CWO

11  Tate and GMC Walton retaliated against plaintiff and have denied her

12  opportunities for employment because she complained about sexual harassment and

13  sex discrimination in the workplace, all in violation of the Fifth Amendment to the

14  United States Constitution.

15      92. Punitive Damages Allegation: The [United States], and their agents and

16  employees named, in paragraph 98, above, engaged in a discriminatory practice or

17  discriminatory practices with malice or with reckless indifference to the federally

18  protected rights of plaintiff.

19      93. As a proximate result of the acts and omissions of [United States], and

20  deprivation of plaintiff's constitutional rights, plaintiff suffered personal injuries

21  including, but not limited to, lost wages and benefits, deprivation of employment

22  and career opportunities, physical injury, and severe emotional distress and

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   anxiety. She has incurred economic and non-economic damages.

2
3                        SIXTH CAUSE OF ACTION:
4                   VIOLATION OF FIFTH AMENDMENT
5        RIGHT TO EQUAL PROTECTION AND DUE PROCESS OF LAW
6
7
8        94. Plaintiff hereby incorporates and realleges as if fully set forth herein each

9   and every allegation of paragraphs 1 through 93.

10       95. By virtue of [United States], Pena and Kramek's management and control

11  of the USCG, the conduct of RADM Lockwood, ....., CWO Tate, CWO Thompson,

12  CWO Dobney, BMC Meyrick, [United States], Bankson, [United States] Shipman,

13  MKC-CEA Poulson, BMl Moore, BMl Hupf, MKl Flood, BM2 Schuch, BM2 Remer,

14  "SK2 Silverman, BM3 Strunk, BM3 Sasser, BM3 Carpenter, SNBM Winters and

15  SNBM Gilchrist, constituted the actions of [United States], Pena and Kramek. At

16  all times, the above-named individuals were acting within the scope of their

17  employment with [United States] Pena and Kramek.

18       96. The acts and omissions of [United States], Pena, Kramek, Blanford,

19  Bankson and Shipman, and their agents and employees named above, in paragraph

20  103, were performed under color of federal law, custom or usage.

21       97. Plaintiff had a federally-protected right, under the Fifth Amendment, and

22  federal common law, to equal employment opportunity, liberty and due process of

23  law.

24       98. Plaintiff was denied liberty, due process and equal protection when she

1   was denied employment opportunities on the basis of her sex and subjected to

2   sexual harassment in the form of unwelcome sexual and gender-based written,

3   verbal and physical conduct which had the purpose and/or effect of unreasonably

4   interfering with plaintiff's work performance and creating an intimidating, hostile

5   and offensive working environment.

6       99. The acts and omissions of the [United States], and their agents and

7   employees named, above in paragraph 103, and each of them, proximately caused

8   the deprivation of the Fifth Amendment rights of plaintiff.

9       100. As a proximate result of the acts and omissions of [United States], and

10  deprivation of her statutory, common law and Fifth Amendment rights, plaintiff

11  suffered personal injuries as set forth in paragraph 93 above.

12      101. Punitive Damages Allegation: The [United States], and their agents and

13  employees named above, willfully and intentionally and with wanton disregard for

14  the federally-protected statutory, common law and Fifth Amendment constitutional

15  rights of the plaintiff, conspired to take and did take actions which led to the

16  unconstitutional and unlawful denial of plaintiff's right to equal protection and due

17  process of law.

18

19      (See Exhibit 132 p. 300): "The Court dismissed all claims except the first six

20  causes of action and the eleventh cause of action, limited solely to the constitutional

21  claims." (See Exh–132).

22  ///

1      ### 3).      __PRIOR TO THE AVALANCHE OF 2001__:

2
3            After being honorably discharged while splitting at her hind-end seams from

4    her severe physical injury, it took the [United States] __85–appointments__ before

5    providing her with a doctor. Welcome to going through the gauntlet of the VA Puget

6    Sound Healthcare System before her FIRST DOCTOR to treat her physical injury

7    from 1994. This first appointment was June 28, 2000 (Exh–63). The Dept of

8    Veterans cancelled her much needed Rheumatology doctor's appointment May 21,

9    2001 (VA cancelled previous appointments too for medical care). Then on May 31,

10   2001, due to criminal mistreatment (torture) started with Providence who put her

11   in four-point-mechanical restraints as these injuries manifested years later as these

12   injuries were being covered up with masking drugs, for years. (Exh–92).

13          The [United States] VA Puget Sound cancelled (8) appt., and no-show for the

14   veteran (13), for that first year. She saw Compensation and Pension (C&P) three-

15   times. She saw __NOT ONE DOCTOR PRIOR TO THE 85 (EIGHTY–FIVE)__

16   __85 APPOINTMENTS AT VA PUGET SOUND__ to provide adequate treatment for

17   her physical injury. AND she did-not see a psychiatrist for mental health either.

18          She saw a social worker, a registered nurse, an intern, a resident of

19   psychiatry, and a nurse practioner. Did you see a DOCTOR here? Someone qualified

20   to help with her physical injury? Yet, the injury was recorded over and over in the

21   medical record since her first appointment January 12, 1996 at VA Puget Sound.

22   Then neglected. PHYSICAL injury cannot be healed nor corrected by drugging the

23   brain, people – hello.

1    **4).**          *Welcome to the Avalanche*:
2
3        Carolyn was unlawfully imprisoned (under the guise of civil commitment) for

4    300 days. Thurston Superior Court and Pierce County Superior Court sanctioned

5    300 days without due process and without a physical examination and evaluation

6    and without legal counsel. The defendants manipulated the civil commitment

7    litigation process besides twisting case law.

8        Plaintiff was severely physically injured upon her unlawful imprisonment

9    and then abused with chemical restraints to then be chemically lobotomized. She

10   spent 50-days behind locked psychiatric prison doors being force injected

11   psychotropic neuroleptic antipsychotic drugs where unlawful mandatory standing

12   orders were enforced due to her refusals to ingest. Right to refuse–denied.

13       She was punished for her non-compliance to ingest drugs as well as standing

14   for her legal right for appropriate and adequate treatment standing for her

15   constitutional and state right to refuse, enforcing her patient rights. Stripped from

16   all of her legal rights unlawfully. Indeed, Carolyn thought she had left the United

17   States of America. Stripped of all of her rights; Constitutional, state regulations and

18   statutes and other Federal laws in order to suit their nefarious motives and actions.

19       ALL entities Fell Below the Standard of Care ailing to rule out medical first.

20   Plaintiff (*respondent then*) was Denied Due Process repetitively and force drugged

21   nearly to death and left severely physically injured without adequate care or

22   individualized treatment. Carolyn's well-documented *physical injury* was treated as

23   a mental disorder that she never had then since or prior. There was no-physical

1    examination and evaluation. Plaintiff was *not* civilly committed according to case

2    law and state regulations and statutes nor the U.S. Constitution. Carolyn was

3    unlawfully imprisoned. Her State laws and rights with many Federal and

4    Constitutional laws and rights were unlawfully and unjustly removed from her, as

5    well as she had no Patient Rights.  The miscarriage of justice in this case is

6    staggering. No due process. No legal counsel. No physical examination and

7    evaluation, yet Superior Courts of Thurston and Pierce County sanctioned 300 days.

8

9    2001 May 31: *Welcome to the Avalanche* of gutting Carolyn's life.

10    2001 May 31 Providence St. Peter Hospital (Providence) fell below the standard of

11    care. Providence failed to give Carolyn a physical examination required pursuant to

12    RCW 71.05.210. She was improperly put in four-point mechanical restraints for

13    (seven-hours-fifty-minutes) 7-hrs-50-mins out of 9-hours in their ER room while left

14    mostly unmonitored. Forced drugs were administered. Right to refuse–denied.

15

16           It was so violent PROVIDENCE ALTERED the FOUR-POINT

17    MECHANICAL RESTRAINTS RECORD, which is illegal, perhaps due to their

18    inflicted harm and physical abuse during a time recorded when Carolyn was

19    "Thrashing" in restraints. Five days later she wrote,  "I [Carolyn] still have several

20    physical signs of deep bruising from being put in restraints for several hours."

21    Written 5-days after the many hours in four-point mechanical restraints of the

22    violent physical abuse and criminal mistreatment.

1    2001 June 01: CASE NO. 01-6-97-9: Thurston County Deputy Prosecuting Attorney

2    filed an Ex Parte for 14-day with a one-minute Court Hearing where Plaintiff

3    (respondent then) for an isolated incident of erratic driving on private property with

4    no crime, no arrest, no ticket, clean driving record, clean background. Yet she was

5    handcuffed then taken to Providence for a psy evaluation due to fumbling over her

6    words and being sleep deprived and with driving a little squirrely on private

7    property. No physical examination.

8         Providence not only *altered* their four-point mechanical restraints records,

9    Providence "Recopied", recopied their drug record intentionally concealing their

10   excessive drugs that were unlawfully made mandatory bypassing all judicial

11   processes for standing orders for forced injections of Haldol for Carolyn's legal right

12   to refuse and enforcing her patient rights to not ingest harmful antipsychotic and

13   psychotropic drugs. Lobotomized with psychotropic drugs and maimed. Carolyn's

14   bowel movement function was maimed.

15       "Both the prospective patient and the accused criminal are subjected to a
16       coercive process buttressed by the power of state which may result in loss of
17       liberty. The prospective patient, however, is afforded fewer procedural
18       protections than we give the accused of crime."[58]
19

20       No right to refuse antipsychotic neuroleptic drugs. It is *not possible*, by legal

21   definition, to be "gravely disabled" as a result of a physical injury. One can ONLY

22   be "gravely disabled" as a result of a "mental disorder". See RCW 71.05.020(9)(15)

23   (2000 c 94). An isolated instance of erratic and/or reckless driving conduct is not the

24   result of a mental disorder. Being sleep deprived with a short-temporary fumbling

25   over one's words is not a mental disorder. Symptoms from a physical condition

1    manifesting and revealing as a possible symptom for a mental disorder, are not, in

2    fact, a mental disorder, they are symptoms. No tests for physical ailments were

3    performed. Right to refuse antipsychotic drugs–denied. Carolyn's well documented

4    *physical injury* was treated as a mental disorder without a physical examination.

5    There was *no physical examination* that took place at either Central Mason Fire,

6    Mason General Hospital (MGH), Western State, or at the [United States] Dept of

7    Veterans–VA Puget Sound (*where her medical record is located with her well-*

8    *documented physical injury*). Forced drugged by each establishment. She left

9    severely physically injured and with new injuries that started at Providence.

10    Plaintiff is still recovering from these forced treatments that caused a debilitating

11    brain-injury, still recovering twenty years later from being maimed too.

12       02 JUL 01: The SAME PERSON, the SAME PERSON, the Pierce County

13    Superior Court Clerk initialed for the Deputy Court Clerk and the Court Clerk and

14    the Filing Court Clerk that then unlawfully imprisoned the *physically injured*

15    plaintiff in an asylum for seventy-two hours. THEN unlawfully extended for 14

16    days. Transferred to [United States] VA Puget Sound on 05 JUL..

17       See RCW 71.05.210 "be examined and evaluated by a licensed physician...."

18    The (State), [and United States], bypassed *not to exceed/within* 72 hours RCW's

19    OVER SIXTY-FIVE TIMES listed in (Exh–90).

20    *Stanford Opdyke and Mary Opgenorth) court appointed not-competent legal*
21    *counsel failed to provide Plaintiff with her constitutional and state right to refuse*
22    *neuroleptic/antipsychotic drugs Prior to Court Hearing and instead obtained a*
23    *signature by deception pursuant to RCW 9A.60.030.* The Court appointed and
24    paid for the not-competent ineffective appointed counsel. Plus, a phantom lawyer
25    on the 14-day. Plaintiff in no way had any legal representation. None.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   The [United States] premeditated a 90 day in six-hours-five-minutes as solidified

2   three-times in the record.

3

4       On 2001 JULY 25 Carolyn had to ask [Unites Stats] Dept of VA for a walking

5   cane!! which she received on JULY 27 prior to being discharged with a grossly

6   neglected physical injury plus chemically lobotomized.[6] There was no treatment for

7   her physical injury, other than the walking cane she'd requested. She was

8   discharged with her initial injury from 1994, with furthered secondary injuries

9   caused by *improper* use of four-point mechanical restraints by; Providence St. Peter

10  Hospital, Central Mason Fire, Mason General Hospital (MGH), Western State, and

11  with a brain-injury.

12      In this portion of the Avalanche, the Defendant UNITED STATES (other

13  Defendants are in the COURT OF APPEALS CASE NO. 557908; State of

14  Washington, Western State, Department of Social and Health Services, et al.),

15  United States VA Puget Sound Healthcare Systems in their failure to provide

16  adequate medical care to a physically injured person, left without a physical

17  examination pursuant to RCW 71.05.210 is a _breach in the standard of care_ that

18  included VA PUGET SOUND PATIENT RIGHTS excerpt:

19      2). "...prompt...appropriate treatment for physical.... disabilities in the least

20  restrictive environment...treatment free from unnecessary or excessive medication."

21

22              (See Exh–64) *(*Exh 1–61) (Exh–63) (Exh–65 pt1)

1       Treating a well-documented severe physical injury as a mental disorder with

2   psychotropic drugs is gross negligence.

3

4       "Injured her R buttock, hips, neck and back. Patient will be put on mood

5       stabilizers and antidepressants." June 12, 2001.

6

7       "... last time I had a brisk walk around the (apartment) compound without

8       the sense that I am dragging my right leg–the first time since my injury"

9       (Injured Feb. 21, 1994) (January 8, 2003). (with emphasis)

10

11  It's gross negligence and medical malpractice to treat a physical injury with

12  sedation, benzodiazepines, tranquilizers, "mood stabilizers and antidepressants",

13  antipsychotic drugs for an alleged marketed mental disorder that Carolyn never

14  had then since or prior. It has taken 20 years to mostly recovery from these forced

15  unlawful treatments. *Chemically lobotomized* by force.

16      "Both the prospective patient and the accused criminal are subjected to a

17      coercive process buttressed by the power of state which may result in loss of

18      liberty. The prospective patient, however, is afforded fewer procedural

19      protections than we give the accused of crime."[58]

20

21      Carolyn did not volunteer in 2001 as Nellie Bly did in 1887 [59, 60] (see Exhibit

22  65 pt1 pp. 106–109, starting at p. 105). Carolyn was unlawfully imprisoned then

23  force injected and forced to ingest psychotropic antipsychotic drugs for her *physical*

24  *injury*. She was Pharmaceutically Raped.[16]

25      [Carolyn] did not fit the criteria written out in case law state law or

26  regulation to be involuntarily committed, yet through the Superior Courts failures

27  to follow the rule of law as these Superior Courts at that time appear to grant

1   special preferential treatment to Petitioners [United States], (and State). [Carolyn]

2   was denied due process, denied access to justice, forced drugged made unable to

3   attend court due to the abuse of chemical restraints, with no physical examination.

4         Her communications and privileges were prevented and removed. Denied a

5   right to a jury trial pursuant to state law RCW 71.05.310. Defendants weaponized

6   the litigation process as well as twisted case law to suit their nefarious treatment.

7   No right to refuse.

8         These inhumane and unfit-for-human establishments (Western, Providence,

9   Dept of Veterans) were last exposed by Bly in 1887, who courageously volunteered

10   then experienced the disturbing conditions "including neglect and physical

11   abuse..."[59] Bly had not come for the landscaping, but to see what really was going

12   on, & she got an eyeful. Conditions were beyond disgusting: rancid food, foul water,

13   forced feeding, fire hazards, & patients tied down." Witchy, vicious nurses choked,

14   beat & harassed deluded patients..."[60] In 2001, these not fit for human

15   establishments as Carolyn verified some of those same disgusting conditions with

16   outrageous treatment and conduct. Carolyn was treated as a subhuman.

17         Carolyn received forced treatments that completely gutted every aspect of her

18   life. Prior to 2001, she was able to read and write and talk. After fifty (50) days of

19   unlawful imprisonment and treatments ended, she could only write her name in

20   tiny letter. She could not talk or process any thoughts normally. She is only now

21   beginning to have more normal bowel movements after all these years.

1   **5).         THE UNITED STATES**
2   **CHEMICALLY LOBOTOMIZED CAROLYN**
3   **AFTER UNLAWFULLY IMPRISONING HER IN 2001**
4
5   **NOTE**The AVALANCHE:

6   <u>31 MAY 2001</u>: Taken to Providence St. Peter Hospital by the Olympia Police for

7   driving erratic and fumbling over her words, where her physical injury of

8   02/21/1994 continued to be neglected, reported, disregarded then ignored.

9   On <u>June 1, 2001</u>, all of her inalienable, constitutional and state rights were removed

10  from her through the Superior Court of Thurston County by the Petitioner filing for

11  an Ex Parte for a premeditated 14-day with a Court Hearing lasting *one-minute*.

12

13  <u>01 JUN 01</u>: Providence St. Peter Hospital unlawfully imprisoned her through the

14  Thurston County Superior Court with a *one-minute Ex Parte*, for driving erratic on

15  private property. The Deputy Prosecuting Attorney Henry Gose McCleary Jr. made

16  an unlawful agreement with the court appointed counsel Elizabeth Elder (*Elder's*

17  *cough was an indicating factor heard on the cassette tape for their unlawful*

18  *agreement*), leaving Carolyn without legal counsel, with her right leg still not

19  completely attached. She was treated for a fabricated mental disorder instead of for

20  her physical injury that remained untreated, ignored even though her

21  Rheumatology Doctors were reported and recorded in the medical record.

22  Providence breach of standard of care was also in-part due to there was no physical

23  examination at any time, forced drugs were administered against her will and prior

24  to the Court Hearing <u>08 JUN 2001</u> in which she contested. Providence had her

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   transferred to [United States] VA Puget Sound VA-1 on <u>12 JUN 01</u>.  On June 13

2   "Seemed 'awfully doped up' that she was usually more animated."

3

4   <u>01 JUL 01</u>: Fire Medic Mason County took her to Mason General Hospital (MGH)

5   where her ex-husband knew and volunteered with these people, so they took his

6   word, based on he worked with them. He left out the fact that he would yank on her

7   right leg to pull it out of her hip socket due to it riding too high that caused

8   debilitating unmanageable pain. No one at Mason General nor Fire Medic knew

9   her. Both organizations only took into account what he said, while she was once

10  again restrained to a table wishing she could die. (The leg yanking is noted in

11  Doctor Paxon's progress notes, later in this Court document too).

12

13  <u>02 JUL 01</u>: Fire Medic Mason County took her to Western asylum due to the

14  unlawful imprisonment through the Superior Court in Thurston County, with a

15  *one-minute hearing filed by an Ex Parte*, for driving.

16

17  <u>02 JUL 01</u>: <u>The SAME PERSON</u>, <u>the SAME PERSON</u>, <u>the Pierce County Superior</u>

18  <u>Court Clerk initialed for the Deputy Court Clerk and the Court Clerk and the Filing</u>

19  <u>Court Clerk</u> and with only one signature on the Petition without an Examining

20  Physician nor a physical *evaluation and examination*, that then unlawfully

21  imprisoned the *physically injured* plaintiff in an asylum for seventy-two hours.

22  THEN unlawfully extended for 14 days due to overriding Carolyn's right to refuse

1   the unlawful forced drugging that (intentionally) prevented her from attending her

2   lawful right to a neutral party where she was Transferred to the [United States] VA

3   Puget Sound. This was for the neglected active-duty honorable service-related

4   *physical injury*, still not treated in 2001, even though her physical injury is recorded

5   over and over again in the records within the USCG and VA Puget Sound.

6

7   05 JUL 01: Transferred to VA-2, VA Puget Sound, again, where the continued

8   unlawful imprisonment continued, as well as unlawful forced drugging, against her

9   will. She had to ask for a walking cane!! By the time she got back to Dr. Charlie

10  Paxon in 2002, she had been tortured in four-point restraints, for hours, that

11  started at Providence on 31 May 2001. This left her contending with unknown

12  injuries due to the being saturated with abuse in chemical restraints (drugs), with a

13  newly acquired brain-injury. Instead of caring and treating her for my physical

14  injury. She was transferred to VA Puget Sound under another unlawful

15  imprisonment, then forced to ingest chemical restraints leaving her in a liquid

16  straight jacket as she was chemically lobotomized, while her physical injury was

17  ignored, left without appropriate care.

18

19  13 JUL 01: VA Puget Sound attending was requesting, per the medical record, a

20  90-day commitment within the first six-hours and five-minutes (6 hrs 5 min), thus

21  bypassing any neutral party or the legal requirement of seventy-two hours.

1        The United States premediated a 90-day in six-hours that also included

2    **double and triple drug doses increased as a punishment** for her

3    non-compliance as she enforced her right to refuse, and VA Patient Rights.

4    <u>27 JUL 01</u>: VA Puget Sound finally discharged her after their unlawful

5    imprisonment sentence, except now she contended with a severe drug-induced

6    brain-injury after VA chemically lobotomized her. Plus, no care for the severe

7    physical injury except for the walking cane she asked for with additional physical

8    injuries from Providence.

9        She was discharged with a *less restrictive alternative* for another 90-days

10   without one physical examination, not one time throughout these atrocities that

11   included maiming my bowel function movement, to include robbing her of her

12   reproductive right as a woman at child bearing age, all of which tore apart her

13   beautiful family and Life.

14   (See Exhibits 1–61 (va + western); from Case No. 3:20-cv-06112)

15

16       In <u>April 2002</u>, Carolyn literally, without notice, walked out of her entire life

17   to have her initial physical injury treated and cared for by Dr. Paxon, so she could

18   live.

19   **End of **NOTE**The AVALANCHE.**

20   ///

21   ///

22   ///

1  **6).**        **MEDICAL MALPRACTICE**
2              **THE UNITED STATES**
3  (*State of Washington–Western, in Court of Appeals Case No. 557908*)

4
5              THE AVALANCHE: VA$_2$
6  **June 12–26, 2001 and July 5 – 27, 2001**

7
8
9              **Covers July 5–27 only**
10
11     The [United States] had a duty to provide adequate medical care and

12  treatment without excessive medication (drugs); *Note: Plaintiff identified both the*

13  *United States, and specific actors facts to keep accuracies through the record.*

14

15              **INTRODUCTION**

16     1.     People being treated for mental illness at the United States VA Puget

17  Sound Veterans Hospital in Washington State are patients, not prisoners. They are

18  thus entitled to therapeutic, rather than punitive, therapeutic treatment. Entitled

19  to with the right to receive care in a safe environment and be free from all forms of

20  abuse, neglect, and harassment. As stated by the Supreme Court:

21     "Persons who have been involuntarily committed are entitled to more

22  considerate treatment and conditions of confinement than criminals whose

23  conditions of confinement are designed to punish." *Youngberg v. Romeo,* 457 U.S.

24  307, 321-22, 102 S. Ct. 2452 (1982).

25  ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    2.    Yet, as a result of stigma deeply rooted in our society and culture,

2    people with mental illness (*trauma* is not a mental illness) often suffer far greater

3    deprivations of liberty, respect, and dignity than those convicted of crimes.  This

4    stigma often expresses itself in the creation of unconstitutional and discriminatory

5    laws and practices designed to segregate those with disabilities from the rest of

6    society.

7

8    3.    The results of violating these laws and practices have been

9    devastating to Plaintiff.  The intentional isolation of mental health patients

10   deprives them of a critical treatment modality and significantly harms their quality

11   of life.  It hinders efforts to provide patients physically injured patients with right to

12   receive individualized medical treatment, integrating into the community, thereby

13   delaying or preventing release.  It deprives patients of their sense of dignity,

14   respect, and worth.

15   4.    The practice of isolating and detaining this class of mental health

16   patients away from the community, without regard for providing the most

17   integrated setting appropriate to their needs, violates Title II of the Americans with

18   Disabilities Act, 42 U.S.C. § 12132, et seq.

19

20   5.    The practice also violates patients' constitutional rights to minimally

21   adequate treatment, equal protection under the law, and freedom from being placed

22   in double jeopardy of further punishment.

6.      This civil rights complaint as well as other constitutional complaints seeks to end the government-sanctioned discrimination described herein.  Plaintiffs ask this Court for declaratory and injunctive relief in order to prevent further harm.

# FIRST CAUSE OF ACTION

**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C 12131, et seq**.

7.      Title II of the Americans with Disabilities Act ("ADA") provides "no qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefit or services, programs, or activities of a public entity or be subjected to discrimination by such entity." 42 U.S.C § 12132.

8.      In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2).

9.      Regulations implementing Title II of the ADA provide: "A public entity (for veterans) shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

1    Defendant is a public entity (for Veterans) within the meaning of Title II of

2    the ADA.

3    10.    Regulations implementing Title II of the ADA provide: "A public entity

4    (for veterans) may not, directly or through contractual or other arrangements,

5    utilize criteria or other methods of administrations: (i) that have the effect of

6    subjecting qualified individuals with disabilities to discrimination on the basis of

7    disability; [or] (ii) that have the purpose or effect of defeating or substantially

8    impairing accomplishment of the objectives of the entity's program with respect to

9    individuals with disabilities...." 28 C.F.R. § 35.130(b)(3).

10    11.    The United States Supreme Court in _Olmstead v. L.C. ex rel. Zimring_,

11    527 U.S. 581 (1999), held that the unnecessary institutionalization of individuals

12    with disabilities is a form of discrimination under Title II of the ADA. In doing so,

13    the Supreme Court interpreted the ADA's "integration mandate" as requiring

14    persons with disabilities to be served in the community when: (1) the state's

15    treating professional determines that community-based treatment is appropriate;

16    (2) the individual does not oppose community placement; and, (3) community

17    placement can be reasonably accommodated. _Id_. 527 U.S. at 607.

18    12.    The ADA prohibits discrimination based on type of disability.

19    The ADA's regulations further provide that "[a] public entity shall not impose or

20    apply eligibility criteria that screen out or tend to screen out an individual with a

21    disability or any class of individuals with disabilities from fully and equally

22    enjoying any service, program, or activity, unless such criteria can be shown to be

1    necessary for the provision of the service, program, or activity being offered." 28

2    C.F.R. § 35.130(b)(8).

3        13.    Pursuant to the ADA, public entities are required to provide

4    meaningful access to their programs, services and activities, and provide any

5    accommodations or modifications necessary for people with disabilities to access

6    those services.

7        14.    Plaintiff, a qualified individual with disabilities that affect one or more

8    substantial and significant life activities.

9        15.    Defendants have operated and continue to operate under color of state

10   law.

11       16.    Defendants, by their actions, inactions, and omissions, violate

12   Plaintiffs' legal rights under Title II of the ADA, 42 U.S.C. § 12132, et seq., the

13   regulations promulgated thereunder at 28 C.F.R. Part 35, and 42 U.S.C. § 1983, by

14   unnecessarily confining

15       17.    Plaintiff in this hospital facility was deprived of her opportunities to

16   engage in community-based therapeutic outings provided to other similarly-situated

17   patients at VA Puget Sound (Dept of Veterans Hospitals), in violation of the ADA's

18   integration mandate.

19       18.    Defendants, by their actions, inactions, and omissions, violate

20   Plaintiffs' legal rights under Title II of the ADA, 42 U.S.C. § 12132, et seq., the

21   regulations promulgated thereunder at 28 C.F.R. Part 35, and 42 U.S.C. § 1983, by

22   aiding and perpetuating discrimination against Plaintiffs who have been acquitted

1    by a court of law due to the presence of an alleged mental illness, developmental

2    disabilities, and traumatic brain injuries. Defendants perpetuate this

3    discrimination by, among other things: presuming Plaintiffs' initial and continued

4    dangerousness, irrespective of the recovery they have shown from their mental

5    illness; preventing Plaintiff from participating in community-based therapeutic

6    outings without any individualized, articulable, and contemporaneous safety

7    concerns; forcing Plaintiff to ingest drugs against her will, removing her individual

8    adequate treatment choice and her legal right to refuse drugs, prevented from going

9    outside of the locked facility, repetitively, prevented from receiving appropriate

10   medical treatment for her well-documented physical injury.

11

12        19.     Defendants utilize eligibility criteria and methods of administration

13   that subject Plaintiff to discrimination on the basis of disability, in violation of 28

14   C.F.R. § 35.130(b)(3) &(8), and otherwise denied meaningful access to their services,

15   programs and activities, as well as prevented her from obtaining medical care for

16   her severe well-documented physical injury medically recorded at the same location,

17   (VA Puget Sound). Defendants fail to provide reasonable modifications to services

18   and programs, such as expedited procedures and support in obtaining medical care

19   that would allow Plaintiff to recuperate from her severe physical injury in a timelier

20   manner. Noteworthy, in _Carlson v. Green_, 446, U.S. 14, 19 (1980), allowing a

21   damages remedy for an Eight Amendment violation for failure to provide adequate

22   medical treatment. _Gutierrez v. Peters_, 111 F.3d. 1364, 1366 (1997), intentionally

1   delaying medical care for a known injury (i.e. broken wrist) has been held to

2   constitute deliberate indifference. [*Farmer v. Brennan*, 511 U.S. (U.S. 1994).

3        20.    To the extent that RCW 71.05.320 and RCW 71.05.280 and RCW 9A.42

4   in general and RCW 9A.40.010 here are inconsistent and incompatible with the

5   ADA provisions just cited, they are preempted, invalid, and unenforceable.

6        21.    Pursuant to 42 U.S.C. § 12133 and 42 U.S.C. § 1983, Plaintiffs seek

7   declaratory and injunctive relief as well as reasonable attorneys' fees and costs

8   incurred in bringing this action.

9

10                   **<u>SECOND AND THIRD CAUSE OF ACTION</u>**

11   **VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE**
12   **<u>FOURTEENTH AMENDMENT</u> TO THE UNITED STATES CONSTITUTION,**
13   **BY AND THROUGH 42 U.S.C. § 1983, VIOLATION OF THE CRUEL AND**
14   **UNUSUAL PUNISHMENT CLAUSE OF THE <u>EIGHTH AMENDMENT</u> TO**
15   **THE UNITED STATES CONSTITUTION**
16

17        22.    The Fourteen Amendment to the United States Constitution

18   guarantees that no "State [shall] deprive any person of life, liberty, or property,

19   without due process of law; nor deny to any person within its jurisdiction the equal

20   protection of the laws." U.S. Const. amend XIV, §, cl. 3.

21        23.    Defendants, and actors and, as such, are obligated to provide all

22   mental health patients due process of law when restricting their substantive rights

23   under the United States Constitution and statutes.

1       24.    Defendants are required under the Fourteen Amendment to provide

2  treatment that complies with the "professional judgement standard" articulated in

3  *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S. Ct. 2452 (1982).

4       25.    Defendants, by their actions, inaction, and omissions, fail to provide

5  constitutionally required treatment to Plaintiff by preventing the professional

6  judgement of treating professionals to be exercised in a timely and effective manner,

7  with the right to refuse neuroleptic "seize the brain" antipsychotic drugs.

8  Defendants fail to provide patients with community-bases restorative treatment

9  consistent with the levels assigned to them by treating professionals, to include

10  providing individualized medical treatment for her physical injury without the

11  unnecessary excessive forced drugging.

12       26.    Defendants are also required by the Fourteen Amendment to provide

13  forensic patients "more considerate treatment and conditions of confinement than

14  criminals whose conditions of confinement are designed to punish." Id. At 321-322.

15       27.    Defendants, by their actions, inactions, and omissions, fail to provide

16  constitutionally required treatment to Plaintiff by subjecting her to unnecessary

17  and unwarranted confinement, although she was not convicted of committing a

18  crime. Defendants denied Plaintiff the community integrated treatment and

19  conditions of confinement that are provided to other similarly situated civilly

20  committed mental health patients, instead subjected her to drastically more

21  restrictive conditions of confinement designed to punish for her non-compliance of

22  forced drugging by Defendants actions. In fact, Defendant double and tripled drug

1   doses based on her non-compliance. This is clearly evident in the treatment of

2   Plaintiff Carolyn Sioux Green, as <u>Defendants openly admit their continued</u>

3   <u>confinement based solely on punishment</u> for non-compliance and rule violations and

4   behaviors rather than clinical necessity, to include the premeditated 90-day to

5   further confine her solidified three-times in the medical record.

6         28.     Defendants are required under the Fourteen Amendment to provide

7   civilly committed (unlawfully imprisoned) patients' mental health treatment that

8   gives them a realistic opportunity to be cured or to improve the mental condition for

9   which they were confined. _Ohlinger v. Watson_, 652 F.2d 775, 778 (9th Cir. 1980).

10  Defendants are required under the Eighth Amendment to not inflict cruel and

11  unusual punishment

12        29.     Defendants, by their actions, inactions, and omissions, fail to provide

13  constitutionally required treatment to Plaintiff a realistic opportunity to be cured or

14  to improved the mental condition for which they were confined by substantially

15  delaying or denying patients' access to community-based treatment, and failed to

16  provide individualized medical care for her known well-documented physical injury.

17  The loss of this indispensable treatment and assessment tool slows or stops

18  patients' recovery and makes it difficult or impossible for them to meet discharge

19  and/or conditional release requirements. Instead, patients are often simply

20  warehoused in the hospital, receiving no-actual-effective-treatment and with no

21  expectation for additional recovery, for no clinical reasons, or individualized medical

22  treatment for her severe physical injury. In fact, Defendants failed to treat her well-

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    documented physical injury then cancelled her needed chiropractic appointment

2    causing further harm. Plaintiff had to request a walking cane from Defendants.

3        30.    The effect of this constitutional deprivation and cruel treatment is best

4    illustrated in the case of Plaintiff Carolyn Sioux Green.

5

6        31.    Under the Fourteen Amendment, and in the context of involuntary

7    commitment (unlawful imprisonment), Defendants cannot restrict patients' liberty

8    interest simply based on a finding of mental illness or dangerous; rather, there

9    must be a determination that a patient is mentally ill *and* presently dangerous to

10   public safety. *O'Connor v. Donaldson* 422 U.S. 563, 573-576, 95 S. Ct. 2486 (1975),

11   the U.S. Supreme Court decided that "... cannot constitutionally confine a

12   nondangerous individual who is capable of surviving safely in freedom by himself or

13   with the help of willing and responsible family members or friends..."; *Foucha v.*

14   *Louisiana*, 504, U.S. 71, 77, 112 S. Ct. 1780 (1992). *Addington v. Texas* requires

15   "clear and convincing evidence" as a standard. We held that the medical conditions

16   for civil commitment must be proved by clear and convincing evidence. The purpose

17   of this standard of proof, to reduce the chances of inappropriate decisions, id., at

18   427, is no less meaningful when the factfinders are professionals as when they are

19   judges or jurors. 441 U.S. 418, (1979); *Addington v. Texas* "the individual's interest

20   in the outcome of a civil commitment processing is of such weight and gravity that

21   due process requires the [United States] to justify confinement by proof more

22   substantial that a mere preponderance of the evidence; *Addington v. Texas* (441

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   U.S. at 426 (1979)) civil commitment "must require that an individual be both

2   mentally ill and dangerous for civil commitment to satisfy due process". Driving

3   fails to meet the dangerous standard. 557 S.W. 2d 511 (1977), vacated, 441 US 418

4   (1979); O'Connor v. Donaldson "Now, the purpose of involuntary hospitalization is

5   treatment and not mere custodial care of punishment if a patient is not a danger to

6   himself or others. Without such treatment there is no justification for a

7   constitutional stand-point for confinement unless you should also find that

8   [Donaldson] was dangerous to either himself or others; Rennie v. Klein, 462 F. Supp.

9   1131 (D.N.J. 1978) "To go from a state of confinement to confinement plus forced

10  medication (drugs) involves a major change in the conditions of confinement, so that

11  Meachum v. Fano, 427 U.S. 215, 96 S. Ct. 2532, 49 L. Ed 2d 451 (1975) is

12  inapposite; Vitek v. Jones, 445 U.S. 480 (1980). Due process required that the

13  nature of commitment bear some reasonable relation to the purpose for which the

14  individual is committed. (Jones v. United States, supra at 368); Vitek v. Jones,

15  "...even if [her] continued confinement were constitutionally permissible, keeping

16  [her] against [her] will in a mental institution is improper absent a determination

17  in civil commitment proceedings of current mental illness and dangerousness."

18  Emphasis added.

19      32.    Defendants, by their actions, inactions, and omissions, violate

20  Plaintiffs due process rights. Defendants violate patients' liberty interest in

21  community-based treatment, conditional release, and final discharge without

22  making any specific findings that they are mentally ill and dangerous. Defendants,

1   by their actions, inactions, and omissions, violate Plaintiffs right to refuse

2   antipsychotic neuroleptic "seize the brain" forced drugging and with Defendant's

3   failure to provide adequate medical treatment for her well-documented physical

4   injury. In _Carlson v. Green_, 446, U.S. 14, 19 (1980), allowing a damages remedy for

5   an Eight Amendment violation for failure to provide adequate medical treatment.

6   _Gutierrez v. Peters_, 111 F.3d. 1364, 1366 (1997), intentionally delaying medical care

7   for a known injury (i.e. broken wrist) has been held to constitute deliberate

8   indifference. [_Farmer v. Brennan_, 511 U.S. (U.S. 1994).

9        33.    This is evident from the situations faced by Plaintiff. Carolyn Sioux

10  Green had no such history of such mental health diagnoses, only a history of mild-

11  low post- traumatic stress in the military, depression caused by her severe physical

12  injury, with substance abuse in complete remission from her teens of over three-

13  decades ago. This Plaintiff received no treatment benefits from being confined in a

14  mental hospital, nor of the forced drugging, nor was her confinement based on

15  current dangerousness. Yet, she was confined in a psychiatric hospital for a total of

16  1,200 hours (**864 hours of confinement at Puget Sound Veterans Hospital**

17  **that included being chemically lobotomized against her will**), without

18  clinical or legal justification. In so doing, Defendants violate Plaintiffs'

19  constitutional due process rights, as well as her right to refuse antipsychotic

20  neuroleptic "seize the brain" forced drugging that was denied by Defendants.

21  Defendants further caused harm. "... According to established tort principles, one

22  who alleges a battery, for lack of informed consent, need show only a lack of consent

1  to the allegedly offensive 'contact' (Prosser on Torts (2d ed. 1955) § 9, p. 32.)."

2      34.    Defendants violate Plaintiffs' due process rights by denying, opposing,

3  or delaying her release from confinement based solely on non-compliance of forced

4  drugging (with rule violations) that do not have any relationship to mental illness

5  or dangerousness. Simple commonplace rule violations–such as associating with the

6  opposite sex, allowing a male patient to use her bathroom while she was fully

7  clothed, assisting disabled veterans by pushing them in their wheelchairs, getting a

8  World War One Veteran a cup of coffee he was allowed to have where the

9  Defendants removed her right to go home with her family for the day. She was

10  further punished by simply helping others. Instead, <u>Defendants double and tripled</u>

11  <u>drug doses for her non-compliance and with extended confinement</u>. Defendants

12  denied the <u>competent</u> plaintiff her legal right to refuse antipsychotic neuroleptic

13  "seize the brain" drugs which is a Washington State and Constitutional right.

14      35.    These actions are routinely cited as a basis to deny or revoke patients'

15  assigned levels or revoke or prevent patients' release, even when rule violations do

16  not indicate mental illness or dangerousness. Worse, as is illustrated in this case,

17  Defendants use more restrictive confinement in a coercive manner to punish the

18  plaintiff who exercised her right to refuse antipsychotic neuroleptic "seize the brain"

19  drugs who challenged the establishment by enforcing her constitutional right to

20  refuse. Defendants thus deprived plaintiff of her fundamental right to liberty in a

21  punitive rather than therapeutic manner, in violation of patients' due process

22  rights, and right to refuse medications. *Riese v. St. Mary Hospital and Medical*

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   *Center* 259 Cal. Rptr. 669, 774 P.2d 698 (1989).

2       *Washington v. Harper* "No rigorous standards or procedure met to force

3   psychotropic medications on an individual." 494, U.S. 210 (1990);

4       *Washington v. Harper* "In order for involuntary medication to be approved, it

5   must be demonstrated that the inmate suffers from a mental disorder and as a

6   result of that disorder constitutes a likelihood of serious harm to himself or others

7   (494 US 210, 244) and/or is gravely disabled" Lodging, Book 9, Policy 600.30, p.1;

8   *Washington v. Harper* "The liberties of citizens to resist the administration of mind-

9   altering drugs arise from our nation's most basic values." (Stevens, J. dissenting).

10  494, US 210, 238 (1990); In *Harper* than an individual has a "significant"

11  constitutionally protected "liberty interest" in avoiding the unwanted

12  administration of antipsychotic drugs (494 US @ 221, 108 L Ed 2d 178, 110 S. Ct

13  1028);

14      In *Harper* 1) a competent individual's right to refuse psychotropic medication

15  is a fundamental liberty interest requiring the highest order of protection under the

16  Fourteenth- Amendment; further in *Harper* because most psychotropic drugs do

17  induce lethargy, drowsiness, and fatigue, e.g. Physicians' Desk Reference 1126,

18  1236, 1640, 1788 [494 US 210, 249], this form of 'medical treatment' may reduce an

19  inmates dangerousness, not by improving his mental condition, but simply by

20  sedating him with a medication that is grossly excessive for that purpose.[Footnote

21  17];

1   _Bigley v Alaska Psychiatric Institute_, S-13116 (2009) "Doctors attributed Bigley's

2   resistance to medication to his delusional belief that people are attempting to poison

3   him. However, it is also true that the medications have sometimes produced

4   harmful physical side effects; _Rennie v. Klein First_ amendment –Freedom of

5   expression, including both the right to communicate and the right to think;

6          In _Rennie v. Klein_, "A drug regimen subjects a patient to harsh side effects

7   and possible permanent disability... Furthermore, a hearing is required to ensure

8   that the use of drugs in a particular case does not violate the first or eighth

9   amendments..."; _Riggens v. Okin_, the Court repeated that an individual has a

10  constitutionally protected liberty interest in avoiding involuntary administration of

11  antipsychotic drugs" –an interest [*179] that only an "essential" or "overriding"

12  state interest might overcome. 504 U.S. at 134, 135, 118 L ed 2d 479, 112 S Ct 1810.

13  The state fails at compelling interest. 478 F. Supp. 1342 (1979).

14

15          The Court repeated in _Riggens_ that "an individual has a constitutionally

16  protected liberty "interest in avoiding involuntary administration of antipsychotic

17  drugs"—an interest that only an "essential" or "overriding" state interest might

18  overcome." 504 U.S., at 134, 135, 118 L. Ed 2d 479, 112 S. Ct 1810; In _Nelson, Pena,_

19  _and Mackey_, "the courts found that the drugs were improperly and for punishment

20  rather than as part of an ongoing psychotherapeutic program." _Cf. Welsh v. Likins_,

21  373 F. Supp. 487, 503 (1974, D. Minn.); _Sell v. United States_, No. 02-5664,

22  "involuntary medication would violate the defendants' federal constitutional rights;

1    *Sell v. United States*, Justice Kennedy, concurring in the judgement, "emphasized

2    that antipsychotic drugs might have side effects that would interfere with the

3    defendant's ability to receive a fair trial." In *Sell*, "Regardless, as we have said, we

4    must assume that *Sell* was not dangerous.";

5        *Vitek v. Jones*, 445 U.S. 480 (1980). Due process required that the nature of

6    commitment bear some reasonable relation to the purpose for which the individual

7    is committed. (*Jones v. United States*, supra at 368); *Vitek v. Jones*, "...even if his

8    continued confinement were constitutionally permissible, keeping him against his

9    will in a mental institution is improper absent a determination in civil commitment

10   proceedings of current mental illness and dangerousness."; In *Jones*, forced

11   administration of <u>antipsychotic</u> <u>medication may not be used as a form of</u>

12   <u>punishment</u>.

13       Look at the force the Defendants used to administer drugs to Carolyn,

14   overriding her rights. Look at what the drugs did to her. She was Pharmaceutically

15   Raped. Chemically lobotomized. It has been established these drugs are intrusive

16   procedures.  "A physician commits malpractice by not exercising that degree of skill

17   and learning that is ordinarily possessed and exercised by members of the

18   profession in good standing acting in the same or similar circumstances." *Durham v.*

19   *Vinson*, 360 S.C. 639, 650-51, 602 S.E.2d 760, 766 (2004).

20       It's gross negligence and medical malpractice to treat a physical injury with

21   sedation, benzodiazepines, tranquilizers, "mood stabilizers and antidepressants",

22   antipsychotic drugs for an alleged marketed mental disorder that Carolyn never

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   had then since or prior. It has taken 20 years to mostly recovery from these forced

2   unlawful treatments. *Chemically lobotomized* by force.

3       In *Cobbs v. Grant*; where "informed consent".... between a cause of action

4   based upon lack of informed and one based upon negligence for the same reason.

5       According to established tort principles, one who alleges a battery, for lack of

6   informed consent, need show only a lack of consent to the allegedly offensive

7   'contact.' (Prosser on Torts (2d ed. 1955) § 9, p. 32.). The court instructed the jury as

8   follows. 'A physician's duty to disclose is not governed by the standard of practice in

9   the community; rather, it is a duty imposed by law. A physician violates his duty to

10  his patient and subjects himself to liability if he withholds any facts which are

11  necessary to form the basis of an intelligent consent by the patient to the proposed

12  treatment.' RATTIGAN, Associate Justice. DEVINE, P. J., concurs. 8 Cal. 3d 229,

13  502 P.2d 1, 104 Cal. Rptr. 505,**(**Cal. 1972).

14

15      In furtherance, violations to the <u>First Amendment</u> of the U.S. Constitution,

16  violations to the <u>Fifth Amendment</u>, violations of the <u>Eighth Amendment</u>, violations

17  of Title 42, U.S.C. §§ 1983, 1985, and 1986, 105 Stat. 1071-1073 (1991).

18      The <u>First Amendment</u> violations of Free Speech. These drugs interfere with a

19  person's freedom of speech. These drugs interfere with personality, thoughts,

20  emotions, expressions, and how a human being communicates.

21  (See Exhibit 66 for Affidavits by Medical Experts).

22  *///*

1     *Excerpts from <u>Riese v. St. Mary Hospital</u> written by amici brief, with minor changes*

2     *made* to name and location.

3

4     **A HOSPITALIZED PATIENT HAS A FEDERAL CONSTITUTIONAL RIGHT**
5     **TO REFUSE ANTIPSYCHOTIC DRUGS UNLESS THE PATIENT HAS BEEN**
6     **FOUND INCOMPETENT TO MAKE TREATMENT DECISIONS OR IS**
7     **IMMINENTLY DANGEROUS TO SELF OR OTHERS.**
8

9     Because Washington State Laws and the Constitution all protect the right to refuse

10     antipsychotic medication. The amici demonstrated in <u>Riese v. St. Mary Hospital</u>

11     that the involuntarily committed retain a right under the **Fourteenth**

12     **Amendment** to refuse antipsychotic medication.

13
14

15     <u>**The Federal Constitution Protects An Individual's**</u>

16     <u>**Right To Refuse Antipsychotic Medication**</u>**:**

17

18        The U.S. Supreme Court has repeatedly held that "[a]mong the historic

19     liberties protected by the Due Process Clause is the 'right to be free from .. •

20     unjustified intrusions on personal security." <u>Vitek v. Jones</u>, 445 U.S. 480, 492 (1980)

21     (quoting <u>Ingraham v. Wright</u>, 430 U.S. 651, 673 (1977)). The individual's firmly

22     embedded common law "right to determine what shall be done with his body,"

23     <u>Schloendorff v. Society of New York Hospitals</u>, 211 N.Y. 125, 129, 105 N.E. 92 (1914)

24     (Cardozo, J.), is without question one of the "personal rights that can be deemed

25     fundamental or implicit in the concept of ordered liberty" and is therefore protected

26     by the Due Process Clause. See <u>Palko v. Connecticut</u>, 302 U.S. 319, 325 (1937)

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  (Cardozo, J.) (internal quotation omitted). This right to personal security and bodily

2  integrity, the supreme Court has made clear, encompasses a fundamental interest

3  "in independence in making certain kinds of important decisions" about what will

4  be done to one's body and mind. _Whalen v. Roe_, 429 U.Sr 589, 599-600 (1977). See

5  _generally Superintendent of Belchertown State School v. Saikewicz_, 373 Mass. 728,

6  742, 370 N.E.2d 417, 426 (1977).

7          The forced administration of antipsychotic drugs to a person competent to

8  refuse such treatment intrudes upon not only these interests in personal security

9  and bodily integrity, but also upon the sanctity of the mental process. An

10 individual's right to refuse antipsychotic drugs is accordingly protected by the

11 United States Constitution. _See generally Brooks_, _The Constitutional Right to_

12 _Refuse Antipsychotic Medications_, 8 Bull. Am. Acad. Psychiatry & Law 179 (1980).

13 In _Mills v. Rogers_, 457 U.S. 291 (1982), the Supreme Court, though remanding for a

14 determination whether state law provided a right to refuse antipsychotic

15 medication, proceeded on the assumption that the Due Process Clauses of the

16 federal Constitution encompasses such a right:

17              As do the parties, we assume for purposes of this discussion that
18              involuntarily committed mental patients do retain liberty interest
19              protected directly by the Constitution, cf. _O'Connor v. Donaldson_, 422
20              U.S. 563, and that these interests are implicated by the involuntary
21              administration of psychotropic drugs.
22
23 Id. At 299, n.16. The Court's reliance on _O'Connor v. Donaldson_ is significant. There

24 the Court unanimously held that an individual retained liberty interests that were

25 protected by the federal Constitution even after the individual was involuntarily

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    committed by court order to a state mental hospital, and even though the individual

2    had been found incompetent. 422 U.S. at 566 n.2.

3           Similarly, in _Winston v. Lee_, the Supreme Court specifically refused to permit

4    surgery upon a criminal defendant to remove a bullet that would have provided

5    probative evidence of the defendant's guilt because that surgery would have

6    constituted an "extensive intrusion on personal privacy and bodily integrity." 470

7    U.S. 753, 764 (1985).

8           Although the case arose under the Fourth Amendment, the analysis in

9    _Winston_ vindicated personal rights virtually identical to those at stake in the

10   present case. In finding the proposed surgery to be too severe an infringement of

11   personal security and bodily integrity to be permitted under any circumstances, the

12   Court acknowledged that forcing a defendant to undergo a serious nonconsensual

13   medical procedure "involves a virtually total divestment of . . . ordinary control." Id.

14   At 765. The existence of conflicting scientific evidence about the risks and

15   intrusiveness of the proposed surgery did not alter the Court's judgment. To

16   contrary, the Court held, "the very uncertainty militates against" forcing the

17   defendant to undergo the operation.

18          Every lower court that has ruled on the issue in the past decade has reached

19   the conclusion that the right to refuse antipsychotic drugs is a substantive liberty

20   interest protected by the federal Constitution – although courts have differed in

21   demarking where the right must yield to a compelling governmental interest. See,

22   e.g., _Project Release v. Prevost_, ,722 F.2d 960, 979 (2d Cir. 1983). Some have based

1    their conclusion on the constitutional right to form and express ideas, others on the

2    constitutional right to privacy, to personal integrity, to personal security, or to

3    substantive due process. That other courts have not agreed on a single rationale for

4    the right is not an argument against recognition by this Court. To the contrary, the

5    breadth of constitutionally protected interests those courts have cited demonstrates

6    that forcible administration of antipsychotic drugs implicates a panoply of

7    fundamental liberty interests. But regardless of the specific source of the right,

8    those courts have all held that involuntarily hospitalized mental patients have a

9    constitutionally protected right to refuse antipsychotic drugs that must be respected

10   by the government.

11

12       In addition to the district court and circuit opinions in _Mills v. Rogers_, both of

13   which found a federal constitutional right to refuse antipsychotic drugs (see _Rogers_

14   _v. Okin_, 478 F. Supp. 1342 (D. Mass. 1979), _Roger v. Okin_, 738 F.2d 1 (1st Cir. 1984)

15   (on remand), see _Winters v. Miller_, 446 F.2d 65 (2d Cir.), cert. denied:- 404 U.S. 985

16   (1971); Davis v. Hubbard, 506 F. supp. 915 (N.D. Ohio 1980); _Rennie v. Klein_, 653

17   F.2d 836 (3d Cir. 1981) (en bane) cert. granted and judgment vacated and

18   remanded, 485 U.S. 1119 (1982), on remand, 720 F.2d 266 (3d Cir. 1983); In Re

19   K.K.B., 606 P.2d 747 (Okla. 1980); _Johnson v. Silvers_, 742 F.2d 823 (4th Cir. 1984);

20   and _Rogers v. Commissioner of Mental Health_, 390 Mass. 489, 458 N.E.2d 308

21   (1983). See also _Project Release v. Prevost_, 722 F.2d 960 (2d Cir. 1983), and

22   _Anderson v. Arizona_, 663 P.2d 570 (Ct. App. Ariz. 1982), both of which hold that

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  patients have a right to refuse antipsychotic drugs and appear to ground that right

2  in both the federal Constitution and state law.

3

4  **Absent An Emergency, A Competent Person Has An Absolute Right to**
5  **Refuse Antipsychotic Medication Even If That Person Has Been**
6  **Involuntarily Hospitalized For Treatment of Mental Illness**.

7

8  Of course, recognition of a patient's right to refuse treatment with antipsychotic

9  drugs does not mean that the right is absolute. Determining its appropriate scope

10  required a weighing of "the individual's interest in liberty against the State's

11  asserted right for restraining individual liberty." *Youngberg v. Romeo*, 457 U.S. at

12  320.

13      *Knecht v. Gillman*, 488 F.2d 1136 (8th Cir. 1973) (mental patients have a

14  constitutional right to refuse the drug apomorphine); *Scott v. Plante*, 532 F.2d 939

15  (3d Cir. 1976) (complaint alleging forced administration of psychotropic drugs states

16  a claim under the federal Constitution); *Bee v. Greaves*, 744 F.2d 1387 (10th Cir.

17  1984), cert. denied, 105 s. Ct. 1187 (1985) (pretrial detainees have a constitutional

18  right to refuse psychotropic drugs); *Osgood v. District of Columbia*, 567 F. Supp.

19  1026 (D.D.C. 1983) (former mental patient has a constitutional right, in jail, to

20  refuse psychotropic drugs); and *Mackey v. Procunier*, 477 F.2d 877 (9th Cir. 1973)

21  (complaint alleging forcible administration of the drug succinylcholine to a prisoner

22  in a state mental facility states a claim under the federal Constitution).

23  Furthermore, although sympathetic to a federal constitutional right many other

1   courts have found it unnecessary to reach that question and have ruled, instead,

2   that involuntarily hospitalized mental patients have a common law right, a state

3   statutory right, or a state constitutional right to refuse psychotropic drugs. E.g.,

4   _Rivers v. Katz_, 67 N.Y.2d 485, 495 N.E.2d 337 (1986); _Goedecke v. State Dep't of_

5   _Institutions_, 603 P.2d 123 (Colo. 1979); _People v. Medina_, 705 P.2d 961 (Colo. 1985)

6   (en bane); _Opinion of the Justices_, 465 A.2d 484 (N.H. 1983).

7

8       The particular constitutional balance struck in _Youngberg_, however, is of

9   little utility in resolving the present case because _Youngberg_ did not involve the

10  individual interest at stake here–the right to refuse unwanted medical treatment.

11  In _Youngberg_ itself the Court held that a profoundly mentally retarded patient in a

12  state hospital had an individual liberty interest in safe conditions, freedom from

13  unnecessary restraint, and adequate training, but that this interest could be

14  adequately protected by a legal standard that "professional judgment was in fact

15  exercised" in deciding upon the extent of restraint imposed or of training given. Id.

16  At 321-324. _Youngberg_ does not, however, stand for the proposition that

17  government may override an individual's decision to refuse medical treatment

18  whenever the treatment appears medically indicated in the exercise of "professional

19  judgment." Although the government has an interest in the health and well-being of

20  its citizens, this interest has never been held to be sufficient in itself to override a

21  <u>competent</u> individual's right to accept or refuse medically indicated treatment. Were

22  the medical treatment at issue an intrusive and risky procedure such as bypass

1  surgery, a mastectomy, or dialysis, it is inconceivable that the Constitution would

2  be held to permit the federal government to force a competent adult to undergo such

3  treatment against his or her will – even if professionals considered the treatment to

4  be in the best medical interest of the patient. Because antipsychotic drugs are

5  similarly intrusive and pose the risk of similarly severe unwanted effects, a

6  <u>competent</u> decision to refuse these drugs must likewise receive constitutional

7  protection.

8         The patient in *Youngberg* was a profoundly mentally retarded individual who

9  was utterly unable to care for himself and functioned at the level of an eighteen-

10  month-old baby. The patient was not competent to make treatment decisions, and

11  had never in his life been competent to make treatment decisions. He claimed a

12  constitutional entitlement to certain adequate levels of treatment and standards of

13  care, and not a right to have any choice to refuse treatment respected. In

14  *Youngberg*, therefore, the government had an obvious interest in caring for a

15  hospitalized individual who was incapable of caring for himself in any way, and the

16  individual was not even seeking to assert any liberty interest in making his own

17  competent decisions about treatment. Given that the individual's constitutional

18  claim was at bottom one for medically adequate conditions and care in <u>Youngberg</u>,

19  the Court struck the balance between the patient's claim of entitlement and the

20  government's interests by applying the "professional judgment" standard.

21  Unlike the patient in *Youngberg*, plaintiff Carolyn Sioux Green is asserting a right

22  to have her decision not to endure the risks and side effects of antipsychotic drugs

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  respected. In general, a competent adult may not constitutionally be professionals

2  considered the treatment to be in the best medical interest of the patient. Because

3  antipsychotic drugs are similarly intrusive and pose the risk of similarly severe

4  unwanted effects, a competent decision to refuse these drugs must likewise receive

5  constitutional protection.

6

7  Unlike the patient in _Youngberg_, plaintiff Carolyn Sioux Green is asserting a right

8  to have her decision not to endure the risks and side effects of antipsychotic drugs

9  respected. In general, a competent adult may not constitutionally be forced by

10  government to submit to unwanted, intrusive medical procedures that entail

11  significant risks. The right at stake in this case is not the right to be free from

12  "arbitrary" administration of antipsychotic drugs. _Rather, it is the right of a_

13  _competent adult to make medical treatment decisions when proposed treatment_

14  _poses serious risks. Forced administration of antipsychotic drugs is constitutionally_

15  _permissible only if something about Ms. Carolyn's particular character or_

16  _circumstances provides the Hospital with a compelling justification for overriding_

17  _her decision to refuse unwanted medical treatment._

18

19  No such justification exists under the circumstances of this case. The mere fact of

20  involuntary commitment does not justify a decision to override an individual's

21  liberty interest in being free of unwanted, risky treatment with antipsychotic drugs.

22  Involuntary commitment is not equivalent to a finding of incompetence to make

1   treatment decisions. Because respondent Carolyn has not been found incompetent

2   to make treatment decisions, only one conceivable basis thus exists for justifying a

3   decision to override Ms. Carolyn's right to refuse medication with antipsychotic

4   drugs: the government's parens patriae interest in caring for her because she is

5   unable to make treatment decisions for her. This purported justification does not

6   provide a sufficient compelling reason for overriding the right to refuse

7   antipsychotic medication in this case.

8

9        No other conceivable government interest would be adequate to justify the

10   intrusion. The state's interest in saving life is not implicated here because

11   antipsychotic drugs do-not save or prolong life. The state's interest in improving the

12   health of the public does not outweigh the patient's constitutionally protected

13   interests. Although the Supreme Court held, in _Jacobson v. Massachusetts_, 197 U.S.

14   11 (1905), that the state's interest in compulsory vaccination outweighed the

15   individual's right to bodily integrity, the balance of governmental and individual

16   interests is far different in the case of antipsychotic drugs. First, the state's interest

17   in administering antipsychotic drugs in the hope that they will help individuals is

18   not as compelling as its interest in administering vaccinations to prevent highly

19   predictable and life-threatening epidemics. Second, far more than vaccinations,

20   antipsychotic drugs dramatically affect the body and mind of the individual and

21   have dangerous and often permanent side effects. Third, ... antipsychotic drugs may

22   not benefit a given patient. Fourth, although there are no realistic alternatives to

1   vaccinations, other treatment methods (such as group or individual psychotherapy

2   and certain forms of properly developed behavior modification) that are less

3   physically intrusive than antipsychotic drugs may be effective for at least some

4   patients. Nor is the interest in institutional efficiency sufficient. Any governmental

5   institution might function more efficiently and effectively if individual freedom

6   could be curtailed. But our constitutional system of government is based on the

7   premise that individual freedom should be protected even at the expense of some

8   loss of governmental efficiency and order. In any event, the threat to these interests

9   is not severe.

10

11  Finally, recognition of the right of <u>competent</u> patients to refuse antipsychotic

12  medication is wholly consistent with the government's interest in furthering

13  professional ethics. <u>Among treating professionals, it is an almost universally</u>

14  <u>accepted principle that patients must give informed consent before they are subject</u>

15  <u>to medical treatment</u>. *See National Comm'n for Protection of Human Subjects of*

16  *Biomedical and Behavioral Research*.

17

18  *Institutionalized As Mentally Infirm* (5-3)-(5-6) (H.E.W. Pub. No. 78-0007, 1978)

19  (Nat'l Comm'n). The underlying legal and ethical premise of the informed consent

20  doctrine is the notion of "thorough-going self determination." *Natanson v. Kline*, 186

21  Kan. 393, 406, 350 P.2d 1093, 1104 (1960). See American Psychological Association,

22  *Ethical Principles of Psychologists*, 36 Am. Psychologist 633, at 633, 636 (1981)

1   (psychologists strive to protect fundamental human rights, they fully inform clients

2   of the purpose and nature of treatment, and they recognize that clients "have

3   freedom of choice with regard to participation").

4   The rationale for substituted judgment was well expressed by the Massachusetts

5   Supreme Judicial Court:

6       The 'best interests' of an incompetent person are not necessarily served by

7   imposing on such persons results not mandated as to competent persons similarly

8   situated. It does not advance the interest of the State or the ward to treat the ward

9   as a person of lesser status or dignity than others. . . To presume that the

10  incompetent person must always be subjected to what many ration-al and

11  intelligent persons may decline is to downgrade the status of the incompetent

12  person by placing a lesser value on his intrinsic human worth and vitality.

13      Courts have traditionally been considered the appropriate forum for resolving

14  issues of competency or danger to self or others, _Rivers v. Katz_, 495 N.E.2d at 343

15  ("[s]uch a determination is uniquely a judicial, not a medical function"), and there is

16  no persuasive reason why courts should not resolve those same issues in the context

17  of forced medication. For example, in _People v. Medina_, the Supreme Court of

18  Colorado, en bane, held that a court must conduct the substituted judgment

19  evaluation because the issues to be resolved are primarily legal in nature:

20      Although the decision to forcibly medicate a patient with antipsychotic drugs

21  undoubtedly involves an aspect of professional medical judgment in connection with

22  psychiatric diagnosis and treatment alternatives, the fact remains that the decision

1   itself directly implicates the patient's legal interests in personal autonomy and

2   bodily integrity. 705 P.2d at 969. _Accord Rivers v. Katz_, 67 N.Y.2d 485, N.E.2d 337

3   (1986); _Rogers v. Commissioner of Mental Health_, 390 Mass. 489, 458 N.E.2d 308

4   (Mass. 1983); In re K.K.B., 609 P.2d 747 (Okla. 1980).

5   Leaving competency and substituted judgment determinations to hospital personnel

6   creates a significant risk that, simply because a professional believes the patient

7   has made the "wrong" decision, the professional will conclude that the patient is

8   incapable of rational thought. Hospital personnel are simply not in the position to

9   make the kind of neutral and detached judgment necessary to respect the patient's

10   rights. Indeed, that is precisely what happened in the present case. It is because of

11   the ..... potentially biased judgments that "[u]nder our Constitution there is no

12   procedural right more fundamental than the right of the citizen, except in the

13   extraordinary circumstances, to tell his side of the story to an impartial tribunal."

14   _Winters v. Miller_, 446 F.2d 65, 71 (2d Cir.), cert. denied, 404 U.S. 985 (1971).

15   **1.**   **FACT**

16   On July 2, 2001 "J. Barnes", a Court Clerk for Pierce County Superior Court.

17   Barnes signed as three different entities. (Exh 15, 24) First, Barnes signed as

18   Deputy Court Clerk. Second, Barnes signed as Court Clerk. Third, Barnes signed as

19   Filing Court Clerk. The SAME PERSON, the SAME PERSON, initialed in three

20   different legal capacities.

1    On <u>July 3</u> Barnes filed a *Notice & Order Fixing Time of Hearing Petition for a*

2    *14-day Involuntary* Treatment on July 3, 2001 knowingly with only-one-signature

3    on the Petition for Initial Detention from a two-party petition. On (Exh 12, 13) the

4    physical examiners signature is missing. No signature. Left blank. Barnes initials

5    can be found on (Exh 10, 11, 12, 13, 15, 21, 22, 23, 24), (particularly see Exh 15, 24)

6    Under RCW 9A.60.040 (1)(a)(b) it is illegal to impersonate someone. (a) Assumes a

7    false identity and does an act in his or her assumed character with intent to defraud

8    another or for any other unlawful purpose; or (b) Pretends to be a representative of

9    some person or organization or a public servant and does an act in his or her

10   pretended capacity with intent to defraud another or for any other unlawful

11   purpose.

12   **2.   <u>FACT</u>**

13    Defendant [United States], Kumar, Attending Psychiatrist at VA Puget

14   Sound. On <u>July 2, 2001</u> the [United States], Kumar, *<u>premeditated a 90-day</u>*

15   *<u>commitment within (6-hrs-5-mins</u>*) six-hours and five-minutes of Carolyn's

16   admittance time to Western recorded, "<u>It will be ideal to transfer her on a 90 day</u>

17   <u>commitment</u>."

18   Emphasis added. (Exh–5).

19   **3.   <u>FACT</u>**

20    Is alleged "DMC" in fact Alba DeMarco who initialed as the attorney for the

21   respondent on <u>July 3, 2001</u>. (Exh 15, 41) Or was it the "J. Barnes" Court Clerk or

22   ///

1  another within the Pierce County Superior Court system who added the initials? In

2  light of the factual criminal impersonation in Exhibits 15 and 24, this answer

3  remains to flush out the lack of integrity of the Pierce County Superior Court

4  systems failure to follow the rule of law as well as abide by the State of

5  Washington's laws and regulations and federal and constitutional laws in the

6  [United States]. Pierce County Attorney "Al DeMarco" WSBA #19701 name is

7  stamped to represent the Pierce County Deputy Court Clerk and as phantom

8  attorney for respondent (Plaintiff now). Perhaps the initials "DMC", are that of Alba

9  (Al) DeMarco the phantom attorney.

10      In the state of Washington according to **RCW 71.05.460** Plaintiff has a right

11  to competent legal counsel: "Every person involuntarily detained shall immediately

12  be informed of his or her right to a hearing to review the legality of his or her

13  detention and of his or her right to counsel, by the professional person in charge of

14  the facility providing evaluation and treatment, or his or her designee, and, when

15  appropriate, by the court. If the person so elects, the court shall immediately

16  appoint an attorney to assist him or her."

17      According to **WAC 388-861-241 (3)(b)(i)** which further states Plaintiff has a

18  right to "Communicate immediately with an attorney..... **(ii)** be told the name and

19  address of the attorney appointed." Plaintiff (*respondent then*) had no legal counsel

20  competent of otherwise. Plaintiff had no legal representation at any time.

21      There was NO attorney for respondent other than a phantom lawyer. The

22  Pierce County Court Clerk initialed for three-different-legal-capacities for a 14 day

1   (The Court ORDERED Fourteen Days in a state institution, the watered-down

2   version term of asylum. A hell-hole) (Exh–15). Making up rules at the Pierce County

3   Superior Court level is an outrage, to include assault and battery from the state.

4   **4.**   **<u>FACT</u>**

5     Western recorded Carolyn's back injury on July 2 @ 5:00 am then treated her

6   with psychotropic drugs (Exh 4c) with her *back injury* noted twice on (Exh–4f).

7   Western failed to give a physical examination ruling out medical first thus falling

8   below the standard of care. Western failed to obtain informed consent for the

9   administration (Exh 4b) of the unwanted use of antipsychotic–neuroleptic drugs on

10  July 2. Carolyn's *back injury* was recorded at 5:00 am (Exh 4c). *Back injury*, a

11  history, was noted again on (Exh–4f) as well as "Right hip" injury in the June 18 VA

12  record in (Exh–2) while Western continued to further force an inappropriate drug

13  regimen treating her *physical injury* as a mental disorder she never had then since

14  or prior (Exh 6, 7, 8) without giving Carolyn a physical examination.

15

16  Plaintiff noted in the top right corner that "Rosemary will NOT copy (the personal

17  possession form) ..."  In her [Carolyn's] forced heavily drug-induced mind-altering

18  drugged up stupor wrote in her own hand "Taken 98tivan before answered or

19  received. Against RCW..." (Exh 3, 4a, 7, 8). On July 2 she was forced into a heavily

20  drug-induced mind-altering state as she was forced injected and forced to ingest the

21  following drugs within 18 hours and 35 minutes; 8 mg Ativan and 20 mg

22  Olanzapine and 500 mg Depakene and 1000 mg Depakene.

1  5.   **FACT**

2       Deputy Prosecuting Attorney for Pierce County Superior Court, Karen C.

3  Calhoun WSBA #24184 filed an Order Detaining Respondent (Plaintiff now) to be

4  detained at Western State without Carolyn having a physically examination. The

5  Examining Physician Glenn Morrison failed to sign the Petition and failed to sign

6  the Affidavit on <u>July 3</u> for the <u>July 5</u> Court Hearing. Thus, filing with only a sole

7  signature of John Haroian.  There was no Examining Physician. No signature.

8  Signature line blank. No signature. Carolyn was severely physically injured. (Exh–

9  12) (Exh–13). Plaintiff was also on an unlawful forced drug regimen without a Right

10  to Refuse. In fact, Carolyn's Right to Refuse was overridden. (Exh–17); (Exh 49, 50);

11  (Exh–90).

12  6.   **FACT**

13       The Petition filed with only a sole signature of John Haroian.  No Examining

14  Physician. No signature. Signature line blank. No signature. Carolyn was severely

15  physically injured. Then forced to incapacity by the excessive abuse use of chemical

16  restraints that included a forced chemical lobotomy.

17

18  7.   **FACT**

19       On <u>3 July</u> Petition for Initial 14-day Detention [Carolyn] was forced injected

20  and forced to ingest 4 mg Ativan and 20 mg Olanzapine and 2000 mg Depakene.

21  Her Right to Refuse was denied. (Exh 17) (Exh–7) (Exh–8).

22  ///

1   **8.**   <u>**FACT**</u>

2       Westerns unlawful forced drug regimen that included a standing order for

3   forced drugging from <u>July 2</u> Ativan 8 mg and 20 mg of Olanzapine and 500 mg of

4   Depakene and 1000 mg of Depakene. <u>July 3</u> Ativan 4 mg and 20 mg of Olanzapine

5   and 2000 mg of Depakene. <u>July 4</u> Ativan 4 mg and 20 mg of Olanzapine and 2000

6   mg of Depakene.

7   This is what a *liquid straight jacket* (abuse of chemical restraints) looks like where

8   [Carolyn] was obviously made unable to attend Court due to a heavily forced drug-

9   induced mind-altering state as she was chemically lobotomized. (Exh–4b) (Exh–6)

10  (Exh–7) (Exh–8) (Exh–11). Without a physical examination. Carolyn had a right to

11  a physical examination as well as a right to refuse. (Exh–17) (Exh–12) (Exh–13).

12

13  **9.**   <u>**FACT**</u>

14      On <u>July 4, 2001</u> an LPN name #25 on Western signature (Exh–88) the LPN

15  presenter of the TWENTY-FOUR HOUR MEDICATION NOTICE for Western

16  State. On <u>July 4, 2001</u> the LPN presenter checked the box of their personal choice

17  for Carolyn to stay on medication when in fact Carolyn hand wrote,

18   "<u>No prescription drugs please xo</u>" (Exh 17). Western State LPN #25 further noted

19  her personal choice in the record (Exh 18) *overriding* Plaintiff's Right to Refuse. The

20  LPN #25 wrote in their personal choice of medication instead of Carolyn's.

21  (Exh–94 LPN name #25 on Western signature p. 39) (Exh–86). Emphasis added.

22  ///

1   **10.   <u>FACT</u>**

2       On <u>July 5</u> Defendant [United States], Kumar, for a <u>second time recorded the</u>

3   <u>*premeditation for a 90 day*</u> stating "Plan is to initiate petition for extension of

4   commitment because of the noncompliance of this patient." (Exh–27) (Exh–5).

5   **11.   <u>FACT</u>**

6       On <u>July 5</u> Mary Opgenorth Pierce County Superior Court Attorney went to

7   the Court Hearing for a 14 day with a <u>signature obtained by deception</u> from

8   Plaintiff. In addition, Opgenorth checked the box "gravely disabled." (Exh 21, 22).

9

10   **12.   <u>FACT</u>**

11       On <u>July 6</u> [United States], Kumar, a <u>third time solidifies the *premeditation*</u>

12   <u>*for a 90 day*</u> stating "Plan is to extend the commitment to 90 days so that

13   compliance to treatment can be monitored."  [United States], Kumar, noted Plaintiff

14   was "…lethargic and sleepy." (Exh 31, 53) (Exh 5, 27).

15       Defendant [United States], Kumar, mandatory forced drug regimen for

16   Carolyn to ingest: 1 mg Ativan every four-hour and 5 mg Olanzapine at bedtime

17   and 25 mg Tramadol at bedtime and 100 mg Trazodone at bedtime and 250 mg

18   Divalproex EC twice-a-day and 60 mg Paxil at bedtime. (Exh–30). On <u>July 7</u>

19   [United States] forced drug regimen for Carolyn who was forced to ingest 1 mg

20   Ativan every four-hour and 5 mg Olanzapine at bedtime and 25 mg Tramadol at

21   bedtime and 100 mg Trazodone at bedtime and 250 mg Divalproex EC twice-a-day

22   and 60 mg Paxil at bedtime. (Exh–30).

1   13.   **FACT**

2   Defendant [United States], Hammond, a Staff Psychiatrist for VA Puget

3   Sound–American Lake. On <u>July 8, 2001</u> [United States] entered in Plaintiffs VA

4   medical record "she is not competent to refuse .... medication, Furthermore, it is

5   not in her interests to engage in a running debate about medication...." "I

6   [United States], Hammond, believe her [Carolyn's] objections to taking

7   psychotropics should be **overridden**." "<u>Administer olanzapine 5 mg now to</u>

8   <u>make up for the refused dose</u> last night. <u>Initiate medication **override**</u> by asking

9   [United States], (Kumar), ..." [United States], Hammond, initiated a neuroleptic

10   drug override (Exh–35) emphasis added. She is competent (Exh 26). Carolyn's

11   right hip is recorded in (Exh 27) as well as many other places.

12   Plaintiff has a right to refuse neuroleptic–antipsychotic drugs and prior to

13   Court (Exh–17). Plaintiff has a right to a physical examination and to have her

14   well documented physical injury in the VA Puget Sound medical records injury

15   adequately cared for prior to the unlawful imprisonment.

16   14.   **FACT**

17   <u>On July 8</u> Defendant [United States]'s, Kumar's,  forced drug regimen for

18   Carolyn who was forced to ingest 1 mg Ativan every four-hour and 5 mg Olanzapine

19   at bedtime and 25 mg Tramadol at bedtime and 100 mg Trazodone at bedtime and

20   250 mg Divalproex EC twice-a-day and 60 mg Paxil at bedtime. Additionally, this

21   same day @ 10:26:09 [United States], Hammond, initiated an <u>override</u> of Carolyn's

22   Right to Refuse. (Exh 30, 35)

1    15.   **<u>FACT</u>**

2        <u>On July 9</u> Defendant [United States], Kumar's, forced drug regimen for

3    Carolyn who was forced to ingest 1 mg Ativan every four-hour and 5 mg Olanzapine

4    at bedtime and 25 mg Tramadol at bedtime and 100 mg Trazodone at bedtime and

5    250 mg Divalproex EC twice-a-day and 60 mg Paxil at bedtime. (Exh 30, 35, 27).

6    16.   **<u>FACT</u>**

7        <u>On July 10</u>, 2001 Defendant [United States], Kumar, Attending Psychiatrist

8    undeniably created an unlawful standing order for mandatory forced injections of

9    Navane to a non-consenting person Carolyn's refusals to ingest drugs. [United

10   States], Kumar, further created an additional unlawful standing order for

11   mandatory forced injections of Trifluoperazine. [United States], Kumar, stated

12   "Patient needs increase of antipsychotic dosage." Kumar stated "If patient refuses

13   any dose of antipsychotic, she should be treated with injectable form of the

14   medication." (Exh 30, 38, 39, 48).

15

16   17.   **<u>FACT</u>**

17       <u>Equally important</u>, Defendant [United States], Kumar, ***tripled drug doses***

18   *of Olanzapine* prior to filing a Petition for the premediated 90 day <u>July 10</u>. (Exh–

19   30, 39)

20       Defendant [United States], Kumar, Attending Psychiatrist (and a social

21   worker) Petitioned Pierce County Superior Court for a 90-day without giving

22   Carolyn a physical examination. (Exh 5, 27, 30, 31, 38, 39, 48) while forcing her

1  to ingest 1 mg Ativan every four-hours and 7.5 mg Olanzapine AM and 7.5 mg

2  Olanzapine PM and 100-50 mg Tramadol every six-hours and 50 mg Trazodone

3  at bedtime and 250 mg Divalproex EC twice-a-day and 60 mg Paxil at bedtime or

4  be force injected Navane and/or Trifluoperazine prior to Court filings or

5  Hearings. (Exh–30).

6  **18.**   **FACT**

7    On July 11: Defendant [United States], Kumars's, unlawful mandatory forced

8  drug regimen for Carolyn to ingest 1 mg Ativan every four-hours and 7.5 mg

9  Olanzapine and AM, 7.5 mg Olanzapine PM and 100-50 mg Tramadol every six-

10  hours and 50 mg Trazodone at bedtime and 250 mg Divalproex EC twice-a-day and

11  60 mg Paxil at bedtime. (Exh 5, 27, 30, 31, 38, 39, 48).

12  **19.**   **FACT**

13    On July 12: Defendant [United States], Kumar, unlawful mandatory forced

14  drug regimen for Carolyn to ingest 1 mg Ativan every four-hours and 7.5 mg

15  Olanzapine and AM, 7.5 mg Olanzapine PM and 100-50 mg Tramadol every six-

16  hours and 50 mg Trazodone at bedtime and 250 mg Divalproex EC twice-a-day and

17  70 mg Paxil at bedtime. Kumar increased Paxil to 70 mg for Plaintiff's right hip

18  pain. (Exh 5, 27, 30, 31, 38, 39, 48).

19

20  **20.**   **FACT**

21    Stanford Opdyke a Pierce County Superior Court appointed not-competent

22  attorney WSBA #12487. On July 12 Stanford Opdyke failed to provide Plaintiff with

1   her TWENTY-FOUR HOUR MEDICATION NOTICE RIGHT TO REFUSE

2   ANTIPSYCHOTIC DRUGS Prior to Court. Stanford Opdyke presented Plaintiff

3   with a STIPULATION AND WAIVER 90/180 DAY HEARING then obtained her

4   signature by deception. (Exh–45). Undeniably there is no way Plaintiff would have

5   ever in her life signed such a document.

6   **21.   FACT**

7   *Stanford Opdyke and Mary Opgenorth court appointed not-competent legal counsel*

8   *failed to provide Plaintiff with her constitutional and state right to refuse*

9   *neuroleptic/antipsychotic drugs Prior to Court Hearing and instead obtained a signature*

10   *by deception pursuant to RCW 9A.60.030.* The Court appointed and court-paid not-

11   competent ineffective appointed counsel.

12   **22.   FACT**

13   On July 12 and 13, and prior, Plaintiff was on an unlawful mandatory forced

14   drug regimen ordered by [United States], Kumar, as well as her *Right to Refuse*

15   *was overridden* by [United States], Hammond, on July 8 (Exh–35) with forced

16   injections to follow for her refusals ordered by the [United States] (Exh 38, 39).

17   At the time of this deceptive signing, she was forced to ingest 1 mg Ativan every

18   four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and 50-

19   100 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

20   Divalproex EC twice-a-day and with an increased dose of Paxil now 70 mg at

21   bedtime (Exh–30). Plaintiff still had not had a physical examination. Her

22   physical injury is recorded at the [United States], VA Puget Sound.

1    Pierce County Superior Court would be considered a kangaroo Court, in 2001

2    for the Courts lack of integrity and with partiality. Court showed unfair

3    influence of fliers.

4    **23.    <u>FACT</u>**

5    <u>On July 13</u>: Defendant [United States], Kumar, ***<u>doubled drug doses</u>*** of

6    Depakote to 500 mg BID. Prior to the Court Hearing [United States] enforced their

7    unlawful mandatory forced drug regimen where Carolyn was forced to ingest 1 mg

8    Ativan every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM

9    and 100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250

10    mg Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected

11    Navane and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53) COURT

12    HEARING WHERE the [United States], Kumar, PIERCE COUNTY SUPERIOR

13    COURT WAS SANCTIONED THE PREMEDIATED 90 DAY (Exh–51).

14

15    **24.    <u>FACT</u>**

16    On <u>July 13</u>, 2001. Karen C. Calhoun WSBA #24184 Deputy Prosecuting

17    Attorney for Pierce County Superior Court. Calhoun appeared in Court with an

18    Order Detaining Respondent (Plaintiff now) to be detained at VA Puget Sound

19    Healthcare Systems without Carolyn Sioux Green having a physically

20    examination. Pierce County Superior Court would be considered a kangaroo

21    Court, in 2001. Superior Court of Pierce County lacks justice and integrity and

22    without-impartiality as filers for Western are given unfair influence.

1  **25.   <u>FACT</u>**

2      The Petitioner [United States], Kumar's, premediated the intentions of an

3  unlawful imprisonment for a 90-day three times prior to the <u>July 10 Petition</u>,

4  prior to the July 13 Court Hearing. On <u>July 13</u> Calhoun went to the Probable

5  Cause Court Hearing for a 90 day with a <u>signature obtained by deception</u> (Exh–

6  45). Deputy Prosecutor Karen Calhoun checked the box "likelihood of serious

7  harm to others" and "gravely disabled" making false misleading and unreliable

8  statements making false misleading and unreliable statements thus Calhoun

9  altered the outcome by her misleading actions under oath to the Court.

10  (Exh 49, 50).

11  **26.   <u>FACT</u>**

12      On <u>July 13</u> Opdyke went to the Probable Cause Court Hearing for a 90 day

13  with Plaintiff's <u>signature obtained by deception</u> (Exh–45). Opdyke checked the box

14  "likelihood of serious harm to others" and "gravely disabled" making false

15  misleading statements with unreliable information with supplemental conjectures

16  and falsities rather than evidence bases information thus Opdyke altered the

17  outcome by his misleading actions under oath to the Court. (Exh 49, 50)

18  **27.   <u>FACT</u>**

19      On <u>July 14</u> Defendant [United States], Kumar, received the <u>*premediated 90*</u>

20  <u>*day*</u> as he noted in the medical record @ 13:17 "Commitment was extended to 90

21  days. After patient refused some doses of medication, an override was done." "At

22  this time she has partial privileges." (Exh 53, 5, 27, 31).

1   **28.**   **FACT**

2         On <u>July 15</u> Defendant [United States], Kumar, enforced the unlawful

3   mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

4   every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

5   100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

6   Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

7   and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

8   **29.**   **FACT**

9         On <u>July 16</u> Defendant [United States], Kumar, enforced the unlawful

10   mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

11   every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

12   100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

13   Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

14   and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

15

16   **30.**   **FACT**

17         On <u>July 17</u> Defendant [United States], Kumar, enforced the unlawful

18   mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

19   every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

20   100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

21   Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

22   and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

1  **31.   <u>FACT</u>**

2     On <u>July 18</u> Defendant [United States], Kumar, enforced the unlawful

3  mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

4  every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

5  100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

6  Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

7  and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

8

9  **32.   <u>FACT</u>**

10    On <u>July 19</u> Defendant [United States], Kumar, enforced the unlawful

11  mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

12  every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

13  100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

14  Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

15  and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

16  **33.   <u>FACT</u>**

17    On <u>July 20</u> Defendant [United States], Kumar, enforced the unlawful

18  mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

19  every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

20  100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

21  Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

22  and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

1   **34.**   **FACT**

2          On July 21 Defendant [United States], Kumar, enforced the unlawful

3   mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

4   every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

5   100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

6   Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

7   and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

8   **35.**   **FACT**

9          On July 22 Defendant [United States], Kumar, enforced the unlawful

10  mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

11  every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

12  100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

13  Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

14  and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

15

16  **36.**   **FACT**

17         On July 23 Defendant [United States], Kumar, enforced the unlawful

18  mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

19  every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

20  100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

21  Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

22  and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

1   **37.**   **FACT**

2       On <u>July 24</u> Defendant [United States], Kumar, enforced the unlawful

3   mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

4   every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

5   100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

6   Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

7   and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

8

9   **38.**   **FACT**

10       On <u>July 25</u> Defendant [United States], Kumar, enforced the unlawful

11   mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

12   every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

13   100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

14   Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

15   and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

16   **39.**   **FACT**

17       On <u>July 26</u> Defendant [United States], Kumar, enforced the unlawful

18   mandatory forced drug regimen where Carolyn was forced to ingest 1 mg Ativan

19   every four-hours and 7.5 mg Olanzapine and AM and 7.5 mg Olanzapine PM and

20   100-50 mg Tramadol every six-hours and 50 mg Trazodone at bedtime and 250 mg

21   Divalproex EC twice-a-day and 70 mg Paxil at bedtime or be force injected Navane

22   and/or Trifluoperazine. (Exh 5, 27, 30, 31, 38, 39, 48, 53).

1    **40.**   <u>**FACT**</u>

2        Defendant [United States], Kumar's,  Attending Psychiatrist. On <u>July 2, 2001</u>

3    United States <u>*premeditated a 90-day*</u> commitment within six-hours and five-

4    minutes of Carolyn's admittance time to Western stating "It will be ideal to transfer

5    her on a 90  day commitment." (Exh–5).

6        On <u>July 5</u> [United States], Kumar, for a second time stated the <u>*premeditation*</u>

7    <u>*for a 90 day*</u> stating "Plan is to initiate petition for extension of commitment because

8    of the noncompliance of this patient." (Exh–27) (Exh–5).

9        On <u>July 6</u> [United States], Kumar, a third time solidifies the <u>*premeditation*</u>

10   <u>*for a 90 day*</u> stating "Plan is to extend the commitment to 90 days so that

11   compliance to treatment can be monitored."  [United States] noted Plaintiff was

12   "…lethargic and sleepy." (Exh 31, 53) (Exh 5, 27)

13

14       [United States]'s, Kumar, mandatory forced drug regimen for Carolyn to

15   ingest: 1 mg Ativan every four-hour and 5 mg Olanzapine at bedtime and 25 mg

16   Tramadol at bedtime and 100 mg Trazodone at bedtime and 250 mg Divalproex EC

17   twice-a-day and 60 mg Paxil at bedtime. (Exh–30). <u>On July 7</u> [United States]

18   mandatory forced drug regimen for Carolyn who was forced to ingest 1 mg Ativan

19   every four-hour and 5 mg Olanzapine at bedtime and 25 mg Tramadol at bedtime

20   and 100 mg Trazodone at bedtime and 250 mg Divalproex EC twice-a-day and 60

21   mg Paxil at bedtime in violation of all of her VA Patient Rights as well as

22   constitutional rights afforded to all American citizens. (Exh–30).

1    *Note: Plaintiff identified both the United States, and specific actors.*

2

3    # **ADDITIONAL LAW & ARGUMENT**

4    Unlawful imprisonment; (1) A person is guilty of unlawful imprisonment if he

5    or she knowingly restrains another person. The [United States] bypassed *not to*

6    *exceed/within* 72 hours RCW's OVER SIXTY-FIVE TIMES listed in (Exh–90) and

7    with premeditation solidified three times in the records.

8    "It will be ideal to transfer her on a 90 day commitment." (Exh–5). This

9    *premeditation for a 90 day* was solidified three times in the record. The first

10    premeditation was within (6 hrs 5 mins).

11

12    *Competency* is a legal term, not a medical term, therefore, it is NOT the doctors

13    right to determine. It is the Courts.

14    Emphasis added. The [United States] bypassed all judicial procedures while

15    the [United States] created its own unlawful standing orders for Carolyn to ingest

16    drugs or be forced injected for her legal right to refuse. The consequences for

17    Carolyn exercising her VA Patient Rights and her constitutional and legal right to

18    refuse, Defendants then doubled drug doses and tripled drug doses is criminal.

19    **Double drug doses. Triple drug doses.**

20    *Vitek v. Jones*, forced administration of antipsychotic medication may not be

21    used as a form of punishment. (See Case Law references).

1  [United States], VA Puget Sound record:

2  FX's Trauma: "**Injured her R buttock, hips, neck and back. Patient will be**

3  **put on mood stabilizers and antidepressants**." (with emphasis)

4

5     Defendant [United States] required Carolyn a competent innocent individual

6  to **ingest 332 drugs (three-hundred-thirty-two drugs) 332 drugs in pill form**

7  or be forcibly injected intramuscularly with Navane & Trifluoperazine potent

8  psychotropic (off-label) drugs per the order of [United States], Kumar, Hammond,

9  who overrode Plaintiffs right to refuse then enforced ingesting with unlawful

10  standing orders for injections. All without a physical examination for her *severe*

11  *physical injury* that was well-documented and recorded at VA Puget Sound. (Exh 1–

12  61) (Exh–71) (Exh–87)

13     For an isolated incident of erratic and/or reckless driving conduct on private

14  property that was not-a-danger to myself or others is not the result of a mental

15  disorder. No arrests. No ticket. Clean driving record. Clean background. Being sleep

16  deprived is not a result of a mental disorder. A short fumbling over one's words is

17  not a mental disorder.

18     Symptoms from a physical condition manifesting and revealing as a possible

19  symptom for a mental disorder, are not, in fact, a mental disorder, they are

20  symptoms. No tests for physical ailments were performed pursuant to RCW

21  71.05.210. Her constitutional rights and her state right to refuse antipsychotic

22  drugs were denied.

1    Plaintiff had no legal counsel. Her Right to Refuse denied, and, in fact, she

2    was punished for exercising her Patient Rights, her Constitutional rights, and state

3    rights. The forced *chemical lobotomies*[6] and unlawful treatments and imprisonment

4    Carolyn received is beyond cruel and unusual. It's criminal.

5

6    In the state of Washington according to **RCW 71.05.460** Plaintiff has a right

7    to competent legal counsel: "Every person involuntarily detained shall immediately

8    be informed of his or her right to a hearing to review the legality of his or her

9    detention and of his or her right to counsel, by the professional person in charge of

10   the facility providing evaluation and treatment, or his or her designee, and, when

11   appropriate, by the court. If the person so elects, the court shall immediately

12   appoint an attorney to assist him or her."

13   According to **WAC 388-861-241 (3)(b)(i)** which further states Plaintiff has a

14   right to "Communicate immediately with an attorney.....  **(ii)** be told the name and

15   address of the attorney appointed." Plaintiff (*respondent then*) had no legal counsel

16   competent of otherwise. Plaintiff had no legal representation at any time.

17   (See Case Law references below).

18   There was <u>NO attorney for respondent other than phantom lawyers</u>.

19   The Pierce County Superior Court Clerk initialed for three-different-legal-capacities

20   for a 14 day (for a 14-days in an asylum!). THEN, 90-days more at VA Puget Sound.

21   Medical providers and Lawyers and Court Commissioners making up rules at the

22   Pierce County Superior Court level is an outrage.

1     **<u>RCW 71.05.210 (2000 c 94 § 6</u>):**

2         Each person involuntarily detained and accepted or admitted at an

3 evaluation and treatment facility shall, within twenty four hours of his or her

4 admission or acceptance at the facility, be examined and evaluated by a licensed

5 physician who may be assisted by a physician assistant according to chapter 18.71A

6 RCW or an advanced registered nurse practitioner according to chapter 18.79 RCW

7 and a mental health professional, and shall receive such treatment and care as his

8 or her condition requires including treatment on an outpatient basis for the period

9 that he or she is detained, except that, beginning twenty-four hours prior to a trial

10 or hearing pursuant to RCW 71.05.215, 71.05.240, 71.05.310, 71.05.320, 71.05.340,

11 or 71.05.370, the individual may refuse psychiatric medications, but may not refuse:

12       (1) Any other medication previously prescribed by a person licensed under

13 Title 18 RCW; or (2) emergency lifesaving treatment, and the individual shall be

14 informed at an appropriate time of his or her right of such refusal. The person shall

15 be detained up to seventy-two hours, if, in the opinion of the professional person in

16 charge of the facility, or his or her professional designee, the person presents a

17 likelihood of serious harm, or is gravely disabled. A person who has been detained

18 for seventy two hours shall no later than the end of such period be released, unless

19 referred for further care on a voluntary basis, or detained pursuant to court order

20 for further treatment as provided in this chapter.

21       If, after examination and evaluation, the licensed physician and mental

22 health professional determine that the initial needs of the person would be better

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  served by placement in a chemical dependency treatment facility, then the person

2  shall be referred to an approved treatment program defined under RCW

3  70.96A.020.

4       An evaluation and treatment center admitting or accepting any person

5  pursuant to this chapter <u>whose physical condition reveals the need for</u>

6  <u>hospitalization shall assure that such person is transferred to an appropriate</u>

7  <u>hospital for evaluation or admission for treatment</u>. Notice of such fact shall be given

8  to the court, the designated attorney, and the county designated mental health

9  professional and the court shall order such continuance in proceedings under this

10  chapter as may be necessary, but in no event may this continuance be more than

11  fourteen days. The RCW does not state how the physical condition "reveals" the

12  need for hospitalization.

13       RCW 71.05.210, today and in 2001 does not state how the physical condition

14  "reveals" the need for hospitalization. According to the RCW "...treatment facility

15  shall, within twenty-fours hours of [her] acceptance at the facility, be examined and

16  evaluated by a licensed physician who may be assisted by a physician assistant

17  according to 18.71 or an advanced registered nurse Practioner according to chapter

18  18.79 RCW..."

19       Furthermore, her physical injury was recorded in the medical records

20  repetitively and in detail. Her physical injury was reported as well as notated in the

21  medical records, then ignored. She had to ask for a walking cane from the [United

22  States] on July 25 that was issued on July 27, 2001

1    After **864 hours of confinement and forced drugging** at the [United States]

2    (Dept of Veterans VA Puget Sound) for the unlawful imprisonment and forced

3    drugged to near annulation <u>a walking cane was issued that Carolyn had to ask for</u>.

4    Think about that.

5    ///

6    ///

7    **RCW 71.05.215 (1997 c 112 § 16**):

8    (1) A person found to be gravely disabled or presents a likelihood of serious

9    harm as a result of a mental disorder has a right to refuse antipsychotic medication

10   unless it is determined that the failure to medicate may result in a likelihood of

11   serious harm or substantial deterioration or substantially prolong the length of

12   involuntary commitment <u>and there is no less intrusive course of treatment than</u>

13   <u>medication in the best interest of that person</u>.

14   (2) The department shall adopt rules to carry out the purposes of this

15   chapter. These rules shall include:

16   a) An attempt to obtain the informed consent of the person prior to

17   administration of antipsychotic medication.

18   (b) For short-term treatment up to thirty days, the right to refuse

19   antipsychotic medications unless there is an additional concurring medical opinion

20   approving medication.

21   With emphasis added in the text.

22   ///

1    (c) For continued treatment beyond thirty days through the hearing on any

2    petition filed under RCW 71.05.370(7), the right to periodic review of the decision to

3    medicate by the medical director or designee.

4    (d) Administration of antipsychotic medication in an emergency and review of

5    this decision within twenty-four hours. An emergency exists if the person presents

6    an imminent likelihood of serious harm, and medically acceptable alternatives to

7    administration of antipsychotic medications are not available or are unlikely to be

8    successful; and in the opinion of the physician, the person's condition constitutes an

9    emergency requiring the treatment be instituted prior to obtaining a second medical

10   opinion.

11   (e) Documentation in the medical record of the physician's attempt to obtain

12   informed consent and the reasons why antipsychotic medication is being

13   administered over the person's objection or lack of consent.

14

15   **<u>RCW 71.05.250 (1989 c 120 7)</u>**:

16   Sec. 7. Section 30, chapter 142, Laws of 1973 I st ex. sess. As last

17   amended by section 6, chapter 439, Laws of 1987 and RCW 71.05.250 arc

18   each amended to read as follows:

19   At the probable cause hearing the detained person shall have the following

20   rights in addition to the rights previously specified:

21   (I) To present evidence on his or her behalf;

22   (2) To cross-examine witnesses who testify against him or her;

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    (3) To be proceeded against by the rules of evidence;

2    (4) To remain silent;

3    (5) To view and copy all petitions and reports in the court tile.

4  The physician-patient privilege or the psychologist-client privilege shall be deemed

5  waived in proceedings under this chapter relating to the administration of

6  antipsychotic medications. As to other proceedings under this chapter, the

7  privileges shall be waived when a court of competent jurisdiction in its discretion

8  determines that such waiver is necessary to protect either the detained person or

9  the public.

10

11    The waiver of a privilege under this section is limited to records or testimony

12  relevant to evaluation of the detained person for purposes of a proceeding under this

13  chapter. Upon motion by the detained person or on its own motion, the court shall

14  examine a record or testimony sought by a petitioner to determine whether it is

15  within the scope of the waiver.

16    The record maker shall not be required to testify / in order to introduce

17  medical or psychological records of the detained person so long as the requirements

18  of RCW 5.45.020 are met except that portions of the record which contains opinions

19  as to the detained person's mental state must be deleted from such records unless

20  the person making such conclusions is available for cross-examination.

21  ///

22  ///

1    **RCW 71.05.280 (1998 c 297 § 15)**:

2    At the expiration of the fourteen-day period of intensive treatment, a person

3    may be confined for further treatment pursuant to RCW 71.05.320 if:

4    (1) Such person after having been taken into custody for evaluation and

5    treatment has threatened, attempted, or inflicted:

6    (a) Physical harm upon the person of another or himself or herself, or

7    substantial damage upon the property of another, and (b) as a result of mental

8    disorder presents a likelihood of serious harm; or

9    (2) Such person was taken into custody as a result of conduct in which he or

10   she attempted or inflicted physical harm upon the person of another or himself or

11   herself, or substantial damage upon the property of others, and continues to

12   present, as a result of mental disorder, a likelihood of serious harm; or

13   (3) Such person has been determined to be incompetent and criminal charges

14   have been dismissed pursuant to RCW 10.77.090(((3))) (4), and has committed acts

15   constituting a felony, and as a result of a mental disorder, presents a substantial

16   likelihood of repeating similar acts. In any proceeding pursuant to this subsection it

17   shall not be necessary to show intent, willfulness, or state of mind as an element of

18   the crime; or

19   (4) Such person is gravely disabled.

20

21   **RCW 71.05.300 (1998 c. 297 § 17)** Filing a petition–Appearance–Notice–

22   Advice as to rights–Appointment of attorney, expert, or professional person.

1    **RCW 71.05.310 (1975 1st ex.s.  c 1999 § 8)** Time for hearing–Due Process–

2    Jury trial–Continuation of treatment.

3

4    **RCW 71.05.320 (1999 c 13 § 7)**:

5    (1) If the <u>court or jury finds that grounds set forth in RCW 71.05.280 have</u>

6    <u>been proven</u> and that the <u>best interests of the person or others will not be served by</u>

7    <u>a less restrictive treatment which is an alternative to detention</u>, the <u>court shall</u>

8    <u>remand him or her to the custody of the department or to a facility certified for</u>

9    <u>ninety day treatment by the department for a further period of intensive treatment</u>

10   <u>not to exceed ninety days from the date of judgment</u>: <u>PROVIDED, That if the</u>

11   <u>grounds set forth in RCW 71.05.280(3) are the basis of commitment</u>, then the period

12   of treatment may be up to but not exceed one hundred eighty days from the date of

13   judgment in a facility certified for one hundred eighty day treatment by the

14   department. If the committed person is developmentally disabled and has been

15   determined incompetent pursuant to RCW 10.77.090 (4), and the best interests of

16   the person or others will not be served by a less-restrictive treatment which is an

17   alternative to detention, the court shall remand him or her to the custody of the

18   department or to a facility certified for one hundred eighty-day treatment by the

19   department. When appropriate and subject to available funds, treatment and

20   training of such persons must be provided in a program specifically reserved for the

21   treatment and training of developmentally disabled persons. A person so committed

1   shall receive habilitation services pursuant to an individualized service plan

2   specifically developed to treat the behavior which was the subject of the criminal

3   proceedings.

4   The treatment program shall be administered by developmental disabilities

5   professionals and others trained specifically in the needs of developmentally

6   disabled persons. The department may limit admissions to this specialized program

7   in order to ensure that expenditures for services do not exceed amounts

8   appropriated by the legislature and allocated by the department for such services.

9   The department may establish admission priorities in the event that the number of

10  eligible persons exceeds the limits set by the department. An order for treatment

11  less restrictive than involuntary detention may include conditions, and if such

12  conditions are not adhered to, the designated mental health professional or

13  developmental disabilities professional may order the person apprehended under

14  the terms and conditions of RCW 71.05.340.

15      If the court or jury finds that grounds set forth in RCW 71.05.280 have been

16  proven, but finds that treatment less restrictive than detention will be in the best

17  interest of the person or others, then the court shall remand him or her to the

18  custody of the department or to a facility certified for ninety day treatment by the

19  department or to a less restrictive alternative for a further period of less restrictive

20  treatment not to exceed ninety days from the date of judgment: <u>PROVIDED, That if</u>

21  <u>the grounds set forth in RCW 71.05.280(3) are the basis of commitment</u>, then the

1   period of treatment may be up to but not exceed one hundred eighty days from the

2   date of judgment.

3       (2) The person shall be released from involuntary treatment at the expiration

4   of the period of commitment imposed under subsection (1) of this section unless the

5   superintendent or professional person in charge of the facility in which he or she is

6   confined, or in the event of a less restrictive alternative, the designated mental

7   health professional or developmental disabilities professional, files a new petition

8   for involuntary treatment on the grounds that the committed person;

9       (a) During the current period of court ordered treatment: (i) Has threatened,

10  attempted, or inflicted physical harm upon the person of another, or substantial

11  damage upon the property of another, and (ii) as a result of mental disorder or

12  developmental disability presents a likelihood of serious harm; or

13      (b) Was taken into custody as a result of conduct in which he or she

14  attempted or inflicted serious physical harm upon the person of another, and

15  continues to present, as a result of mental disorder or developmental disability a

16  likelihood of serious harm; or

17      (c) Is in custody pursuant to RCW 71.05.280(3) and as a result of

18  mental disorder or developmental disability presents a substantial likelihood of

19  repeating similar acts considering the charged criminal behavior, life history,

20  progress in treatment, and the public safety; or

21      (d) Continues to be gravely disabled.

22  ///

1    If the conduct required to be proven in (b) and (c) of this subsection was found by a

2    judge or jury in a prior trial under this chapter, it shall not be necessary to reprove

3    that element. Such new petition for involuntary treatment shall be filed and heard

4    in the superior court of the county of the facility which is filing the new petition for

5    involuntary treatment unless good cause is shown for a change of venue. The cost of

6    the proceedings shall be borne by the state. The hearing shall be held as provided in

7    RCW 71.05.310, and if the court or jury finds that the grounds for additional

8    confinement as set forth in this subsection are present, the court may order the

9    committed person returned for an additional period of treatment not to exceed one

10   hundred eighty days from the date of judgment. At the end of the one hundred

11   eighty day period of commitment, the committed person shall be released unless a

12   petition for another one hundred eighty day period of continued treatment is filed

13   and heard in the same manner as provided in this subsection. Successive one

14   hundred eighty day commitments are permissible on the same grounds and

15   pursuant to the same procedures as the original one hundred eighty day

16   commitment. (3) No person committed as provided in this section may be detained

17   unless a valid order of commitment is in effect. No order of commitment can exceed

18   one hundred eighty days in length.

19

20   **<u>RCW 71.05.370: (1997 c 112 § 31)</u>**:

21        Insofar as danger to the individual or others is not created, each person

22   involuntarily detained, treated in a less restrictive alternative course of treatment,

1   or committed for treatment and evaluation pursuant to this chapter shall have, in

2   addition to other rights not specifically withheld by law, the following rights, a list

3   of which shall be prominently posted in all facilities, institutions, and hospitals

4   providing such services:

5        (1) To wear his or her own clothes and to keep and use his or her own

6   personal possessions, except when deprivation of same is essential to protect the

7   safety of the resident or other persons;

8        (2) To keep and be allowed to spend a reasonable sum of her own money for

9   canteen expenses and small purchases;

10       (3) To have access to individual storage space for her private use;

11       (4) To have visitors at reasonable times;

12       (5) To have reasonable access to a telephone, both to make and receive

13   confidential calls;

14       (6) To have ready access to letter writing materials, including stamps, and to

15   send and receive uncensored correspondence through the mails;

16       (7) Not to consent to the administration of antipsychotic medications beyond

17   the hearing conducted pursuant to RCW 71.05.320(2) or the performance of

18   electroconvulsant therapy or surgery, except emergency life-saving surgery, unless

19   ordered by a court of competent jurisdiction pursuant to the following standards

20   and procedures:

21       (a) The administration of antipsychotic medication or electroconvulsant

22   therapy shall not be ordered unless the petitioning party proves by clear, cogent,

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   and convincing evidence that there exists a compelling state interest that justifies

2   overriding the patient's lack of consent to the administration of antipsychotic

3   medications or electroconvulsant therapy, that the proposed treatment is necessary

4   and effective, and that medically acceptable alternative forms of treatment are not

5   available, have not been successful, or are not likely to be effective.

6        (b) The court shall make specific findings of fact concerning) The existence of

7   one or more compelling state interests;(ii) the necessity and effectiveness of the

8   treatment; and (iii)the person's desires regarding the proposed treatment. If the

9   patient is unable to make a rational and informed decision about consenting to or

10   refusing the proposed treatment, the court shall make a substituted judgment for

11   the patient as if he or she were competent to make such a determination.

12

13        (c) The person shall be present at any hearing on a request to administer

14   antipsychotic medication or electroconvulsant therapy filed pursuant to this

15   subsection. The person has the right: (i) To be represented by an attorney; (ii) to

16   present evidence; (iii) to cross examine witnesses; (iv) to have the rules of evidence

17   enforced; (v) to remain silent; (vi) to view and copy all petitions and reports in the

18   court file; and (vii) to be given reasonable notice and an opportunity to prepare for

19   the hearing. The court may appoint a psychiatrist, psychologist within their scope of

20   practice, or physician to examine and testify on behalf of such person. The court

21   shall appoint a psychiatrist, psychologist within their scope of practice, or physician

1  designated by such person or the person's counsel to testify on behalf of the person

2  in cases where an order for electroconvulsant therapy is sought.

3      (d) An order for the administration of antipsychotic medications entered

4  following a hearing conducted pursuant to this section shall be effective for the

5  period of the current involuntary treatment order, and any interim period during

6  which the person is awaiting trial or hearing on a new petition for involuntary

7  treatment or involuntary medication.

8      (e) Any person detained pursuant to RCW 71.05.320(2), who subsequently

9  refuses antipsychotic medication, shall be entitled to the procedures set forth in

10 RCW 71.05.370(7).

11      (f) Antipsychotic medication may be administered to a nonconsenting person

12 detained or committed pursuant to this chapter without a court order pursuant to

13 RCW 71.05.215(2) or under the following circumstances) A person presents an

14 imminent likelihood of serious harm;(ii) Medically acceptable alternatives to

15 administration of antipsychotic medications are not available, have not been

16 successful, or are not likely to be effective; and (iii) In the opinion of the physician

17 with responsibility for treatment of the person, or his or her designee, the person's

18 condition constitutes an emergency requiring the treatment be instituted before a

19 judicial hearing as authorized pursuant to this section can be held. If antipsychotic

20 medications are administered over a person's lack of consent pursuant to this

21 subsection, a petition for an order authorizing the administration of antipsychotic

22 medications shall be filed on the next judicial day. The hearing shall be held within

1    two judicial days. If deemed necessary by the physician with responsibility for the

2    treatment of the person, administration of antipsychotic medications may continue

3    until the hearing is held;

4         (8) To dispose of property and sign contracts unless such person has been

5    adjudicated an incompetent in a court proceeding directed to that particular issue;

6         (9) Not to have psychosurgery performed on him or her under any

7    circumstances.

8    **WAC 388-861-241** (1)(B), "prior to the involuntary administration of

9    antipsychotic medication. In an emergency, antipsychotic medications may be

10    administered prior to the court hearing PROVIDED that an examining physician

11    must file a petition..." There was No Physical Examiner at Western, or the [United

12    States] (Exh 12, 13).There is No Petition filed with the Court by Western or the

13    [United States] (Exh 11) for forced injections of neuroleptic–antipsychotic drugs in

14    Court records at any time, nor is there any Petition filed in Court records from July

15    2–27 thus bypassing ALL judicial processes nor did the person [Carolyn] appear as

16    required pursuant to RCW 71.05.215 and RCW 71.05.370 (1997 c 112 §§ 16 31):

17    In furtherance, *see* Case Law Exh–90.

18         Clearly stated in RCW 9A.28.020 (3b) a criminal attempt is when a person is

19    guilt of an attempt to commit a crime if, with intent to commit a specific crime, he

20    or she does any act which is substantial step toward the commission of that crime.

21    Plaintiff has a right to freedom and liberties and privileges, a right to refuse

22    neuroleptic–antipsychotic drugs, and a right to have a physical evaluation.

1      There was <u>NO RIGHT TO REFUSE TWENTY-FOUR HOUR MEDICATION</u>

2   <u>NOTICE Prior to Court</u> (Exh 17, 18), or at any time. Had the [United States] acted

3   as a reasonably medical provider Plaintiff would have had due process, a right to

4   refuse neuroleptic (seize the brain drugs) prior to court and any other time, freedom

5   and liberties, and the right to individualized care for her injury. Instead, she was

6   repetitively deprived of her rights and privileges then chemically lobotomized.

7   ///

8      In *Carlson v. Green*, 446, U.S. 14, 19 (1980), allowing a damages remedy for

9   an Eight Amendment violation for failure to provide adequate medical treatment.

10  *Davis v. Passman*, 442 U.S.  228, 248–49 (1979), permitting damages remedy for

11  gender discrimination under the Fifth Amendment Due Process Clause. *Gutierrez v.*

12  *Peters*, 111 F.3d. 1364, 1366 (1997), intentionally delaying medical care for a known

13  injury (i.e. broken wrist) has been held to constitute deliberate indifference. [*Farmer*

14  *v. Brennan*, 511 U.S. (U.S. 1994). In <u>Riese v. St. Mary Hospital</u> (1989 9th Cir.) the

15  court rules that absent a judicial determination of incompetence, antipsychotic

16  drugs cannot be administered to involuntary committed..... without informed

17  consent. In <u>Cobbs v. Grant</u> (1972) the court instructed the jury as follows: 'A

18  physician's duty to disclose is not governed by the standard of practice in the

19  community; rather, it is a duty imposed by law."

20     Based on the RCW's, Exhibits, federal and constitutional laws in the [United

21  States] of America, the Plaintiff was denied her *right to refuse antipsychotic*

22  *neuroleptic drugs* and in fact her individual choice was mocked then

1    **OVERRIDDEN** by the [United States], (Hammond).

2        She has a right to refuse neuroleptic–antipsychotic drugs pursuant to RCW

3    71.05.215 and RCW 71.05.250 and RCW 71.05.280 and RCW 71.05.370 to not have

4    her rights ***overridden***. In furtherance, RCW 71.05.380 (1973 1st ex.s c 142 § 43)

5    specifically 42 (9) "Not to have a lobotomy performed on him under any

6    circumstances." I [Carolyn] endured two forced chemical lobotomies from the

7    [United States] (and one from Western and one from Providence who initiated the

8    first *chemical lobotomy*). She is still recovering in 2021 from a debilitating brain-

9    injury.

10       In addition, Plaintiff had a right to a physical evaluation pursuant to RCW

11   71.05.210 within 24-hours. Defendant exercised their personal choice over the law

12   and that of Carolyn. Defendant [United States]'s gross negligence was the direct

13   and proximate result of Plaintiff's injuries. Violating Plaintiffs right to <u>Fourteenth</u>

14   <u>amendment</u> Due Process to be heard by a neutral party and access to justice, thus

15   depriving her of rights, privileges, liberties, freedoms under the color of law in §

16   1983.

17       Violating her right provided under the <u>First Amendment</u> Freedom of

18   expression, including both the right to communicate and the right to think, she was

19   forced a chemical lobotomy. Violating her right provided under the <u>Fifth</u>

20   <u>Amendment</u>– "nor shall any person...be deprived of life, liberty, or property without

21   due process of law..." Violating her <u>Eight Amendment</u> rights which prohibits cruel

22   and unusual punishment.

1    In furtherance, violations to Title 42, U.S.C. §§ 1983, 1985, and 1986, 105

2    Stat. 1071-1073 (1991).

3

4    Deliberate indifference. For example, intentionally refusing to respond to an

5    inmate's complaints has been acknowledged as constituting deliberate indifference.

6    [*Gutierrez v. Peters*, 111 F.3d 1364, 1366 (7th Cir. Ill. 1997)]; Intentionally delaying

7    medical care for a known injury (i.e., a broken wrist) has been held to constitute

8    deliberate indifference. [*Farmer v. Brennan*, 511 U.S. 825 (U.S. 1994).]

9    Plaintiff incorporates by reference in the facts alleged in the above

10   paragraphs and facts and Exhibits as a whole that the Defendant [United States]

11   owed a duty to exercise reasonable care abiding by state and federal laws and

12   Constitutional laws and Patient Rights. By failing to physician examine Carolyn for

13   her well-documented severe physical injury, forced drugged her against her

14   constitutional rights and state rights and against her will with no-informed consent,

15   defendant breached their duty of care, falling below the standard of care. Plaintiff

16   has a right to due process, a right to refuse, a right to legal counsel. Defendant

17   [United States] gross negligence was the direct and proximate result of Plaintiff's

18   injuries, economic losses, pain and suffering, financial hardships, lobotomizing her

19   against her will. As well as violations depriving her of her rights, privileges,

20   freedoms and liberties provided by the Constitution and laws in Section 1983,

21   violations of the Fifth Amendment, violations of the First Amendment, and

22   violations of the Eighth Amendment.

# 7).    BREACH OF STANDARD OF CARE
# THE UNITED STATES
### (USCG), (DEPT OF VETERANS)

*See Exhibits 1–57 uscg + va; Exhibits 1–61 va + western; Exhibit 63; Exhibit 64; Exhibit 130;*

**3. Standard of Care** aka
   **Treatment Guideline** aka
   **Formal Guidelines**

Certain specialties have certain standards that apply. The facts and circumstances

apply to each case 1) What happened 2) Accurately prove the Standard of Care was

not followed 3) That it caused injury to the patient;

   Active-duty Military are entitled to receive adequate medical care.

   Brief excerpt; VA PUGET SOUND PATIENT RIGHTS (Exh–64);
   2). "...prompt and appropriate treatment for physical and emotional disorders or
   disabilities in the least restrictive environment....treatment free from
   unnecessary or excessive medication."
   4). "You have the right to communicate freely and privately with persons outside
   the facility and have... visitors....reasonable access to public telephones ..."
   11). " You have a rights to be informed of any human experimentation or other
   research/educational projects affecting your care or treatment."

Prove the health care provider establishment fell below the Standard of Care:

   **USCG**: Failed to provide adequate medical treatment. Denied medical care.

Reprimanded for seeking medical care outside of a medical appointment.

Denied a second opinion. Retaliated against. Honorably discharged severely

physically injured.

1    **VA 1996–2018**: Failed to provide adequate medical treatment for the

2    physically injured veteran. Excessively medicated her masking her physical injury.

3

4    2000 June 28: It took **85–appointments before her FIRST DOCTOR** at

5    VA Puget Sound, Dr. Charles Paxon in Rheumatology. Yes, well over six-

6    years (6) years at this point in time. Dept of VA grossly neglected and

7    mismanaged Carolyn's well-documented physical injury attributing it to post-

8    traumatic stress then grossly neglected her well documented physical injury.

9    (Dr. Paxon noted on this first visit, "***This has never been treated directly***

10   ***except by massage and physical therapy****. Low back pain is constantly*

11   *present but not a major issue until she feels the hip is out. The **hips seems to***

12   ***develop this malfunction** at times for no apparent reason. She has never*

13   *worn a belt to try to hold the iliac wings together. In part, this is maybe*

14   *because she does not like any pressure there from any tight waistband of any*

15   *sort...") emphasis added* (2000 JUN 28) (Exh–63 H)

16   **VA 2001**: *Failed to rule of medical side first.*

17   The [United States] premeditated a 90-day unlawful imprisonment within

18   (6-hrs-5-min), premeditated solidified three times in the record.

19   Failed the rights of the patient who refused to ingest drugs against the

20   Constitution. No informed consent. [United States] trampled on the patients' rights

21   then forced Carolyn to ingest harmful inappropriate drugs for her physical injury

22   and threatened her with forced injections if she did not ingest the drugs. Doubling

1  drug doses then Tripling drug doses prior to and after court hearing and filings,

2  daily and repetitively. All against her will, against her patient rights, against many

3  Federal and State laws to include the U.S. Constitution.

4  **BREACH OF STANDARD OF CARE**: **Medical Screening Exam.**

5      **USCG:** Denied medical care. <u>Reprimanded</u> for asking a medical provider for

6  help outside of an appointment. Denied medical care and treatment. Treatment was

7  not adequate nor effective. Treatment was inappropriate drugs and physical

8  therapy. Retaliated against.

9      **VA 2001: Failed to Rule Out Medical First**. **Denied Right to Refuse**.

10  *Veteran was not physically "examined and evaluated...".* [United States] failed to

11  give Carolyn adequate medical attention for her physical injury by initially failing

12  to give her a physical "examination and evaluation", instead caused additional

13  injuries as well as administered drugs–forced causing brain damage. [United

14  States], against Carolyn's will, was given a forced *chemical lobotomy*. One from

15  June 12–26 and, with the second more damaging July 5–27. (one by Western, and

16  one by Providence who initiated the forced drugging). Plaintiff was left physically

17  injured without adequate medical care. In fact, Carolyn had to ask [United States],

18  Dept of VA for a *walking cane* after her near annihilation.

19  Q.    **2001 WHEN WAS THE MEDICAL SCREENING EXAM?**

20  **A**.    There was no physical examination and evaluation in 2001. In fact,

21  VA: FX's Trauma: "<u>Injured her R buttock, hips, neck and back. Patient will be put</u>

22  <u>on mood stabilizers and antidepressants</u>." (June 12, 2001). With emphasis.

4.     **PROVE CAUSATION**, that is the medical negligence directly caused injury

or damage to the patient; forced to ingest or be forcibly injected drugs (off-label)

that caused brain-damage and *tardive dyskinesia* (a movement problem) as well

as other abnormal bodily functions by the intrusiveness of these antipsychotic

drugs–neuroleptics–"seize the brain drugs" while ignoring the patient's physical

injury is gross negligence.

Q.     **2001 RIGHT TO REFUSE**:

How many times was Carolyn required to ingest off-label potent mind-altering

drugs and threatened to be force injected for not ingesting harmful inappropriate

drugs due to unlawful mandatory standing orders of forced and threats for her

refusals?? (Exh–30) Plaintiff was required to ingest THREE HUNDRED AND

THIRTY TWO DRUGS IN PILL FORM or be force injected intramuscularly.

VA: FX's Trauma: "Injured her R buttock, hips, neck and back. Patient will

be put on mood stabilizers and antidepressants." (June 12, 2001). And so they did,

continue, including an antipsychotic for the drug induced insomnia from Paxil.

**A**. Unlawful Mandatory Standing Orders for Forced injections for her refusals to

ingest harmful drugs. Required to ingest for her "non-compliance."

In furtherance, RCW 71.05.380 (1973 1st ex.s c 142 § 43) specifically 42 (9):

"Not to have a lobotomy performed on him under any circumstances."

I [Carolyn] endured these forced *chemical lobotomies*, still recovering in 2021.

1     "... <u>last time I had a brisk walk around the (apartment) compound without</u>
2     <u>the sense that I am dragging my right leg–the first time since my injury"</u>
3     <u>(Injured Feb. 21, 1994) (January 8, 2003)</u>.
4

5     "<u>Injured her R buttock, hips, neck and back. Patient will be put on mood</u>
6     <u>stabilizers and antidepressants</u>." VA Puget Sound's complete incompetence
7     recorded June 12, 2001. With emphasis.
8

9     Plaintiff was forced to ingest *neuroleptic–antipsychotic–psychotropic* "seize

10  the brain" drugs against her will with *no-right to refuse* at any time, further

11  violating her **Right to Refuse** pursuant to numerous RCW codes starting with,

12  briefly;

13     RCW 71.05.200 (1997 c 112 § 14) (1)(e) "That the person has the <u>right to refuse</u>

14     medications, including <u>antipsychotic</u> medication beginning twenty-four hours

15     prior to the probable cause hearing. RCW 71.05.215 (1997 c 112 § 16 page 17,

16     lines 6-35) (1), (1a), (1b). RCW 71.05.370 (1997 c 112 § 31)

17     (7)a),(7)(b),(7)(c),(7)(e),(7)(f)(iii).

18  Beginning twenty-four hours prior to a trial or hearing pursuant to RCW 71.05.215,

19  71.05.240, 71.05.310, 71.05.320, 71.05.340, or 71.05.370, <u>the individual may refuse</u>

20  <u>psychiatric medications</u>.

21

22     In addition, [United States] failed to file a Petition for Forced Injections to a non-

23     consenting person. Undeniably, Defendant United States, (*and State*), created

24     their own *mandatory standing orders for forced injections <u>bypassing</u> ALL judicial*

25     <u>*processes*</u> at least SIXTY-FIVE TIMES for a 72 hour release.

1   **(Exh–64)** <u>VA PUGET SOUND PATIENT RIGHTS</u> excerpts;

2       2). "...prompt and appropriate treatment for physical and emotional disorders

3   or disabilities in the least restrictive environment....treatment free from

4   unnecessary or excessive medication."

5       4). "You have the right to communicate freely and privately with persons

6   outside the facility and have... visitors....reasonable access to public telephones ..."

7       11). "You have a right to be informed of any human experimentation or other

8   research/educational projects affecting your care or treatment."

9

10      "A physician commits malpractice by not exercising that degree of skill and

11  learning that is ordinarily possessed and exercised by members of the profession in

12  good standing acting in the same or similar circumstances." <u>Durham v. Vinson</u>, 360

13  S.C. 639, 650-51, 602 S.E.2d 760, 766 (2004).

14      It's gross negligence and medical malpractice to treat a physical injury with

15  sedation, benzodiazepines, tranquilizers, "mood stabilizers and antidepressants",

16  antipsychotic drugs for an alleged marketed mental disorder that Carolyn never

17  had then since or prior. It has taken 20 years to mostly recovery from these forced

18  unlawful treatments. *Chemically lobotomized* by force.

19

20      *See* **Exhibit 90 CASE LAW and RCW's.**

21      *See* **Exhibit 102 RCW's**.

22  ///

1  **8).**   <u>**ACTIVE DUTY**</u>:

2

3    These claims is hereby submitted to the United States pursuant to the Civil

4  Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e,

5  et seq .. and accompanying regulations, the Privacy Act, the Federal Ton Claims

6  Act, 28 U.S.C. § 2674, and 28 C.F.R. § 14.2, et seq., the Military Claims Act, 10

7  U.S.C. § 2733, the Fifth Amendment to the United States Constitution.

8    This is a formal complaint for administrative relief and damages for sexual

9  harassment, gender-based employment discrimination, retaliation and reprisal,

10  violation of the right to privacy, intentional infliction of emotional distress,

11  negligent hiring and retention, defamation, libel and slander, tortious interference

12  with contracts, outrage, the common law tort of sexual harassment, and conspiracy

13  to violate complainant's rights to equal employment opportunity and due process

14  under the color of law.

15

16   <u>Exhibit 132</u>: <u>FEDERAL RECORDS CENTER RETRIEVAL request 07/26/21</u>

17  <u>for COURT RECORDS, received 08/3/2021</u>: CASE C95–748Z aka 2:20-cv-00748–

18  TSZ; with partial court records filed in (CASE No. 2:20-cv-01804, Dkt 16–5 and 16–

19  6). Under the Fifth Amendment for Retaliation and Sexual Harassment in Case No.

20  C95–748Z relief can be granted.

21

22  Listed are a few excerpts from these Court Records;

1        . 8 ¶¶ 17–19 "it was her goal to make the Coast Guard her career and to

2   become an Aviation Survialman (ASM)";

3        p. 10 ¶¶ 10–14 "... referred to as "the new wench on board...";

4        p. 10 ¶¶15–17 "...."cunt" was programmed in the telephone display..." prior to

5   radio communications watch and a "...derogatory comment...on her mirror";

6        p. 10 ¶¶21–23 "...called a "douche bag" in front of superior ..."

7        p. 70 ¶¶2–9 "In plaintiff [Carolyn's] case, the facts, as stated in her complaint

8   and sworn to in her affidavit, Appendix A hereto, include being called a "cunt", a

9   "wench" and a "douche bag". She was subjected to men urinating in front of her,

10  discussions of ejaculation, and simulated sexual acts involving the groins of her

11  superiors. She was menaced with a screwdriver, subjected to an illegal car prowl,

12  and forced to sleep on a living room couch, in violation of Coast Guard regulations.

13  These, and the numerous acts of harassment named in her complaint, are not acts

14  "incident to military service"."

15       p. 163 ¶¶4–9 "Due to the egregious and physically threatening nature of the

16  incidents (for example, complainant was ordered to paint in the messdeck void on a

17  44' MLB and forced to breath intoxicating fumes without a respirator), complainant

18  suffered from suppressed memory of one or more of the incidents...." (See Exhibit

19  128 p. 144–147);

20       p. 181 "... committed an act of illegal menacing toward complainant...

21  apparently angered by complainant's desire to help put up a "pull-up bar",

22  encountered complainant in the boathouse, picked up a screwdriver from the

1    boatswain hole, and in from of complainant repeatedly stabbed the screwdriver into

2    a counter top while screaming at her. He yelled, "You're not helping. You're

3    hindering. This is the straw that broke the camel's back. This is going to bit you in

4    the ass."

5

6        <u>p. 317</u> Mr. Guarnero U.S. Attorney: "She is, Your Honor. And again, that

7    particular incident regarding---- was itself a subject of an investigation. And the

8    Coast Guard investigation found that they could not validate that that incident had

9    ever occurred...."

10        Today, in 2021, Plaintiff addresses this *Court regarding Mr. Guarnero's*

11    *statement in this matter. Verification was intentionally concealed by the USCG and*

12    *easily verifiable by Chief Mark Poulson (now CWO Poulson) as it was reported and*

13    *recorded by him of the hostile (reckless endangerment) work environment incident.*

14        Menacing and reckless endangerment. <u>*Menacing*</u>: "is a crime governed by

15    state laws, which vary by state, but typically involves displaying a weapon or a

16    course of conduct that intentionally places another person in reasonable fear of

17    physical injury." <u>*Reckless Endangerment*</u>: is a crime consisting of acts that crat a

18    substantial risk of serious physical injury to another person.

19    ///

20    ///

21    ///

22    ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    The trapping then confining in the void prevented from exiting to breath, and

2    screwdriver incident at Chetco are not sexual harassment according to the law.

3    The Executive Officer, second in command was the one menacing Carolyn with a

4    screwdriver stabbing it repetitively in the wooden counter top while angerly

5    screaming at her over a pull-up bar installation. The void trapping was by her

6    immediate supervisor during that time period.

7

8    Furthermore, Exhibit 130 p. 148 Carolyn left the Military Entrance

9    Processing Station (MEPS) original papers out, on purpose. This is what occurred

10   prior to my first unit: Station Chetco River. The pass by my genitalia on her first

11   pap smear in the Military at MEPS. Welcome to violations and abuse that started

12   on April 04, 1991.... ..Reverse of Standard Form 93." A true copy of the original

13   document Standard Form 93 will be provided upon request.

14

15   p. 42 "...with the specific intent to cause grievous bodily harm for

16   intentionally trapping me in a void while ordering me to paint lead death paint

17   without a respirator for an extended period of time. This was directly after using

18   the solvent Toluene to prep the surface.... I was starting to suffocate from being

19   trapped while painting lead death paint in a void of a boat without using a

20   respirator after using Toluene prior to painting."

21

22   Listed are a few excerpts from these Court Records in Exhibit 133;

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1     <u>p. 153</u> ¶¶13–19"... committed an act of illegal menacing toward complainant...

2    apparently angered by complainant's desire to help put up a "pull-up bar",

3    encountered complainant in the boathouse, picked up a screwdriver from the

4    boatswain hole, and in from of complainant repeatedly stabbed the screwdriver

5    into a counter top while screaming at her. He yelled, "You're not helping. You're

6    hindering. This is the straw that broke the camel's back. This is going to bit you

7    in the ass."

8     Plaintiff has *legal standing*. This case further states the United States

9    government cannot raise the issue of Administrative Remedy Exhausting on Appeal

10   due to they Failed to File a Cross–Appeal.

11     <u>FOR THE RECORD</u>: "The United States Coast Guard has the <u>worst</u> record

12   for sexual harassment of any federal agency." The Executive Officer (XO), the

13   second in command. "When interview groups were asked if the chain of command

14   worked in <u>redress of grievances</u>, a frequent reply was "<u>the chain of command is the</u>

15   <u>problem</u>." The new XO due to a tour of duty rotation, XO said "<u>regarding the sexual</u>

16   <u>harassment, "It's the worst I've seen in thirteen years. They're like a pack of wolves,</u>

17   <u>three or four</u>." With emphasis.

18

19   ***<u>Deliberate indifference</u>***. *For example, intentionally refusing to respond to an*

20   *inmate's complaints has been acknowledged as constituting deliberate indifference.*

21   *[Gutierrez v. Peters, 111 F.3d 1364, 1366 (7th Cir. Ill. 1997)]; Intentionally delaying*

22   *medical care for a known injury (i.e., a broken wrist) has been held to constitute*

23   *deliberate indifference. [Farmer v. Brennan, 511 U.S. 825 (U.S. 1994).]*

24

1    _Gutierrez v. Peters_, 111 F.3d. 1364, 1366 (1997), intentionally delaying

2    medical care for a known injury (i.e. broken wrist) has been held to constitute

3    deliberate indifference. [_Farmer v. Brennan_, 511 U.S. (U.S. 1994).

4         In _Davis v. Passman_, 442 U.S.  228, 248–49 (1979), permitting damages

5    remedy for gender discrimination under the Fifth Amendment Due Process Clause.

6    _Carlson v. Green_, 446, U.S. 14, 19 (1980), allowing a damages remedy for an Eight

7    Amendment violation for failure to provide adequate medical treatment.

8

9    ## 9).   <u>UNIFORM CODE OF MILITARY JUSTICE (UCMJ)</u>

10        Complainant asserts the conduct complained of herein additionally violates,

11   but is not limited to violating, the following sections of the Uniform Code of Military

12   Justice:

13        A.    <u>Article 124</u>, maiming.

14        B.    <u>Article 134</u>, communicating a threat and

15              indecent, insulting or obscene language or conduct prejudicial to good

16              order  and discipline;

17        C.    <u>Articles 89. 91 and 117</u>, provoking speech and gestures of disrespect;

18        D.    <u>Articles 92</u>- dereliction of duty, failure to obey a general order;

19        E.    <u>Article 133</u>, conduct unbecoming an officer; and

20        F.    <u>Article 93</u>, cruelty and maltreatment.

21        G.    <u>Article 81</u>, conspiracy.

22   ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   **10).**               **<u>CAROLYN'S INJURIES, briefly</u>**

2   OTHER FACTS ENTITLING PLAINTIFF TO RELIEF

3   *EXHIBIT EXCERPTS*:

4   1.          ***Right Hip***: <u>Exh–80</u> <u>p. 3</u>, June 28, 2000, "During these episodes she

5   has a feeling that as if her right hip is "up" and out the socket. She states she and

6   her husband is experiencing with home therapy on this discovered that it was

7   sometimes helpful to pull sharply on the right leg causing a pop in the hip area and

8   then a relaxation of pain."; Mar. 26, 2002 <u>p. 10</u>, "...likes the upslip correction and

9   her husband actually has been doing it more or less in an unschooled fashion for

10  quite a while. Today she brings him to go over my [Dr. Paxon] method."

11  Feb. 24, 2006 <u>p. 76</u>, "Right hip girdle remains dysfunctional."; <u>p</u> Aug. 27, 2006

12  <u>p. 89</u>, "continues to have an unhappy dysfunctional right hip area."; Jul. 03, 2006 <u>p.</u>

13  <u>141</u>, "leg needs a yank."; Aug. 27, 2007 <u>p. 101</u>, "she always has a chronic bilateral

14  sacroiliac area pain with predominance of symptoms in the right buttock and lateral

15  hip."; <u>Exh–81</u> <u>p. 3–4</u>, noted Jan. 3, 2005 with SI Dysfunction; "Chronic Recurrent SI

16  Dysfunction."

17  <u>Exh–95</u> <u>(Case No. 3:20-cv-06206 Mason General Hospital)</u>, <u>p. 6</u> ¶¶21–22, <u>p. 7</u>

18  ¶¶1–3 in reference to Jul. 1–2, 2001, "Apparently, GB had forgotten to mention that

19  he had been yanking Carolyn's right leg out of her hip socket to reduce severe pain

20  due to the not fully attached leg riding up to the top of the hip socket of the patient.

21  Those leg yanking home pain relief procedures are noted in Plaintiffs VA Puget

1    Sound Health Care Systems medical record located in Dr. Charles Paxon's progress

2    notes.";

3         p. 7 ¶¶14–19, "The four-point restraints with CFM were 20-minutes from Old

4    Farm Road to Mason General. Then another round of four-point restraints on the

5    backside of the physically injured patient that lasted approximately (2-hour-5-min)

6    while at Mason General and without a physical examination pursuant to RCW

7    71.05.210. Then another round of four-point restraints for (1-hour-9-min) to

8    Western asylum, Western state.... For a physical injury with NO physical

9    examination." (*See* (Exh 1–61 va+western)). Initiated at Providence (Exh–106 pt1

10   Four-Point-Mechanical-Restraints for 7-hrs-50-mins plus "Thrashing" and with an

11   *altered four-point-mechanical-restraint-record* by Providence, see Exh–63 p. 20–21,

12   p. 27; Exh–106 pt1 p. 15 summary).

13

14   **2.**         ***Pelvic support***: Exh–65 pt1, pt2; SI Lock Belts to support Carolyn's

15   pelvic due to her physical injury, (pt1: p. 154, p. 155, p. 161, p. 176);

16   (pt2: p. 36, p. 37, p. 41 belts can be shown in uncropped photo). (*See* Exh–80 p. 3–4,

17   particularly the underlined portion of Jun. 28, 2000). Exh–80 p. 21 Oct. 16, 2002

18   "wearing two sacral belts, criss crossed, like Panch Villa.";

19   p. 56 Mar. 23, 2005 "using a sacral belt to help hold the pelvic corrections." etc.;

20   Exh–96 pt2 as shown on p. 46, a snap shot of what a great deal of 1996–2000 looked

21   like, lying down, without pelvic support or adequate treatment. Exh–80 p. 106 Mar.

22   24, 2008 "Currently [she's] attending school in the longer she has to sit the worse

1   her trouble. Her current semester she has either been studying or lying down."; p.

2   25 Jan. 8, 2003 "I [Carolyn] feel I am getting better tho very slowly: I am now stiff

3   in the morning until about 10 AM; it used to be until 3 PM" "Last time, I had a

4   brisk walk around the compound (apartment) without the sense that I am dragging

5   my right leg – the first time since my injury." Noted Jan. 8, 2003 injured Feb. 24,

6   1994. (*See* Exh–87 p. 32, p. 2–50); (Exh–87 p. 239).

7

8   **3.**        ***Underwear***: Exh–65 pt2 p. 3, p. 49: underwear; Exh–80 p. 3–4

9   (underlined portion) "She has never worn a belt to try to hold the iliac wings

10  together. In part, this maybe because she does not like any pressure there from any

11  tight waistband from any sort, and claims that she frequently spares underwear

12  because of that." (Exh–96 pt2 p. 10)

13

14        Exh–87 p. 90 starting at paragraph two through p. 91 paragraph two while at

15  VA Puget Sound, stated in part here, "S/O I can't understand why my underwear is

16  an issue. Apparently, the veteran was told on day shift that she should be wearing

17  underwear. Spoke to her privately and explained that it was not appropriate to go

18  underwearless because in some positions it was obvious she had none on." "Stated

19  that she [Carolyn] could only wear certain kinds secondary to her back condition."

20        "Furthermore, let me point out, I am most certainly informed about different

21  positions with underwear since I did attend (and was a part-time instructor) at

22  John Robert Powers (School of Personal Development and Modeling)..." (see Exh–96

1    pt2 p. 10 photo; p. 17 photo, p. 66 photo; Exh–65 pt2 p. 3 photo; p. 48–49 photo; p.

2    54–55 photo; p. 62 photo; Exh–80 p. 4 underlined section; Exh–87 p. 90–91;

3        Exh–65 pt1 p. 153, p. 165, p. 176, p. 177, p. 185).

4

5    **4.**     ***Right Ankle: right tibia*****:**  Exh–82 are also the consequences of denial

6    of medical care and for not treating my initial injury that included my *right–tibia*,

7    thus eventually affecting my right ankle; Exh–65 pt2 p. 30–31; Exh–65 pt3 p. 49–

8    69; Exh–77; Exh–76 p. 300–301 09/16/2016, scroll to the beginning then Ctrl find

9    "ankle". Exh–127 p. 5 "...there was a question of tibialis anterior weakness on the

10   right..."

11        What she would point out here is prior to her catastrophic injury 21 Feb

12   1994, in 1991 she qualified for the American Gladiators as a contender prior to

13   entering the Military.

14

15    **5.**     ***Dangerousness*****:** Exh–104 p. 10 Providence noted "client was putting

16   herself and bystanders in danger when she was driving erratically on a gravel lot."

17   Exh–89 p. 30 Plaintiffs' Driving Record Abstract of Complete Driving Records

18   current as of 03/29/2018. (See pp. 31–35). Clean record.

19   Exh–90 p. 5 starting at Great Weight on to pp. 6–7, of which statements

20   can be verified in Exh–104 p. 14; p. 20, (the record is also false in that Carolyn was

21   *not*–arrested (see Exh–89 p. 35 "... not been arrested or booked."). No arrests.

22   No crime. No charges filed. Clean background. Clean driving record.

1      Exh–104 p. 21, "By the way she was driving prior to admissions she, put

2    people and herself in danger," is an absolute erroneous statement;

3    p. 36, a week later while in the States custody "pt. was driving her car in such a

4    bizarre and unsafe manner that she put herself and possibly others in grave harm."

5    (See Exh–104 p. 40 for the first 90-day filed on Jun. 8, 2001 after the groundless Ex

6    Parte was erroneously filed on Jun. 1, 2001 for a fourteen-day in the *one-minute Ex*

7    *Parte hearing*); p. 42 "patient was driving her car .... she put herself and others in

8    grave danger of serious harm." This statement was made while [Carolyn] was in the

9    States custody for eight-days plus the ER nightmare at Providence the night prior.

10    This is more perjury and falsity, especially while locked up, plus the fact that no

11    other people were in the vicinity of her driving the previous week.

12

13       (Exh 3 va+western p. 8) "According to CDMHP, she had been driving

14    dangerously..."; (Exh–10 p. 22 not dangerous); (Exh–15 p. 29 not dangerous); (Exh–

15    23 p. 42 not dangerous); (Exh–50 p. 97 likelihood of serious harm aka dangerous

16    while in the States custody); (Exh–51 p. 99 for a 90-day) that was (*premeditated*

17    Exh–5 p. 98).

18       Exh–102 p. 14, (**RCW 71.24.300(4)**) NEW SECTION. Sec. 4.

19    The legislature intends that, .... file a petition for a ninety-day (90 day) for a

20    *less restrictive alternative* in lieu of a petition for a fourteen-day (14 day)

21    commitment. (See Exh–63 va+western, then p. 25 refutes p. 24 regarding four-point

22    mechanical restraints use); (Exh–104 p. 40);

1     This also applies to the Providence Case No. 20-2-02155-34 (See Exh–104;

2     Exh–63 p. 19). (See Exh–102 p. 12 starting at line 21 though p. 14 lines 1–11).

3     Weaponizing the litigation process then twisting case law to suit the

4     nefarious narrative bypassing all judicial processes.

5

6     **6.**     ***In Reference***: posed with the question by the court to the effect of

7     asking how long it would take Carolyn to transfer her Jeep title after making the

8     final payment, paying it off. His [Mr. Lewis's] answer more than likely will be along

9     the lines of it would only take Carolyn same day or within a week, not very long

10    afterward. Where, in fact, it took the brain injured Plaintiff more than a decade to

11    transfer her title, in 2018. See Exh–96 pt2 p. 5–6 Mr. William "Bill" Lewis Sr.

12    Listed by photograph and writings in Exh–96 of employers and friends from grade

13    and high school references about my conduct, personality and behavior throughout

14    the years. In my earlier years prior to my physical injury while active duty, where I

15    worked for very respected reputable professional honorable companies, with

16    responsibilities accounting for thousands of dollars in cash monies and with

17    responsibilities for millions of dollars in perishable product as an accounts payable

18    job paying millions of dollars to vendors.

19

20    **7.**     ***Firearm Rights***: Exh–89 Restoration of Rights (Case No. 19-2-04117-

21    34 Aug. 11, 2019), p. 8 see box four (4) not-checked.; p. 24, "I Carolyn Sioux never

22    had this condition," with the affidavit signed Oct. 9, 2019. *see* p. 27.; Previous and

1    while active-duty p. 68 National Defense Service Medal; M-16 Marksman, Pistol

2    Marksman. Exh–63 p. 38, "She states she is not mentally ill nor has she ever been."

3    Trauma is not a mental illness. Physical injuries are not a mental illness. Exh–80 p.

4    56, "She is annoyed we have bipolar disorder on her problem list. And that I [Dr.

5    Paxon] have used it. I pointed out I borrowed it from the existing database; she has

6    apparently had it stricken by April Gerlock (Exh–72) .... "Lastly, she asks for

7    treatments directed to hip and leg today..."

8           Exh–87 p. 55 "Ex Parte in civil commit cases, whether unlawful of lawful

9    instantly removes and makes an individual ineligible-barred from their Second

10   Amendment firearm right until restored by the State, and through a lengthy

11   process. Ex Parte, or a 14–day, is another form used for gun confiscation." Another

12   *unfair* process; (*See* Exh–104 pp. 46–48); (Exh 1–61 va+western p. 148 see # six;

13   Exh–63 p. 19).

14

15          Therefore, Plaintiff is requesting additional relief be granted in that this

16   Honorable Federal Court restore to Plaintiff her Restoration of Rights for the

17   remaining states in these United States of America. Especially in light of the

18   perjury evidence and with the grotesque miscarriage of justice, to restore to her

19   what was illegally and unlawfully taken from her, for years. She was even in

20   contempt of court a few times without her knowledge. (Exh–87 p. 226 "Not to

21   mention the *years* without her rights, and in contempt of court, unbeknownst to

22   me." See p. 300).

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    Exh–127 p. 7 "Denies knowledge of 90day CC" Jun. 12, 2001.

2    Jun. 8, 2001 was the only Court hearing Plaintiff attended and while on unlawful

3    forced injections of Haldol that included unlawful standing orders self-created by

4    Providence who bypassed all judicial processes. Plaintiff "Contested hearing" for 90

5    day; Then in Exh–63 p. 30 of some of the forced injections of Haldol by Providence.

6    (See Exh–109 Providence "recopied" drug record for the fraudulent concealment of

7    their drug records being recopied in their attempt to conceal their nefarious crimes.

8    RCW 4.16.350). (See Exh–106 pt3 p.3–8); (See Exh–108 pt2 for only a few of the

9    forced injections noted that conflict with Providence's "recopied" drug record p. 64,

10   p. 76, p. 88, p. 90, p. 94, Haldol *prior* to Court hearing and after with *no-right-to-*

11   *refuse* at any time. (See Exh–106 pt4 p. 5–8; Exh–110).

12

13   **9.**      ***Reproductive Rights, loss of***: Exh–34 va + western p. 58 states "She

14   questioned each of her meds and refused the Olanzapine saying "I'm trying get

15   pregnant and that med is not good for me." Each night she has held up the med line

16   with questions about her meds. She has refused some meds each night,"" Jul. 7,

17   2001. Exh–64 p. 38, "States she will not take medication it is against her religion

18   and she is currently trying to get pregnant," Jun. 12, 2001; Exh–80 p. 139 a 2006

19   notation on the bottom right corner ".....wiped out at end of day need naps unable to

20   hold a child pregnant or otherwise w/ this R hip." Exh–108 pt1 p. 101, "My husband

21   & I are planning/children..." (See Exh–102 p. 16 ¶30).

22   ///

1    **10.**          ***Drugs***: Exh–67 pt1 p. 44–45 Celebrex (Celecoxib) a NSAID aka an

2    anti-inflammatory drug. The pharma data records are sparce at best and do not

3    reflect the true dispensing and refills of this drug, either.

4          Exh–80 p. 131 Oct. 11, 2011 "...she is already taking full dose of Celecoxib."

5    "... she would like to gradually wean away from morphine. She wonders about using

6    ibuprofen to do that. Unfortunately, she is on full dose Celebrex already." (See Exh–

7    67 all, particularly pp. 44–45; Exh–92)

8          Additionally, in regards to Aspartame. Under Title 21 § 201.58 Waiver of

9    labeling requirements (law). There is no label of Aspartame in the drug effects

10   literature nor is Aspartame listed on the bottle as an ingredient which is a violation

11   under the Title. Accordingly, who gave the waiver? (Exh–67).

12

13   **11**.          ***Neck pain***: Exh–75 p. 3 First cervical (neck) pain recorded Jul. 22,

14   1992; "...comes in with headache and neck pain." "Somewhat painful ROM

15   especially of the neck. Some tenderness and spasms at the base of the right side of

16   the neck," while active duty. Years of reporting about my neck and pain. First

17   treatment drugs. Then traction and physical therapy years later as referenced Jan.

18   31, 2017. This was after a long haul going through the bureaucratic gatekeeping

19   with negligent and unreasonable delay in care by VA Puget Sound's Pain Clinic (see

20   Exh–75 pt1, pt2); (Exh–67 pt1 pp. 39–40). Furthermore, Exh–80 p. 131 Oct. 11,

21   2011 "...she is already taking full dose of Celecoxib."  "... she would like to gradually

22   wean away from morphine...."

1   **12**.          ***Brain injury–damage***: Her debilitating brain-injury from the

2   defendants' [United States] actions by chemically lobotomizing her occurred in

3   2001, followed by years of excessive unnecessary drugs by the [United States] that

4   prevented her from exercising reasonable diligence prior to her filings which began

5   August 11, 2019. It is nearly impossible to function as a human being without a

6   proper functioning brain. It is scientifically proven by case studies with extensive

7   literature and with experts' affidavits in how psychotropic drugs damage a human's

8   brain functions effecting the frontal lobe, temporal lobe, parietal lobe, occipital lobe,

9   cerebellum, and brain stem, where much damage occurs.

10          _Drug prescriptions_ *see* Exh 67, 68, 69, 70, 71, 72, 74, 92) (Exh–63 pp. 30–31;

11  p. 36; p. 41–44; Exh–66; Exh–64)

12          _Drug side effects_ *see* Exh–66 p. 11–150; Exh–70; Exh–71; Exh–72 pp. 11–18;

13  Exh–74 p. 8).

14

15          "Opiates in combination with a Benzodiazepine carries a 5x increase risk for

16  adverse outcome including death," per [United States].

17

18          CHRONIC OPIOID THERAPY FOR THIRTEEN YEARS (13 Years)

19                          + OTHER DRUG COMBINATIONS

20

21          *According to a JAMA Internal Medicine study, Off-label uses account for more*

22          *than 44% more adverse effects.*[1]

1    Scientifically proven facts through peer reviewed literature, plus the fact that

2    medical experts have testified in courts of the harmful effects these forced drugs

3    have on mental functioning. Disrupting neuropathways making them inoperative.

4    Prescribed drugs create mental disfunctions in much of the same way, disrupting

5    the way the brain connects to the processing centers affecting the frontal lobe,

6    temporal lobe, parietal lobe, occipital lobe, cerebellum, and brain stem. Affidavits by

7    experts are included to solidify these claims (Exh–66) (Exh–65 pt2 pp. 6–17; Exh–65

8    pt1 pp. 158–160, p. 11; p. 17; p. 18; p. 48; p. 60; p. 71, pp. 123–141) Drug side effects

9    and drug interactions listed in the document bring more scientific evidence with

10   real life experience of the extraordinary circumstances and challenges the Plaintiff

11   has had to overcome in order to bring her claims to the Court.

12

13   12.    *Maiming*: Exh–63 see all; Exh–65 pt1 see all; Exh–65 pt2 a type of a

14   visual photographic summary version of maiming; Exh–63 pt3 see all; Exh–75 pt1

15   see all; Exh–75 pt2 see all; Exh–76 see all; Exh–77 see all; Exh–78 p. 3, see all;

16   Exh–79 p.3;

17       Exh–80 p. 3–4 "This has never been treated directly except by massage and

18   physical therapy. Low back pain is constantly present but not a major issue until

19   she feels the hip is out. The hip seems to develop this malfunction at times for no

20   apparent reason. At times she has had to treat the hop once every two or three

21   weeks at home. She has never worn a belt to try to hold the iliac wings together. In

22   part, this is maybe because she does not like any pressure there from any tight

1   waistband from any sort, and claims that she frequently spares underwear because

2   of that."; p. 136 noted in 2006: "pelvic upslip secondary to R buttock to include

3   ligaments, pyriformis muscle, sciatic nerves trunk level, ® attachments.... ®

4   shoulder arthritis.....SI dysfunction.... had I been treated when I was acute I

5   wouldn't be chronic." p. 137 "even with medication and a [Lidoderm] patch, my sit

6   bone required ice to sit longer periods." "Purchased the vehicle I'm currently in so I

7   can sit and drive." "When I was married it hurt to have intercourse." "drive w/ left

8   foot a lot.";

9        p. 138 "rectum muscles have to put sterile gloves on to push my stool out of

10   my rectum previously extraordinary athlete" "loss use of ® buttocks" "iliotibial band

11   release" "foot gets cold"; p. 139 "standin`g time less than one minute" "constantly

12   loose my balance" ® buttock & hip pain sitting – prolonged pains at different points

13   in time" "® foot – drop foot calf cold foot ®" "Only on meds baths gabapentin,

14   morphine, [Lidoderm], ethyl chloride, can function, wiped out at end of day need

15   naps unable to hold a child pregnant or otherwise w/ this ® hip"; p. 141 "Leg needs

16   a yank" noted Jul. 6, 2006;

17        Exh–80 p. 149 Jan. 21 May 17 2004 "piriformis syndrome and myofascial

18   pain syndrome, lumbopelvic dysfunction, right pelvic upslip with significant

19   lumbosacral spasm, severe right piriformis of syndrome (Jan. 1997) where I had an

20   electroceutical blockade of the sciatic, with poor results and considered a failed

21   treatment a month later, chronic musculoskeletal pain with piriformis syndrome,

22   pubic dysfunction, and should decreased range of motion. She has hypertonus to her

1    entire system. 10/16/02. Still has right pelvis upslip. Pelvis dysfunction/lumbopelvic

2    pain. Chronic, recurrent sacroiliac strain/dysfunction syndrome along with pelvic

3    upslip and hypertonus of the cervical/thoracic/lumbosacral spine mid and major in

4    kind." "My last noted visit: well-managed chronic recurrent sacroiliac, strain/

5    dysfunction syndrome, May 17, 2004 (*after 10 years into the injury here*)."

6            Exh–81 see all, "Chronic Recurrent SI Dysfunction", "Cervicogenic

7    headache" "Sacroiliac strain/dysfunction syndrome" 2004, "Chronic musculoskeletal

8    pain with piriformis syndrome, pelvic dysfunction and shoulder decreased range of

9    motion" 1997, "Severe Piriformis Syndrome" 1997, "Piriformis syndrome and

10   myofascial pain syndrome" 1995,

11   1. "Myofascial pain"

12   2. "Lumbopelvic dysfunction"

13   3. "Right piriformis syndrome"

14   4. "Poor dynamic balance"

15   5. "depression secondary to #1-#4" 1995;

16           Exh–82 right ankle congressional inquiry; Exh–83 see all; Exh–84 see all

17   "Prone Functional Short Leg – Right" 2007 and Chronic back pain, neck pain and

18   upper/ lower extremity…" 2016, Prone Functional Leg Length Discrepancy – right

19   2011; "Prone Functional Leg Length Discrepancy -right" 2013–2017; Exh–92; Exh–

20   106 pt1 Four Point Mechanical Restraints;

21           Exh–108 pt2 p. 50, and so forth.

1    <u>Exh–129</u> <u>p. 8</u> "1. Right posttraumatic piriformis syndrome with persistent

2    buttock and sciatic-pattern pain. 2. Chronic neck and shoulder pain with multilevel

3    cervical degenerative processes and secondary myofascial pain syndrome." "Plaintiff

4    is only addressing the buttock hip injury here in this portion of the record, although

5    the neck very relevant here too: "The initial focus of discussion will be on the right

6    buttock complaint. The precipitating injury was a fall off a ladder in which she

7    slipped and struck her buttock repetitively, resulting in a very substantial buttock

8    hematoma. This occurred February 21, 1994." 1994.

9    <u>p. 11</u> "Ms. Carolyn is beginning to develop some neuropathic pain with

10   hypersensitivity superficially, and clearly she is developing what may become, if not

11   definitively treated, a rather entrenched pain syndrome that could progress to

12   irreversible neuropathic elements." 1995. 1995.

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

F:                            **EXHIBITS**
         **THE UNITED STATES USCG (<u>FACTS</u>)**

<u>**EXHIBIT NUMBER**</u> **is referenced on the left side.**

1.    <u>20 SEPT **1994**</u>: USCGC Mellon (WHEC 717): "32 yo fell onboard ship injured

      back + right buttocks." "No running, No lifting 15 lbs, No repeated stair

      climbing, should not be stationed onboard a ship."

2.    Madigan Army Medical Center (MAMC)

      <u>12 APR 95</u>: MAMC Neuromuscular Clinic Dr. J. Newmark write up.

      <u>05 MAY 95</u>: MAMC Neuromuscular Clinic Dr. J. Newmark tests.

3.    <u>11 MAY 95</u>: Emergency Room Stevens Hospital

      "Buttocks pain. Chronic muscle spasms in R buttocks. Pain intense at

      present. Requests pain meds. Pain radiates down R leg." (Vicodin #20,

      Anaprox DS 15, Soma 20).

4.    <u>18 MAY 95</u>: Support Center Seattle -E.D. Bonneau, FNP write up for 28 APR

      visit. "She [Carolyn] <u>'does not feel cared for' by me 'all you do is throw drugs</u>

      <u>at me</u>." This despite the fact that she has been referred to....."

***   <u>31 MAY 95</u>: <u>Reprimanded</u> for making direct contact with a medical provider

      outside of an appointment. Injured 464 days at this point.

5.    <u>11 JUL 95</u>: MAMC Physical Medicine Major Harry Smolen M.D.

      "Significant for tenderness over the greater trochanter and along the iliotibial

      band and over the piriformis region on the right. The Neuro exam was

      normal, slight pain on Patrick's test and on the Ober test.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   1. Probable (crossed out possible) right piriformis syndrome.

2   2. Greater Trochanter Bursitis.

3   3. Right Iliotibial Band Syndrome.

4   4. Cervical myofascial pain syndrome.

5 6. <u>07 JUL 95</u>: Northwest Pain Specialist, Dr. Louis Saeger

6   **1)**. <u>Right posttraumatic piriformis syndrome with persistent buttock and</u>

7   <u>sciatic-pattern pain</u>.

8   **2)**. <u>Chronic neck and shoulder pain with multilevel cervical degenerative</u>

9   <u>processes and secondary myofascial pain syndrome</u>.

10   "I would note this connection that the stresses associated with her workplace

11   harassment when she was aboard ship probably did relate indirectly to the

12   occurrence of the injury in that she was extremely distracted and, although

13   she describes herself as quite athletic and not prone to accidents, the fall

14   from the ladder was in the context of a period of extreme stress and

15   distraction." (Station Chetco River -Mark appeal-reply, then chalk

16   harassment up to training. Support Center Seattle with Retaliation and

17   Sexual harassment by CDR Castro the Medical Officer and CWO Tate the

18   Medical Administrator and with denial of medical care.) With emphasis.

19   843.8 Piriformis syndrome.

20   723.1 Neck pain.

21   719.41 Shoulder pain.

22   729.1 Myofascial pain.

7.  20 JUL 95: Emergency Room Stevens Hospital

    Right Hip Pain. (Vicodin given) (Vicodin *here* is on Providence 5/31/2001)

8.  01 AUG 95: USCG Dr. Castro's Medical Board write up, with my date

    corrections prior to typed Medical Board- Dr. Arturo H. Castro, M.D. CDR

9.  01 AUG 95: USCG Medical Board Cover Sheet with Diagnosis, and Finding

10. 04 AUG 95: Carolyn Statement of Rebuttal Medical Board

11. 20 AUG 95: Physical Disability Evaluation System authored by Executive

    Officer Commander (CDR) Executive Officer J.A Breckenridge, By Direction

12. AUG 95: Some Progress Notes for August, shows buttocks and hip injury.

    Cold turkey off Valium 2.5 mg from 5. mg to zero, which is very dangerous.

    USCG initially prescribed Valium 5 mg, then reduced to 2.5 mg, to cold

    turkey, in a very short period of time, which is very dangerous.

13. 31 AUG 95: Support Center Seattle CDR Arturo H. Castro M.D.

    "Multiple pain syndrome (chronic) [IMB pending decision] Discusses care

    with Dr. Hughes. (She has no idea who Dr. Hughes is).

    MAMC Pain Clinic consult.

14. 14 SEPT 95: Pacific Medical Center, Susan Allen, Physical Therapist note to

    Dr. Harry Smolen, MAMC Physical Medicine. Additional notes from Dr.

    Castro and other medical with Support Center Seattle.

15. 18 SEP 95: Northwest Pain Specialist USCG Reimbursement to Carolyn

16. 23 OCT 95: University of Washington School of Medicine, Dr. Michael Kliot.

    Letter to Dr. Louis C. Saeger (Northwest Pain Specialist), with a cc to Dr.

1      Mark A. Tomski. Plus, billing for "Second Opinion Regarding Piriformis

2      Syndrome - see letter dated 06 DEC 95" from Northwest Pain Specialist and

3      University of Washington Physicians. Patient paid.

4   17.    23 OCT 95: Dr. Mark A. Tomski Physiatrist (Physical) Medicine

5   18.    24 OCT 95: Central Physical Evaluation Board (CPEB)

6   19.    26 OCT 95: Letter from Yvonne Fee to LCDR Henry Reed, Supervisor

7      DWL13 Regarding the local Medical Officer, Dr. Castro and Mr. Tate.

8      In-part; "A LCDR, Henry Reed, Supervisor DW13 was notified in writing by

9      Yvonne Fee, FPA, on 26 OCT 1995 ....."She also stated her Neurologist and

10     had finally been diagnosed. It appears she has a very serious injury that has

11     been neglected and misdiagnosed by Dr. Castro..." Dr. Castro was really

12     upset, stated he was going to enter a AMA, and told her to see Mr. Tate. We

13     then went to his office and he proceeded to chastise her for something. He

14     told her he would have to go speak with the XO, CDR BRECKINRIDGE, and

15     he disappeared..." "...however, I can tell you the COAST GUARD is going to

16     be blamed from something they have no control over, (our local medical

17     officer, Dr. Castro and Mr. Tate) who shot themselves in the foot yesterday."

18     "Not everyone who see Dr. Castro is a malingerer or whiner when they see

19     him for ...Not everyone who seeks medical care will recover on

20     Motrin/Valium/or pain medication. I feel I would be doing our active duty

21     members a great disservice if I had not written this report." (cited Exh–63 pp.

22     9–10; p. 6); (Exh–130).

1   20.  <u>01 NOV 95</u>: Dr. Mark A. Tomski Physiatrist (Physical) Medicine

2   21.  <u>08 NOV 95</u>: Dr. Mark A. Tomski Physiatrist (Physical) Medicine

3   22.  <u>15 NOV 95</u>: Letter to Kathryn Darner from CWO Gary Tate, By Direction.

4       Bill for services would not be processed until progress reports are received.

5   23.  <u>22 NOV 95</u>: Temporary Physical Disability Retirement Effective 21 DEC 95

6   24.  <u>28 NOV 95</u>: Dr. Mark A. Tomski Physiatrist (Physical) Medicine

7   25.  <u>04 DEC 95</u>: Dr. Mark A. Tomski Physiatrist (Physical) Medicine

8   26.  <u>05 DEC 95</u>: Dr. Mark A. Tomski treatment and care. 10/23, 11/01, 11/08,

9       11/28, 12/04. Non-Federal Health Care Bill Letter from [Carolyn].

10      Reimbursement for patient [Carolyn's] payments. Still active duty.

11  27.  <u>06 DEC 95</u>: Administrative Remarks (Page 7) Reprimand (for medical appt)

12      Commanding Officer J. T. Peck (CAPT) "You were formally counseled this

13      period regarding your responsibilities in following procedures to make

14      medical appointments... since you are assigned to the Health Services

15      Division..." Plaintiff points out her as well that it was CWO Tate who had her

16      assigned there. She was to be assigned to the building in support of USCGC

17      MELLONS needs while in port, until CWO Tate decided otherwise.

18  28.  <u>06 DEC 95</u>: Non-Federal Health Care Bill submitted by Carolyn requesting

19      reimbursement for outside the system medical help, treatment and care.

20  29.  <u>13 DEC 95</u>: Non-Federal Health Care Bill statement by Commanding Officer

21      J.T. Peck, addressing two comments in her 06 DEC letter.

1          **a.)** Dr. Smolen at Madigan [MAMC] was contacted about the

2    statement that "no one knowledgeable in treatment of piriformis syndrome."

3          **b.)** Carolyn was denied second opinion by Dr. Castro. Still active duty.

4    "Dr. Casto did deny [Carolyn's] request for a second opinion. He told her that

5    he was not going to send her for a second opinion, when she had not been

6    seen by the pain clinic at Madigan [MAMC] for the first opinion.

7    (See Exhibit 16; OCT 23 '95) as a billing for "Second Opinion Regarding

8    Piriformis Syndrome - see letter dated 06 DEC 95" from Northwest Pain

9    Specialist and University of Washington Physicians. Patient paid.

10   30.   20 DEC 95: USCG CPEB Findings and Recommended Disposition

11         1995 December 21: Plaintiff was honorably medically discharged while

12   severely physically injured then only given Naproxen tablets with no other

13   medical no care. She was slandered by CDR Breckenridge (XO) in front of

14   Captain Peck (CO) upon her honorable discharge stating "Look at yourself

15   you're a basket case." This was after Plaintiff had walked around

16   catastrophically injured 668 days (22 months, nearly two-years) in the

17   reckless care where this Command failed to provide necessary medical care

18   for her well-documented physical injury while active duty. Then honorable

19   discharged without medical care and without a treatment plan. Kicked to the

20   curb four days before Christmas.

21   31.   08 JAN **1996**: Dr. Mark A. Tomski - Physiatrist (Physical) Medicine

22         (*What started out with piriformis syndrome and sciatic nerve problems left*

1     *untreated without appropriate medical care became much more years later*.):

2     *Piriformis syndrome and myofascial pain syndrome

3     *Lumbopelvic dysfunction

4     *Right pelvic upslip with significant lumbosacral spasm.

5     *Severe right piriformis of syndrome (Jan. 1997) where I had an

6     Electroceutical Blockade of the Sciatic, with poor results and considered a

7     failed treatment a month later.

8     *Chronic musculoskeletal pain with piriformis syndrome, public dysfunction,

9     and shoulder decreased range of motion. She has hypertonus to her entire

10     system. With emphasis.

11     *Improved sacroiliac strain syndrome (she's made remarkable progress since

12     10/16/02. Still has right pelvis upslip. Pelvic dysfunction/Lumbopelvic pain.

13     *Chronic, recurrent sacroiliac strain/dysfunction syndrome along with pelvic

14     upslip, and hypertonus of the cervical/thoracic/lumbosacral spine mild and

15     major in kind.

16        Her last visit was noted as well-managed chronic recurrent sacroiliac,

17     strain/dysfunction syndrome, May 17, 2004 (after 10-yrs from injury date)).

18

19        As an Active-duty service member Carolyn had a right to medical care. Her

20     **physical injury** was well-documented and the **sole reason** for the active-duty

21     member to be temporarily assigned a land unit from the requested ship she asked to

22     be stationed on.

1    <u>See Exhibit 130 pp. 143–208</u>

2

3    Meritorious Team Commendation Ribbon      1995 April 12

4    Meritorious Team Commendation Ribbon      1994 November 03

5    Meritorious Team Commendation Ribbon      1994 June 16

6    Good Conduct        1994 June 17

7    A couple of give me ribbons.

8    Good Page 7      93 AUG 23

9    Good Page 7      94 AUG 03

10   Good Page 7      94 SEP 30

11   Good Page 7      95 MAY 31

12   Good Page 7

13   Letter of Appreciation from the Port of Gold Beach, Oregon 1993 September 14

14   Letter of Recommendation for Boarding Team Member 1995 February 14

15        PLUS, other Good Page 7's not listed.

16

17        THIS was not enough for the Command to provide her with necessary needed

18   medical care for her severe physical injury. Instead, she was retaliated against and

19   <u>reprimanded</u>.

20   ///

21   ///

22   ///

# EXHIBITS

## Exhibits 1–61 [United States],
## (*State–Western, Court of Appeals Case No. 557908*)

**The number on the left is referenced as the <u>EXHIBIT NUMBER</u>.**

1. **<u>07/01/2001</u>** Notice of Statement of Rights (Adult)

   Return of Service (due to Providence St. Peter Hospital)

   Supplemental Information: recently released from VA American Lake.

   Refused to drugs, "fighting to get out of her restraints and yelling about

   Jesus."

2. h/o Right Hip Pain (secondary to h/o shipboard fall) From: Providence

3. **<u>07/02</u>** Western asylum Transport Record from Central Fire Medic "She was

   given Aitvan 2 mg IM at 1:25 a.m. on 7/2/01."

   Noice of Detention, Emergency Detention to: Western State

4. 4a): Carolyn wrote "taken Ativan before answered or received. Against

   RCW..." 4b): Western State "Prescribed Medication Informed Consent".

   4c): "Back injury" noted @ 5:00 am. on 07/02

   4d). 2 mg of Ativan forced IM for not wanting to be covered w/ a blanket.

   4e). 2 mg of Ativan forced IM for not wanting to be covered w/ a blanket.

   4f). Back injury noted on *Brief* Physical Assessment. History of Back injury.

5. "It will be ideal to transfer her on 90 day commitment," a premeditated 90

   day statement made Attending Psychiatrist. VA Puget Sound.

6. Forced drugs: Ativan 2mg @ 0720 am on 7/2 (*see* Exh 63)

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1       Forced drugs, more @ 0934 am on 7/2

2   7.   Western *unlawful* Mandatory Forced Drug Regimen: July 2–5 (see Exh 17)

3   8.   Western's *unlawful* Mandatory Forced Drugging July 2–5 to a non-

4       consenting person, Carolyn (Plaintiff; respondent then). NOTE: July 2 all

5       drugs were *administered in 18 hours and 35 minutes*: *8mg Ativan and 20 mg*

6       *Olanzapine and 500 mg Depakene and 1000 mg of Depakene.*

7   9.   Western State Petition and affidavit for 14 day involuntary treatment

8       submitted by a Social Worker, on 7/3 then filed on 7/5 <u>Case No. 01-6-00742-4</u>

9   10.   PETITION for Fourteen Day (without a physical "evaluat[ion] and

10      examinat[ion]" pursuant to RCW 71.05.210. Carolyn was unlawfully

11      committed *without* being given  a physical examination ruling out medical

12      first, for her severe physical injury.

13   11.   PETITION: Box NOT checked for "respondent may be involuntarily treated

14      with antipsychotic medication. No forced drugging petition.

15   12.   Affidavit in Support of PETITION: One signature of (psychologist). Blank

16      line for an examining physician. No physical examination or evaluation.

17   13.   PETITION: No signature by Examining Physician. Blank signature line. **13b**:

18      14 day Petition served to Carolyn. "She was sort of responded to my

19      page...confused.... @ 6:10 pm. On 07/03

20   14.   "Received call from SL, SW at WSH. Pt will go to court on 7/5 for 14 day

21      commitment, transfer to ALVA approved for that day, to arrive prior to 1pm."

22      VA Puget Sound record. 7/2

15. Notice of Order Fixing Time of Hearing Petition for Involuntary Treatment Case No. 01-6-00742-4. "JB", a Court Clerk for Superior Court Pierce Court. The SAME PERSON The SAME PERSON "JB" initialed as the Filing Court Clerk and the Deputy Court Clerk as well the Court Clerk as seen in EXH 24.

16. *Strike 16*, as this is a duplicate of #14.

17. 24 Hour Medication Notice (Right to Refuse) Prior to Court–DENIED. Carolyn hand wrote "no prescription drugs please xo" where the petition presenter checked the box agree to remain of medication. Against Plt's rights.

18. Western presenter of 24 Hour Medication Notice (Right to Refuse) Prior to Court made a false statement in the record @ 10 adding in *their personal* choice and not the Plaintiff (respondent then). Ptf was refused Right to Refuse antipsychotic drugs 24 hours Prior to Court Hearing of July 5 at any other time.

19. "Rape of the Mind" techniques of Psychiatry in the late 20th Century were now sufficient to destroy nearly any person ever since the Korean War.

20. Mandatory Forced Drug Regimen by Western: Depakene 1000 mg BID and Olanzapine 20 mg and Ativan po QID (four times/day).

21. Obtaining a signature by deception WSBA #8291court appointed not competent attorney. (*See* Exhibits 7, 17)

22. Due to obtaining a signature by deception by WSBA #8291 court appointed not-competent attorney Findings of Fact & Conclusions of Law. (Exh 7, 17)

23. Not checked: a likelihood of serious harm to others. Gravely disabled checked.

1  24.  <u>SAME PERSON</u> "JB" a Court Clerk initialed as Deputy Court Clerk and

2      Court Clerk and Filing Court Clerk. Barnes initialed in 3-different legal

3      capacities. (*See* Exh 15)

4  25.  14-day Order Detaining Respondent (Carolyn) without a physical

5      examination and evaluation and Right to Refuse–DENIED. 07/05 Fri.

6  26.  No Due Process, no physical examination and evaluation yet readmitted and

7      forced drugged nearly to death for a physical injury. Unlawful

8      imprisonment Pierce County. "...and    is considered competent..."

9  27.  "Plan to initiate petition for extension of commitment because of

10     noncompliance of this patient" 07/05/2001 @ 1554 by Kumar who bypassed all

11     judicial processes and without a physical examination and evaluation and

12     Right to Refuse–denied. "Right hip pain, chronic & episodic." "Tooth

13     problem." ("Very unsteady (& d/c'd after a few steps due to fear of falling.)"

14  28.   "Was medicated with prn Ativan...Having trouble staying on task, for

15     example sitting down. Medicate per order." 07/05

16  29.  Seven (7) medications all forced with No Right to Refuse. Evidence of

17     psychomotor agitation, defined as "purposeless motions and restlessness."

18     Signs of brain damage.

19  30.  VA Mandatory Forced Drug Regimen to a non-consenting person [Carolyn]

20     Right to Refuse–DENIED. (*See* Exh 11, 17)

21  31.   "Patient is lethargic and sleepy..." 07/06 "Plan is to extend the commitment

22     to 90 days so that compliance to treatment can be monitored," per Kumar VA

1      Puget Sound.

2   32.   "She's on plenty of antidepressants already." "Patient says that trazodone at

3       night makes her too groggy. She is satisfied with her other medication."

4       Carolyn never stated she was satisfied with any medication. 07/07

5   33.   "Can I [Carolyn] get privileges tomorrow? Do you think I can go to the

6       clothing room to straighten out the clothes there?" Carolyn had No-Privileges

7       (NP) to go outside.

8   34.   "questioned each of her med "I'm trying to get pregnant and that med is not

9       good for me." "Each night she has held up the med line with questions about

10       her meds. She has refused some meds each night." She is easily irritated

11       anytime her meds are discussed." I [Carolyn's] Right to Refuse–DENIED.

12   35.   OVERRIDE Right to Refuse. "Patient refused olanzapine 5 mg last night."

13       "Consequently, I believe that her objections to taking psychotropics should be

14       overridden." "Administer olanzapine 5 mg now to make up for the refused

15       does last night. Initiate medication override..." Hammond. 07/08

16   36.   "She will at times, stare with a blank, lost look on her face for about 1-2 min

17       at a time, then pick up in the conversation where she had been speaking."

18       Signs of brain damage. 07/08

19   37. "....continues to look out the window and after a few minutes, walked slowly

20       toward her room. Another fifteen minutes and veteran walked over to the

21       treatment from for her vitals." "...and just stared at the med nurse....stared at

22       her med, then, at the writer and after a few minutes, did take her

1   medication." "NP (no privileges) status at this time and writer feels status

2   should remain NP at this time." 07/09

3   38.   *Unlawful standing order for forced injections for refusal to ingest drugs*

4   *bypassing all judicial processes*: "if patient refuses any dose of antipsychotic,

5   she should be treated with injectable form of the medications." "Inj Navane is

6   to be given if patient refused PO meds." Kumar 07/10 @ 0956 am (*See* Exh 30

7   doses of Olanzapine tripled prior to Court Petition, [Carolyn] still had no-

8   physical examination and evaluation. Right to Refuse–Denied and

9   overridden. (*See* Exh 35)

10   39.   *Unlawful Standing Order for Forced Injections of Triflupenazine 2 mg BID* to

11   *be given if patien refuses Olanzapine*" Kumar 07/10 @ 10:00 am.

12   40.   "TRIFULOPERAZINE INJ, SOLN 2mg BID PRN to be given if patient

13   refuses Olanzapine." Nandan P. Kumar created an unlawful standing order

14   for mandatory injections for Carolyn's refusal to ingest drugs.

15   41.   Notice of Order Fixing Time of Hearing Petition for Involuntary Treatment

16   Case No. 01-6-00742-4 for 90 day at American Lake VA. WSBA #19701 name

17   stamped as "Deputy Court Clerk". No attorney for the respondent (Plaintiff

18   now). 07/10

19   42.   Affidavit in Support of Petition RCW 71.05 PETITIONERS Kumar and Zoe (a

20   social worker) checked "Less restrictive ....will not serve the best interest of

21   respondent still requires..... " (treatment from hell) (*see* Exh 30)

22   43.   "DEMANDING HER RIGHTS..." (I [Carolyn] had NO RIGHTS.

1       NO DUE PROCESS. NO PHYSICAL EXAMINATION OR EVALUATION.

2       NO RIGHT TO REFUSE.) 07/11

3  44.  "Pt continues to demonstrate over attentive behaviors toward male patients...

4       She pushes wheel chair patients around in their chairs, makes requests for

5       veteran's who don't feel like coming to the nurses station, intercedes for other

6       patient's making recommendations for their care...asserting it is her right to

7       "help" others." "NO privilege increase is recommended."

8       *(Welcome to* [United States] *VA Puget Sound 100% Prison.*) 07/11

9  45.  Obtained a signature by deception WSBA #12487 court appointed not

10      competent counsel for a 90 day stay at Puget Sound Veterans.... "for up to 90

11      days under court order." SO failed to provide 24 Hour Medication Notice too.

12      (*See* Exh 11, 17, 30, 35, 38, 39) 07/12

13 46.  Notice of Release 07/13 Western's unlawful imprisonment (Exh 15, 25, 8) as

14      Kumar resumes Petition for his *premeditated* 90 day (Exh 5).

15 47.  "Slow to get up, requiring multiple calls by staff, before presenting for

16      medication etc." 7/13 (More signs of brain damage from my Right to Refuse

17      overridden daily and enforced with a standing order for forced injections

18      without a physical examination and eval.) 7/13

19 48.  "Patient needs increase in antipsychotics."(This was after how many

20      refusals?) "If patient refuses any dose of antipsychotics, she should be treated

21      with injectable form of the medications." "Inj Navane is to be given if patient

22      refused PO meds." Kumar 7/10

1    49.    Findings of Fact and Conclusions of Law *premeditated* 90-day. SO obtained a

2          signature by deception also not providing a 24-hour Medication Notice

3          Prior to Court. 07/13

4    50.    Boxes checked by Prosecutor (possibly by not competent court appointed

5          attorney SO), likelihood of serious harm to others, is gravely disabled.

6    51.    ORDER Detaining Respondent for the *premeditated* "ideal" 90-day while on

7          forced injections by passing all judicial processes and without a physical

8          examination and evaluation. 07/13

9    52.    "Anytime my medication is changed I want to be notified!" Vet upset over

10       increase in medication. 07/13

11    53.   "h/o right hip pain (secondary to h/o shipboard fall). 90 day extended after

12       patient refused some doses of medication, an over ride was done." "Only

13       partial privileges."

14    54.   "Patient was treated with Depakote, Zyprexa and Desyrel. Ativan was given.

15       Non-compliance with treatment. Behavior agreement," for a *physical injury*.

16    55.   "I went to visit Mr. (W)." "The resident does spend a lot of time outside.)"

17       This is the say I got in trouble for giving a WWI veteran a cup of coffee he

18       was allowed to have. My privileges to go home were revoked. 07/15

19    56.   "Patient was treated with Depakote, Zyprexa and Desyrel. Ativan was given.

20       Non-compliance with treatment. Behavior agreement," for a *physical injury*.

21       Commitment was extended to 90 days. After patient refused sme doses of

22       medication, an over ride was done. Partial privileges. 07/18

1    57.    A WALKING CANE!! I had to ask for. 07/25

2    58.    (another 90 day), Less Restrictive with a standing order in Court records to

3           ingest drugs bypassing all judicial pro. 07/27

4    59.    "Late entry 08/03: C/O R HIP PAIN, CHRONIC...ACCESS THE NEED OF A

5           CANE (WHICH PT WAS REQUESTING). A CANE WAS PROVIDED." Plus,

6           11 (eleven) medications.

7    60.    Filed Closed OCT 11 2001, Case No. 01-6-00742-4.

8    61.     "I want to call the police." "I want to notify the police because you are pulling

9           my privileges for encouraging someone." "The veteran also got a cup of coffee

10          for the resident [WWI resident Mr. W]. "Allowed pt to use hospital phone to

11          notify --- that day pass for tomorrow was no longer valid since veteran does

12          not have adequate privileges to utilized the pass." NP for getting a WWI

13          veteran a cup of coffee. 07/21

14

15                          **<u>EXHIBITS 62–103</u>**

16
17
18   <u>EQUITABLE TOLLING (**EQT**)</u>

19   62.    EQT Calendars years. 1996-2018 + definitions

20   63.    EQT INTRO History, brief

21   64.    EQT VA Puget Sound Patient Rights

22   65.    Part1 EQT Carolyn injury, Drugs, brain-body damage

23          Part2 EQT Carolyn injury, Drugs, brain-body damage

24          Part3 EQT Carolyn injury, Drugs, brain-body damage

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    66.    EQT Drug Harm AFFIDAVITS for Experts

2    67.    EQT pt1 DRUG Transparency *Morphine,* dispensing and prescribing

3    68.    EQT pt2 DRUG Transparency

4    69.    EQT pt3 DRUG Transparency

5    70.    EQT pt4 DRUG Transparency, Other Veterans and one non-vet

6    71.    EQT pt5 DRUG Transparency VA Puget Sound harmful-drug-interact

7    72.    EQT pt6 DRUGS Gerlock and VanGoda inappropriate prescribing

8    73.    EQT 1996-2018 VA Puget Sound Appointments (see Exh–92)

9    74.    USCG DRUGS Pier 36 Support Center Seattle

10   75.    EQT med MRI cervical history, & VA Pain Clinic (physical)

11   76.    EQT med Dr Adam GEIGER Naturopathic Medicine Doctor (physical)

12   77.    EQT med Dr. Jeffery LEE Naturopathic Medicine Doctor (physical)

13   78.    EQT med Dr. Daniel SECREST Naturopathic Medicine Doctor (physical)

14   79.    EQT med Dr. Nelson HAGER Sports Medicine (physical)

15   80.    EQT med Dr. Charles PAXON Rheumatology Doctor

16   81.    EQT med Dr. Mark TOMSKI Physiatrist (*Physical)* Medicine

17   82.    EQT Right Ankle Congressional Inquiry for reimbursement for care 2016

18   83.    EQT pt1 med Ruth MCCAULEY Physical Therapist (physical)

19          EQT pt2 Occupational Therapy (physical)

20   84.    EQT pt1 med Dr. Ed BEDNARZ Chiropractic Medical Doctor (physical)

21   85.    EQT pt2 med Dr. Ed Bednarz Chiropractic Medical Doctor (physical)

22          EQT The PROCESS and my living conditions for 2015–2021

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   86.    NAMES of individuals, credentials, attorney info

2   87.    EQT LOCKED Behind (~~Hospital~~) Prison Doors 50–Days. Advanced reader

3          copy on Kindle

4   88.    Veterans Suicide Annual Report by Dept of VA 2019

5   89.    EQT Restoration of Rights (firearm) Aug–Nov. 1, 2019

6   90.    **12–72–GW** (12 hours, 72 hours, Great weight), Is it legal, Case Law

7   91.    Medical Malpractice

8   92.    EQT DRUG excel sheets for VA Puget Sound

9   93.    State of Washington TORT-Claim filing-response 2021 JAN 12

10   94.    Request Court Roster + Roster of Western names to match signature

11   95.    EQT Pltf active case Mason General amended complaint + remanded to

12          Superior Court Mason County (Dkt. 15) 01/25/21 and (Dkt. 33) 04/02/21.

13   96.    EQT pt1 Carolyn, reclaiming her health

14          EQT pt2 Carolyn, a snippet of old references

15   97.    Email correspondence [United States] Dept of Veterans, plus Plaintiff

16          submitted an in-part Joint Status Report for Defendants (State, VA, Pierce

17          County) for Case No. 3:20-cv-06112–BHS.

18   98.    Invalid Declaration Made by Dept of VA re: Exh–98

19   99.    PROOF of receipt TORT CLAIM filed 31 Dec 2020

20   100.   Proof of Service State of WA Requests for Admissions / MELVIN

21   101.   Proof of Service US Dept of Veterans Requests for Admissions/ MELVIN

22   102.   Regional Support Network (RSN), Western, Pierce County, RCWs

1   103.   pt1 Carolyn's Frozen Cookie Business

2          pt2 Carolyn's Frozen Cookie Business

3
4
5

# <u>EXHIBITS 104–120</u>

6  <u>relates mostly to CASE No. 20-2-02155-34 Thurston County Superior Court</u>
7  <u>(TCSC) where the 2001 AVALANCHE started:</u>

8
9

10  **104**.  <u>THURSTON COUNTY SUPERIOR COURT (TCSC) REDACTED COURT</u>

11       <u>RECORDS for Case No. 2-20-02155-34</u>

12  **105**.  pt1 <u>TCSC Providence LEGAL PACKET</u>, and with <u>Providence Motion to</u>

13       <u>Dismiss Denied</u> 04/02/2021; pt2 **DRG–430** "Most Frequent Diagnoses and

14       Procedures for DRG's by Insurance Codes."

15  **106**:  <u>Providence EXHIBIT PACKETS pt1, pt2, pt3, pt4, pt5</u>;

16             pt1 Four–Point–Mechanical–Restraints Exh Pkt Answer Keys.
17             pt2 Unlawful–Imprisonment Exh Pkt Answer Keys.
18             pt3 Right-to-Refuse Exh Pkt Answer Keys.
19             pt4 Medical Names Exh Pkt Answer Keys.
20             pt5 Spiritual Services Exh Pkt Answer Keys.
21
22  **107**:  <u>ANSWERS for Requests for Admits SET–1 to SET–5</u>.

23  **108**:  CAROLYN'S LOGBOOK while unlawfully imprisoned at PROVIDENCE, pt1

24       and pt2 *redacted*.;

25          (*See* <u>Exh–106</u> pt1 all; pt2 see p. 43): AUTHENTIC ORIGINAL

26       LOGBOOK Carolyn's Logbook (referenced in TCSC Court Records Index #86;

27       Index #87; Index #88; Index #89; Exh 20 and 16 Logbook excerpts) written by

28       Carolyn while unlawfully imprisoned at Providence is located with: Dave

1    Meyer c/o Joyce Meyer Ministries 700 Grace Parkway, Fenton, MO 63026,

2    telephone number (636) 349-0303, sent USPS on 04-25-2019 @ 250 PM

3    registered mail #RE838051825US with a received delivery 04-30-2019 @ 1217

4    PM. Other evidence such as the authentic ice crème tops (Exh–106 pt3 *right*

5    *to refuse* pp. 13–14); (Index #124 Exh 20 p.21, p.21b) other evidence (e.g.,

6    Carolyn's 1989 Toyota Long Beach Grand Prix racing hot pink pits jacket)

7    sent August 2018 along with court and other relevant documents of which

8    can be verified with, originals of evidence showing proof of brain-damage.

9    Additionally, the matching bottom shorts to the jacket were sent to her ex-

10   husband along with old family photos of them that did not include her, as she

11   was catching up on life. Those items were sent in 2018.

12   **109**:   Providence St. Peter Hospital "Recopied" Drug Record

13   **110**:    Providence St. Peter Hospital: RIGHT to REFUSE DENIED

14   **111**:   Plaintiff Requests for Admissions RFA SET–1.

15   **112**:   Plaintiff Requests for Admissions RFA SET–2.

16   **113**:   Plaintiff Requests for Admissions RFA SET–3.

17   **114**:   Plaintiff Requests for Admissions RFA SET–4 Haldol.

18   **115**:   Plaintiff Requests for Admissions RFA SET–5.

19           CASE No. 20-2-02155-34 is referenced in this docket including Exhibits;

20   (Exh–4 pp. 20–24, p. 27); (Exh–5 p. 17); (Exh–4 p. 20–35, p. 48; p. 52–53);

21   (Exh–65 pt1 p. 11–47, p. 106–111); (Exh–65 pt2 p. 6–8); (Exh–65 pt3 p. 1–6);

22   (Exh–107 p. 17 ¶¶6–12; (Exh–106 pt2 pp. 43–45); and so forth.

23   **116**:   Providence Defendant Responses SET–1 RFA Admits.

24   **117**:   Providence Defendant Responses SET–2 RFA Admits.

25   **118**:   Providence Defendant Responses SET–3 RFA Admits.

26   **119**:   Providence Defendant Responses SET–4 RFA Admits.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   **120**:   Providence Defendant Responses SET–5 RFA Admits.

2

3

4   # **EXHIBITS 121–135**

5

6

7   **121**:   WASHINGTON MEDICAL COMMISSION FORMAL COMPLAINTS

8   (Exh 86, 94 names); (*See* Exh–106 pt4 pp. 12–52). On Aug. 3, 2021 a note

9   stuffed inside the partially opened medical commission formal complaints box

10   was discovered.

11   **122**:   VA Puget Sound Healthcare Systems dispensing and refilling of Morphine

12   with drug violations *proof of service*, Director Michael Tadych, Director

13   Christopher Hoey, Director Timothy Dawson, Director Anthony Mariano,

14   Gerald Little, Tong Li, State of Washington Attorney General Rob Ferguson.

15   **123**:   Proof of mailing and postal receipts (See Incapacity number 27 (a–cc)).

16   **124**:   GI Bill Letter for Extension January 29, 2007.

17   (See <u>Exhibit 96 pt2</u> pp. 138–139 and <u>Exhibit 89</u> pp. 66–67) University of

18   Washington transcript, that includes Pierce Community College.

19   **125**:   <u>pt1</u> Plaintiff's written correspondence documents to VA Puget Sound

20   Healthcare System starting Feb. 26, 1998 through Oct. 2018;

21   ○   1998 Feb 26 Treatment at C & P Clinic <u>p. 2</u>;

22   ○   2007 Jan 29 Request for GI Bill Extension <u>p. 4</u>;

23   ○   2007 Dec 17 Blue Team female <u>p. 5</u>;

24   ○   2014 Sep 25 Senator Patty Murphy <u>p. 6</u>;

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    o   2017 Nov 27 Jason Cox in Pain Clinic (PC) p. 7;

2    o   2017 Dec 27 Director Dr. Timothy Dawson in PC p. 9;

3    o   2018 Jan 8 Patient Advocate, Compliant Kimico Norton p. 10;

4    o   2018 Feb 22 Formal Complaint of James Ault PC p. 11;

5    o   2018 Feb 22 Formal Complaint Linda Reed p. 14;

6    o   2018 Jun 11 Privacy Officer Jeffery Swanberg p. 15;

7    o   2018 Sep 18 Formal Complaint Dr. Anthony Mariano PC p. 21;

8    o   2018 Sep 18 Formal Complaint Director Christopher Hoey p. 37;

9    o   2018 Oct 24 *Morphine* Formal Complaints Michael Tadych, Tong Li,

10       Gerald Little, Christopher Hoey. p. 50.;

11

12       Referenced in the correspondence, Anthony Mariano starting on p. 21 "I could

13   see how someone could think you [Carolyn] may have bipolar, because you talk

14   fast." "Talking fast in an appointment to have my neck treated is a prospective

15   payment rate to drug me instead of asking WHY sometimes I talk fast??" Carolyn:

16   "I have talked fast most of my life. In fact, so much so, that when I worked for an

17   auto auction in Southern California the owners offered, paid, and then sent me to

18   "polish" my TALKING FAST SKILLS by sending me to the Kansas City Missouri

19   Auction School where they teach people how to talk faster and with more clarity."

20   (See pp. 33–36)

21       p. 23 Plaintiffs appointment was with a Fellow instead of a qualified doctor,

22   "Who stated, "Slow Uptritation of Gabapentin to up to 1200 mg TID to effect."

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    Additionally, the fellow noted, "with neck pain, worse on right than left..." "Did I

2    increase the dose? NO."

3         The Pain Clinic was to treat her chronic neck pain, yet Mariano increased

4    drugs instead of provided needed adequate procedural care. Mariano was more

5    interested in prescribing more drugs and mental health going off the bogus

6    erroneous 2001 horrors of hell that VA was heavily involved and took part in. (See

7    Exhibit 75 pt1 p. 3 initial neck pain recorded 1992 Jul 22).

8         From February through July 2021, Plaintiff currently has invested over

9    $5,000 dollars out of pocket to have her neck appropriately effectively treated, as

10   well as other body parts, with PRP and Prolotherapy (See Exhibit 77; Exhibit 84

11   and Exhibit 85; Exhibit 75 pt1 and Exhibit 75 pt2.

12

13        She is showing great signs of improvement for a grossly neglected and

14   excessively inappropriately overmedicated cervical spine neck injury.

15        Exhibit 64  p. 6 Veterans Patient Rights states "You will receive to the extent

16   that you are eligible, prompt treatment for physical or emotional disorders or

17   disabilities in the least restrictive environment necessary for that treatment free

18   from unnecessary or excessive medication. (See Exhibit 30 p. 51; Exhibit 92).

19   ///

20        o   Exh–125 pt2, pt3 VA Privacy Officer Jefferey Swanberg and for his

21            refusal to give me a complete copy of who has been in her medical record

22            on December 4, 2017.

1     o   June 11, 2018 as to her FOIA was refused by Swanberg to how much VA

2          paid Western State and Providence for unlawful actions in 2001.

3     o   Perhaps the VA can explain to the Court the reason that Jason Cox (p.

4          34–39) has been in her medical record nearly as many times as her

5          Chiropractor (p. 73–79) of over a decade? The "Finger in the Dike Doctor"

6          p. 122 and;

7     o   pt3 James Ault p. 4 (see Ault Exh–125 pt1 p. 11–13). "1. Nurse Ault

8          stated: She is very unhappy that sedation is not available at ALVA."

9          "2. Corrected and accurate, she was "disgusted because we are putting

10         people who have been to WAR through this!" Referring to the run around,

11         this had nothing to do with sedation."

12     o  Her initial response to what I am about to share, was to go talk to the

13         [United States] VA Puget Sound –Seattle Division, but that was before I

14         learned on the 18th of January in 2018 at a required volunteer meeting

15         that the Seattle VA had covered up their big identity theft problem that

16         was happening with their Travel Boxes. A couple three years ago prior to

17         learning of this from the person who reported the incident.

18            People reached into full boxes of completed claim forms for travel

19         reimbursement expenses (Form 10-3542) that contained personal data

20         (Social Security numbers, birth dates, addresses, full legal names etc…),

21         then pulled the travel slips right out of the boxes thereby stealing the

22         information and creating havoc with identity theft.

1           The VA Puget Sound intentionally covered up their identity theft

2           problem only to replace the boxes with a hush.

3           This avoidant, deceitful, and nonchalant type of practiced behavior is

4           no different than the lack of procedural care for her injury (Si-Joint and

5           Neck) care. At a minimum, grossly neglected, and then ignored. Her Si-

6           Joint was already severe. Then having her neck (cervical spine) that was

7           mild turned to moderate and then went severe, totally due to inadequate

8           care, including prevention of care.

9           This VA just did not listen, ask, read, but freely and willingly over

10           prescribed in excess of dangerous drug cocktails, for years. 22 years. With

11           no informed consent, I was prescribed off-label drugs on some of the worst

12           drugs on the market, of which included **Black Boxed Warning!!** drugs.

13  **126**:  In January 2021, Plaintiff further shows she was disabled to such a degree

14        that she did not understand the nature of the proceedings by filing a Motion

15  to Consolidate two Superior Court cases in the Washington State Supreme Court.

16        A partial record is offered for proof of that filing.

17  **127**.  VA-1 (covers dates June 12–26) and VA-2 (covers dates July 5–27) medical

18        portion of 2001 unlawful imprisonment and forced to ingest harmful potent

19        off-label drugs and threatened to be injected by worse of more harmful drugs

20        as the consequences for not ingesting by the [United States] Dept of

21        Veterans.

1   128.   SOLUTIONS: with examples of how the medical record patient problem list

2          is being destroyed by the system.

3   129.   The UNITED STATES, U.S. Coast Guard (USCG) EEOC No. DOT 95–0374

4          record noted mental instead of *physical injury*; Exhibit 108 pt2 p. 92;

5          Exhibit 89 p. 106 redacted; Exhibit 96 pt2 p. 49 redacted; Exhibit 108 pt1 p.

6          90; Reprimanded while active-duty by the USCG Command for requesting

7          medical help outside of an appointment. Reprimanded three-times in writing.

8   130.   "The Binder" included in the flash drive with the United States two Tort

9          Claim filings received December 2020 (Exh–99); (CASE No. 2:20-cv-01804–

10         JLR; Dkt 2 pp. 17–25 as well as Dkt 35 Order-10 line ¶22); USCG Medical

11         Records–redacted.

12  131.   SPLAT pt1 and pt2 of Carolyn's older writing about her USCG treatment

13         experiences;

14         p. 16 "I was ordered to paint lead [death] paint after using the solvent

15         Toluene in a void on one of the 44' Motor Life Boats (MLB) without a

16         respirator, in 1993...... Meanwhile, I had Petty Officer SS standing over the

17  void using himself as a shield blocking me from exiting the void safely or from even

18  getting a breath of non-toxic air.";

19         p. 18 "I did not come to the unit for the XO to come into the boathouse to

20  literally and repetitively stab a flathead screwdriver into the boatswain table

21  directly in front of me, because he was enraged with me that I went to the

22  Engineering Officer to find out how I could help get the pull-up bar mounted in the

1  small exercise room." "A hostile work environment." As a reminder the Plaintiff

2  qualified as a contender for the American Gladiators just prior to entering active-

3  duty. Pull-ups happen to be great for upper body strength. Pull-ups were also the

4  first test during tryouts to disqualify both men and women a possible spot as a

5  contender for the American Gladiators, of which she was one of the fifty from across

6  the U.S. who qualified as a contender.

7

8      See <u>Exh–132 p. 181</u> "... committed an act of illegal menacing toward
9  complainant... apparently angered by complainant's desire to help put up a "pull-up
10  bar", encountered complainant in the boathouse, picked up a screwdriver from the
11  boatswain hole, and in from of complainant repeatedly stabbed the screwdriver into
12  a counter top while screaming at her. He yelled, "You're not helping. You're
13  hindering. This is the straw that broke the camel's back. This is going to bit you in
14  the ass."
15
16      Furthermore, <u>Exh–130 p. 148</u> She left the MEPS original papers out, on

17  purpose. The pass by her genitalia on my first pap smear in the military.

18  Welcome to violations and abuse starting on April 4, 1991....Reverse

19  of Standard Form 93." A true copy of the original document Standard Form

20  93 will be provided up on request.

21      <u>p. 42</u> "...with the specific intent to cause grievous bodily harm for

22  intentionally trapping me in a void while ordering me to paint lead death paint

23  without a respirator for an extended period of time. This was directly after using

24  the solvent Toluene to prep the surface.... I was starting to suffocate from being

25  trapped while painting lead death paint in a void of a boat without using a

26  respirator after using Toluene prior to painting."

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   **132**.   <u>FEDERAL RECORDS CENTER RETRIEVAL request 07/26/21 for COURT</u>

2   <u>RECORDS, received 08/3/2021</u>: CASE C95–748Z aka 2:20-cv-00748–TSZ; with

3   partial court records filed in (CASE No. 2:20-cv-01804, Dkt 16–5 and 16–6). In Case

4   No. C95–748Z relief can be granted under the Fifth Amendment for Retaliation and

5   Sexual Harassment.

6   <u>Listed are a few excerpts from these Court Records</u>;

7       <u>p. 8</u> ¶¶ 17–19 "it was her goal to make the Coast Guard her career and to

8   become an Aviation Survialman (ASM)";

9       <u>p. 10</u> ¶¶ 10–14 "... referred to as "the new wench on board...";

10      <u>p. 10</u> ¶¶15–17 "...."cunt" was programmed in the telephone display..." prior to

11  radio communications watch and a "...derogatory comment...on her mirror";

12      <u>p. 10</u> ¶¶21–23 "...called a "douche bag" in front of superior ..."

13      <u>p. 70</u> ¶¶2–9 "In plaintiff [Carolyn's] case, the facts, as stated in her complaint

14  and sworn to in her affidavit, Appendix A hereto, include being called a "cunt", a

15  "wench" and a "douche bag". She was subjected to men urinating in front of her,

16  discussions of ejaculation, and simulated sexual acts involving the groins of her

17  superiors. She was menaced with a screwdriver, subjected to an illegal car prowl,

18  and forced to sleep on a living room couch, in violation of Coast Guard regulations.

19  These, and the numerous acts of harassment named in her complaint, are not acts

20  "incident to military service"."

21      <u>p. 163</u> ¶¶4–9 "Due to the egregious and physically threatening nature of the

22  incidents (for example, complainant was ordered to paint in the messdeck void on a

1  44' MLB and forced to breath intoxicating fumes without a respirator), complainant

2  suffered from suppressed memory of one or more of the incidents...." (See <u>Exhibit</u>

3  <u>128</u> p. 144–147);

4      <u>p. 181</u> "... committed an act of illegal menacing toward complainant...

5  apparently angered by complainant's desire to help put up a "pull-up bar",

6  encountered complainant in the boathouse, picked up a screwdriver from the

7  boatswain hole, and in from of complainant repeatedly stabbed the screwdriver into

8  a counter top while screaming at her. He yelled, "You're not helping. You're

9  hindering. This is the straw that broke the camel's back. This is going to bit you in

10  the ass."

11

12      <u>p. 317</u> Mr. Guarnero U.S. Attorney: "She is, Your Honor. And again, that

13  particular incident regarding---- was itself a subject of an investigation. And the

14  Coast Guard investigation found that they could not validate that that incident had

15  ever occurred...."

16      Today, in 2021, Plaintiff addresses this *Court regarding Mr. Guarnero's*

17  *statement in this matter. Verification in the investigation was concealed*

18  *intentionally by the USCG as verifiability was easily obtained by Chief Mark*

19  *Poulson (CEA Poulson)– (now Chief Warrant Officer–CWO Poulson) as it was*

20  *reported and recorded by him of the hostile menacing incident.*

21  <u>133.  CASE NO. C95–748Z COURT RECORD EXCERPTS:</u>

1      p. 24 "The Coast Guard had the highest rate of reported sexual harassment

2  of women."

3      "In sum, the Coast Guard's own review of the problem of sexual harassment

4  reveals that [Carolyn's] experience is not unique. The United States Coast Guard

5  has the worst record for sexual harassment of any federal agency. Compared to the

6  Army, Navy, and Air Force, the Coast Guard acknowledges that it has the poorest

7  record of attracting women recruits. It should not be the law of this Circuit that

8  there is nothing a District Court can do to provide a remedy to that class of federal

9  employees who suffer the highest rate of sexual harassment." (Exh–133 p. 28)

10
11      p. 27 "Report, at VIII-54.

12      Finally, women employed by the Coast Guard reported a lack of confidence

13  that the making of a complaint would do any good, and are of the opinion that it

14  often makes things much worse for them:

15
16      Victims also had limited expectations concerning the effectiveness of formal
17      actions. As indicated in Table VIII.I-12, the percentage of victims who
18      believed that formal complaints would stop the harassment was much
19      smaller than the percentage who believed that nothing would be done or it
20      would make their work situation more unpleasant. Moreover, since both the
21      chain of command and the designated Civil Rights counselors are frequently
22      male, many women feel uncomfortable or intimidated about discussing these
23      issues.

24
25      During interviews, some Coast Guard women expressed the belief that
26      women who filed formal grievances did not get promoted. At places such as
27      the Academy, there is also a peer group "code of silence" or loyalty which the
28      victim would be breaking if she pursued a grievance or complained. This
29      might well subject her to even worse forms of harassment and ostracism.

1

2      Interviews revealed another reason for not reporting. When interview groups
3      were asked if the chain of command worked in redress of grievances, a
4      frequent reply was "the chain of command is the problem." [United States]
5      screwdriver menacing could have easily been verified had the United States
6      Defendants chose to not conceal matter.

7

8   "The United States Coast Guard has the <u>worst</u> record for sexual harassment of any

9   federal agency." The Executive Officer (XO), the second in command was the one

10  menacing Plaintiff with the screwdriver stabbing it repetitively in the wooden

11  counter while angerly screaming at Plaintiff over a pull-up bar installation. "When

12  interview groups we asked if the chain of command worked in redress of grievances,

13  a frequent reply was "the chain of command is the problem."

14

15      Tour of duty XO rotation stated **<u>regarding the sexual harassment, "It's</u>**

16      **<u>the worst I've seen in thirteen years. They're like a pack of wolves,</u>**

17      **<u>three or four</u>."** With emphasis added.

18

19  **134**. <u>Case No. 2:20-cv-01804</u> Order dismissed without prejudice due to lack of

20  subject matter jurisdiction. Initial filings removed by the United States.

21

22  **135**.  Carolyn's LOGBOOK record of May 31, 2001 showing on June 8 she had not

23  seen a neutral party; *one-minute* Ex Parte Hearing, USCG removal from the ship

24  due to physical injury.

25  //////

# <u>LEGAL AUTHORITIES (Some)</u>
# <u>AGAINST THE UNITED STATES</u>
# **(Exh–90)**

1. *Washington v. Harper* "No rigorous standards or procedure met to force <u>psychotropic medications</u> on an individual." 494, U.S. 210 (1990).

2. *Washington v. Harper* "In order for involuntary medication to be approved, it must be demonstrated.....inmate suffers from a mental disorder and as a result of that disorder constitutes a likelihood of serious harm to himself or others (494 US 210, 244) and/or is gravely disabled" Lodging, Book 9, Policy 600.30, p.1

3. *Washington v. Harper* "The liberties of citizens to resist the administration of <u>mind-altering drugs</u> arise from our nation's most basic values." (Stevens, J. dissenting).494, US 210, 238 (1990)

4. *Washington v. Harper* than an individual has a "significant" constitutionally protected "liberty interest" in avoiding the unwanted administration of <u>antipsychotic drugs</u> (494 US @ 221, 108 L Ed 2d 178, 110 S. Ct 1028).

5. *Washington v. Harper* 1) a competent individual's right to refuse <u>psychotropic medication</u> is a fundamental liberty interest requiring the highest order of protection under the Fourteenth- Amendment;

6. *Washington v. Harper* Because most <u>psychotropic drugs</u> do induce lethargy, drowsiness, and fatigue, e.g. Physicians' Desk Reference 1126, 1236, 1640, 1788 [494 US 210, 249], this form of "medical treatment' may reduce an inmates dangerousness, not by improving his mental condition, but simply by sedating him with a medication that is grossly excessive for that purpose. [Footnote 17]

1   **7.** *Addington v. Texas* requires "clear and convincing evidence" as a

2   standard. We held that the medical conditions for civil commitment must be

3   proved by clear and convincing evidence. The purpose of this standard of proof,

4   to reduce the chances of inappropriate decisions, id., at 427, is no less

5   meaningful when the factfinders are professionals as when they are judges or

6   jurors. 441 U.S. 418, (1979)

7   **8.** *Addington v. Texas* "the individual's interest in the outcome of a civil

8   commitment processing is of such weight and gravity that <u>due process requires</u>

9   <u>the State to justify confinement by proof more substantial that a mere</u>

10   <u>preponderance of the evidence</u>.

11   **9.** *Addington v. Texas* (441 U.S. at 426 (1979)) civil commitment "must require that

12   an individual be both *mentally ill* and dangerous for civil commitment to satisfy

13   due process". Driving fails to meet the dangerous standard. 557 S.W. 2d 511

14   (1977), vacated, 441 US 418 (1979)

15   **10.** *Bigley v Alaska Psychiatric Institute*, S-13116 (2009) "Doctors attributed Bigley's

16   resistance to medication to his delusional belief that people are attempting to

17   poison him. However, it is also true that the medications have sometimes

18   produced harmful physical side effects.

19   **11.** *O'Connor v. Donaldson* 422 U.S. 573-576 (1975), the U.S. Supreme Court decided

20   that "<u>A State cannot constitutionally confine a nondangerous individual</u> who is

21   capable of surviving safely in freedom by himself or with the help of willing and

22   responsible family members or friends..."

1    **12.** *O'Connor v. Donaldson* "Now, the purpose of involuntary hospitalization is

2    treatment and not mere custodial care of punishment if a patient is not a danger

3    to himself or others. Without such treatment there is <u>no justification for a</u>

4    <u>constitutional stand-point for confinement</u> unless you should also find that

5    [Donaldson] was dangerous to either himself or others.

6    **13.** *Rennie v. Klein*, 462 F. Supp. 1131 (D.N.J. 1978) "To go from a state of

7    confinement to confinement plus forced medication (drugs) involves a major

8    change in the conditions of confinement, so that *Meachum v. Fano*, 427 U.S. 215,

9    96 S. Ct. 2532, 49 L. Ed 2d 451 (1975) is inapposite.

10   **14.** *Rennie v. Klein First amendment* –Freedom of expression, including both the

11   right to communicate and the right to think.

12   **15.** *Rennie v. Klein*, "A drug regimen subjects a patient to harsh side effects and

13   possible permanent disability... Furthermore, a hearing is required to ensure

14   that the use of drugs.... does not violate the first or eighth amendments..."

15   **16.** *Riggens v. Okin*, the Court repeated that an individual has a constitutionally

16   protected liberty interest in avoiding involuntary administration of antipsychotic

17   drugs" –an interest [*179] that only an "essential" or "overriding" state interest

18   might overcome. 504 U.S. at 134, 135, 118 L ed 2d 479, 112 S Ct 1810. The state

19   fails at compelling interest. 478 F. Supp. 1342 (1979).

20   **17.** The Court repeated in *Riggens* that "an individual has a constitutionally

21   protected liberty "interest in avoiding involuntary administration of

22   antipsychotic drugs"—an interest that only an "essential" or "overriding" state

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    interest might overcome." 504 U.S., ¶134, 135, 118 L. Ed 2d 479, 112 S. Ct 1810.

2    **18.** In *Nelson*, *Pena*, and *Mackey*, "the courts found that the drugs were improperly

3    and for punishment rather than as part of an ongoing psychotherapeutic

4    program." *Cf. Welsh v. Likins*, 373 F. Supp. 487, 503 (1974, D. Minn.).

5    **19.** *Sell v. United States*, No. 02-5664, "involuntary medication would violate the

6    defendants' federal constitutional rights.

7    **20.** *Sell v. United States*, Justice Kennedy, concurring in the judgement,

8    "emphasized that antipsychotic drugs might have side effects that would

9    interfere with the defendant's ability to receive a fair trial."

10   **21.** *Sell v. United States*, "Regardless, as we have said, we must assume that *Sell*

11   was not dangerous."

12   **22.** *Vitek v. Jones*, 445 U.S. 480 (1980). Due process required that the nature of

13   commitment bear some reasonable relation to the purpose for which the

14   individual is committed. (*Jones v. United States*, supra at 368).

15   **23.** *Vitek v. Jones*, "...even if his continued confinement were constitutionally

16   permissible, keeping him against his will in a mental institution is improper

17   absent a determination in civil commitment proceedings of current mental

18   illness and dangerousness."

19   **24.** *Vitek v. Jones*, Forced administration of <u>antipsychotic medication may not be

20   used as a form of punishment</u>.

21   **25.** *Cobbs v. Grant*; "A physician's duty to disclose is not governed by the "standard

22   of practice" ... rather, it is a duty imposed by law.

1   **26.** *Riese v. St. Mary Hospital*; See p. 84 through p. 95 lines 1–14.

2   **27.** *Youngberg v. Romeo* "Person's who have been involuntarily committed are

3       entitled to more considerate treatment and conditions of confinement than

4       criminals whose conditions of confinement are designed to punish."

5   **28.** See p. 78 lines 2–6; *Carlson v. Green*; *Gutierrez v. Peters* intentionally delaying

6       medical care for a known injury... held to constitute deliberate indifference.

7       [*Farmer v. Brennan*]. (and so forth with legal authorities).

8   "A physician commits malpractice by not exercising that degree of skill and learning

9   that is ordinarily possessed and exercised by members of the profession in good

10  standing acting in the same or similar circumstances." <u>*Durham v. Vinson*</u>, 360 S.C.

11  639, 650-51, 602 S.E.2d 760, 766 (2004).

12      It's gross negligence and medical malpractice to treat a physical injury with

13  sedation, benzodiazepines, tranquilizers, "mood stabilizers and antidepressants",

14  antipsychotic drugs for an alleged marketed mental disorder that Carolyn never

15  had then since or prior. It has taken 20 years to mostly recovery from these forced

16  unlawful unconstitutional treatments. *Chemically lobotomized* by force.

17      In furtherance, violations to the <u>First Amendment</u> of the U.S. Constitution,

18  violations to the <u>Fifth Amendment</u>, violations of the <u>Eighth Amendment</u>, violations

19  of Title 42, U.S.C. §§ 1983, 1985, and 1986, 105 Stat. 1071-1073 (1991).

20      The First Amendment violations of Free Speech. These drugs interfere with a

21  person's freedom of speech. These drugs interfere with personality, thoughts,

22  emotions, expressions, and how a human being communicates.

# G.                        <u>PRAYER FOR RELIEF</u>

Relief sought that can be granted; A written public apology to;

A written public apology to my Mother, Dixie Green, a Sioux Indian, who hasn't spoken to me since 2003, due to ["*it was her mouth again*"], of which was mainly from negligent care, left walking around with my right leg not completely attached for over eight years while being saturated with excessive inappropriate mis-managed and poly drugged instead of the needed adequate procedural care for my catastrophic *physical injury*.

The sole reason for a temporary land duty station from the [United States] USCGC Mellon (WHEC 717) on September 20, 1994, due to the physical injury. <u>Reprimanded three times by the Command at USCG Support Center Seattle</u> who then left me walking on my right leg not completely attached that did not receive adequate treatment starting April 10, 2002 through [United States] VA Puget Sound. Well after being honorable discharged December 21, 1995 for the February 21, 1994 injury while active-duty.

Additionally, I am requesting a written public apology to my old-family, The Beckers, who believed and thought I dishonored their treasured Cowboy name, caused by the neglected care for my *physical injury*, for which I was then unlawfully and criminally imprisoned in an asylum to include other horrendous places, treated as a subhuman–treated like a piece of trash, for a grossly neglected *physical injury*,

1   as well as Providence etc. to then be drugged to nearly to death July 2 at Western

2   for a *physical injury*. And, with the continued gross neglect of my well-documented

3   *physical injury* throughout the [United States] VA Puget Sound Healthcare System,

4   and by them [VA] in 2001.

5

6        The [United States], Department of Veterans Affairs, VA Puget Sound

7   Healthcare System who excessively medicated me while neglecting my physical

8   injury, to include 13 YEARS (thirteen-years) of CHRONIC OPIOID THERAPY,

9   with 10 years (ten years) in combination with a Benzodiazepines,. "Opiates in

10  combination with Benzodiazepines carries a 5x increase risk for adverse outcome

11  including death," per the [United States], with other life altering drug interactions.

12  The [United States] chemically lobotomized Carolyn in 2001.

13

14       **Maiming**; only biological females could better understand the abnormalities

15  of putting their thumb up their vagina to help themselves have a bowel movement

16  of which the Plaintiff has done during a great deal of that time period after

17  improper use of restraints as well as aloe vera enemas occasionally since starting

18  late 2014 to assist in defecating due to her bowel functions were maimed initially at

19  Providence that was followed by Central Mason Fire, Mason General Hospital, and

20  Western. Carolyn's PHYSICAL INJURY was completely and grossly neglected.

21       Plus, forced barbaric *chemical lobotomies* that caused severe brain damage,

22  and still left severely physically injured.

1  **1).**                    <u>**DRUGS**</u>

2

3  **A.**          <u>**AUDIT PHARMACY**</u>: Pharmacy in ALL these establishments,

4      Federal and State and non-profits, need to be audited. No exceptions. I was

5      honorably discharged after being cold turkey off of Valium inappropriately that

6      was, apparently, prescribed to treat my *physical injury* with a mild case of post-

7      traumatic stress while active duty. Providence "recopied" their drug record.

8          Mason General has drugs that were administered by them yet on the

9      Western record (Exh–3 p. 8).

10         The [United States] Dept of Veterans is the largest drug cartel of any federal

11     agency, perhaps next to the Department of Defense (DoD), where the careless

12     drug prescribing started for my injury instead of adequate medical treatment

13     (Exh–74 for a partial list). Pacifying and masking my physical injury. (See Exh–

14     67; Exh–109).

15

16  **B.**          <u>**DRUG PERMIT PADS**</u>:  Anyone graduation college with a degree in

17     medical whether that be a doctor, physician, nurse, etc., who does not have a

18     minor or major in pharmacology with other related mechanisms of how these

19     drugs work and effect one's brain and body will be issued a <u>Drug Permit Pad</u> to

20     prescribe drugs. Something to be renewed similar to a license or other permit

21     renewals. Change the law and start placing prescribers on permits, <u>Drug Permit</u>

22     <u>Pads</u>, which can be yanked or revoked at any time, without notice, or modified

23     by the issuer. Monitored on a quarterly basis, especially to high prescriber

1   pertaining to anyone in mental health, with a possibility of a bi-annual permit

2   renewal.

3       Start <u>Drug Permit Pads</u> with current graduating students, while requiring

4   more stringent classes and time requirements with experience based within

5   Pharmacology knowledge and education for those with current drug pads now.

6       A good start, only well versed and knowledgeable pharmacy specialist with

7   experience in tapering people off of drugs, know what the specific mechanisms of

8   actions are, how the drugs works (microbiology), how enzymes are activated, how

9   drugs inhibit and act, the pharmacodynamics, pharmacokinetics, molecular

10  structure, side effects including what are the cross reactivity (drug interactions).

11      And, possibly, understanding the basics of pharmacogenetics -a new field.

12  Currently from my understanding, students are mainly only taught a basic

13  overview in school and then practice drugs in the field, as a University of

14  Washington student shared with me in March 2018;  "No specialized studies of

15  drugs of any kind because you learn how to apply the drugs in the field. In short,

16  practice on people."

17

18  **C.**      **<u>DRUGS</u>**: No ranking member of any rank has the authority to

19      prescribe nor suggest drugs without a higher formal educational background

20      specifically in pharmacology to include mandatory continuing education.

21

22  **D.  <u>LIMIT DRUG INTERACTIONS BY LAW</u>.**

1   **2).**                                     **MILITARY**

2                          **MODIFICATIONS & REDUCTIONS**

3

4   Regulation and Policy *changes*:

5   E.            <u>**BY DIRECTION**</u>: By direction is handed to another ranking member

6   without much or any monitoring. With no known follow up for By direction, this

7   allows abuse of power with no accountability.

8          By direction, for a lack of better descriptions, is handed to the next higher-

9   ranking member like its candy. Sweet, yet too much of it can make you sick–with

10  power to even discharge an injured active-duty member, then deny medical care.

11         Then not followed up on or with the ranking member who was given/granted

12  the By direction. <u>The higher-ranking members tend to (always) favor the other</u>

13  <u>higher-ranking members, instead of integrity and character</u>. Unfair influence.

14         Rank, unfortunately, is not synonymous with integrity, although I thought it

15  was. If rank were synonymous with integrity then please explain the reason

16  higher ranking members are marked for integrity.

17         Integrity is not a given with rank, neither is a backbone or having heart.

18         Without knowing the structure in place for the process of how By direction

19  operationally works for accountability, which is failing. An outside Regional

20  Office or an office already in place *outside of the District* should be required to

21  evaluate those granted a By direction, especially D13.

22         Let me be very clear here: I was <u>REPRIMANDED THREE-TIMES</u>. I was

23  <u>reprimanded twice</u> by the use of a By direction. I was denied a second opinion.

1    My medical care was disastrous with inexcusable medical care by unqualified

2    higher-ranking members, <u>then reprimanded once</u> from the Commanding Officer

3    of Support Center Seattle Pier 36. <u>Reprimanded</u>. Then with the continued

4    failures attempting to turn my PHYSICAL INJURY into an alleged mental

5    disorder is a disgrace and completely shows the incompetence at the highest

6    level.

7

8  **F.**      **UCMJ**: No ranking member of any rank has the authority to deny, add

9    road blocks, go out of their way to interfere and make obtaining medical care

10    impossible for a physically injured person on American soil. (that's my story–

11    denied medical care, retaliated against, to have my catastrophic physical injury

12    appropriately treated, this was by the unqualified medical providers, too).

13    After my case is heard in the Courts, should a member of the Armed Forces

14    or contracted individual over step this, denying medical care, to then recklessly

15    on purpose discharge the physically injured individual, the punishment to be

16    considered should be 25 years to life in prison as a deterrent.

17

18    Maiming is no joke. To then be left behind is beyond inhumane. It is beyond

19    words being maimed (there are no words for the pain of being maimed), however,

20    the Bible calls this a "light affliction" 2 Corth 4:17; *For our light affliction which*

21    *is but for a moment, is working for us a far more exceeding and eternal weight of*

22    *glory.*

1    To be clear: I was given a death sentence upon my honorable discharge. I

2    qualified as a contender for the American Gladiators prior to entering active-

3    duty, so I had a long way to go down physically.

4

5    **G.**        **MARKS**: There is no good reason to have seven different box choices

6              for integrity. Seven choices are ridiculous. Seriously. (*I've personally waivered*

7              *in a couple places in my life, mostly to infiltrate the system to live through my*

8              *injuries and from the excessive prescribed potent off-label drugs. Plus, I didn't*

9              *have a high school diploma to enter the Military or serve my country in the first*

10             *place.*) Marks are for the purpose of improvement of the individual for growth.

11             To help an active-duty member better themselves, their unit, community and

12             society. Instead, Marks are used against personnel as well as for prevention of

13             advancement. The Good ole boy's network. Old Salts. Two out of three units

14             used marks as weapons. Therefore, I lack respect for the Marking System in

15             the Military due to my experience in how marks were what's good for me is

16             not good for you, based on pulling rank inappropriately. Two units out of

17             three. Rank is for authority and order. Rank is not for your self-entitlements

18             with personal self-glorifying purgatives.

19             *A reminder*:

20                  "The United States Coast Guard has the <u>worst</u> record for sexual

21             harassment of any federal agency."

22             *///*

1        "When interview groups were asked if the chain of command worked in

2    redress of grievances, a frequent reply was "the chain of command is the

3    problem."

4        "Regarding the sexual harassment, "It's the worst I've seen in thirteen years.

5    They're like a pack of wolves, three or four.""

6

7        The screwdriver and void trapping incidents at Chetco are not sexual

8    harassment according to the law, the screwdriver menacing is considered a felony.

9        The Executive Officer, second in command was the one menacing Carolyn

10   with a screwdriver stabbing it repetitively in the wooden counter while angerly

11   screaming at her over a pull-up bar installation, while the trapping and confining

12   Carolyn in a void preventing her to exit toxic fumes without a respirator was a

13   direct immediate supervisor, that day.

14       Menacing and reckless endangerment. _Menacing_: "is a crime governed by

15   state laws, which vary by state, but typically involves displaying a weapon or a

16   course of conduct that intentionally places another person in reasonable fear of

17   physical injury." _Reckless Endangerment_: is a crime consisting of acts that that a

18   substantial risk of serious physical injury to another person. [63, 64]

19

20   **H.**        **PHYSICAL EXAMINATIONS**: No ranking member of any rank has

21        the authority to alter or change the limitations of an individual noted by the

22        examining physician (not to include foreign lands, e.g. war, due to I cannot

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  speak into that with zero experience or knowledge). It's simple, if the ranking

2  member was not in the process of the examination then they have no

3  authority to change the limitations (my story).

4  (*Examiner noted lifting no more than 10 lbs., where the higher-ranking*

5  *member (a Major) wrote over 10 lbs. making it 40 lbs. with his initials.*

6  *Additionally crossed off reduced working hours, who <u>was NO part of the</u>*

7  *<u>examination process</u>.) This is rank abusive of power bullgarbage referenced*

8  *here. These modifications were made after* Carolyn had been <u>walking around</u>

9  <u>on her broken hind-end for 507 days</u> (1, year, 4 months, 22 days) with no

10  adequate medical treatment or procedural care, put on drugs for medical

11  treatment.

12  *Rank should not have this prerogative nor this type of self-entitlement.*) Stop

13  maiming and killing your own kind for God's sake. I was an amateur athlete

14  when I entered the USCG to be honorably discharged so very injured to where

15  I could hardly walk, prescribed inappropriate masking drugs, made to mask

16  cover-up and pacify my injury, on purpose.

17

18  I.    **<u>RANKING MEMBERS IN THE MILITARY</u>**: no longer will an

19  individual have the authority to remove or deny medical care for a physically

20  injured active-duty member on American soil, especially documented. To

21  receive medical care is a right of an active-duty member, especially injured.

22  Five Officers failed, with four due to the unfair influence of the By direction.

1   Castro and Tate were retaliatory in their conduct and behavior, going out of

2   their way to deny medical care. This conduct and behavior are considered

3   retaliation in nature. Then, the second in command who slandered the

4   member upon discharge failed to provide adequate medical treatment.

5   Instead, she honorable discharged the severely injured active-duty member in

6   December, even after being informed in October 1995 by D13 about her

7   physical injury.

8

9   **J.**     **TRANSFERS**: Should an individual experience the same type of ill

10   treatment e.g. the void, the menacing action with a screwdriver, or the vulgar

11   degrading derogatory name calling whether by slander or libel, the member

12   should be offered the option to transfer or sever their contract with an

13   honorable discharge and with a severance package due to default of their

14   contract by the United States.

15

16   **K.**     **ACTIVE-DUTY PERSONNEL USED FOR MEDICAL TRAINING**

17   **PURPOSES AGAINST THE ACTIVE-DUTY MEMBERS  "NO"**:

18       When the member requests that a doctor perform their surgery (Carolyn's

19   nose for example) and not an individual in training or the like, then honor

20   someone's "no". I specifically requested that the doctor perform this surgery that

21   the ENT ordered as his resolve for the sinus infections for what he incorrectly

22   determined to be caused by a deviated septum. As it turned out, the sinus issues

1   were mostly due to the excessive drugs administered in 2001 that killed my gut

2   bacteria causing my abnormal food allergies from excessive drugging. I paid

3   $150 to learn this, without a botched-up sinus surgery. Nutritional supplements

4   and other nutritional alternatives were used effectively, not drugs.

5       I was informed by the anesthesiology that Madigan Army Medical Center

6   (MAMC) is a training hospital, therefore, I didn't have a choice not to be trained

7   or practiced on. This is more inappropriate use of rank and position to override

8   the patients' rights. In 2021, I still have issues with my sinuses due to the

9   *training* I specifically stated I did not agree to.

10      Furthermore, there was nothing in my contract that stated I would agree to

11  be experimented or trained on medically anywhere or be used as a research

12  project at any time.

13      MAMC: Other information. MAMC would not allow a dependent, a dear

14  sweet friend of mine, to wear shoes after her knee replacement due to *hospital*

15  *policy, only socks were permitted.*

16      She wore shoes the minute she left her bed every day at home. She was

17  unable to gain any traction without her shoes. Think about that. How did

18  MAMC hospital policy become more important than her safety? MAMC

19  transferred her in and out of Palliative Care. TWICE.  A full blown out knee

20  replacement on a 95-year-old woman who had a heart murmur. A test was

21  required prior to this surgery. No one followed up on the required test results. A

22  knee replacement surgery was scheduled. The "Board" determined to perform

1    surgery on her, assigned the surgeon without notifying the surgeon about her

2    heart murmur. The surgeon directly stated to me and another they would have

3    not performed surgery had it known about the heart murmur. This doctor

4    showed compassion by attending to her bedside in the ICU numerous times

5    before she was sent to Palliative Care, the first time. I'll leave it right there.

6

7    **L.**   __PATIENT RIGHTS__: I cannot stress this enough that part of the

8         system in the Military is prejudice, one-sided towards the higher ranking

9         member, with a desperate need for a neutral party for human protection

10        mechanism. There needs to be a placement for a neutral party while active

11        duty when the command is the problem.

12   ///

13   ///

14        Carolyn is very open to suggestions. It is beyond inhumane to discharge

15   someone so catastrophically injured to where they can barely walk after they've

16   been denied adequate medical care on American soil while retaliating against the

17   active-duty member during the process to receive care.

18   The dispending and prescribing of drugs is beyond excessive. Change is needed.

19   ///

20   ///

21   ///

22   ///

1   **3)**       **<u>SUPERIOR COURT SYSTEM &JUSTICES</u>**
2                      **<u>MODIFICATIONS</u>**

5   **M.**      **<u>EX PARTE</u>**: Ban Ex Parte from *civil commitments.* No exceptions.

6      According to the rule of law, an American citizen one is guaranteed a neutral

7      party within 72 hours in the courts. The State Regulations were bypassed over

8      65-times! Thus, overriding Carolyn's rights. Ex Parte unjustly removes your

9      freedoms and liberties.

11   **N.**      **<u>FOUR-POINT-MECHANICAL RESTRAINTS</u>**:

12   (Exh–106 pt1) (Exh–107 ctrl find "restraints") (Exh–112 and Exh–117)

13      Without a question, Providence St. Peter Hospital should be required by

14   Court order to recertify restraints bi-annually (instead of annually) for a

15   minimum of three-years due to their criminal mistreatment and abuse and plus

16   their [Providence] who intentionally altered their 4-point-mechanical restraints

17   records.

19   **O.**      **<u>DRUG CERTIFICATION</u>**: Prior to any Court Hearing for civil

20      commitments (often unlawful imprisonment) anything beyond a 72-hour and

21      anything after will now be required by law to inform the Court with an

22      affidavit of what drugs were ordered then administered to an individual,

23      whether voluntarly or forced. The purpose of those drugs and the reason for

24      their administration whether by injection or in pill form. Providence, a

1    magnet hospital's intentional concealment of their "recopied" drug record in

2    their attempt to conceal their nefarious crimes.

3    Carolyn was force drugged by injections and required to ingest harmful drugs

4    against her will, including prior to Court Hearings and filings.

5    She was harshly punished for standing up for her legal rights.

6    **P.**     **ADD TIME REQUIREMENTS FOR**;

7    o   Civil Commitment Supplemental Information documents

8    o   Court filings

9    o   Court proceedings

10   o   Emergency room reports

11   o   Medical examination times

12

13   **Q.**     **Designated Crisis Responder**; (DCR) aka **County Designated**

14   **Mental Health Professional** (CDMHP); have no science in their degree, only

15   mental health, yet can strip you of *all* of your civil liberties. Therefore,

16   individuals with more educational background must be a requirement, to include

17   a neutral party.

18

19   **R.**     **SOCIAL WORKERS**: have no science in their degree, only mental

20   health. Frankly, if you're a social worker (can be the DCR / CDMHP) where

21   you can continue to write while someone is *thrashing* in four-point mechanical

22   *///*

1   restraints, yet the writer (social worker) continues to write without ever trying to

2   help the patient, this person should reconsider being in medical.

3        I've read *thrashing* more than once in my records. It took me months,

4   months, to get past *thrashing* in order to continue reading other documents about

5   mechanical restraints to then continue to heal from torture.

6        Same with Haldol. It took me months, months to get past the Haldol

7   nightmare before I could continue reading other documents to heal from this

8   cruel and unusual punishment.

9        For the record: A social worker, yes, social workers, and a psychologist were

10  given the authority to initiate the process to strip me of my rights liberties and

11  freedoms with no physical background or anatomy or science in their background.

12

13  **S.**      **CHARGE NURSES**: Five charge nurses at Providence refused to do

14        the right thing after the excessive times I refused to ingest drugs, to then

15        instead be force injected by them. I read about charge nurse issues in the

16        Western file too. At the [United States] Dept of Veterans, it was LPN's.

17

18  **T.**      **PSY DOCTORS**: in the courts are invalid and unreliable yet

19        considered experts when it comes to civil commitment with their name or

20        someone else's name in the same profession. Two corrupt people professing to

21        be "professionals" can indefinitely lock you up. Therefore, add human

22        protection mechanisms especially for anything past the 72-hours for

1    involuntary civil commitment, which is often times unlawful imprisonment

2    due to corruption. Additionally, the [United States] Dept of Veterans medical

3    providers practicing psychiatry who gave their business cards professing to be

4    a psychologist or counselor type, when, in fact, they were in psychiatry

5    seeking to dispense and prescribe drugs, who were also receiving grant monies

6    for their research.

7        Masquerading and pretending to be someone they are not. The law

8    considers this criminal impersonation.

9

10   **U.**        **FLIP THE COIN IN THE COURTROOM**:

11   o *Dangerousness* aka as *likelihood of serious harm to self and others* is

12      weaponized (used against the innocent) by using *Addington v. Texas* case law

13      to remove liberties and rights, plus second amendment rights. This lynch pin

14      of *dangerousness and gravely disabled* is weaponized against [defendants]

15      respondents as it's unlawfully used to satisfy due process. An Ex Parte in

16      civil commitment (a 14 day) automatically removes your 2nd Amendment

17      rights. In society now this infringement has become more problematic.

18        Misusing and twisting case law, weaponizing the litigation process to

19      then have the bench of the Superior Courts rubberstamp to familiar

20      prosecutors and petitioners. This appears to pay good dividends to those

21      invested in stripping rights of Americans.

22   o Prospective patient; Insurance $$$ depending on the codes.

1      o   Prospective patient rate psychosis = DRG 430 is/was the FOURTH highest

2           insurance code used for reimbursement. (<u>Exh–105 pt2</u>)

3

4   **V.**      **<u>COURT COMMISSIONERS</u>**:

5      <u>a Judge should be the only authority in the Courts who can remove civil</u>

6      <u>liberties and freedoms of an individual</u> due to four (4) Court Commissioners

7      failed to perform their duties in accordance with the Judicial Rules of

8      Conduct. Cannon Rules 2.2; 2.3; 2.6. If a Judge is not available then two–

9      Court Commissioners need be considered, required.

10     o   My case was preventable.

11     o   Stiff fines should be imposed for the rubber-stamping conduct.

12

13   **W.**      **<u>JUSTICES (IN SUPERIOR COURTS)</u>**:

14      To go out on a limb; due to my horrific experiences, I believe a State Judge,

15      especially, Court Commissioners, consider adding in their job description a

16      requirement to go through the court system as someone who is filing (as a

17      filer). While a delegated judicial assistance or an officer of the court follows up

18      in-between who then reports to the IT Department and the Justice of the

19      failure and glitches noted. To then have software corrections and changes

20      made in a reasonable amount of time.

21      The Court systems process is a bit jaded and prejudice looking with eyes

22      coming in from the outside. I was looked upon with a distorted perception due

1     to involuntary commitment is aka mental illness in the Courts, starting with

2     the Court Clerks in Thurston County, when, in fact, it was unlawful

3     imprisonment, and criminal. To be clear, the abuse of power in the Superior

4     Courts in 2001 is staggering. Later years, too.

5          Perhaps a *judicial officer* can go through on a bi-annual basis with the

6     Justices rotating once annually to access their bench and what is required of

7     the individual prior to seeing the Judge. Rotating Judges annually, thus,

8     giving all the justices the skewed experience American citizens face when

9     accessing their Courts for a legitimate complaint.

10         In 2020, with all respect and honor to the Justices, it is unreasonable to

11    request the Plaintiff to "ask" the Deputy Prosecuting Attorney on what would

12    satisfy [them] to have the restoration of my firearm rights restored WHEN IN

13    FACT it was the same position and powers that be who violated the laws in

14    the first place. After honoring the Judges request, the 2020 Deputy

15    Prosecuting Attorney requested that I seek a psychiatrist and have paper or

16    something stating that I wasn't a danger. Read that again. I proved my case

17    without fulfilling his request as my Second Amendment rights for the state of

18    Washington were restored.

19         For driving on private property. No ticket. No arrest. No crime. Clean

20    background. Clean driving record. If anything, I should have been given a

21    ticket for reckless driving. This is what a broken system with familiar people

1    in the same Superior Courts system looks like. We are living breathing human

2    beings.

3

4        One would be better informed of the dysfunction to what the American

5    citizen had to wade through to get through the bureaucratic poppycock for a

6    *legitimate* filing.

7

8    **X.**      **TERMS**: One definition for a term.

9    o  *Gravely disabled* doesn't need 50 different definitions in the same country,

10      yet this term as well as others varies considerably per state.

11    o  Court terms; e.g., *Transcript, Verbatim Record Proceeding, Record*

12      *Proceeding*; all have the same definition yet are spoken differently and listed

13      for filing differently, thus, creates confusion for most any filer.

14    o  After filing in Thurston, Pierce, Mason and King County in Washington State

15      (WA), our country needs some type of a standardized system to access the

16      courts. A basic standard. If I live in WA and move to Arizona (AZ) a citizen

17      shouldn't need to start from scratch on how to access the court, some in-part

18      due to a judicial preference or computer software system creating and making

19      its own set of standards.

20    ///

21    ///

22    ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    **Y.**       **<u>COURT COMPUTER AND SYSTEM PROBLEMS</u>**:

2        1) Forms: the first attempt to derail individuals from accessing the judicial

3        system to file a valid complaint. 2) Drop down name selections e.g. motions,

4        certificate of service, etc., in the same state have different drop down names

5   ///

6        for the same filing type; some lacking selections, some too many selections.

7        There is a redundant and yet limited selection for filing.

8

9    **Z.**       **<u>PATIENT RIGHTS</u>**: When involuntary or voluntarily committed or

10       *unlawfully imprisoned* for any reason, the person shall have a Patient

11       Advocate and a lawyer that is not influenced in anyway by the hospital or

12       others in the courts. I cannot stress this enough that this part of the system is

13       prejudice/bias at the Superior Court level with a desperate need for a neutral

14       party for human protection mechanism, even today in 2021.

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

# 4).   <u>U.S. DEPT OF VETERANS MODIFICATIONS</u>

**Brief excerpt; VA PUGET SOUND PATIENT RIGHTS** (Exh–64);

2). "...prompt and appropriate treatment for physical and emotional disorders or disabilities in the least restrictive environment....treatment free from unnecessary or excessive medication."

4). "You have the right to communicate freely and privately with persons outside the facility and have... visitors.... reasonable access to public telephones ..."

11). " You have a rights to be informed of any human experimentation or other research/educational projects affecting your care or treatment."

**AA.**      <u>**DEPARTMENT OF VETERANS**</u>: *Solutions* see Exhibit 128.

Create an *INITIAL COMPUTER SYSTEM GATE* that <u>cannot be bypassed</u>, for any reason. NO exceptions. Security measures need to be enforced. Make this an automatic pop-up that no one bypasses, (same setting as the suicide question is set-up in the system). Because if you leave a little crack in the door the unlawful imprisonments, force drugging, excessive prescribing of medications that creates a death culture will continue, suicide too.

1.      <u>**ONE PARAGRAPH**</u> – A summary introduction with a limited number of characters to be determined). The veteran, *and* one qualified medical provide who is outside of mental health. Can be a family member or a friend or

1    someone (not a medical student) with trusted experience helping veterans, to

2    assist in the writing the paragraph. NO one person writes this summary. This is

3    a condensed patient summary to ensure continuity of care with ANY medical

4    provider.

5    **2.**    **<u>DRUGS</u>** – this is a MUST to keep pharma at the front door–period.

6    NO exceptions. List horizontally:

7    **a) Informed Consent**

8    **b)** Drug name (brand/generic).

9    **c)** Type of drug: anti-depressant, neuroleptic, benzodiazepine, etc.

10    **d)** List Top 4 side effects

11    **e)** Prescriber's name.

12    **f)** Drug Permit Pad number.

13    **g)** Reason for prescription.

14    **h)** Off-label or on-label.

15    **i)** Date of prescription.

16    **j)** Date of reevaluation (expected discontinuance date).

17    **k)** How much the drug costs.

18    **l)** Dispensing location.

19    **m)** Drug Interactions. (Limited by the law) (See Exh–71 p. 5; p. 10; p. 17; pp.

20    47–53; p. 81; p. 86; p. 88; p. 102; p. 114; p. 145; p. 153; p. 171; p. 183; p.

21    185; p. 203; pp. 277–281) ( Exh–70 pp. 3–7; p. 67; p. 86; p. 178; p. 269; p.

22    280; pp. 287–288;  (See Exh–68 pt2).

1   **n)** RESCHEDULE of some drugs, with different classifications

2   **o)** STOP listing Oral medications with Topical medications together

3   **p)** Most drugs prescribed to me had a **BLACK BOX WARNING**!!

4      a) Require a warning sticker on the prescription bottle.

5      b) ***<u>Black Box Warning</u>*** –list the entire term "Black Box Warning", in

6        bold text, all spelled out. The short diluted version of "Boxed" or

7        "Warning" needs to be barred. List **BLACK BOXED WARNING**!!

8        directly under the name of the drug prescribed.

9      c) Disclosed at the beginning of the drug information panel handouts

10       and inserts directly by the drug name in bold print.

11     d) It is scientifically proven that drugs used OFF-label create new

12       symptoms/diseases. A*ccording to a JAMA Internal Medicine study,*

13       *Off-label uses account for more than 44% more adverse effects.*[1]

14     e) Require Informed Consent.

15     f) An example: Adderall is one of the most popular drugs in schools.

16       FDA put a Black Boxed Warning on Adderall August 22, 2006 yet

17       it's the most popular drug in schools among.  Some say Adderall is

18       very similar to methamphetamine. A label sticker on the outside of

19       the bottle. (See Exh–92)

20     g)  Stop allowing pharmacy conglomerates to dilute the harm by using

21       only the word "Box" as the warning while tucked someplace in the

22       text diluting the importance and serious dangers.

1     **q)** Mandatory Essential Security Measures need to be placed, and strictly

2     enforced: Enclosed are drug records to show how the record changes with

3     other excessive prescribing with bad standards of practice.

4     Pharma MUST be kept at the *front door* –period. (See Exh–67; Exh–

5     68; Exh–69; Exh–70; Exh–71; Exh–72; Exh–74; Exh–88; Exh–92; Exh–106

6     pt3; Exh–109; Exh–122).

7     **r)** <u>PRESCRIBING AND DISPENSING, ADDITIONAL REQUIREMENTS</u>:

8     o **\*Informed Consent for Patients!**

9     o \*Doctors Informed Decision to prescribe any drug.

10     o \*A full disclosure of adverse effects/affects, upfront.

11     o \*Safe taper help for discontinuance off of VA drugs.

12     o **\**Black Box Warning!!*** notification.

13     o \*Drug interaction limits.

14

15     VA PUGET SOUND Patient Rights (Exh–64)

16     2) prompt & appropriate treatment...free from unnecessary or excessive medication.

17

18     **C.**    **<u>SEPARATE COLUMNS LIST</u>** close in proximity to include:

19     (See Exhibit 128 pp. 9–17 to see the current computer screen open

20     window. The topic listed below is to reconfigure how the window shows

21     the patient profile and information)

22     *///*

1   **1)** <u>ROOT causes</u> – 1-5. Stays stationary; does not change, unless adding an

2       additional injury.

3   **2)** <u>Secondary Symptoms</u> (opinions/diagnosis of medical professionals are *only*

4       listed here).

5   **3)** <u>Hardware</u>: Rods, pins, screws, plates, wires, shrapnel, artificial

6       organs/limbs, pace makers, IUD's etc. By listing hardware, it removes

7       questions for MRI and x-ray's, thus streamlining care especially in

8       emergency situations.

9   **4)** <u>Treatments/Procedural Care</u> – procedural injections, kidney dialysis…

10  **5)** <u>Surgeries</u>: Knee replacement, broken arm, transplants . . .

11  **6)** <u>Allergies</u> - all listed here. Additionally, a doctor should not be required nor

12      dictate nor decide IF "My Body" has an allergic reaction/ allergy. A human

13      being has a God given right to refuse drugs, especially forced drugs.

14  **7)** <u>Add an **Identifier number**</u> to show an individual cannot have an MRI

15      based on (C3: the hardware answers. This quickly moves the patient to

16      the appropriate test; a CT scan, PET scan, etc.

17

18      D.      <u>The **ROOT** cause</u> gets buried by the current system with anything any

19  provider adds thereby creating new diagnosis. The root cause does not change!!

20  See a small sample of my personal example from my medical record shown in

21  *Exhibit 128*. Create and have a column designated for the "newly" diagnosed for

22  secondary symptoms (C2).

1    <u>**AN EXAMPLE OF HOW THE SYSTEM CHANGES THE RECORD**</u>:

2    When I started seeing Dr. Charles "Charlie" Paxon in 2002, my active

3    problems list: *ALL physically injury related*.

4    **(2002-2004) PROBLEMS LIST/PMHx: ACTIVE PROBLEMS**

5    (mostly before 2004) (*Note: initial injury 21 Feb 1994*)

6       1.  <u>Right pelvic girdle pain</u>

7       2.  <u>History of hematoma right sciatic nerve</u>

8       3.  <u>Dysphoric feeling right (like a foot drop)</u>

9       4.  <u>Right Iliac Up-slip</u>

10      5.  <u>Ligamentous pain sacrotuberous sacrospinous group on the right</u>

11      6.  <u>Pyriformis syndrome</u>

12      7.  <u>Lumbosacral pain</u>

13      8.  <u>Lumbopelvic dysfunctions</u>

14      9.  <u>Right Pelvic Up-slip</u>

15     10. <u>Pelvic rotated a bit to the left</u>

16     11. <u>Right groin pain – ?referred from lumbosacral</u>

17     12. <u>Right lateral hip pain, unsteadiness (04/2004)</u>

18     13. <u>Right Ischia Tuberosity source movements could be used to pain</u>

19

20   \*\*\**All injury related*.\*\*\*   Then after the 2001 Avalanche, in 2004 shows:

21   **PROBLEMS LIST/PMHx: ACTIVE PROBLEMS:**

22   (Sept 24, 2004 also last known drug listed w/ appts record) start:

1      1. Eczema

2      2. <u>Sacroiliac (ligament) sprain</u>

3      3. <u>Low back pain</u>

4      4. Bipolar I, unspecified

5      5. Adult Sexual Abuse

6      6. Prolong Post trauma stress

7

8    **This is the order of "ACTIVE PROBLEMS" (*Watch how my injury gets***

9    ***buried here.* The system is, in a sense, destroying the record.)**

10   **The ROOT cause is starting to get buried in 2005, possibly in early years.**

11

12   **PROBLEMS LIST/PMHx: ACTIVE PROBLEMS:**

13   August 3, **2005**:

14     1. Rosacea

15     2. Allergic rhinitis

16     3. Nicotine dependence

17     4. Patellar tendinitis

18     5. <u>Degeneration of cervical Intervertebral disc</u>

19     6. Eczema

20     7. <u>Sacroiliac (ligament) sprain</u>

21     8. <u>Low back pain (due to myofascial trouble</u>. Cause not known)

22     9. Prolonged Post trauma stress

1   **PROBLEMS LIST/PMHx: ACTIVE PROBLEMS:**

2   August 26, **2005**:

3       1. Hip: arthralgia (pain on rotation, pain in groin)

4       2. Rosacea

5       3. Allergic rhinitis

6       4. Nicotine dependence

7       5. Degeneration of cervical and vertebral disc

8       6. Eczema

9       7. Sacroiliac (ligament) sprain

10      8. Low back pain (see 08/03/2005) definition.

11  **PROBLEMS LIST/PMHx: ACTIVE PROBLEMS:**
12  November 2, **2005**:
13
14      1. Care involving other physical therapy (ICD-9-CM V57.1)

15      2. Lumbar radiculopathy

16      3. Hip: arthralgia (pain on rotation, pain in groin)

17      4. Rosacea

18      5. Allergic rhinitis

19      6. Nicotine dependence

20      7. Degeneration of cervical and vertebral disc

21      8. Eczema

22      9. Sacroiliac (ligament) sprain

23      10. Low back pain (see 08/03/2005) definition

24      11. Prolong post trauma stress

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    *FAST FORWARD*: to 2011

2    **PROBLEMS LIST/PMHx: ACTIVE PROBLEMS:**

3    October 4, **2011**:

4    1.  PTSD, chronic

5    2.  Carpal Tunnel Syndrome * (ICD-9-CM 354.0)

6    3.  Cervicalgia

7    4.  Thoracic Pain

8    5.  Disorder of the Sacrum

9    6.  Myofascial Pain Syndrome * (ICD-9-CM 729.1)

10   7.  Pain in joint involving shoulder region (ICD-9-CM 719.41)

11   8.  Lumbar Radiculopathy (ICD-9-CM 716.95)

12   9.  Hip: arthralgia (pain on rotation, pain in groin) * (ICD-9-CM 716.95)

13   10. Rosacea

14   11. Allergic rhinitis

15   12. Patellar tendinitis (ICD-9-CM 716.64)

16   13. Degeneration of cervical Intervertebral disc (ICD

17   14. Eczema * (ICD-9-CM 692.9)

18   15. Sacroiliac (ligaments) sprain

19   16. Low Back Pain

20   17. PROLONG POSTRAUM STRESS

21

22   (*As you can see, the system is creating, and is, a medical disaster*.)

1   **PROBLEMS LIST/PMHx: ACTIVE PROBLEMS:**

2   Rheumatology April 20, **2015**. The sole reason for my visit was NECK pain

3   requesting an MRI update after <u>10 years</u> (a decade). MRI Request Denied.

4   1.  Thigh pain (SNOMED CT 78514002) (*from lack of procedural care much*

5       *earlier on*)

6   2.  Acute bronchitis (ICD-9-CM 466.0) (*drug induced harm not injury related*)

7   3.  Pain in joint involving lower leg (ICD-9-CM 719.46)

8   4.  PTSd chronic (*drug induced harm, violent trauma, system trauma*)

9   5.  Carpal Tunnel Syndrome * (ICD-9-CM 354.0) (*If didn't have this?*)

10  6.  Thoracic Pain (??)

11  7.  Myofascial Pain Syndrome * (ICD-9-CM 729.1) (*drug induced, and caused*

12      *by procedural care delays...if I had this?*)

13  8.  Lumbar Radiculopathy (ICD-9-CM 724.4)

14  9.  Hip: arthralgia (pain on rotation, pain in groin) * (ICD-9-CM 716.95)

15  10. Rosacea (*stress induced, drug related*)

16  11. Allergic rhinitis (*drug induced harm not injury related – 2001*

17      *Pharmaceutical Rape caused, plus an egg allergy*)

18  12. Degeneration of cervical intervertebral disc (ICD-9-CM 722.4)

19      (neck ROOT cause)

20  13. Eczema * (ICD-9CM 692.9) (*I don't have this, either?*)

21  14. Low Back Pain (cause: *NO care for the injury manifested into other areas,*

22      *and drug side effects, namely (Celebrex*))///

1    E.    **ADD BACK IN A PHOTOGRAPH OF THE PATIENT**

2    A photograph of the patient taken within 5-years in the patient's profile. This helps

3    providers recall a next patient allowing the provider to reset for each individual;

4    good or bad.

5          Across the board, there is no continuity of care in Healthcare. Therefore,

6    medical providers [Dept of Veterans] spend half or more of the appointment time

7    reviewing and getting *familiar* with the patient, doing a drug check-in, and not

8    what the patient came in for in the first place, which was for Healthcare not

9    Healthdrugs.

10

11   **BB.**          **TRANSPORTATION**:

12   **1)**. Using a bus that holds a capacity of 30-32 veterans and VA employees on every

13   trip to American Lake VA and Seattle VA, or vice versa, is currently standard

14   practice. The times the larger bus needs to be used is the first and the last run,

15   possibly one or none of the other runs need a bus that hold this capacity of

16   passengers. The *union* driver is paid based on the capacity of the bus, not the

17   passengers count. **2)**. Use the larger capacity bus in the first and last runs, and then

18   use a smaller van with wheelchair access to carry approx. 8–13 passengers on the

19   other runs throughout the day. The individual (*named*) within the Transportation

20   department was very helpful and would be well equipped to answer this question.

21   **3)**. Saves money while offering the same service. Keep in mind this also will reduce

22   the union drivers pay. It saves taxpayers money and uses resources more wisely.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    **CC.**           <u>**NAMING**</u>:

2    FULL DISCLOSURE for all medical providers to ensure safety: Interns,

3    residents, fellows, nurses, including what type of Medical Doctor and their field of

4    study e.g. Anesthesiologist, Orthopedic, Psychiatric, Psychology, Rheumatology,

5    Sports Medicine and so forth. Furthermore, I did not know I ever saw a

6    psychiatrist, ever, at the VA as their [United States] VA Puget Sound business

7    card states "Mental Health Nurse Practioner" or "Psychologist." Thus,

8    impersonating, and masquerading, as a safe different type of medical provider,

9    one who does not prescribe drugs. If you do not like your profession, please

10    change jobs. Name the specialty after M.D., Ph.d., D.O., etc. e.g., Sports Medicine.

11    **DD.**        <u>**REMOVE VA HOSPITALS FROM THE NATIONAL REGISTER**</u>

12        <u>**OF HISTORIC PLACES**</u>. This will permit needed updates to the hospital.

13    **EE.**          <u>**NATUROPATHIC MEDICINE DOCTORS**</u>:

14    Add and recognize Naturopathic Medicine Doctors as an option for non-drug

15    treatment. If needed, add an ICD code for Prolotherapy and Platelet Rich Plasma

16    (PRP) treatments to be included in the Dept of Veterans as a Community Care

17    option. There is a meaningful partnership with Bastyr's School of Naturpathic

18    Medicine and Dept of VA in Washington State. [64]

19    Chiropractic care and massage should be considered essential services, same with

20    Naturopathic Doctors, essential. These medical modalities improve the quality of

21    life, reduces costs, increases patient satisfaction. These modality treatments and

22    care have been invaluable, a necessity for my recovery and for quality of life.

1   **5)**          **<u>PRAYER FOR RELIEF</u>**
2   **<u>Submitted in 1995 are here now an addition and</u>**
3   **<u>considered a separate *relief* plus, the *relief* stated in 2021</u>**
4

5   Undeniably, there is no way to put a dollar figure on L*ife* in how unlawful

6   imprisonment and criminal mistreatment who was on the violent end of trauma

7   enduring forced barbaric *chemical lobotomies* and how being *maimed* destroyed

8   years of Plaintiff's life due to Superior Courts Pierce and Thurston County and

9   other establishments to include lawyers, so-called medical providers, and

10  Defendants the [United States] who failed to follow the rule of law, Federal and

11  State laws and regulatory standards and policies and guidelines, and Military

12  standards and protocols.

13

14  WHEREFORE, plaintiffs seeks the following relief:

15  <u>Declaratory Judgment</u>: A declaratory judgment that the [United States]

16  challenged Actions constitute sex discrimination in violation of federal law and

17  enjoining and permanently restraining these violations of the United States

18  Constitution.

19  <u>Injunctive Relief</u>: A permanent injunction prohibiting [United States] from

20  discriminating against or retaliating against the plaintiff in violation of federal law.

21  <u>Special Damages</u>: The Court should award plaintiff past and future special

22  damages in the form of lost wages, front pay and retirement benefits in an amount

23  to be proven at trial.

1       <u>Compensatory Damages</u>: The Court should award plaintiff compensatory

2       damages for mental and emotional distress and pain and suffering in an

3  amount to be proven at trial, with interest from the date of this action.

4       <u>Punitive Damages</u>: [United States] should be required to pay punitive

5  damages as provided by Title 42, U.S.C. §§ 1983, 1985, and 1986, 105 Stat. 1071-

6  1073 (1991), Bivens, and other applicable laws, in an amount to be proven at trial,

7  with interest from the date of this action.

8       <u>Attorneys' Fees and Costs</u>: The Court should award plaintiff the costs of this

9       action together with plaintiff's reasonable attorneys' fees, as provided by 5

10  U.S.C. § 552a(g)(3)(B), (4)(B), 42 U.S.C. 2000e-5(k), and other applicable laws.

11       <u>Other Relief</u>: The Court should grant such other and further relief as the

12  Court deems just and equitable."

13

14  **1.**  A lifetime of medical care and with medical providers of Carolyn's choice.

15  **2.**  A lifetime of medical to include, not limited to, CT scans, MRI's, pet scans and

16       other scan tests with updated brain scans bi-annually for the next 3-years then

17       yearly for the next 5-years then every other year for the next 10 years followed

18       up thereafter; to improve cognitive functioning and processing restoration with

19       testing to restore her God given gifts and talents with monitored improvements;

20       to proceed to restore the Plaintiffs brain to a healthier functional level.

21  **3.**  Professional assisted speech (talking) daily interactions; to overcome Aphasia,

22       allowing her brain to function and heal.

1   **4.** Continue essential holistic medical approaches with massage weekly, bi-weekly.

2   **5.** Continue essential holistic medical approaches with Prolotherapy and PRP

3      (platelet rich plasma) treatments as these continue to be successful physical

4      structural restoration regenerating tissue treatments to include other

5      naturopathic modalities.

6   **6.** Medical specialists for life.

7   **7.** Hyperbaric Oxygen Treatments.

8   **8.** Other alternative treatments, such a cryotherapy.

9   **9.** Strength training, as well as weight lifting to recover muscle mass for longevity.

10  **10.** Restore *Carolyn's* Frozen Cookie business to be sold in vending machines and in

11      the frozen section of grocery stores.

12  **11.** Restore CANDIDCAROLYN®'s Photography by putting her photos in hospitals

13      as well as above MRI machines and other medical settings where many hospitals

14      and clinics have ceiling light covers, and with greeting cards.

15  **12.** A contract with the Government for postage stamps to have a different flower

16      represent each war, as well as a greeting card section.

17  **13.** Have a seat at the table about the need to modify drug classifications. Black Box

18      Warning drugs appear to get a free pass in the formal Scheduling. Reschedule

19      and add appropriate terms. Such as antipsychotic is a marketing term

20      pharmaceutical created by big pharma. These drugs are neuroleptics "seize the

21      brain" drugs, and should be recognized as neurotoxins, harmful to the central

22      nervous system.

1    **14.** Have input as a co-creator for those in or graduating medical school to be

2    required to have a double major or possibly a minor in pharmacy.

3    **15.** Co-create Drug Permit Pads.

4    **16.** A new car of my choice, with a lifetime of free upgrades and rentals.

5    **17.** Gasoline for life.

6    **18.** A permanent driver's license–Carolyn is requesting her driving *privilege* become

7    a right in the United States of America, her home country. My argument here is

8    that I DROVE ON ALL THOSE DRUGS in all years maintaining a clean

9    background and clean driving record.

10    **19.** Adventures and fun with friend's allowance.

11    **20.** A new Cannon camera.

12    **21.** A new Cannon printer, the copier FedEx uses.

13    **22.** A laptop.

14    **23.** A mentor, and life coach.

15    **24.** Unlimited tech support in-person and online.

16    **25.** Monthly spa treatments.

17    **26.** Attorney's wages paid to the plaintiff.

18    **27.** Reimbursement for Court and postal fees, plus expenditures.

19    **28.** Paid bi-annual cruises to accommodate four people.

20    **29.** To include general damages.

21    **30.** Reimbursement for vitamin supplements.

22    **31.** Reimbursement for effective medical treatments of PRP and Prolotherapy.

1   **32.** Reimbursement for Chiropractic care.

2   **33.** Monetary for economic losses.

3   **34.** Monetary for suffering; pain.

4   **35.** Monetary for emotional trauma, mental anguish.

5   **36.** Monetary for disfigurement; aggravation of pre-existing condition.

6   **37.** Monetary for loss of enjoyment of life and liberties.

7   **38.** A web page.

8   **39.** Voiceovers, training, and for an M&M caricature, with a friend.

9   **40.** Compounded interest added to relief stated in 1995 from Case No. C95–748Z as

10      a separate monetary award.

11   **41.** Redact, seal and then close my United States Coast Guard file and my United

12      States Department of Veterans Affairs file minus my physical injury

13      documentation and the honorable good page seven's.

14   **42.** To start with a clean slate.

15   **43.** 1.5 billion dollars (one-and-a-half-billion-dollars).

16   **44.** A trust account monitored and controlled by Dave & Joyce Meyer, with Chuck

17      Pierce and Dutch Sheets as co-executors, with one-alternate.

18   **45.** Restore Plaintiff Carolyn Sioux Green's good name.

19

20      (See <u>Exhibit 132 p. 300</u>): "The Court dismissed all claims except the first six

21   causes of action and the eleventh cause of action, limited solely to the constitutional

22   claims." (See Exh–132).///

1    **6)**              **<u>MISCELLANEOUS</u>**
2                       **<u>RELIEF REQUESTED</u>**
3
4

5       <u>In regards to the **American Disabilities Act (ADA)**</u>:

6    **I.**    In the state of Washington under RCW 70.92 PROVISIONS IN BUILDING

7            FOR AGED AND HANDICAPPED PERSONS Sections, there is

8    no requirement to have <u>power</u> added to the doors for **Handicap doors**. Thus, a

9    person in a wheelchair has to wait for someone who is able to open the door, making

10   this more than an inconvenience. It touches on a person's safety to exit the building.

11          Perhaps someone is the industry could write an addition to this provision. I

12   have asked a large "bank" about the reason the door didn't open for someone in a

13   wheelchair. The reason I was given is that the "regulation did not require." The

14   Handicap door did not require power.

15

16   **II.**   **<u>ADD BBQ & CAMPFIRE LIGHTERS</u>** as an alternative <u>without a safety</u>

17          requirement. Currently under 16 CFR § 1210.3 (for cigarette lighters) a

18          safety is required. As someone who has had thumb and hand challenges there

19          is no reason that I should have to use matches since it is very difficult to use

20          a lighter with a safety even for a candle or to light a BBQ. Put an age

21          requirement on the no-safety lighter, lock it in a cage like they do spray paint

22          if needed. I should be able to choose between a lighter and matches.

23   ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1  **7)**        <u>**THE UNITED STATES**</u>
2      <u>**SENATE COMMITTEE on VETERANS AFFAIRS**</u>
3
4

5  <u>**NEW VETERANS COMMITTEE REQUIREMENTS**</u>: Any person on the U.S.

6  Senate Committee on Veterans Affairs will be required to have received medical

7  care through the Dept of Veterans Healthcare System for a minimum of six-

8  months to one-year.

9       Respectfully, any individual who serves on the Veterans Affairs Committee

10  will have served or is active-duty and received medical care from the Dept of

11  Veterans. Only two or three non-veterans (with no prior service) may be on the

12  Committee for legal writings for modifications and drafting legal documents and

13  law purposes to assistance the Committee members.

14       The Senate Veterans Committee on Veterans Affairs should be comprised

15  mostly of the WarFighter Community. This new requirement is due to the poor

16  decisions from the Committee members who have no experience in how the

17  system functions. Although their harmful changes may not have been

18  intentional, it is adding unnecessary tasks to medical providers, is a contributing

19  factor for killing and deforming and crippling veterans daily, which contributes

20  to suicide.

21  ///

22  ///

23  ///

1   **H:**          <u>**EQUITABLE TOLLING (Fairness)**</u>

2                   <u>**TABLE ON CONTENTS**</u>

3

4   1) Argument for Equitable Tolling (Fairness) ........................................................236

5   2) U.S. Coast Guard Drug Regimen ........................................................................255

6   3) U.S. Department of Veterans (VA Puget Sound) Drug Regimen ......................259

7   4) Identified Damaging Effects of a Frontal Lobotomy–*chemical*...........................263

8   5) US Dept of Veterans (VA Puget Sound) Drug Regimen *continued* ....................268

9   6) *Morphine*: Federal & State Drug Violations for Distribution & Refilling..........279

10  7) Drug Interaction Overview and Drug Interactions ............................................291

11  8) How Long it Took ............................................................................................298

12  9) Incapacity ........................................................................................................305

13  10) Drug Side Effects ..............................................................................................316

14  11) Affidavits by Experts for damaging Drug Effects (See Exhibit 66) ...................329

15  12) The 6.7 Year Process. The Short Version .........................................................330

16  13) Exhibit Excerpts of Carolyn's Injuries .......................................................145, 338

17

18

19                   **EQUITABLE TOLLING (EQT)**

20  ///

21  ///

22  ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   **1)**                    **ARGUMENT**
2                     **EQUITABLE TOLLING (EQT)**
3
4   **Defendant [United States]. With special actors named as recorded in the**
5   **medical and Court records for accuracy to the facts, events.**

6        In defense of the Plaintiff CAROLYN SIOUX GREEN missing the Statute of
7   Limitations filing deadlines states that said delays (brain impairment and with
8   physical injuries) and (retrograde memory) were extraordinary and out of her
9   control due to the obstacles that caused delays as outlined below. Plaintiff shows
10  that her mental impairment was so severe that she was unable to rationally or
11  factually and did not understand the nature of the proceedings. This is further
12  evidence that she filed formal complaints in 2020 with many government agencies,
13  including the Washington State Supreme Court to consolidate two Superior Court
14  cases.

15       Repressed memories; *Keene v. Edie (King County Superior Court 1993)*. The
16  jury "found that Ronald Edie, 57 of Auburn, had molested his former neighbor
17  between 1973 and 1977. Her claims were bolstered by testimony of two of Edie's
18  daughters and a woman who testifies he molested them when they were children."
19  (Richard Seven, "Psychiatry of Repressed Memories on Trial." Seattle Times July 9,
20  1993). Alley v. Alley (King County Superior Court, 1994). ("Dentist Found Liable in
21  Recovered Memory Case," *PR Newswire*, June 13, 1994.)[57]

22       For additional brain-damage impairment, in *Rivas v. Overlake Hosp. Med.*
23  *Ctr.*, 164 Wn. 2d 261, 268 (2008) (statute of limitations may be tolled when person

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   meets substantive standard form incapacity.) In *Rivas*, the Washington State

2   Supreme Court held that for tolling to apply, a plaintiff must demonstrate that she

3   was incapacited at the time her cause of action accrued, and that she was

4   incapacitated to an extent that she could not understand the nature of the

5   proceedings.

6        Statute of Limitations should be tolled. Plaintiff was incapacitated due to

7   how [United States], (*and other actors*), were involved in those facts. The drug

8   damaging–medications impacted every aspect of Plaintiffs life. (*see* Exh 63–72, 92)

9        **2001**: Contributing to Plaintiff's excessive delay in filing within the statute of

10  limitations while unlawfully detained initially by *Providence* St. Peter Hospital,

11  [Carolyn] was required to ingest and forcibly injected potent off-label psychotropic

12  drugs approx. **44 (forty-two) times** per the order by (*Haws, Chappell*). Due to

13  Providence's "recopied" drug record the number of drugs ingested will vary. In

14  addition, Providence altered their four-point mechanical restraints records it was so

15  violent.

16       The forced injections of Haldol are accurate and were mandatory even prior

17  to the only Court Hearing on June 8 the she contested. Carolyn was forcibly injected

18  at *Mason General Hospital* **one** forced Inj., then with *Central Fire Medic* **one** forced

19  Inj. of Ativan 2mg. *Western* (State), Carolyn was required to ingest and forcibly

20  injected potent off-label psychotropic drugs **22 times (twenty-two) times**, even

21  prior to court. The [United States], (*VA Puget Sound*), where Carolyn was required

22  to **ingest 332 (three- hundred-thirty-two) drugs in pill form** or be forcibly

1   injected Navane & Trifluoperazine potent off-label psychotropic drugs per the order

2   of [United States], (*Kumar*, *Hammond*), who overrode Plaintiffs right to refuse then

3   enforced ingesting with unlawful standing orders for injections. All without a

4   physical examination and evaluation for her *severe physical injury*. (Exh 1–61)

5   (Exh–71) (Exh–87)

6          Her initial right-sided hind-end/buttocks/hip/neck physical injuries were

7   delayed procedural care an additional 282 days after the unlawful imprisonment as

8   she was chemically lobotomized with psychotropic drugs where she sustained a

9   debilitating brain-injury, plus newly sustained physical injuries to her left-side

10  hind-end from the hours of improper use of four-point mechanical restraints being

11  further maimed while at Providence for her initial physical injury that was grossly

12  neglected by medical providers.

13         ➢  *See* EXHIBITS for drugs prescribed, damages caused, mental deficiency,

14            physical disability, to include incapacitation, lobe damage to the brain:

15            (Exh 64 [United States] (VA Patient Rights)) (Exh–65); (Exh–66); (Exh–

16            67); (Exh–68); (Exh–69); (Exh–70); (Exh–71); (Exh–72); (Exh–74);

17            (Exh–92); (Exh–96)

18

19         Statutes of limitation are not mere technicalities, but are fundamental to a

20  well-ordered judicial system. *Board of Regents v. Tomanino*, 446 U.S. 478, 487, 100

21  S. Ct. 1790, 64 L. Ed. 2d 440 (1980).  The purpose of statutes of limitation is to

22  compel action to be commenced within what the legislature deems to be a

1   reasonable period-of-time, and not postponed indefinitely. *Summerrise v. Stephens*,

2   75 Wn.2d 808, 812, 454 P.2d 224 (1969).

3   Equitable tolling "permits a court to allow an action to proceed when justice

4   requires it, even though a statutory time period has nominally elapsed." *State v.*

5   *Littlefair*, 112 Wn. App. 749, 759, 51 P.3d 116 (2002) (quoting State v. Duvall, 86

6   Wn. App. 871, 874, 940 P.2d 671 (1997).

7   Circumstances permitting equitable tolling include "bad faith, deception, or

8   false assurances by the defendants, and the exercise of diligence by the plaintiff."

9   Id. At 875, 940, P.2d 671 (quoting *Finkelstein v. Security Prop., Inc.*, 76 Wn. App.

10  733, 739-40, 888 P.2d 161 (1995).

11   In *Douchette*, 117 Wn.2d at 812 Courts have determined that equitable

12  tolling is appropriate when "consistent with both the purpose of the statute

13  providing the cause of action and the purpose of the statute of limitations."

14

15  According to the Court of Appeals of Washington in *State v. Duvall, 86*

16  *Wash.App* 871, 874 940 P.2d 671 (1997), "The doctrine of equitable tolling permits a

17  court to allow an action to proceed when justice requires it, even though a statutory

18  time period has nominally elapsed."

19  Equitable tolling is granted for extraordinary circumstances, going beyond

20  what is usual, regular, or customary. Equitable tolling is an extraordinary remedy

21  that allows a court to resuscitate untimely claims. Plaintiff respectfully requests

22  this Court to resuscitate her claims.

1    A litigant is entitled to equitable tolling if they can establish the following

2    two elements: "(1) that [they] ha[ve] been pursuing [their] rights diligently, and (2)

3    that some extraordinary circumstance stood in [their] way." *Irwin v. Veterans*

4    *Administration*, 498 U.S. 89 (1990).  In *Millay v. Cam*, 955 P.2d, 791, 797 (Wash.

5    1998) the doctrine of equitable tolling allows a court to toll the statue of limitations

6    when justice requires.

7

8    For a petitioner to qualify for equitable tolling due to mental impairment the

9    petitioner must meet a two-part test established by *Bills v. Clark* (9th Circuit 2010).

10    With regard to mental incapacity, "any standard for equitable tolling due to

11    mental impairment must evaluate whether the petitioner's condition made it

12    impossible to comply with the filing deadline." *Bills v. Clark*, 628 F.3d 1092, 1099

13    (9th Cir. 2010). Plaintiff is required to meet a two-part test to be eligible for

14    equitable tolling due to mental impairment:

15    (1). First, a petitioner must show her mental impairment was an "extraordinary

16    circumstance" beyond her control … by demonstrating the impairment was so

17    severe that either

18        (a) petitioner was unable rationally or factually to personally

19        understand the need to timely file, or

20        (b) petitioner's mental state rendered her unable personally to prepare

21        a complaint and effectuate its filing.

22    (2) Second, the petitioner must show diligence in pursuing the claims to the extent

23    she could understand them, but that the mental impairment made it impossible to

24    meet the filing deadline under the totality of the circumstances, including

25    reasonably available access to assistance.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    As seen in *Stoll v. Runyon* the plaintiff, Stoll, was entitled to equitable tolling

2    after the extreme sexual assault and harassment she experienced at her job where

3    Stoll was left so traumatized she could not participate or even directly communicate

4    with her lawyer for her EEOC proceedings without having panic attacks. 165 F.3d

5    1238 (9th Cir. 1999). Stoll's lawyer sent letters to her psychologists' office to

6    communicate with her that were then read in her presence. "According to Dr.

7    Weber, Stoll had been unable to understand her legal rights and act on them from

8    the time he began treating her in December 1990.

9    Some examples, Plaintiffs writing from 2001 as seen through out Exhibit 108

10   pt1 and pt2 as the gradual progression of the damaging effects done to her brain

11   from forced psychotropic drugging during the unlawful imprisonments.

12   ""Awfully doped up" she's usually more animated." Exhibit 65 pt2 pp. 9–10

13   further shows where plaintiff was barely able to write her own name, only in very

14   small letters compared to earlier writings. Of a thirteen-page orientation handbook

15   by [United States], (*VA Puget Sound*), Carolyn was only able to color in with pencil

16   the "O's" on the cover of the orientation handbook that she was unable to read it at

17   that point. In 2003, Plaintiff's brain damage is evidenced more by Exhibit 65 pt2 p.

18   15 from the effects of being chemically lobotomized. Experts' testimony affidavits for

19   more of the damaging effects of these drugs are located in Exhibit 66.

20   In Exhibit 72, for example, plaintiff provided a progress report from an

21   appointment she had on February 24, 2006 where she reported she ("fell asleep in

22   the bathtub twice the morning following the first dose") of quetiapine that she was

1    inappropriately prescribed and with excessive medications. (Exh–72 p. 17). Later

2    this co-prescriber clinical psychologist was fired and her license was suspended then

3    terminated due to her unprofessional conduct of "Sexual Misconduct or Contact"

4    with a male veteran, thus not providing adequate medical care to others, petitioner

5    included. (Exh–72 p. 20). The harmful drug effects further delayed the plaintiff.

6         By the time 2007 was upon plaintiff, she sought to have all of her ten-years of

7    unused GI Bill Educational benefits extended after nine-years (9 years) lapsed with

8    no-use due to her medical conditions and of being excessively medicated. She was

9    chemically lobotomized in 2001. She sought help to communicate and write a brief

10   note to have her educational benefits extended for an opportunity for later use. The

11   educational specialist spoke with the [United States] provider for the extension,

12   that was later granted. (Exhibit 124 at 2).

13        Meanwhile while recovering through brain damage, plaintiff was receiving

14   necessary medical treatments for her initial injury which occurred in 1994. She was

15   honorably discharged without adequate medical care by the [United States], then

16   injured at Providence.

17        Plaintiff was not aware of the four-point mechanical restraints damages until

18   September 12, 2018, as that injury was masked with excessive drugs, as she

19   thought the physical manifestations were from her initial injury that occurred while

20   active-duty. It was not. It was, in fact, the restraints mistreatment and physical

21   abuse that caused the left-hind-end tortured side that was caused by the improper

22   use of restraints used as a means of convenience, left unmonitored too.

1   It was so violent that Providence altered their four-point-mechanical restraints

2   records.

3        Her brain-injury from the defendants' actions by chemically lobotomizing her

4   occurred in 2001, followed by years of excessive unnecessary drugs by the [United

5   States] that prevented her from exercising reasonable diligence prior to her filings

6   which began August 11, 2019. It is nearly impossible to function as a human being

7   without a proper functioning brain. It is scientifically proven by case studies with

8   extensive literature and with experts' affidavits in how psychotropic drugs damage

9   a human's brain functions effecting the frontal lobe, temporal lobe, parietal lobe,

10  occipital lobe, cerebellum, and brain stem, where much damage occurs.

11       In furtherance, Plaintiff shows that her mental impairment was so severe

12  that she was unable to rationally or factually and did not understand the nature of

13  the proceedings as she filed formal complaints in 2020, sent through USPS certified

14  and registered mail with return receipts listed under the Incapacity Section number

15  27 (a-cc)to:

16       Washington State Bar Association (WSBA) 01/08/2020 USPS

17  #70191640000105937597 01/13/20; Washington State Medical Commission USPS

18  #RA309359876US  04/04/20 with formal complaint forms filled out going through

19  the required process. WA Med Commission opened the contents then returned with

20  no-response; Washington State Nursing Commission; Prosecutors Office Thurston

21  County; Jon Tunheim 01/08/2020; Prosecutors Office Pierce County; Mary Robnett

22  01/08/2020 USPS #70191640000105937603 01/13/2020 Pierce County Prosecutor

1   Mary Robnett; Attorney General of Washington State 01/08/202 USPS

2   #70191640000105937573 01/13/20; Washington State Commission on Judicial

3   Conduct 01/08/2020 USPS #70191640000105937580 01/13/20; U.S. Secretary of

4   Dept of Health and Human Services Secretary Alex Azar II 04/09/2020 USPS

5   #RA309359880US  04/04/20; Western State formal complaint filed with Cheryl

6   Strange USPS #RA309359862US  04/04/20. For a civil suit DSHS required a

7   certified mailing and registered mail and an email and a licensed process server in

8   order for a response; Western State formal complaint filed with Sean Murphy USPS

9   #RA309359859US  04/04/20;

10   *Morphine*: VA Puget Sound Dept of Veterans formal complaints about drugs,

11   *Morphine* in particular, (10-24-2018) via certified mail was filed with:

12   #RA309359814 03/30/2020 and USPS #7018068000014504405 10/09/2018 VA Puget

13   Sound Director Michael C. Tadych; USPS #70180680000145044875 10/09/2018 VA

14   Puget Sound Director of Pharmacy Christopher T. Hoey; Hand delivered to VA

15   Puget Sound Pharmacy for interoffice mail Dr. Li Tong; Hand delivered to VA Puget

16   Sound Pharmacy for interoffice mail VA Puget Sound Dr. Gerald R. Little; USPS

17   #70180680000145044899 10/09/2018 VA Puget Sound Director of Pain Clinic Dr.

18   Timothy C. Dawson; USPS #70180680000145044882 10/09/2018 VA Puget Sound

19   Director of Pain Clinic Dr. Anthony J. Mariano; USPS #RA309359831 03/30/2020

20   and USPS #70180360000134514609 10/25/2018 Hon. Secretary of Dept of VA

21   Robert Wilkie; #RA309359805 03/30/2020 U.S. Inspector General Michael Missal,

1    U.S. Department of Veterans Affairs USPS #RA309359845US 03/30/2020 U.S. WA

2    State Depart. of Health Systems; USPS

3    #RA309359862 US 03/30/2020 U.S. WA State Cheryl Strange (Western); USPS

4    #RA309359859US 03/30/2020 U.S. WA State Sean Murphy (Western);

5    #RA309359876US 03/30/2020 U.S. WA State Medical Commission (W*ho opened the*

6    *box with formal complaint. Then returned the box complete with contents not fully*

7    *opened. A brief note was later found in August 2021*.); USPS #RA309359880

8    03/30/2020

9        U.S. Secretary Alex Azar II, U.S. Dept. of Health & Human Services; USPS

10   #RA309359828US 03/30/2020 U.S. The Joint Commission in DC; USPS

11   #RA309359791US 03/30/2020 U.S. The Joint Commission in IL; USPS

12   #RA309359788US 03/30/2020 U.S. DEA Seattle WA.

13   USPS #RA309359774US 03/30/2020 U.S. DEA Headquarter DC Washington State

14   ignored her, so she went up the federal chain of command. With more evidence

15   complied, sent registered mail May 29: USPS #RE051022084US U.S. Dept. of

16   Justice Attorney General William Barr; USPS #RE051022075US U.S. Dept. of

17   Defense Honorable Mark T. Esper; and a few other places too.

18       All were in receipt. <u>Carolyn obviously did not understand the nature of the</u>

19   <u>proceedings. She filed complaints with factual evidence, and with the Morphine and</u>

20   <u>drug violations.</u> Plaintiff even filed to consolidate two Superior Court Cases in

21   Washington Supreme Court.

22   ///

1      Equally important, due to the extent of her physical injuries with the

2    exponential medical procedure delays with defendants directly and proximately

3    caused harm to plaintiff from and with her initial injury plus the mechanical

4    restraints injuries of from being maimed, she is still receiving effective necessary

5    medical procedures into 2021. (Exhibit 63).

6      Scientifically proven facts through peer reviewed literature, plus factual

7    evidence by medical experts' affidavits who've testified in courts of the harmful

8    effects these forced drugs have on mental functioning, the brain, by disrupting

9    neuropathways making them inoperative. Prescribed drugs create mental

10   dysfunctions in much of the same way, disrupting the way the brain connects and

11   communicates to the processing centers affecting the frontal lobe, temporal lobe,

12   parietal lobe, occipital lobe, cerebellum, and brain stem.

13      Affidavits by experts are included to solidify these claims. *See* (Exh–66)

14   (Exh–65 pt2 pp. 6–17; Exh–65 pt1 pp. 158–160, p. 11; p. 17; p. 18; p. 48; p. 60; p. 71,

15   pp. 123–141) Drug side effects and drug interactions listed in the document bring

16   more scientific evidence with real life experience of the extraordinary circumstances

17   and challenges the Plaintiff has had to overcome in order to bring her claims to

18   Court.

19      o  *Drug prescriptions see* Exh 67, 68, 69, 70, 71, 72, 74, 92) (Exh–63 pp. 30–

20         31; p. 36; p. 41–44; Exh–66; Exh–64)

21      o  *Drug side effects see* Exh–66 p. 11–150; Exh–70; Exh–71; Exh–72 pp. 11–

22         18; Exh–74 p. 8)

1      o   "Brain & Neurotoxins" for more information @candidCarolyn on Pinterest.

2      o   JAMA Internal Medicine stated in 2016 that off-label drug uses account

3          for more than 44% more adverse effects. (Exh–67 O).

4      o   "Opiates in combination with a Benzodiazepine carries a 5x increase risk

5          for adverse outcome including death," per [United States].

6

7       Besides that, the [United States] excessive drug treatment for injuries

8  included <u>13 YEARS of CHRONIC OPIOID THERAPY, along with other excessive</u>

9  <u>drug damaging interaction combinations</u>. Plaintiff does show that mental

10  impairment made it impossible for her to comply with the filing deadline, which

11  accrued in July 2014. She also does show that her mental impairment was "so

12  severe" that she was unable "rationally or factually to show that to personally

13  understand the need to timely file," and that her mental state rendered her unable

14  to prepare and file a complaint.

15

16       In this case, *Carolyn v. United States,* Plaintiff is able to fulfill these two

17  requirements as has suffered from severe brain damage to include being chemically

18  lobotomized and lacked mental clarity to file her petition for many years, as she was

19  only capable to start the legal process August 2019 as she was unable to prepare a

20  complaint and effectuate its filing. To prepare a complaint, it's taken more than six-

21  years. Plaintiff therefore is entitled to equitable tolling.

22  ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    **No-exemptions from liability**:

2        [United States], Dept of Veterans, claims for immunity pursuant to RCW

3    71.05.120(1) clearly states, 'PROVIDED, That such duties were performed in good

4    faith and without gross negligence,' as it applies to civil commitment. However,

5    Carolyn was *not* civilly committed according to case law and state regulations and

6    statutes, nor the U.S. Constitution, Carolyn was unlawfully imprisoned. There are

7    no-exemptions from liability in unlawful imprisonment. There are no-exemptions

8    for force drugging Plaintiff to near annulation while chemically lobotomizing her in

9    2001 while grossly neglecting her physical injury.

10       Therefore, RCW 71.05.120(1) does not apply here. Her state laws and rights

11   with many Constitutional and federal laws and patient rights were removed from

12   her unlawfully. Defendant's immunity authority is destroyed due to unlawful

13   imprisonment pursuant to 9A.08.040; Criminal mistreatment with other Federal

14   and State laws applying. Such as, General Requirements of Culpability 9A.28.040;

15   Criminal Conspiracy 9A.36.010; Assault in the First Degree 9A.36.050; Reckless

16   Endangerment 9A.72.070; Perjury and False Swearing 9A.72.010.

17

18       Gross negligence is defined as: "the failure to exercise slight care. It is

19   negligence that is substantially greater than ordinary negligence. Failure to

20   exercise slight care does not mean the total absence of care but care substantially

21   less than ordinary care." Washington Pattern Instruction [WPI] 10.07. The

22   Washington Supreme Court defines gross negligence as "gross or great negligence,

1   that is, negligence substantially and appreciably greater than ordinary negligence.

2   Its correlative, failure to exercise slight care, means not the total absence of care

3   but care substantially or appreciably less than the quantum of care inherent in

4   ordinary negligence." (emphasis added in text). *Nist v. Tudor*, 407 P.2d 798, 331

5   (Wash. 1965), see also *Boyce v. West*, 862 P.2d 592, 665 (Wash. App. 1993) (gross

6   negligence is "...negligent acts [that fall] greatly below the standard established by

7   law for the protection of others against unreasonable risk of harm...").

8        Thus, there is no-immunity from ordinary medical tort liability when the

9   provider's conduct in gross negligence. Bad faith is defined as: "actual or

10  constructive fraud, or a neglect or refusal to fulfill some duty...by some interested or

11  sinister motive." *Bentzen v. Demmons*, 842 P.2d 1015, 349 n.8 (Wash. App. 1993),

12  see also *Spencer v. King County*, 692 P.2d 874, 208 (Wash. App. 1984) (bad faith

13  implies acting with tainted, fraudulent or ill will motives).

14

15       Premeditation for a 90-day by the [United States], Kumar, solidified in the
16  record three-times. **Double and tripling drug doses due to her refusal and**
17  **non-compliance to ingest is a form of punishment**. In *Vitek v. Jones*, Forced
18  administration of antipsychotic medication may not be used as a form of
19  punishment. Dolus Malus.
20  (See Case Law Exhibit 90; Exhibit 102; as well as further in the document).
21
22       Here's a one liner from the [United States] showing their gross negligence

23  "Injured her R buttock, hips, neck and back. Patient will be put on mood stabilizers

24  and antidepressants." (June 12, 2001) Emphasis added.

25       Without a doubt, to force administer medication then with *increases* of potent

26  *neuroleptic* "seize the brain" drugs to a non-consenting individual to then daily and

1    repetitively override this same reasonable person's individual choice in how their

2    care is managed by treating a well-documented medically recorded *physical injury*

3    that was ignored then treated as an erroneous mental label is gross negligence.

4    Carolyn thought that she had left the United States of America.

5          As recorded in the [United States] medical records by her gold standard

6    doctor who wrote a remark Carolyn made during an appointment "... <u>last time I had</u>

7    <u>a brisk walk around the (apartment) compound without the sense that I am</u>

8    <u>dragging my right leg–the first time since my injury" (Injured Feb. 21, 1994)</u>

9    <u>(January 8, 2003)</u>. (emphasis added).

10         "A physician commits malpractice by not exercising that degree of skill and

11   learning that is ordinarily possessed and exercised by members of the profession in

12   good standing acting in the same or similar circumstances." *Durham v. Vinson*, 360

13   S.C. 639, 650-51, 602 S.E.2d 760, 766 (2004).

14         It's gross negligence and medical malpractice to treat a physical injury with

15   sedation, benzodiazepines, tranquilizers, "mood stabilizers and antidepressants",

16   and antipsychotic drugs for an alleged marketed mental disorder that Carolyn

17   never had then since or prior. It has taken 20 years to mostly recovery from these

18   forced unlawful treatments. United States *chemically lobotomized* her, twice.

19         As a result of Defendants [United States] actions and misconduct, she was

20   not able to bring this claim earlier due to she was so debilitated by their actions.

21   Then the actions that followed as her physical injury was further grossly

22   mismanaged by [United States] (VA Puget Sound). The drugs and drug interactions

1     caused life altering consequences. She was not in a mental state and physically and

2     structurally unstable to bring claims to assert her rights until later. As soon as she

3     was able to file, she did. It would be unfair to hold her to the prior statute due to

4     she was not able during that time to commence these claims from what Defendants

5     [United States] unlawfully treated to Plaintiff..

6

7        The Supreme Court has repeatedly applied equitable tolling to the statute of

8     limitations to prevent unjust results or to maintain the integrity of a statue.

9     **Equitable Tolling of Claims may be Allowed as Seen in**;

10     **1)**. *In Irwin v. Veterans Affairs*, 498 U.S. 89 (1990), the Supreme Court held

11     limitations included in waivers of sovereign immunity would be subject to equitable

12     tolling unless Congress specifically precluded such tolling; **2)**. Ignorance of the

13     injury and/or its cause because of a claimant's lack of diligence does not delay

14     accrual of the claim; if the cause is unknowable despite the claimant's diligence,

15     accrual may be delayed. *Skwira v. United States*, 344 F.3d 64, 78 (1st Cir. 2003);

16     *Kronisch v. United States*, 150 F.3d 112 (2nd Cir. 1998); **3)**. Government physicians'

17     reassurances that medical complications experienced by the plaintiff are normal

18     may delay the plaintiff's knowledge of his injury and toll the statute of limitations.

19     *Dearing v. United States*, 835 F.2d 226 (9th Cir. 1987); **4)**. Government's active or

20     fraudulent concealment of its role in the injury causing event may toll the statute of

21     limitations. *Muth v. United States*, 1 F.3d 246 (4th Cir. 1993); *Bennett ex rel. Estate*

22     *of Bennett v. United States*, 429 F.Supp.2d 270 (D.Mass. 2006); *Valdez ex rel. Donely*

23     *v. United States*, 518 F3d 173 (2d Cir. 2008) (government misconduct or

1    concealment not necessary to invoke doctrine of equitable tolling); **5).** Government's

2    continuing tortious conduct or continuous medical treatment may delay accrual of

3    the claim. *Otto v. National Institute of Health*, 815 F.2d 985 (4th Cir. 1987)

4    ("doctrine is based on a patient's right to place trust and confidence in his

5    physician" and "the patient is excused from challenging the quality of care being

6    rendered until the confidential relationship terminates"); *Wehrman v. United*

7    *States*, 830 F.2d 1480 (8th Cir. 1987); **6).** If the government's negligence caused the

8    plaintiff's mental incapacity to understand the significance of the relevant facts,

9    tolling may be allowed. *Washington v. United States*, 769 F.2d 1436 (9th Cir. 1985).

10

11        *Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89 (1990), provides the

12   framework for deciding "the applicability of equitable tolling in suits against the

13   Government."

14        The Government's response that § 2401(b)'s time limits are not subject to

15   tolling because they are jurisdictional restrictions. Though the courts govern

16   litigation against the Government, a court can toll them on equitable grounds. The

17   FTCA's jurisdictional provision states that courts may hear suits "under

18   circumstances where the United States, if a private person, would be liable to the

19   claimant." 28 U. S. C. §1346(b).

20        Court of Appeals opinion of the (9th Cir.) 558–559. "..it makes no difference

21   that a time bar conditions a waiver of sovereign immunity, even if Congress enacted

22   the measure when different interpretive conventions applied; that is the very point

23   of this Court's decision to treat time bars in suits against the Government,

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   whenever passed, the same as in litigation between private parties." See *Irwin*, 498

2   U. S., at 95–96; *Scarborough*, 541 U. S., at 420–422; *Franconia*, 536 U. S., at 145.

3          Accordingly, the Court held that the FTCA's time bars are non-jurisdictional

4   are subject to equitable tolling. The Court of Appeals (9th Cir.) rejected the

5   Government's argument and concluded that courts may toll both of the FTCA's

6   limitations periods. *United States v. June* (2015).

7          In *Irwin*'s "general rule" that equitable tolling is available in suits against

8   the Government. 498 U. S., at 95. "The justification the Government offers for

9   departing from that principle fails: Section 2401(b) is not a jurisdictional require-

10  ment. The time limits in the FTCA are just time limits, nothing more."

11         The Court explained in *Irwin*, that is not because the phrase itself

12  "manifest[s] a . . . congressional intent with respect to the availability of equitable

13  tolling." 498 U. S., at 95. "The words on which the Government pins its hopes are

14  just the words of a limitations statute of a particular era. And nothing else supports

15  the Government's claim that Congress, when enacting the FTCA, wanted to

16  incorporate this Court's view of the Tucker Act's time bar—much less that Congress

17  expressed that purported intent with the needed clear statement." "All that matters

18  is that such time limits function as conditions on the Government's waiver of

19  sovereign immunity."

20

21         Here, in this case, *Carolyn v. United States,* Plaintiff is able to fulfil the

22  requirements as she has suffered from mental incapacitation due to brain-damage

1    to include being chemically lobotomized as well as shows the scientifically proven

2    damaging effects drugs have on the brain, backed with experts' affidavits, plus

3    being maimed, as petitioner's mental state rendered her unable personally to

4    prepare a complaint and effectuate its filing until August 2019 is enough to fulfill

5    the "extraordinary circumstance" requirement. Throughout the period the statute of

6    limitations was running and passed, Plaintiff has provided evidence demonstrating

7    she lacked the mental clarity to file her own petition and pursue her rights

8    diligently prior to August 2019.

9        To prepare a complaint, it's taken more than six-years. She further shows she

10    was disabled to such a degree that she did not understand the nature of the

11    proceedings. Plaintiff therefore is entitled to equitable tolling. Equitable tolling is

12    an extraordinary remedy that allows a court to resuscitate untimely claims.

13    Plaintiff respectfully requests this Court to resuscitate her claims.

14

15

16           THE STATUTE OF LIMITATIONS SHOULD BE TOLLED (Fairness)
17                Carolyn has *legal standing* in all cases.

18    ///

19    ///

20    ///

21    ///

# 2).           U.S. COAST GUARD DRUG REGIMEN
## STARTS HERE:

27)<u>1994</u>:

    <u>**Six (6) drugs**</u> contributed to Plaintiffs excessive delay in filing within the statute of limitations. The USCG prescribed drugs 6 (six) brain impairment and anesthetizing drugs inappropriately to treat her *physical injury* instead of procedural care.

28)<u>1995</u>: <u>**Ten (10) drugs**</u> contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by U.S. Coast Guard 10 (ten) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

    USCG failed to provide medical care who then in fact denied her adequate medical care, and refused to provide the recommended tests ordered by a specialist. The USCG <u>reprimanded</u> her for seeking to speak with a doctor outside of a medical appointment. <u>Reprimanded</u>.

    <u>She was also denied a second opinion by the Medical Officer who created a hostile medical environment</u>. This was prior to and after being <u>reprimanded by the Commanding Officer and the Medical Administrator</u>. The Command through a By direction labeled her <u>well-documented physical injury</u> a mental disorder instead of treating and providing appropriate adequate medical care for her physical injury.

1      To further the inhumane negligent treatment by the USCG, she was

2   honorably discharged after she was still catastrophically physically injured and

3   cold turkey off Valium in which the USCG recklessly used this drug to treat her

4   physical injury and a "mild" case of post-traumatic stress. She was left without

5   medical care or treatment after the USCG basically kicked her to the curb giving

6   her a death sentence.

7

8      The Medical Officer, a Commander, and the Medical Administrator, a Chief

9   Warrant Officer, through a <u>By direction</u> initiated the retaliation and hostile medical

10   environment that further lead up the chain of command to reinforce their personal

11   attacks that were approved by the Command. (Exh–130; Exh 1–57 uscg + va).

12      FIVE OFFICERS were derelict in their duty and failed to perform their

13   duties to a physically injured active-duty service member who was temporarily

14   assigned to the land unit due to her physical injury.

15      A LCDR, Henry Reed, Supervisor D13 was notified in writing by Yvonne Fee,

16   FPA, on 26 OCT 1995 ....."She also stated her Neurologist and had finally been

17   diagnosed. It appears she has a very serious injury that has been neglected and

18   misdiagnosed by Dr. Castro..." "Dr. Castro was really upset, stated he was going to

19   enter a AMA, and told her to see Mr. Tate. We then went to his office and he

20   proceeded to chastise her for something. He told her he would have to go speak with

21   the XO, CDR BRECKINRIDGE, and he disappeared..." "...however, I can tell you

22   the COAST GUARD is going to be blamed from something they have no control

1   over, (our local medical officer, Dr. Castro and Mr. Tate) who shot themselves in the

2   foot yesterday." "Not everyone who see Dr. Castro is a malingerer or whiner when

3   they see him for ...Not everyone who seeks medical care will recover on

4   Motrin/Valium/or pain medication. I feel I would be doing our active duty members

5   a great disservice if I had not written this report." (cited Exh–63 pp. 9–10; p. 6);

6   (Exh–130 p. 89).

7

8          The [UNITED STATES] had a duty to provide Carolyn with adequate

9   medical care while active duty.

10          "The United States Coast Guard has the <u>worst</u> record for sexual harassment

11   of any federal agency." "When interview groups were asked if the chain of

12   command worked in redress of grievances, a frequent reply was "the chain of

13   command is the problem." The tour of duty rotation new XO at Chetco stated

14   "<u>regarding the sexual harassment, "It's the worst I've seen in thirteen years.</u>

15   <u>They're like a pack of wolves, three or four.</u>" Emphasis added.

16

17   <u>Exhibit 132</u>:

18          <u>p. 10</u> ¶¶ 10–14 "... referred to as "the new wench on board...";

19          <u>p. 10</u> ¶¶15–17 "...."cunt" was programmed in the telephone display..." prior to

20   radio communications watch and a "...derogatory comment...on her mirror";

21          <u>p. 10</u> ¶¶21–23 "...called a "douche bag" in front of superior ..."

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    p. 70 ¶¶2–9 "In plaintiff [Carolyn's] case, being called a "cunt", a "wench" and

2    a "douche bag". She was subjected to men urinating in front of her, discussions of

3    ejaculation, and simulated sexual acts involving the groins of her superiors. She

4    was menaced with a screwdriver, subjected to an illegal car prowl, and forced to

5    sleep on a living room couch, in violation of Coast Guard regulations. These, and the

6    numerous acts of harassment named in her complaint, are not acts "incident to

7    military service"."

8    p. 163 ¶¶4–9 "Due to the egregious and physically threatening nature of the

9    incidents (for example, complainant was ordered to paint in the messdeck void on a

10   44' MLB and forced to breath intoxicating fumes without a respirator), complainant

11   suffered from suppressed memory of one or more of the incidents...." (See Exhibit

12   128 p. 144–147);

13   p. 181 "... committed an act of illegal menacing toward complainant...

14   apparently angered by complainant's desire to help put up a "pull-up bar",

15   encountered complainant in the boathouse, picked up a screwdriver from the

16   boatswain hole, and in from of complainant repeatedly stabbed the screwdriver into

17   a counter top while screaming at her. He yelled, "You're not helping. You're

18   hindering. This is the straw that broke the camel's back. This is going to bit you in

19   the ass."

20   ///

21   ///

22   ///

1  **3).**              **DEPT OF VETERANS DRUG REGIME**
2                        **STARTS HERE:**
3

4     [United States] VA Patient Rights excerpt; 2). "...prompt and appropriate
5     treatment for physical and emotional disorders...disabilities.... ...treatment
6     free from unnecessary or excessive medication." (Exh–64 p. 6)
7

8   29) **1996 January 12**:

9     (Exh 64 p. 6) According to [United States] Dept of Veterans Code of Patient

10    Concern in-part states: 2). "You will receive to the extent that you are eligible,

11    prompt, and appropriate treatment for physical or emotional disorders, or

12    disabilities in the least restrictive environment necessary for that treatment free

13    from unnecessary or excessive medication." VA Form 1989 10-7991: with

14    emphasis.

15    **Four (4) drugs** contributed to Plaintiffs excessive delay in filing within the

16    statute of limitations. [Carolyn] was prescribed by VA Puget Sound 4 (four)

17    brain impairment and anesthetizing drugs and inappropriate off-label drugs.

18  30) **1997**: **Five (5) drugs** contributed to Plaintiffs excessive delay in filing within

19    the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 5 (five)

20    brain impairment and anesthetizing drugs and inappropriate off-label drugs.

21  31) **1998**: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the

22    statute of limitations. [Carolyn] was prescribed by VA Puget Sound 6 (six) brain

23    impairment and anesthetizing drugs and inappropriate off-label drugs.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

32) **1999**: **Seven (7) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 7 (seven) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

33) **2000**: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 6 (six) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

34) **2001**: **Welcome to the Avalanche**:

<u>Force Drugged by these establishments: Providence, Western, Mason General, Central Fire Medic, [United States] VA Puget Sound twice (VA-1, VA-2)</u>: (Exh–64) (Exh–87) (Exh 1–61 va + western)

| | |
|---|---|
| Acetaminophen | Navane (threat) |
| Ativan/Lorazepam | Olanzapine/Zyprexa** |
| Azirthromycin | Paxil |
| Denzapine/Clozapine | Pseudoephedrine HCL |
| Depakote | Restoril/Temazepam |
| Droperidol | Seroquel/Quetiapine |
| Etodolac | Tramadol/Ultram |
| Haldol | Trazodone |
| Hydroxyzine HCL | Trifluoperazine (threat) |
| Ibuprofen | Valproic acid/ Depakene |
| Klonopin/Clonazepam** | Vistaril |
| (***Contains Aspartame*) | |

That is what Pharmaceutical Rape looks like.

*Pharmaceutical rape involves suffering physical, emotional, mental, social, and spiritual damage at the hands of those holding power who deny any wrongdoing and remain free to do the same to others.*

1    ALL before someone finally actually listened to her during the last onslaught of this

2    50-day horrific nightmare where she was forced injected drugs nearly to death, and

3    with cruel and unusual punishment. And, she walked out with a WALKING CANE

4    1,200 hours later which she had to ask for!! A walking cane is not a drug; it is used

5    to help people walk with stability.

6

7        **2001**: (**21 drugs**). The supposed antidote (Cogentin) for the assaults of forced

8        injections of HALDOL was intentionally withheld by Providence (and an

9        additional 2-drugs were used as threats of forced injections as enforcement to

10       ingest –a form of retaliation and punishment from [United States] VA Puget

11       Sound. (**21 drugs**). (Exh–63) (Exh–64) (Exh–87) (Exh–66)

12

13   VA Puget Sound: FX's Trauma: "Injured her R buttock, hips, neck and back. Patient

14   will be put on mood stabilizers and antidepressants." *And so, the VA Puget Sound*

15   *continued, including an antipsychotic for the drug induced insomnia from Paxil.*

16   *Paxil was used as a pain killer by VA, too.* (June 12, 2001)

17

18       "... last time I had a brisk walk around the (apartment) compound without the

19       sense that I am dragging my right leg–the first time since my injury"

20       (Injured Feb. 21, 1994) (January 8, 2003). With emphasis.

21

22       How each establishment (hospital/ prison) stacked up pharmaceutically with

23   forced drugging by injections and/or required to ingest, enforced with unlawful

24   standing orders for forced injections for her non-compliance to ingest and of her

25   legal right to refuse. All of these drugs were used off-label by force:

1    **<u>Drug Interactions just for the 50-days:</u>**

2    Providence: Major: 8, Moderate: 17.

3    [United States] American Lake VA-1: Major 1, Moderate 2.

4    Western: Major 1, Moderate 5.

5    [United States] American Lake VA-2: Major: 6, Moderate 16.

6    *COMBINED* drug interactions in her system:

7    *Major 23, Moderate 57, with 12 Therapeutic Duplications.*

8

9          JAMA Internal Medicine stated in 2016 that off-label drug uses account for

10   more than 44% more adverse effects.[1] (Exh–67 O).

11

12   [United States] "You will receive to the extent that you are eligible, <u>prompt, and</u>

13   <u>appropriate treatment for physical</u> or emotional disorders, or disabilities in the least

14   restrictive environment necessary for that treatment <u>free from unnecessary or</u>

15   <u>excessive medication</u>." VA Form 1989 10-7991: with emphasis. 3). "You will not be

16   denied your legal rights while hospitalized..." (See Exh 64 pp. 4–10)

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

# 4).      IDENTIFIED DAMAGING EFFECTS OF A FRONTAL CHEMICAL LOBOTOMY

## Carolyn was *Chemically Lobotomized* in 2001

a) "A surgical procedure called the frontal lobotomy was used for a period of time. It was later **replaced with psychotropic drugs**, counseling, and behavior modification therapies which are still used today." [6] (emphasis added)

b) "The **frontal lobe is the home of much of what makes us human**. Frontal lobes play an important part in attention, concentration, working memory, short term memory, impulse control, judgement, language, problem solving and reasoning.    Frontal lobes assist in planning, coordination, controlling and executive behavior. Damage to the frontal lobes may result in problems with all aspects of cognitive processing."[24] (emphasis added)

c) **makes us human**. Frontal lobes play an important part in attention,

d) Howard Dully, a lobotomy survivor of "one of the most brutal procedures in medical history." Mr. Dully was one of the youngest recipients, a 12 year old, of a forced lobotomy in 1960, with that of an ice pick. It has taken Mr. Dully 20 years to recover from his forced frontal lobotomy. Today, he still *suffers memory loss*. Howard Dully went from a survivor to a thriver and publicly speaks about his experience.[32]

1    **e)** "A psychiatrist present at the lobotomy asked Rosemary Kennedy to tell him

2        stories and repeat the months of the year. The doctor kept scraping away brain

3        tissue until Rosemary could no longer talk."[26] "They continued until Rosemary

4        could no longer respond coherently, at which point they declared the operation

5        complete. Rosemary left the operating table with the mental capacity of a two year

6        old child." _Psychotropic drugs do this same thing, removing one's ability to speak_

7        _and process thoughts like a human being._ Appearing normal on the outside, yet

8        processing much differently than designed on the inside.

9

10    **f)** "Damage to the frontal lobes can result in: Loss of simple movement of various

11        body parts (Paralysis); Inability to plan a sequence of complex movements needed

12        to complete multi-stepped tasks, such as making coffee (Sequencing); Loss of

13        spontaneity in interacting with others; Inability to express language (Broca's

14        Aphasia); Loss of flexibility in thinking and persistence of a single idea or

15        behaviour (Perseveration); Inability to focus on a task and to filter out distractions

16        (Attention); Mood fluctuations (Emotional lability); Difficulty problem solving;

17        Difficulty inhibiting or controlling a response or impulse (Disinhibition); Reduced

18        motivation, initiation and persistence on activities (Adynamia); Reduced

19        awareness/insight into difficulties; Changes in social behaviour; Changes in

20        personality." [7]

21    ///

1    **g)** "Dopamine, a neurotransmitter that plays a role in reward and motivation, is

2    heavily active in the frontal lobe because most of the brain's dopamine-sensitive

3    neurons located here which is damaged by psychotropic and other drugs (four-

4    forced chemical lobotomies). Frontal lobe difficulties can lead to executive

5    functioning issues. Thinking, planning, short term memory. Inability to engage

6    immoral decision-making. Difficulties with planning, <u>executive functioning</u>, and

7    attention. Loss of memory, sudden and dramatic changes in personality, a decline

8    in intelligence. Changes in emotions, <u>difficulty understanding social cues or</u>

9    <u>relating to the emotions of other people</u>. <u>Changes in motor skills and spatial</u>

10    <u>reasoning abilities</u>."[28] (emphasis added)

11

12    **h)** "The frontal lobes are important for voluntary movement, <u>expressive language</u>

13    <u>and for managing higher level executive functions</u>. Executive functions refer to a

14    collection of <u>cognitive skills including the capacity to plan</u>, <u>organize</u>, <u>initiate</u>, self-

15    monitor and control one's responses in order to achieve a goal."[9]

16

17    **i)** "Some potential symptoms of frontal lobe damage can include: loss of movement,

18    either partial paresis or complete paralysis, on the opposite side of the body,

19    difficulty performing tasks that require a sequence of movements, <u>trouble with</u>

20    <u>speech or language (aphasia), poor planning or organization</u>, persistence with one

21    behavior, way of thinking, or set of rules, <u>difficulties with higher order functions</u>

22    <u>like reasoning, problem-solving, and judgment, problems with maintaining</u>

1    <u>attention or concentration</u>, decreases in motivation, mood swings, impaired ability

2    to initiate activities or interactions, drastic changes in personality or behavior,

3    which can include apathy, irritability, poor impulse control or lack of inhibition

4    <u>difficulty solving problems</u>, <u>lack of muscle coordination</u>, <u>memory loss</u>, <u>loss of</u>

5    <u>balance</u>, <u>visual disturbances</u>, and <u>difficulty focusing</u>."[27]

6  **j)** Lobotomies destroy the frontal lobes connections to other parts of the brain...

7    destroys personality and intellect.[51]

8  **k)** "Freeman believed that cutting certain nerves in the brain could eliminate excess

9    emotion and stabilize a personality. Indeed, many people who received the

10    transorbital lobotomy seemed to lose their ability to feel intense emotions,

11    appearing childlike and less prone to worry."[8]

12      Only the methods of lobotomizing humans have changed from the ice pick in

13    the orbital and or the scrapping of brain matter. Psychotropic drugs cause similar

14    damage to the brain by chemically severing neurotransmitters and connections

15    causing brain damage with debilitating effects to the frontal lobe, other parts of

16    the brain.

17

18  **l)** "Damage to the primary motor, supplemental motor, and premotor areas lead to

19    weakness and impaired execution of motor tasks of the contralateral side. The

20    inferolateral areas of the dominant hemisphere are the expressive language area

21    (Broca area, Brodmann areas 44 and 45), to which damage will result in a non-

22    fluent expressive type of aphasia. Frontal lobe syndrome, in general, refers to a

1   clinical syndrome resulting from damage, and impaired function of the prefrontal

2   cortex, which is a large association area of the frontal lobe. The areas involved

3   may include the anterior cingulate, the lateral prefrontal cortex, the orbitofrontal

4   cortex, and the frontal poles."[23]

5

6       It is scientifically proven by case studies with extensive literature and with

7   experts' affidavits in how psychotropic drugs damage brain functions effecting the

8   frontal lobe, temporal lobe, parietal lobe, occipital lobe, cerebellum, and brain stem,

9   where much damage occurs.

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

5).       **U.S. DEPT OF VETERANS**
          **DRUG REGIMEN**
                                      *CONTINUED*


[United States] VA Patient Rights excerpt; 2). "...prompt and appropriate treatment for physical and emotional disorders...disabilities.... ...treatment free from unnecessary or excessive medication." (Exh–64 p. 6)

35)**2002**: **Ten (10) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations. [Carolyn] was prescribed by VA Puget Sound 10 (ten) brain impairment and anesthetizing drugs and inappropriate off-label drugs.

36)**2003**: **Eleven (11) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 11 (eleven) brain impairment and anesthetizing drugs and inappropriate off-label drugs. I voluntarily (pursued) entered a 30-day Women's Trauma Recovery Program in Palo, Alto seeking help to recover from traumatic events that occurred during her active-service time while leaving out the horrors of 2001.

37)**2004**: **Nine (9) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 9 (nine) brain impairment and anesthetizing drugs and inappropriate off-label drugs.


**CHRONIC OPIOID THERAPY STARTED IN 2005**

38)**2005**: **Twelve (12)** drugs contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 12 (twelve) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. CHRONIC OPIOID THERAPY.

39)**2006**: **Eleven (11) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 11 (eleven) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. CHRONIC OPIOID THERAPY.

40)**2007**: **Nine (9) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 9 (nine)

brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

41) <u>**2008**</u>: **Eight (8) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 8 (eight) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

42) <u>**2009**</u>: **Eight (8) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 8 (eight) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

43) <u>**2010**</u>: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 6 (six) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

44) <u>**2011**</u>: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 6 (six) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

45) <u>**2012**</u>: **Six (6) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 6 (six) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

(*Drug prescriptions see* Exh 67, 68, 69, 70, 71, 72, 92) (Exh–64) (Exh–66)

46) <u>**2013**</u>: **Seven (7) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 7 (seven) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

47) <u>**2014**</u>: **Nine (9) drugs** contributed to Plaintiffs excessive delay in filing within the statute of limitations [Carolyn] was prescribed by VA Puget Sound 9 (nine) brain impairment and anesthetizing drugs to include chronic *opioid* therapy and other inappropriate off-label drugs. <u>CHRONIC OPIOID THERAPY</u>.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES (CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    At the end of **March**, she severely injured her right ankle ligaments (Exh–

2    82) due to her *right*-sided initial injury being grossly neglected while her *left-side*

3    hind-end injury and violent trauma continued to be <u>masked by chronic opioid</u>

4    <u>therapy and inappropriate off-label drugs</u>. She had sharp pains and spasms in her

5    rectal colon area dropping her to her knees in pain.

6    The [United States] Dept of Veterans gave her a flimsy brace along with a

7    couple cortisone shots that did nothing to heal her injury. She was later provided

8    with excellent care advice from her Podiatrist to seek Prolotherapy to recover her

9    ankle mobility.

10    In **October**, her liver showed signs of failing as with her bile ducts and

11    gallbladder too. Her liver was not breaking down her protein, therefore she was

12    sleeping excessively, fatigued, and her hair was falling out. Dr. Andrew Iverson and

13    Dr. Cy Fisher, both Naturopathic doctors had her do liver cleanses and to increase

14    her proteins, get lots of rest, while her *left-side* hind-end injury and violent trauma

15    continued to be masked by chronic opioid therapy and inappropriate off-label drugs.

16    She had sharp pains and spasms in her rectal colon area dropping her to her

17    knees in pain. She thought this was due to her initial right-side injury. It was not.

18
19    THE STATUTE OF LIMITATIONS SHOULD BE TOLLED (Fairness)
20    Carolyn Sioux Green has *legal standing* in all cases.
21
22
23    48)<u>**2015**</u>: **Seven (7) drugs** contributed to Plaintiffs excessive delay in filing within
24    the statute of limitations [Carolyn] was prescribed by VA Puget Sound 7 (seven)
25    brain impairment and anesthetizing drugs to include chronic *opioid* therapy and
26    other inappropriate off-label drugs. (Exh–92) <u>CHRONIC OPIOID THERAPY</u>.

1    On February 11th of 2015, she started to write sentences one after another

2    that had nothing to do with the previous sentence to heal from violent trauma and

3    make sense of what happened (Exh–85). She has continued to have sharp pains and

4    spasms in her rectal colon area dropping her to her knees in pain while over at a

5    friend's house.

6    Her *left-side* hind-end injury and trauma continued to be masked by chronic

7    *opioid* therapy and other inappropriate off-label drugs. Her *left*-side hind-end and

8    left leg started showing more signs of neurological damage, including numbness to

9    her *left* labia that numbness continued to her lower leg including her inner heel.

10   She thought it was due to her right-side hind-end injury. It was not. It was the left

11   hind-end tortured side.

12   Her liver and bile duct and her gallbladder functions are slow to improve, yet

13   are improving.

14   She is still having problems with shortness of breath and breathing and has

15   not seen a cardiologist at any time. Further causing delays. Carolyn requested to

16   see a cardiologist in 2015. Carolyn wore a heart monitor where test results showed

17   signs of Bradycardia Toxidrome (fewer than 60 bpm) and Tachycardia (more than

18   100 bpm). Carolyn's results showed "Maximum HR 143 bpm" and "Minimum HR 49

19   bpm" [17] (Exh–65 pt3). For the record, the [United States] failed to inform the patient

20   about this, she read it in the record.

21

22   (*Drug prescriptions see* Exh 67, 68, 69, 70, 71, 72, 92) (Exh–64) (Exh–66)

49) **2016**: **Eight (8) drugs**. The chronic *opioid* therapy continued. On December 20th, Carolyn self–discontinued the *daily* brain impairment and anesthetizing drugs prescribed by the Dept of VA. Prior to that date, she was on eight **(8) drugs** that contributed to Plaintiffs excessive extraordinary delay in filing within the statute of limitations. (Exh–92)

May 18, 2016 she filed a Congressional Inquiry about her right ankle that she had been paying out of pocket seeking financial reimbursement, as this created a financial hardship. Her request was granted, after fighting the Dept of VA, of course. (Exh–82). CHRONIC OPIOID THERAPY.


## 2017: END TO CHRONIC OPIOID THERAPY
## DUE TO SELF-DISCONTINUANCE.

50) **2017**: **One (1)** drug until June 9th the 13 years of chronic *opioid* therapy ended due to Carolyn's self-discontinuance (Exh–67).

August 30th she had a life changing procedural treatment to her *left side* hind-end revealing how damaged and maimed she was due to walking on this injury the drugs were masking. Carolyn cried for two days knowing things I would not have done (exercises, adding weights at the gym, climbing floors of stairs, ran a half marathon in 2014– SHE KNOWS BETTER, especially since she was an amateur athlete prior to her initial injury).

The additional maiming due to walking on chronic *opioid* therapy while her injuries were grossly neglected by the VA Puget Sound, then by other medical establishments. Four new crowns on her bottom lower molars from filing down the mountainous parts of her teeth from grinding as she walked around in excruciating pain. Then to an Endodontist for three root canals caused by the previous dentist who had a dental tech leave hard particles under the crowns.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    Carolyn's liver and bile ducts and her gallbladder functions are slow to

2    improve, yet are improving.

3    Carolyn wore a heart monitor where test results showed signs of Bradycardia

4    Toxidrome (fewer than 60 bpm) and Tachycardia (more than 100 bpm). Carolyn's

5    results showed "Maximum HR 158 bpm" and "Minimum HR 55 bpm"[17] (Exh–65

6    pt3)

7    51) **2018**: Slowly piecing her life back together as she began to heal both cognitively

8    and physically. It was during that time she discovered numerous things that she

9    had uncharacteristically failed to handle (i.e., transferring her Jeep title after

10    paying it off many years earlier). November Carolyn moved out of the state of

11    Washington and continued to process what had transpired the last twenty-years.

12    (Exh–85)

13    52) **2019–2020**: August 11, 2019 started the legal process. (Exh–89)

14    She Restoration of Rights through Thurston County Superior Court Case No. 19-

15    2-04117-34 which were taken from me through an inappropriate *one-minute* Ex

16    Parte in 2001. Her firearm rights were restored on November 1, 2019. She has

17    been numerous times and without her knowledge been in contempt of Court

18    prior to this restoration by not being made aware of her firearm rights

19    unlawfully removed.

20    With the continuation of filing formal complaints starting early in 2020. She

21    did what she was able to cognitively do with residual brain damage from being

22    chemically lobotomized, to file through the process, which was mostly incorrect.

1    Carolyn filed formal complaints to: Washington State Bar Association

2    (WSBA), Washington State Medical Commission, Washington State Nursing

3    Commission, Washington State Judicial Commission, Washington State Dept of

4    Social and Health Services, Washington state Dept of Veterans Administration

5    Director at VA Puget Sound, Washington State DSHS Cheryl Strange–Western,

6    Washington State DSHS Sean Murphy–Western, Washington State Dept of

7    Veterans Administration Secretary, Washington State Thurston County

8    Prosecutor, Washington Attorney General, Washington State Pierce County

9    Prosecutor, DEA Headquarters, DEA Seattle, WA, The Joint Commission in DC,

10   The Joint Commission in IL, Inspector General Michael Missal, U.S. Dept. of

11   VA, Secretary Alex Azar II, U.S. Dept. of Health & Human Service, U.S. Dept. of

12   Justice Attorney General, U.S. Dept. of Defense.

13       The Tort Claim filings was filed upon notification in December of 2020.

14   These establishments were all notified about the unlawful (medical kidnapping)

15   imprisonment, criminal mistreatment, illegal distribution and refilling of *liquid-

16   Morphine* with solid facts. (*see* Incapacity No. 27)

17

18   ➢ A brief recap about physical injuries: During the entire process (maiming) she

19   was still receiving procedural care and mending from her structural damage due

20   to the improper care for her injuries (i.e., drug induced: liver and bile duct

21   failures and with gall bladder decreased and functioning failings, pancreatitis

22   drug-induced, other ligament attachment issues, many torn ligaments to her

1    right ankle due to the lack of care for her initial injury that took a Congressional

2    Inquiry May 18, 2016 to be reimbursement her out of pocket expense).

3    　　Her liver, bile ducts and gallbladder were failing in 2014. Pancreatitis in

4    2015 that was drug-induced in which she slept a great deal of this year due in

5    part to the pancreatitis as well as her liver was not breaking down her proteins.

6    　　Neurological issues (numbness of her left labia, numbness down her left-leg

7    to her inner heel area even in 2017).

8    　　In 2015, Carolyn wore a heart monitor. Test results showed signs of

9    Bradycardia Toxidrome (fewer than 60 bpm) and Tachycardia (more than 100 bpm).

10   Carolyn's results: "Maximum HR 143 bpm" and "Minimum HR 49 bpm" [17] In 2017,

11   she wore another heart monitor that continued to show signs of Bradycardia

12   Toxidrome and Tachycardia. Carolyn's results: "Maximum HR 158 bpm" and

13   "Minimum HR 55 bpm"[17] (Exh–65 pt1, pt2, pt3)

14

15   　　Through 2002-2009 she was being treated by Dr. Charles Paxon for her

16   initial right sided physical injuries (Exh–80). Further and later the left-sided

17   injuries (from the improper use of four-point mechanical restraints) that started

18   manifesting in 2014 as she believed this pain and structural weakness was part of

19   her right-sided injury. It was not. It was her left-hind-end tortured side.

20   　　She was treated by Naturopathic Dr. Adam Geiger from 2015-2020 for her

21   physical structural injuries who has greatly helped her recovery. Carolyn has

22   continued to pay out of pocket while enduring the financial hardship for her needed

1   treatments since 2016–2021 (well over 7K) of needed necessary medical treatments

2   for structural support to become structurally sound.

3       The [United States] VA Puget Sound rarely rarely chips in funds for these

4   necessary medical procedural treatments for a stronger structural to function in

5   life).

6       Scientifically proven facts through peer reviewed literature, plus the fact that

7   medical experts have testified in courts of the harmful effects these forced drugs

8   have on mental functioning. Disrupting neuropathways making them

9   inoperative.

10       Prescribed drugs create mental disfunctions in much of the same way,

11   disrupting the way the brain connects to the processing centers affecting the

12   frontal lobe, temporal lobe, parietal lobe, occipital lobe, cerebellum, and brain

13   stem. Affidavits by experts are included to solidify these claims (Exh–66) (Exh–

14   65 pt2 pp. 6–17; Exh–65 pt1 pp. 158–160, p. 11; p. 17; p. 18; p. 48; p. 60; p. 71,

15   pp. 123–141) Drug side effects and drug interactions listed in the document

16   bring more scientific evidence with real life experience of the extraordinary

17   circumstances and challenges the Plaintiff has had to overcome in order to bring

18   her claims to the Court.

19

20   *Drug prescriptions* see Exh 67, 68, 69, 70, 71, 72, 74, 92) (Exh–63 pp. 30–31; p.

21   36; p. 41–44; Exh–66; Exh–64.

22

23   *Drug side effects* see Exh–66 p. 11–150; Exh–70; Exh–71; Exh–72 pp. 11–18;

24   Exh–74 p. 8.

1      More admissible evidence is Morphine, a Schedule II drug, plus other drugs.

2    Morphine is one solid valid cause of how Carolyn very slowly ran a half-marathon in

3    2014 while still being physically injured. This is something Carolyn, as a previous

4    amateur athlete would in no way have considered; running, further demonstrating

5    her brain impairment disability. She was saturated in masking drugs covering up

6    her physical injuries, to include the debilitating brain impairments.

7      Needless to say, it is nearly impossible to function as a human being without

8    a proper functioning brain. Although she has done many things to manage her life,

9    it is nowhere near what her capabilities were prior to being chemically lobotomized

10    as well as on the slow drip to suicide prescribed by the [United States], and for two

11    decades.

12      To name one drug interaction of the many; Morphine with a Benzodiazepine

13    (Clonazepam) that Carolyn was ingesting, "Opiates in combination with a

14    Benzodiazepine carries a 5x increase risk for adverse outcome including death," per

15    Dept of Veterans–VA Puget Sound. Serotonin syndrome with other drugs as well.

16    Notably, according to JAMA Internal Medicine in 2016 the off-label drug uses

17    account for more than 44% more adverse effects.[1] (EXH 65, 67, 71).

18      As a result, when the Plaintiff injured her right ankle March 2014–secondary

19    to her initial injury, then due to her additional injury and mental capacity it took

20    her until mid-2016 to address the financial hardship of paying out of pocket for

21    medical care by filing a written complaint for a Congressional Inquiry for

22    reimbursement from [United States] Dept of Veterans, which was granted (Exh–

1    82). More recent brain impairments are displayed as Plaintiff's vehicle license tabs

2    expired for

3    over 3 months unknowing to her until the other day, something unheard of for

4    Carolyn with a proper functioning brain, especially after working in the automotive

5    business. This debilitating brain disability is also displayed in the duplicated filings

6    in Thurston County Superior Court of several exhibits late 2020.

7

8          Other history can be obtained from previous and current close contacts and

9    references for Carolyn's changes. (See Exhibit 96 pt2)

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

1 **6).**                      **MORPHINE**

2

3                      **THE UNITED STATES**
4      **DEPT OF VETERANS ADMINISTRATION**,
5      **VA PUGET SOUND HEALTHCARE SYSTEMS**

6

7              **MORPHINE DISTRIBUTION +**
8      **DRUG PHARMA DATA INACCURACIES**
9                      **(Exhibit–67)**

10

11      Now here's an absurd truth, another true story. Carolyn thought to herself,

12 "I wonder what would happen if I called to order liquid–*Morphine* from the VA

13 Puget Sound after I stopped taking morphine." I reported this to two medical

14 providers at VA Puget Sound and one Non-VA care physician. Then I, on purpose,

15 started calling VA Puget Sound –American Lake pharmacy (#6634A) medication

16 refill line for *Morphine*. (Exh–67)

17

18      The VA Puget Sound remotely (no contact whatsoever) with the doctor for

19 seven (7) months continued to refill a *Morphine* S04 (100mL/refill) prescription,

20 monthly. Had Carolyn not stopped calling for <u>REFILLS of *liquid–**Morphine***</u>, and

21 had the Trump Administration not changed the opioid prescription laws, instead of

22 1600 mL Carolyn would have in her legal possession today (2021) over 3500 mL

23 (and counting) of *liquid–Morphine* S04 (100 mL/refill). Which is approximately

24 *equivalent* to *One Gallon* of liquid–*Morphine*.

1    She does believe however her point was made after she <u>refilled the drug for an</u>

2    <u>additional 5-months AFTER she reported self-discontinuance</u>; an endless supply of

3    liquid *Morphine* right at her fingertips. A Schedule II controlled substance,

4    *Morphine*; she had an endless supply of in the middle of an opioid epidemic.

5            There is no year that Plaintiff is aware of that the Courts or the State of

6    Washington gave the [United States] U.S. Department of Veterans Administration

7    a free pass with entitlements to prescribe and dispense *liquid-Morphine* to a patron

8    who was not taking the Schedule II class drug. Plaintiff would have more than *one-*

9    *gallon of liquid–Morphine* in her legal possession had the Plaintiff not stopped

10   calling for refills. Think about that. Carolyn currently has at least 500 mL of *liquid–*

11   *Morphine* unopened. An endless supply of *liquid–Morphine* in the middle of an

12   opioid epidemic. Our Veteran's suicide rate has increased in-part fueled by the

13   Department of Veterans Administration, namely VA Puget Sound Healthcare

14   Systems, here.

15

16   Therefore;

17            **<u>VA PUGET SOUND HEALTHCARE SYSTEM,</u>**

18            **<u>DEPARTMENT OF VETERANS ADMINISTRATION</u>**

19

20   On July 5 and August 18 and October 10 and November 1 of 2017 VA Puget Sound

21   Healthcare Systems located in the State of Washington, refilled a Scheduled II

22   controlled substance for *liquid–Morphine* SO4 10mg/ 5 mL as needed (100 mL) per

23   refill.

1     In 2017, on <u>November 1</u>: RX #10476804 Tong Li refilled 10 mg/5 mL as

2   needed (100 mL) *liquid–Morphine*. On <u>October 10</u>: RX #10450969 Tong Li refilled

3   10 mg/5 mL as needed (100 mL) *liquid–Morphine*. <u>September</u>: Carolyn forgot to call.

4   Count it as VA Puget Sound would have sent. On <u>August 18</u>: RX #10374266 Tong Li

5   refilled 10 mg/5 mL as needed (100 mL) *liquid–Morphine*. On <u>July 5</u>: RX #10296642

6   Gerald R. Little refilled 10 mg/5 mL as needed (100 mL) *liquid–Morphine*.

7

8     Carolyn reported her self-discontinuance of *Morphine* to three professional

9   medical providers: (within VA Puget Sound: Dr. Nelson Hager, and a GI doctor, plus

10   an outside of the system Naturopathic Medical Doctor, Dr. Adam R. Geiger) of her

11   <u>last dose that was taken on June 9, 2017</u>.

12   VA Puget Sound included Aspartame in some of the drugs Plaintiff was prescribed,

13   starting July 1998, some drugs contain this "food additive" which was not labeled.

14   Not listed in the drug handout provided by VA Puget Sound nor on the drug panel

15   about this ingredient known as Aspartame aka Phenylalanine with the new brand

16   adorned name of Amino Sweet. Plaintiff has allergic reactions to Aspartame.

17

18

19   # <u>FACTS & LAW & ARGUMENT</u>

20     Defendant [UNITED STATES] (VA Puget Sound Healthcare System Director

21   Michael C. Tadych, Director of Pharmacy Christopher T. Hoey, Tong Li, Gerald

22   Little) refilled 10 mg/5 mL as needed (100 mL) of *liquid–Morphine* to an individual

23   who was no longer ingesting the Schedule II drug. This individual [Carolyn]

1   reported her self-discontinuance of *Morphine* to three professional medical

2   providers: (within VA Puget Sound: Dr. Nelson Hager, and the GI doctor, and with

3   an outside medical provider Dr. Adam Geiger) of her last dose June 9, 2017 after

4   self–discontinuance.

5

6         Based on RCW 69.50.206–Schedule II defines "(c) Opiates. Unless specifically

7   excepted or unless in another schedule, any of the following synthetic opiates,

8   including its isomers, esters, ethers, salts, and salts of isomers, esters, and ethers,

9   whenever the existence of such isomers, esters, ethers, and salts is possible within

10  the specific chemical designation, dextrorphan and levopropoxyphene excepted..."

11  According to RCW 69.50.308–Prescriptions "(a) A controlled substance may be

12  dispensed only as provided in this section. Prescriptions electronically

13  communicated must also meet the requirements under RCW 69.50.312. (3)(d) A

14  prescription for a substance included in Schedule II may not be refilled."

15

16        [United States] VA Puget Sound Healthcare System medical providers and

17  the Administration located in the State of Washington refilled a Scheduled II

18  controlled substance for *liquid–Morphine* SO4 10mg/ 5 mL as needed (100 mL) per

19  refill to an individual no longer ingesting this drug. (Exh–67).

20        On November 1: RX #10476804 Tong Li refilled 10 mg/5 mL as needed (100

21  mL) *liquid–Morphine.* On October 10: RX #10450969 Tong Li refilled 10 mg/5 mL as

22  needed (100 mL) *liquid–Morphine.* On August 18: RX #10374266 Tong Li refilled 10

1   mg/5 mL as needed (100 mL) *liquid–Morphine*. On July 5: RX #10296642 Gerald R.

2   Little refilled 10 mg/5 mL as needed (100 mL) *liquid–Morphine*. (Exh–67 D–H)

3

4   THE UNITED STATES was formally notified more than once. Notified in written

5   form as well as delivered by USPS certified mail return receipt. (*Plus, The State of*

6   *Washington Attorney General, other governmental institutions, agencies*):

7   **1**. 10/11/2018 @ 0615 am USPS #70180680000145044905 Taydch, Michael C.,

8       Director of VA Puget Sound Healthcare System.

9   **2**. 10/11/2018 @ 0816 am USPS #70180680000145044875 Hoey, Christopher T.,

10      Director of Pharmacy VA Puget Sound Healthcare System.

11  **3**. 10/11/2018 @ 0816 am USPS #70180680000145044899 Dawson, Timothy C.,

12      Director of the Pain Clinic VA Puget Sound Healthcare System.

13  **4**. 10/11/2018 @ 0934 am USPS #70180680000145044882 Mariano, Anthony J.,

14      Director of the Pain Clinic VA Puget Sound Healthcare System.

15  **5**. 10/11/2018 @ 0522 am USPS #70180360000134514609 Secretary Robert Wilke

16      U.S. Department of Veterans Administration.

17  **6**. The Attorney General of Washington State 01/08/202 USPS

18  #70191640000105937573 01/13/20.

19  **7**. See No. 27 listed under incapacity for the other governmental institutions and

20  agencies made aware of these state and federal drug violations.

21       Prior to the certified mail return receipt notifications, on June 2, 2018

1   UNITED STATES AND OTHERS GOVERNMENTAL INSTITUTIONS,

2   INCLUDING THE STATE OF WASHINGTON ATTORNEY GENERAL were

3   mailed the Morphine evidence documents collected from the American Lake

4   Pharmacy dispensary by Norm of the unlawfully distributed and refills of Morphine

5   by VA Puget Sound. USPS #RF255682304US; by Postal Clerk #9 at the Lakewood,

6   WA Post Office 98498/ 98499. Bill #: 840-59800212-5-176115-2.

7   THE UNITED STATES [VA Puget Sound] included Aspartame in some of the drugs

8   Plaintiff was prescribed, starting July 1998, some drugs contain this "food additive"

9   which was not labeled. Not listed in the drug handout provided by VA Puget Sound

10  nor on the drug panel about this ingredient known as Aspartame aka

11  Phenylalanine with the new brand adorned name of Amino Sweet (Exh 65 pt1, 68,

12  69, 71). Plaintiff has allergic reactions to Aspartame.

13

14        More admissible evidence is Morphine, a Schedule II drug, plus other drugs.

15  Morphine is one solid valid cause of how Carolyn very slowly ran a half-marathon in

16  2014 while still being physically injured. This is something Carolyn, as a previous

17  amateur athlete would in no way have considered; running, further demonstrating

18  her brain impairment disability. She was saturated in masking drugs covering up

19  her physical injuries, to include debilitating brain impairment. To name one drug

20  interaction of the many; Morphine with a Benzodiazepine (Clonazepam) that

21  Carolyn was ingesting, "Opiates in combination with a Benzodiazepine carries a 5x

22  increase risk for adverse outcome including death," per Dept of Veterans–VA Puget

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   Sound. Serotonin syndrome with other drugs as well. Notably, according to JAMA

2   Internal Medicine in 2016 the off-label uses account for more than 44% more

3   adverse effects." (Exh–65) (Exh–67 O) (Exh–71).

4

5       It appears VA Puget Sound has left the pharmaceutical conglomerates in

6   charge of VA Drugs that is killing veterans while VA Puget Sound is heavy on the

7   gatekeeping preventing procedural care. In fact, denied access to procedural care,

8   and turned away. Flat out refusals for procedural care, and care, with the only

9   option to remain only on their drugs for treatment. Either that, or go pay out of your

10  pocket for procedural care (that has cost me thousands of dollars) of which I have

11  done for years! To overcome, recover and heal from being maimed (Exh 65, 76, 77,

12  78, 81, 82) Another VA Pharma bed partnership deal with royalties and stock fluff

13  funds? Travel and vacations? Perhaps "Pep rallies"? along with the lackadaisical

14  institutionalized corrosive culture –including unions, insensitivity to dangerous

15  drugs... Morphine–and–such.

16      Under Title 21 §1306.12, possibly 1306.14 as well, which states prescribing

17  this drug, an Opioid, a controlled substance classified under Schedule II is clearly

18  against Title 21 Code of Federal Regulation under §1306.12 (a): "Refilling

19  prescriptions: issuance of multiple prescriptions. The refilling of a prescription for a

20  controlled substance listed in Schedule II is prohibited." And, (i) states, "Each

21  separate prescription is issued for a legitimate medical purpose by an individual

22  practitioner acting in the usual course of professional practice."

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   There is *no legitimate medical purpose* by an individual practioners to refill

2   or dispense a Schedule II controlled substance drug to an individual who has self-

3   discontinued then reported and documented by three medical providers.

4   According to **Title 21 §1306.12, possibly 1306.14**, VA Puget Sound Healthcare

5   System is in violation on four counts.

6

7   Pursuant to WAC 246-919-970 Coprescribing of opioids with certain medication "(1)

8   The physician shall not knowingly prescribe opioids in combination with the

9   following medications without documentation of medical decision making: (a)

10   Benzodiazepines. VA Puget Sound prescribed this combination, and then some, for

11   over a decade." (Exh–67 N) (Exh–72).

12

13   The reckless institutionalized insensitive way the UNITED STATES [VA

14   Puget Sound] prescribes drugs is reckless, gross negligent. Instead of procedural

15   care for her neck and her lower half, while she continued to be maimed, how does 13

16   years (THIRTEEN YEARS) of CHRONIC OPIOID THERAPY sound instead of

17   procedural care?? (Exh–65) (Exh–92). This is the bad standard practice of care that

18   the Department of Veterans has practiced for far too long, naming the VA Puget

19   Sound Healthcare Systems here.

20   Opioids may be essential, and indeed are, in the treatment of chronic pain.

21   There is no drug class that Plaintiff is aware of the kills pain like opioids. Opioids

22   helped Carolyn get through maiming early on. Then VA Puget Sound then later

1  used it as a pacifying drug to treat her neck and lower extremity instead of treating

2  her injuries with procedural care. WAC 246-919-850 clearly states that "The

3  commission recognizes that controlled substances including opioids may be

4  essential in the treatment of ..... chronic pain..."

5

6  Additionally,

7  **THE UNITED STATES [VA PUGET SOUND HEALTHCARE SYSTEMS]**

8  **Pharma Data Record is Lacking Accountability with Many Drugs Missing**

9  **on the Formal Pharma Data Record That are Federal & State Violations**.

10  Other drugs; Celebrex, Methacarbomol, Gabapentin, Lidoderm Patches,

11  Citalopram, and Paxil. The *unaccounted-for drugs on the pharma data record*, yet

12  accounted for with empty bottles, documented in the progress notes, some with

13  pills/drops for proof. Its jaw dropping to see the pharma data lacking accountability,

14  and with complete slackness on records keeping – for dangerous mind-altering life-

15  destroying drugs. (Exh–67) (Exh–64).

16

17  There is a *major* lack of accountability in Pharma with VA Puget Sound

18  Healthcare Systems. Examples are the numerous prescription refills not listed on

19  the VA Puget Sound pharmacy data record. There are several other state and

20  federal drug violations with drugs not recorded on the pharmacy dispensary record

21  in the patient records. Plaintiff has containers and drugs of some of those not listed.

22  One example is, how can one have a bottle with 8 of 12 refills yet the initial 8

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   prescriptions filled of Methacarbomol are missing on the pharma data record? How

2   does that happen when Carolyn has bottles and types of drugs for proof of this bad

3   standardized practice? Where are ALL the years she ingested Celebrex or

4   Gabapentin that are missing on the pharma data record. The answer is, most are in

5   the Progress Notes, plus knowing she ingested those for years, well over a decade.

6   (Exh 67, 69, 71, 72, 92)

7

8       Several drugs need to be rescheduled for accountability purposes, and

9   accuracy in the pharma data record (Exh 67, 68, 69, 92). Using the current Drug

10  Classification Schedule of certain drugs appears to be *hiding* drugs when the drug

11  is dispensed from VA Puget Sound. *Morphine* falling off the patient's progress notes

12  not alerting an anesthesiologist. For example; prior to being sedated. (Exh–67)

13

14      According to RCW 18.64.245 Prescription records–Digital or electronic form–

15  Penalty states that "(1) Every proprietor or manager of a pharmacy shall keep

16  readily available a suitable record of prescriptions which shall preserve for a period

17  of not less than two years the record of every prescription dispensed at such

18  pharmacy which shall be numbered, dated, and filed, and shall produce the same in

19  court or before any grand jury whenever lawfully required to do so. The record shall

20  be maintained either separately from all other records of the pharmacy or in such

21  form that the information required is readily retrievable from ordinary business

22  records of the pharmacy." (Exh 67, 68, 69, 70, 71, 72, 92)

1     Pursuant to RCW 69.41.042 Record requirements, "A pharmaceutical

2     manufacturer, wholesaler, pharmacy, or practitioner who purchases, dispenses, or

3     distributes legend drugs shall maintain invoices or such other records as are

4     necessary to account for the receipt and disposition of the legend drugs. The records

5     maintained pursuant to this section shall be available for inspection by the

6     commission and its authorized representatives and shall be maintained for two

7     years." (Exh 67, 68, 69, 70, 71, 72, 92)

8

9     In accordance with RCW 69.41.020 Prohibited acts–Information not

10    privileged communication states, "Legend drugs shall not be sold, delivered,

11    dispensed or administered except in accordance with this chapter. (1) No person

12    shall obtain or attempt to obtain a legend drug, or procure or attempt to procure the

13    administration of a legend drug: (3) No person shall willfully make a false

14    statement in any prescription, order, report, or record, required by this chapter. (7)

15    No person shall willfully fail to maintain the records required by RCW 69.41.042

16    and *69.41.270. (Exh 67, 68, 69, 70, 71, 72, 92)

17

18    According to RCW 69.50.308–Prescriptions "(a) A controlled substance may

19    be dispensed only as provided in this section. Prescriptions electronically

20    communicated must also meet the requirements under RCW 69.50.312. (3)(d) A

21    prescription for a substance included in Schedule II may not be refilled."

22    VA Puget Sound including Aspartame in some of the drugs Plaintiff was prescribed,

1  starting July 1998, some drugs contain this "food additive" which was not labeled

2  according to **Title 21§172.804(d)(2).** Not listed in the drug handout provided by VA

3  Puget Sound for the ingredient Aspartame aka Phenylalanine not listed on the

4  bottle; not on the drug panel. (Exh 65 pt1, 68, 69, 71)

5

6      In Washington State the NEW RCW 18.71.800 is somewhat more than

7  gatekeeping, it's also prevention of treatment for those in need of opioids for chronic

8  pain. People are suffering. The added Bureaucratic Poppycock of red tape is

9  creating unneeded delays for those in need of pain relief.

10  Then there is the Federal Controlled Substances Act and the Washington State

11  controlled substance laws violations against VA Puget Sound.

12

13      THE STATUTE OF LIMITATIONS SHOULD BE TOLLED (Fairness).
14          Plaintiff has *legal standing* in all cases.

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

# 7).        DRUG INTERACTIONS OVERVIEW

JAMA Internal Medicine reported in 2016 that off-label drug uses account for more than 44% more adverse effects. (Exh–67 O).

To help understand how the following drug regimen is dangerous with life-altering, with devastating consequences, consider the drug interaction classifications. She was not informed.

It does not take more than a fifth-grader to read anyone with a prescription drug pad has the capability and capacity to kill you, or drag you through pharma's long drawn out slow death sentence, some equating to suicide.

According to drugs dot com, drug interactions are listed as *major*, *moderate*, and *minor*, with *therapeutic duplication*.

Drug Interaction Classification (drugs dot com)

*Major*: Highly clinically significant. Avoid combinations; the risk of the interaction outweighs the benefit.

*Moderate*: Moderately clinically significant. Usually avoid combinations; use it only under special circumstances

*Minor*: Minimally clinically significant. Minimize risk; assess risk and consider an alternative drug, take steps to circumvent the interaction risk and/or institute a monitoring plan.

*Therapeutic Duplication*: Therapeutic duplication is the use of more than one medicine from the same drug category or therapeutic class to treat the same

1   condition. This can be intentional in cases where drugs with similar actions are

2   used together for demonstrated therapeutic benefit. It can also be unintentional in

3   cases where a patient has been treated by more than one doctor, or had

4   prescriptions filled at more than one pharmacy, and can have potentially adverse

5   consequences.

6

7        How each establishment (hospital/ prison) stacked up pharmaceutically with

8   forced drugging by injections and/or required to ingest, enforced with unlawful

9   standing orders for forced injections for her non-compliance to ingest and of her

10   legal right to refuse. All of these drugs were used off-label by force:

11
12
13        **<u>Drug Interactions for the 50-days:</u>**

14        Providence: Major: 8, Moderate: 17.

15        [United States] American Lake VA-1: Major 1, Moderate 2.

16        Western: Major 1, Moderate 5.

17        [United States] American Lake VA-2: Major: 6, Moderate 16.

18        *COMBINED* drug interactions in her system:

19        *Major 23, Moderate 57, with 12 Therapeutic Duplications.*

20   ///

21   ///

22   ///

23   ///

# DRUG INTERACTIONS

Drugs Prescribed and Dispended, Courtesy of

[United States] VA Puget Sound

3/4 Prison 1/4 hospital

<u>A brief excerpt of the drug regimen harm by VA Puget Sound [United States]</u>.

**<u>2003-2014</u>:** 7-drugs with 7 major and 10 moderate

12 years on Clonazepam**

12 years on Gabapentin

 5 years on Methadone

10 years on Morphine

11 years on Risperidone **

11 years on Celebrex

 8 years on Citalopram

**Contains Aspartame

**<u>1996-2002</u>:** 2-drugs with 1 major

Paxil and Trazodone

**<u>2006</u>:** 7-drugs with 6 major, 10 moderate and

3 therapeutic duplications, for ONE MONTH– February. This carried on for years.

Methadone

Risperidone **

Celebrex

Seroquel

Gabapentin

Citalopram

Clonazepam**

**Contains Aspartame

Therapeutic Duplication of drugs: four psychotropic, five central nervous system,

two antipsychotics.

**<u>2005-2014</u>:** for 3-drugs, 3-major

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    Morphine and Clonazepam and Methadone "Opiates in combination with

2    benzodiazepines carries a 5x increase for adverse outcome including death," and

3    "may have opioid hyperallergic."

4         Plus, six-of those years of being on *morphine* and *methadone* simultaneously,

5    due to the lack of procedural care years prior, and while receiving exponentially

6    delayed vital procedural care. This is just the tip of the iceberg of some of the drug

7    interaction she has endured, struggled and managed to live through, by the grace of

8    God.

9         According to a JAMA Internal Medicine in 2016 the off-label drug uses

10   account for more than 44% more adverse effects.[1] (Exh–67 O).

11

12   **THE UNITED STATES, [VA PUGET SOUND HEALTHCARE SYSTEMS]**

13   **Pharma Data Record is Lacking Accountability with Many Drugs Missing**

14   **on the Formal Pharma Data Record hat are Federal & State Violations**.

15        Other drugs; Celebrex, Methacarbomol, Gabapentin, Lidoderm Patches,

16   Citalopram, and Paxil. The *unaccounted-for drugs on the pharma data record*, yet

17   accounted for with empty bottles, documented in the progress notes, some with

18   pills/drops for proof. Its jaw dropping to see the pharma data lacking accountability,

19   and with complete slackness on records keeping – for dangerous mind-altering life-

20   destroying drugs. (Exh–67) (Exh–64)

21        There is an alarming lack of accountability in Pharma with [United States]

22   VA Puget Sound Healthcare Systems. Examples are the numerous prescription

23   refills not listed on the VA Puget Sound pharmacy data record. There are several

1   other state and federal drug violations with drugs not recorded on the pharmacy

2   dispensary record in the patient records. Plaintiff has containers and drugs of some

3   of those not listed.

4       One example is, how can one have <u>a bottle with 8 of 12 refills yet the initial 8</u>

5   <u>prescriptions filled of Methacarbomol are missing on the pharma data record</u>? How

6   does that happen when Carolyn has bottles and types of drugs for proof of this bad

7   standardized practice? Where are ALL the years she ingested Celebrex or

8   Gabapentin that are missing on the pharma data record. The answer is, most are in

9   the Progress Notes, plus knowing she ingested those for years, well over a decade

10   with some drugs much longer. (Exh 67, 69, 71, 72, 92)

11

12      Several drugs need to be rescheduled for accountability purposes, and

13   accuracy in the pharma data record (Exh 67, 68, 69, 92). Using the current Drug

14   Classification Schedule of certain drugs appears to be *hiding* drugs when the drug

15   is dispensed and refilled from VA Puget Sound. *Liquid–Morphine* falling off the

16   patient's progress notes not alerting an anesthesiologist. For example; prior to being

17   sedated. (Exh–67)

18

19   <u>Excerpts from Exhibit 87</u>; "*LOCKED Behind Prison (Hospital) Doors 50-Days*"

20      "The greater dismantling of the human being is done with off-label drug

21   prescriptions, the drug cascading, remotely prescribing, the negligent and serial

22   overprescribers, blind copy and paste refilling, adverse drug effects, undisclosed

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    Aspartame in some drugs, as well as the consistent nonchalant lackadaisical

2    attitude about medication remediation (gloss over the meds sheet) of the excessive

3    unmonitored refills. The VA Puget Sound practices drugs on veteran patients

4    without ethical standards, whatsoever. Putting veteran's –the WAR ones especially,

5    putting them in harm's way by the repetitive carelessness of VA's deadly drug

6    cocktail regimens.

7        Foundational level hypocrites is the true VA Puget Sound motto, today. Their

8    [VA] diseased healthcare "model" partnered with the drug companies (VA disclosed

9    and *admittedly spoke about their partnership in 2015*), and uses the backs of

10   veteran's and active duty for, undisclosed experimental research purposes.

11   Professional Drug Pushers with a license.

12

13       These establishments need to be held accountable for every veteran and

14   active-duty member where procedural treatment is/was delayed while being placed

15   on inappropriate mind-altering and masking drugs mimicking care.

16   Johnson & Johnson led. Then partnered with and promoted leave *No Veteran*

17   *Behind*. Thus, adding gasoline to the mostly drug-induced "suicidal intent" –caused

18   mainly by drug effects, then by *mandating screening* for all vets who've experienced

19   trauma, to then label them with a psychiatric diagnosis –a "public health" problem,

20   with the first line of defense for treatment, which is drugs–instead of talking. Then

21   left them with no safe outlet to express themselves, by talking, without some type of

22   negative life-altering repercussions or being reported for their expression.

1    "Those with a mental health or substance abuse diagnosis who got mental health

2    treatment were roughly twice as likely to die by suicide than those who had a

3    diagnosis but did not access mental health treatment."

4    See Exhibit 70; Drug Transparency other Veterans + a non-veteran.

5    ///

6    ///

7    ///

8    ///

9    ///

10    ///

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

1
2
3
4
5

# 8).                    HOW LONG IT TOOK
Carolyn's Brief Overview of VA Puget Sound
*Disastrous* HealthCare System
(Exh–64) (Exh–73) (Exh–92)

6   [United States] "You will receive to the extent that you are eligible, <u>prompt, and</u>
7   <u>appropriate treatment for physical</u> or emotional disorders, or disabilities in the
8   least restrictive environment necessary for that treatment <u>free from unnecessary</u>
9   <u>or excessive medication</u>."  with emphasis. (See Exh 64 pp. 4–10)

10
11                  Plaintiff entered the VA Puget Sound on January 12, 1996.
12

13   • It took 4.6 years PLUS 690 days from the initial injury while on active duty

14     totaling **2370 days** (**6.49 years** or 78 months) to then on May 31, 2001 and later

15     to be put in four-point mechanical restraints for hours with a right buttocks and

16     hip, right shoulder and neck injury, while creating new physical injuries that

17     affected her bowel movement functions and surrounding internal areas on her

18     left-side-hind-end that was initiated at Providence. (Exh–80) (Exh–73) (Exh–92)

19   • It took 4.6 years (54 months or 1629 days) before her FIRST qualified doctor, Dr.

20     Charles Paxon, a gold standard doctor who wrote June 28, 2000, that her injury

21     had "*never*" been treated other than with physical therapy and massage. (Exh–

22     67 H).

23   • I received *a walking cane* of which I had to ask for, and that was asked for on

24     July 25, 2001, then issued two-days later. From 01/12/96 to 07/27/01 is 2023

25     days; (5.54 years or 66.5 months). A walking cane is not a drug; it is used to help

26     people walk with stability. (Exh–67 GG)

27

1   • It took 6.24 years (75 months or 2,280 days) to start and receive regular

2     procedural care for her right leg SI-Joint ligament attachments April 2002

3     (01/12/96 to 04/10/02). Her right knee took until February 2018. (Exh–80) (Exh–

4     73) (Exh–92) (Exh–76) (Exh–77).

5

6   • The VA then took 21 years (253 months or 7690 days) for her FIRST procedural

7     treatment to her NECK right side, an injection (01/12/96 to 01/31/2017) of which

8     three (3) more treatments but of Radio Frequency Ablation (RFA) followed due

9     to the neck severity, in 2017 (Exh–75). Of course, this was after the denied

10    cervical MRI after 10 years for an update in 2015.

11    In 2021, her neck has been treated with PRP and Prolotherapy treatments that

12    have been a game changer for functionality, living with much reduced neck pain

13    with more mobility, with no prescribed drugs. (Exh–77).

14

15  • I asked the assigned Primary Care Provider (unqualified) physician–*same*

16    *physician who refilled morphine without being seen in seven-months*, for me to

17    see a cardiologist in 2015 due to breathing problems with shortness of breath.

18    Then the additional heart rhythm issues that were discovered and recorded on

19    the ZIO heart monitor with minimum heart beats at 49 bpm and maximum

20    heart beats at 155 bpm. *Carolyn*, have you seen a cardiologist? No. VA Puget

21    Sound denied me to see a cardiologist. Or should I be more diplomatic and say

22    I'm still waiting six-years later? (Exh–65 A) (Exh–67 D–F) (Exh–65 pt3).

1   •  I haven't even mentioned the dental care disaster that I recently paid $3,000 for

2     the two (2) needed root canals on 2-of the 4-crowns that I have an approval from

3     [United States] VA Puget Sound for Non-VA care, yet constant delays for

4     treatment and care in WA. In fact, it wasn't until I couldn't even have room

5     temperature water in her mouth before I paid out of pocket to have her teeth

6     fixed even though I am fully covered for dental with VA. Why am I paying,

7     again?

8        Had another root canal for one of the crowns on the lower right side from

9     drug-induced dental and nerve damage, and a bad dentist, with more intentional

10    delays and that turns into prevention of care issues from [United States] VA

11    Puget Sound. VA Phoenix had her consult and approval within a very short time

12    (less than a week) for needed dental care 2019. That's very different now in 2021

13    since the patron needs to call the [United States] VA Phoenix to make sure your

14    going to receive care in a reasonable time when it comes to Community Care

15    (aka Fee-Services for years, Non-VA care for years, now the Mission Act).

16

17   •  Then the other secondary injury to her right ankle due to not taking care to treat

18    the initial injury that included her right knee. I walked around on her right

19    ankle with torn ligaments for nearly a year while waiting for care. Then paying

20    for her right ankle treatment out of pocket, initially, that ended with a

21    Congressional Inquiry for the full reimbursement of $1400 in 2016. In 2021, I

1    have continued to have treatments to restore and strengthen her right ankle.

2    (Exh–82) (Exh–76) (Exh–77)

3        And then, eye examinations for care for reading glasses which included a

4    drug-induced stigmatism. Paid out of pocket here too, instead of seeing a

5    "student" for Ophthalmology [United States] VA Puget Sound.

6

7  •  And then, to have the needed Prolotherapy and Platelet-rich plasma (PRP)

8    procedural care treatments to recover from the left-side-hind-end torture by

9    Providence injuries. Still paying out of pocket in 2021, since VA Puget Sound

10   Health Care System is, incompetent even with the new Mission Act of 2019. I

11   started the proper paperwork for said treatments and [United States] VA Puget

12   Sound failed to follow through or pay for. I was given a verbal "approved" for

13   needed procedural care. It has cost thousands of dollars out of her pocket to

14   recover from her physical structural injuries and to overcome being maimed.

15   (Exh 76, 77, 78, 79, 80, 81, 82)

16

17  •  How about a more recent asinine requirement at [United States] VA Phoenix

18   December 2019. In order to continue chiropractic care after well over a decade of

19   being treated on a monthly basis, I will be *required to have an x-ray*.

20   Purposeless. Her most recent adjustments when requested were from the VA

21   Puget Sound from June 2019. An x-ray is purposeless in this case since I have

22   consecutively seen a chiropractor ONCE A MONTH for well over a decade,

1    consistently and consecutively in the VA system. But since I was in a different

2    state a few months later, even though I hundreds upon hundreds of pages seeing

3    the same Chiropractor at VA Puget Sound. VA Phoenix's requirement is for me

4    to have an x-ray before I can continue care.

5

6  •  Oh, in order for a "pre-authorization" for Chiropractic care, VA Phoenix required

7    me to physically come in to VA Phoenix to be physically examined in the middle

8    of a pandemic, of which they denied and then informed me I would need to see

9    the Pain Clinic to further her needed care. This is nothing short of the

10   Bureaucratic Poppycock with more prevention of care. Needless to say, I pay out

11   of pocket for her current top-notch Chiropractor. (Exh–78)

12

13 •  During ALL this there was that onslaught of the [United States] VA Puget

14   Sound Drugs for counterfeit care 1996-2018. Let that soak in. (Exh–92)

15

16 •  Prior to this, while serving active duty where I was severely physical injured.

17   The medical providers cold turkey pulled Carolyn off 2.5–5mg of Valium (Aug.

18   1995), plus other inappropriate drugs to treat a physical injury. Treating a

19   physical injury with mind-bending drugs is gross negligence, and reckless.

20   (Exh –74)

21

22 •  The number of excessive prescribed drugs, and forced, is nothing short of

23   disastrous. This is a slow drip of suicide and the dismantling of her human being

1   along and with adverse drug effects (Exh–71). One drug effect was self-

2   mutilation of taking sewing needles to her face as well as tweezing all the hairs

3   from her knees to her ankles, and Serotonin syndrome too (Exh 69, 71). Brought

4   to you by *Paxil*–a Glasko Smith and Kline (GSK) designer drug.

5

6   • Dept of VA poisoning me with Aspartame too, starting July 1998, since some

7   drugs I was prescribed contain this "food additive" which was not labeled

8   according to Title 21§172.804(d)(2). Not listed in the drug handout VA Puget

9   Sound provided nor was Aspartame aka Phenylalanine listed on the bottle; not

10  on the drug panel. (Exh 65 pt1, 68, 69, 71)

11  • With the Defendants [United States] interference and unlawful delay (unlawful

12  imprisoned) and forced chemical lobotomies in 2001 (Exh 63) for the Plaintiff to

13  receive medical treatments for her *physical injury*, then Dept of VA's

14  forgetfulness of *How Long it Took* for Plaintiff to receive her FIRST qualified

15  medical doctor and that took 4.6 years (54 months) for her *physical injury* (Exh

16  80, 73).

17

18  • Image walking around on your right leg not-completely attached for 5.54 years

19  (2023 days) before receiving a walking cane!! that Carolyn had to ask for.

20  Apparently, due to illiteracy, with a bit of deafness and unlawful actions. It took

21  1,200-hours of unlawful imprisonment and forced injections of Haldol from

22  Providence and 4-point mechanical restraints for hours and with more forced

drugging along the way that included four-forced chemical lobotomies to receive a walk cane.

- Remember, I [Carolyn] had to ask [United States] VA Puget Sound for a walking cane. Plaintiff was honorably medically discharged with just NSAIDS aka anti-inflammatories with no medical care or treatment plan for her catastrophic *physical injury*.

     Then it took [United States] Dept of VA 6.24 years (75 months) before procedural care began due to the additional delay factually with Dept of VA unlawful imprisonment. Plaintiff is still recovering from a drug-induced brain-injury with cognitive functioning processing abnormalities and with delays in due to Defendant<u>s</u> [United States] *gross negligence* to treat a physical injury.

- Here's a one-liner showing VA Puget Sound's complete incompetence "<u>Injured her R buttock, hips, neck and back. Patient will be put on mood stabilizers and antidepressants</u>." (emphasis mine).

- Then as recorded in the medical records by my gold standard doctor who wrote a comment Carolyn made during an appointment "... <u>last time I had a brisk walk around the (apartment) compound without the sense that I am dragging my right leg–the first time since my injury</u>" (Injured Feb. 21, 1994) (January 8, 2003).

     THE STATUTE OF LIMITATIONS SHOULD BE TOLLED (Fairness)

# 9).                    INCAPACITY 2001–2020

## a partial list as *Carolyn* is still recovering

1. <u>2001 MAY</u>: Welcome to the Avalanche.

2. <u>2002 APR</u>: Carolyn walked out of her entire life to start procedural care for her service connected injury of 1994 Feb 21, while the Providence restraints injuries were masked with drugs and after having four chemical lobotomies.

3. <u>2002</u>: Divorced due to the forced debilitating and crippling treatments in 2001.

4. <u>2003: Palo Alto</u>, CA. Voluntary inpatient for post traumatic stress.

5. <u>2006 FEB 24</u> @ 1609: [United States] VanGoda "fell asleep in the bathtub twice the morning following the first dose) so cut the pill in half and still finds it sedating." overly drugged by the [United States]. (Exh–72, Exh 67–71) Drug induced insomnia – sleep studies of those who are deficient in sleep.

6. All [United States] VA MEDICAL APPOINTMENTS (Exh–73)

7. All [United States] VA PUGET SOUND DRUG PRESCRIPTIONS (Exh 65) (Exh–67) (Exh–70) (Exh–72) (Exh–92).

8. Serotonin Syndrome (Paxil, . . .) (Exh 65, Exh 67–72)

9. **It took 85–appointments** to have her First Doctor for her physical injury from 1994, and then later the 2001 injuries manifested years later as it was being covered with excessive masking drugs, years. (Exh–92).

1   **10.** <u>2007 – 2014</u> She attended Pierce Community College and the University of

2        Washington, with a tutor for nearly every class, plus she attended summer

3        school every year prior to and after attending the University of Washington.

4   **11.** <u>America's Disability Act (ADA)</u> Carolyn had private tutoring through the

5        America's Disability Act (ADA) for one-on-one help for nearly every class at

6        Pierce County Community College and the University of Washington Tacoma.

7        (Exh–89) During that time Carolyn was ingesting between 6–9 drugs including

8        she was on Chronic Opioid Therapy with a combination, deadly drug

9        interactions and combinations. (Exh–92)

10

11   **12.** <u>2008</u> paid off her Jeep? She did not go pick up her title until over a decade later.

12   **13.** <u>2007 JAN 29</u>; GI Bill extension requests for 10 years

13   **14.** Her friends and people in the church called to wake her up. Called to remind her

14        to take a shower. Called to remind her to wash her hair.

15   **15.** <u>2011 JUN 16</u> [United States] Gerlock retired and left Carolyn on antipsychotic

16        and a benzodiazepine drug for her *physical injury*; "Continue risperidone and

17        lorazepam as written." Then VA Puget Sound blindly copied and repasted refills.

18        Risperidone was inappropriately prescribed for drug induced insomnia caused by

19        Paxil. April Gerlock inappropriately prescribed psychotropic drugs for Carolyn's

20        physical injury with her collaborative treatment provide [United States]

21        VanGoda who was fired after having a sexual relation with another veterans.

22        [United States] VanGoda also failed to provide help when Carolyn requested to

1   have these drugs discontinued. [United States] VanGoda chuckled and provided

2   no help. Gerlock failed to transfer providers and continued to prescribe drugs

3   that were for short term, while [United States] Gerlock prescribed short term

4   drugs for years. [United States] Gerlock failed transfer providers as required,

5   patient abandonment. (Exh–72)

6   **16.** 2014 OCT: Carolyn was experiencing her hair failing out as well as being overly

7   tired. She sought the help of Dr. Andrew Inverson, a Naturopathic Doctor. It was

8   detected she was having problems with her liver breaking down proteins as well

9   as her bile ducts were struggling.

10

11  **17.** 2015 FEB: The Process started (Exh–85) 2015–2021.

12  **18.** 2015 MAR: Carolyn torn several ligaments on her right ankle due to her injuries

13  not being adequately taken care of, masked with drugs by VA Puget Sound. This

14  was a secondary injury caused by the initial injury that was grossly neglected

15  and mismanaged in the USCG, and with drugs. (Exh–82)

16  **19.** 2015: Carolyn slept a great deal in this year due to her liver was not breaking

17  down proteins. Her thyroid was negatively affected too.

18

19  **20.** 2015-2018 Pain Clinic; after she self-discontinued Gabapentin's afternoon dose,

20  the Pain Clinic has an inadequate medical provider, a "fellow" add back in the

21  afternoon dose instead of the VA Puget Sound offering procedural treatment for

22  my long standing chronic neck pain (which by the way is being mostly resolving

1    from pain due to PRP and Prolotherapy treatments with ozone in 2021 that the

2    veteran has continued to *pay for out of pocket* to become whole structurally, not

3    the [United States] slow drip of suicide with drugs. To have the root cause of her

4    neck (cervical spine) adequately treated, since 1992 July 22. (Exh–75). To

5    include VA Puget Sound attempting to increase drug instead of procedural care

6    for her neck.

7

8    **21.** 2016 DEC 20 Carolyn successful self-discontinued all of the daily inappropriate

9    drug cocktails, with only *Morphine* being the last 09 JUNE 2017. (Exh–67)

10    **22.** 2016: Carolyn was experiencing problems with her pancreas. VA Puget Sound

11    did testing under sedation for an EUS. It was later considered a chemically

12    induced pancreatitis. Carolyn continues this year to work on her liver.

13

14    **23.** 2017 JUN 09 Carolyn, by the grace of God, has successfully self-discontinued

15    *Morphine*. This was her final remaining prescribed drug. She has since sought

16    and continued adequate effective care for her *physical injuries* that were masked

17    (covered with drugs) and grossly neglected and mismanaged. She continues to

18    recover from the chemical lobotomies from 2001 and from the drug saturation

19    from the [United States] Dept of VA. August was a turning point for her physical

20    health as she works toward wholeness.

21    As a result, when the Plaintiff injured her right ankle March 2014–secondary to

22    her initial injury, then due to her additional injury and mental capacity it took

1    her until mid-2016 to address the financial hardship of paying out of pocket for

2    medical care by filing a written complaint for a Congressional Inquiry for

3    reimbursement from Dept of Veterans, which was granted. (Exh–82)

4

5    **24.** 2017 AUG: Learned of other veterans struggling with drug interactions. Reached

6    out to Dr. Hager about options to help who suggested the Patient Advocate, who

7    did nothing, who was no help. Received a text message from Rhydonna who her

8    son was on suicide watch. It was later learned it was the DRUGS that were

9    creating the suicidal thoughts. He is still with us today. She started helping

10   other veterans with their drug interactions. (Exh–70)

11

12   **25.** 2018: Title to her Jeep after pay off (a decade later. Something that can be

13   verified that Carolyn would have picked up the next day or within a reasonable

14   amount of time. She starting posting records and documents on her hallway

15   walls and using her hallways to break down the records to understand and put

16   the puzzle together untwisting and uncovering the lies in her case.

17

18   **26.** 2019 AUG: Filed for Restoration of Rights (firearm rights) Thurston County

19   Superior Court Case No. 19-2-04117-34 restored in WA on 2019 NOV 01. The

20   was the beginning of the legal process from Case No. 01-6-97-9 where the

21   Avalanche started. Later in 2019, she started receiving effective chiropractor

22   treatments from Dr. Daniel Secrest when she moved to Arizona.

1    She started paying out of her pocket due to the unreasonable process VA

2    Phoenix created in order to obtain care and treatments by a Community Care

3    provider. VA Phoenix made the process ridiculous to obtain and receive this

4    essential necessary care, of effective treatments performed by Secrest Family

5    Chiropractor, where she has made great strides in her health and mobility. She

6    continued to see Dr. Adam Geiger in January 2020 for Prolotherapy and Platelet

7    Rich Plasma (PRP) effective and essential medical treatments. She continued

8    these effective treatments again in 2021, with Dr. Jeffrey Lee at Five Seasons

9    Health for Prolotherapy with ozone and PRP. Carolyn continues to make great

10   strides in her physical health as she's recovering from violent complex trauma.

11   And, these treatments are recovering her neck mobility and flexibility with

12   much reduced pain. Carolyn would not be walking or in the health she is in had

13   it not been for these top-notch gold standard essential Naturopathic Doctors

14

15   **27.** 2020; Carolyn did not understand the process. She filed complaints with factual

16   evidence, and with the Morphine and drug violations to:

17   **a)** Washington State Bar Association (WSBA) 01/08/2020 USPS

18   #70191640000105937597 01/13/20.

19   **b)** Washington State Medical Commission USPS #RA309359876US  04/04/20

20   with formal complaint forms filled out going through the required process.

21   WA Med Commission opened the contents then returned with no-response.

22   **c)** Washington State Nursing Commission

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1     **d)** Prosecutors Office Thurston County; Jon Tunheim 01/08/2020

2     **e)** Prosecutors Office Pierce County; Mary Robnett 01/08/2020 USPS

3        #70191640000105937603 01/13/2020 Pierce County Prosecutor Mary Robnett

4     **f)** Attorney General of Washington State 01/08/202 USPS

5        #70191640000105937573 01/13/20.

6     **g)** Washington State Commission on Judicial Conduct 01/08/2020 USPS

7        #70191640000105937580 01/13/20

8     **h)** U.S. Secretary of Dept of Health and Human Services Secretary Alex Azar II

9        04/09/2020 USPS #RA309359880US  04/04/20.

10    **i)** Western State formal complaint filed with Cheryl Strange USPS

11       #RA309359862US  04/04/20. For a civil suit DSHS required a certified

12       mailing and registered mail and an email and a licensed process server in

13       order for a response.

14    **j)** Western State formal complaint filed with Sean Murphy USPS

15       #RA309359859US  04/04/20.

16    **k)** *Morphine*: VA Puget Sound Dept of Veterans formal complaints about drugs,

17       *Morphine* in particular, (10-24-2018) via certified mail was filed with:

18       #RA309359814 03/30/2020 and USPS #7018068000014504405 10/09/2018 VA

19       Puget Sound Director Michael C. Tadych

20    **l)** USPS #70180680000145044875 10/09/2018 VA Puget Sound Director of

21       Pharmacy Christopher T. Hoey

22    **m)** Hand delivered to VA Puget Sound Pharmacy for interoffice mail Dr. Li Tong

1    **n)** Hand delivered to VA Puget Sound Pharmacy for interoffice mail VA Puget

2        Sound Dr. Gerald R. Little

3    **o)** USPS #70180680000145044899 10/09/2018 VA Puget Sound Director of Pain

4        Clinic Dr. Timothy C. Dawson

5    **p)** USPS #70180680000145044882 10/09/2018 VA Puget Sound Director of Pain

6        Clinic Dr. Anthony J. Mariano

7    **q)** USPS #RA309359831 03/30/2020 and USPS #70180360000134514609

8        10/25/2018 Hon. Secretary of Dept of VA Robert Wilkie

9    **r)** #RA309359805 03/30/2020 U.S. Inspector General Michael Missal, U.S.

10       Department of Veterans Affairs

11    **s)** USPS #RA309359845US 03/30/2020 U.S. WA State Depart. of Health

12       Systems

13    **t)** USPS #RA309359862 US 03/30/2020 U.S. WA State Cheryl Strange

14       (Western)

15    **u)** USPS #RA309359859US 03/30/2020 U.S. WA State Sean Murphy (Western)

16    *v)* #RA309359876US 03/30/2020 U.S. WA State Medical Commission (W*ho*

17       *opened the box with formal complaint. Then returned the box complete with*

18       *contents with no response.*)

19    **w)** USPS #RA309359880 03/30/2020 U.S. Secretary Alex Azar II, U.S. Depart. of

20       Health & Human Services

21    **x)** USPS #RA309359828US 03/30/2020 U.S. The Joint Commission in DC

22    **y)** USPS #RA309359791US 03/30/2020 U.S. The Joint Commission in IL

1    **z)**  USPS #RA309359788US 03/30/2020 U.S. DEA Seattle WA

2   **aa)**     USPS #RA309359774US 03/30/2020 U.S. DEA Headquarter DC

3   **bb)**     Washington State ignored her, so she went up the federal chain of

4      command.

5      With more evidence complied, sent registered mail May 29: USPS

6      #RE051022084US U.S. Depart. of Justice Attorney General William Barr

7      USPS #RE051022075US U.S. Depart. of Defense Honorable Mark T. Esper

8      and a few other places too.

9   **cc)**     Plaintiff sent her LOCKED book to 535 members of congress (−26

10      returned due to address) in Dec. 2019. Certified mail return receipt: The

11      Supreme Court of Washington State, each member, and each member of The

12      Supreme Court of the United States by certified mail return receipt. All were

13      in receipt.

14   **28.** 2020 OCT: Carolyn filed civil suits regarding Case No. 01-06-97-9,

15      and Case No. 01-6-00742-4.

16   **29.** 2021: Carolyn let her vehicle tabs expire for over 3 months (completely out of

17      character her). She filed her 2019 Arizona taxes in the year 2021. Washington

18      State does not require veterans with a disability pension to file.

19   **30.** 2021 SEP: This is where we are today, September 20, 2021.

20

21

22       THE STATUTE OF LIMITATIONS SHOULD BE TOLLED (Fairness).
23         Carolyn Sioux Green has *legal standing* in all cases.

1     To force *medication increases* of potent *neuroleptic* drugs to a non-consenting

2  individual to then daily and repetitively override this same reasonable person's

3  individual choice in how their care is managed by treating a recorded and well-

4  documented physical injury that was ignored as an erroneous mental label is gross

5  negligence. Carolyn thought that she had left the United States of America.

6     It's gross negligence to treat a physical injury with sedation, antipsychotic

7  drugs for an alleged marketed mental disorder that Carolyn never had then since or

8  prior. It has taken 20 years to recovery from these forced unlawful treatments.

9  *Chemically lobotomized*. By force.

10    As a result of Defendants [United States] conduct, she was not able to bring

11  this claim earlier due to I was so debilitated by their actions. Then the actions that

12  followed as her physical injury was further grossly mismanaged by [United States]

13  VA Puget Sound. The drugs and drug interactions caused life altering

14  consequences. She was not in a mental state to bring claims to assert my rights

15  until later. As soon as I was able to file, she did. It would be unfair to hold me to the

16  prior statute due to I was not able during that time to commence these claims from

17  what Defendants [United States] unlawfully did to Plaintiff [Carolyn].

18

19    The failures of the establishments to give Carolyn a physical examination to

20  rule out medical first caused irreparable harm. The Superior Courts gave no great

21  weight required by law, rubber stamped a one-minute Ex Parte Hearing.

22  Petitioners made false misleading and perjured their statements as entered in the

1   Court records on June 1, June 8, July 5, July 13, July 27 as well the affidavits filed

2   with each Petition, to include the one-minute Ex Parte? The unreliable false and

3   misleading evidence provided in the Supplemental Information, other records,

4   testimony under oath in the groundless filings.

5       The *premeditated* 14 day in both Pierce and Thurston County Superior

6   Courts. Appears that six-hours is the going rate for premediation in both Courts.

7   According to the rule of law, one has the right to see a neutral party in 72-hours.

8   Both Superior Courts were/are seriously lacking integrity. The State of Washington

9   filed a Petition with unreliable information with supplemental conjectures and

10   falsities rather than evidence-based information thus, depriving the Plaintiff

11   (respondent then) of basic notice and the opportunity to be heard. Forced drugged

12   before every hearing and filing. No right to counsel. No right to be heard by an

13   impartial judicial officer. The false statements made under oath as recorded in

14   Court records directly affected the outcome and decisions causing the grotesque

15   miscarriage of justice. There was no clear convincing evidence whatsoever.

16
17
18       Other history can be obtained from previous and current close contacts for

19   Carolyn's changes. (Exh 96)

20

21       THE STATUTE OF LIMITATION SHOULD BE TOLLED (Fairness)

22         Plaintiff has *legal standing* in all cases.

1  **10).**               **DRUG SIDE EFFECTS**

2              (EXH 65, 66, 67, 68, 69, 70, 71, 72, 74, 88, 92)

3

4  *A.* **Off-label drugs account for at least 44% of adverse side effects**. The

5  *majority* of drugs prescribed to me where all *off-label,* except anti-inflammatory

6  and for a short period of time *opioids*, however, the majority of time chronic

7  *opioid* therapy was *off-label*. According to a JAMA Internal Medicine in 2016 the

8  off-label uses account for more than 44% more adverse effects.[1] (Exh–67 O)

9  **B. Drugs.com**. Carolyn's user name: 984980 Carolyn's password:

10  betterthinking984980 After logging in, go to the top right corner that shows user

11  name "**984980**," and then click on **My Interactions List**. There you will find my

12  verified(mostly) of some of the drug interactions, as well as some other veterans.

13  All of which I have in printed form. https://www.drugs.com/. (Exh–67 A)(Exh–70)

14  (Exh–71)

15  *C.* 2005-2014: Morphine and Clonazepam and Methadone "Opiates in combination

16  with benzodiazepines carries a 5x increase for adverse outcome including death,"

17  and may have "opioid hyperallergic." Warning stated by Doctor Timothy Dawson

18  at the VA Puget Sound Pain Clinic on the June 23, 2014 record, signed off on

19  September 22, 2014 in the Plaintiffs medical record. Plus, six-of those years

20  ingesting *morphine* and *methadone* simultaneously due to lack of procedural

21  care and while receiving exponentially delayed vital procedural care. This is just

22  the tip of the iceberg of some of the drug interaction I have endured, struggled

1    and managed to live through, by the grace of God. *Off-label.* Three-major drug-

2    interactions. (Exh–65) (Exh–67 O)

3    **D.** "Depressants are a class of drug which **slow down** brain functioning. They do

4    this by depressing the central nervous system (CNS). This sedative quality of

5    these sustances..."[49] (Exh–92)

6    **E.** Other effects from depressants "slurred speech, poor concentration, confusion,

7    headache, light-headedness, problems with movement and memory, lowered

8    blood pressure, slowed breathing."[50] (Exh–67 O, Exh–69)

9    **F.** *Droperidol.* Immediate effects of Droperidol 5 mg; Freezing responses and

10    immobility to even speak, disengagement; induced restlessness in all 20 subjects

11    known as Akathisia; dysphoria; visible observable mild motor restlessness; some

12    wondered whether they had done some irreversible damage to their brains.[33]

13    (Exh–63 N and O) (Exh–95).

14    **G.** "In fact, most people who experience psychosis are sleep deprived."[41]

15    **H.** *Haldol*: *Haldol. Haldol. The effects of Haldol*; "within ten minutes a marked

16    slowing of thinking and movement developed, along with profound inner

17    restlessness. Neither [of us] could continue work." Each left work for over two

18    days. "Paralysis of volition, a lack of physical and psychic energy. [We] felt

19    unable to read, telephone or perform household tasks of [our] own will..." "A

20    complex mix of sedation, the feeling of increased effortless, affective dysphoria,

21    poor concentration and anergia". A blank mind. "too zoned, too robotic, emotions

22    dead." Side effects far extend beyond sedation or clear thinking. *Dopamine* is

1  greatly affected in negative ways that deplete energy, motivation, pleasure,

2  being able to pursue goals, finding and keeping a job. To be able to engage in

3  relationships socially and with more initiate relationships. Appearing one way

4  on the outside while completely debilitated on the inside.[34]

5        Haldol is linked to the highest rate of Extrapyramidal side effects which are

6  extremely painful debilitating and crippling. Parkinson's disease, too. I was

7  denied my Right to Refuse every injection of Haldol at Providence. I was denied

8  my Right to Refuse to ingest any form of any drug at any time. Haldol causes

9  severe reactions to natural sunlight. In 2021, I still experience exaggerated

10  squinting. The consequences for enforcing my Right to Refuse lead to the

11  defendants acting as judge, jury and executioner bypassing all judicial processes

12  at every turn. My *physical injury* was further neglected as I did not have a

13  physical examination even though <u>I reported my back pain and my</u>

14  <u>Rheumatology doctors</u>, starting at Providence. My back pain relating to my

15  injury is recorded in every medical record by each establishment, then grossly

16  neglected. (Exh–63 T, U, X, Exh–65)

17

18  **I.**  *Haldol:* "Haldol can cause dose-related prolongation of the QT interval."[37]

19  **J.**  *Antipsychotics* are the most common <u>chemical restraint</u> used in the United

20  States of America, to include children and the elderly.[55] (Exh–92) (Exh–63 N, O,

21  T, X, Y, CC, EE)/.

22                 (EXH 65, 66, 67, 68, 69, 70, 71, 72, 74, 88, 92)

1  **K.** "The discovery of the antipsychotic/dopamine receptor, now commonly known as

2      the *dopamine* D$_2$ receptor. Led to repeated confirmation that it is the primary

3      site of action for all antipsychotics."[36]

4  **L.** First generation antipsychotics (Haldol) are well known to cause a higher risk of

5      neurological side effects while second generation antipsychotics are known to

6      cause a higher risk of metabolic side effects stated also by the

7      Psychopharmacology Institute.[47] (Exh–63 T)

8  **M.** Dr. Grace Jackson testified that the "pharmaceutical industry has skewed and

9      suppressed data showing the harms these drugs caused. Jackson testified that

10      the life expectancies of people taking drugs .....had shortened by as much as

11      twenty to twenty-five years, that the drugs caused many ...to be "chemical brain

12      injured, contributing to an "epidemic of dementia." (Exh–66)

13

14  **N.** 2006 February, one month as a sample: Methadone, Celebrex, citalopram,

15      quetiapine, gabapentin, Risperdal, clonazepam. Drug interactions: major=7,

16      moderate=9, therapeutic duplication=3. A few side-effects listed on drugs dot

17      com: <u>dizziness</u>, <u>drowsiness</u>, <u>confusion</u>, <u>difficulty concentrating</u>, <u>impaired in</u>

18      <u>thinking</u>, <u>judgement</u>, and <u>motor coordination</u>, <u>irregular heart rhythm</u>, <u>congenital</u>

19      <u>long QT syndrome</u>, plus other side-effects. This does not include the 44%

20      increased side effects due to the off-label use effects of these drugs. (Exh–72)

21  **O.** Clonazepam, a benzodiazepine is considered a short-term drug yet VA Puget

22      Sound's definition of short term drug in my case was 17 years. (Exh–72)

1    **P.** "Opiates in combination with benzodiazepines carries a 5x increase risk for

2        adverse outcome including death."[29] (Exh 65, 67)

3    **Q.** "Bad Care" in regards to prescribing *opioids and benzodiazepines* in combination

4        was stated by Dr. Anthony Mariano (VA Puget Sound) on September 1, 2015

5        during one of the five required classes I attended in order to obtain care from VA

6        Puget Sound Pain Clinic. Admitting the Department of Veterans Administration

7        *fell below the standard of care.* (Exh–65) (Exh–67 O)

8

9    **R.** Between 2001–2007, "In the year before death, more than half had filled

10       prescriptions for opioids and benzodiazepines... This medication combination is

11       known to increase the risk of respiratory depression, which is the unusually slow

12       and shallow breathing that is the primary cause of death in most fatal opioid

13       overdoses."[54] In more recent years, studies show an increase in morbidity.

14       Plaintiff was prescribed this lethal death cocktail of opioids and benzodiazepines

15       for well over 10 years. A decade. (Exh 65, 67, 69, 71, 72)

16    **S.** "Opioids depress the central nervous system, slowing down messages from the

17       brain to the body. They bind the opioid receptors in the brain and spinal cord–

18       the areas.....Opioids can slow breathing, lower blood pressure and pulse, cause

19       an irregular heartbeat and lower body temperature." "Opioids affect the brain

20       stem, an area that regulates automatic body functions, e.g. breathing."[39]

21    **T.** "Fell asleep in the bathtub twice this morning following the first dose...". (2006)

22       "The most dangerous time is when there is a dose change."[41]  (Exh 72) (Exh–71)

1   **U.** In 2014 "VA's subsequently admitted cover-up of the opiate-driven deaths of

2       Jason Simcakoski and roughly 30 other veterans at Tomah, Wisconsin."[45] These

3       bad standards of care and reckless prescribing practices by Dept of VA (VA

4       Puget Sound in my case) are not uncommon among veterans.

5   **V.** "This wasn't just one rogue prescriber, but a case that resulted, in part, from an

6       array of little-known, Big Pharma-driven practices." Drug industry grants

7       funding VA researcher and pushed the Dept of VA into pushing the drug

8       industries narrative, prescribe for off-label uses.[45]

9   **W.** "You can't organize yourself without a connection to another human being and

10      you can't make that connection if you embalm yourself with drugs."[47]

11  **X.** Human beings' natural expressions are altered on psychotropic drugs, one of

12      which includes difficulty of speech, many other abnormal manifestations which

13      effect your motor function and coordination. Your thought processes and how

14      your brain connects each thought to another, or not, are broken (and required)

15      due to the connection breakages and chemical restraints these drugs create.

16      Plus, the damaging drug interactions.

17  **Y.** Participating in other areas of life while physically injured and saturated in

18      inappropriate prescribed drugs in no way represents the Plaintiff understood

19      any part of the process. Plaintiff did not and could not understand the nature of

20      the proceeding or process to access justice. The scientific evidence is

21      overwhelming of how damaging drugs and (lethal) drug-cocktails distort and

22      destroy the brain and body, at the mitochondria level. [52]

1        <u>(EXH 65, 66, 67, 68, 69, 70, 71, 72, 74, 88, 92)</u>

2    **Z.**  "All classes of **psychotropic drugs** have documented toxic mitochondrial

3        effects. Many of which block key enzymes in the electron transport chain of the

4        mitochondria." Disrupters: antidepressants, pain relivers, benzodiazepines.[52]

5    **AA.**    Studies found that about "80% of the examined off-label prescriptions were

6        not supported by strong scientific evidence. Most common were antidepressants,

7        antipsychotics, and anticonvulsants."[39] (Exh–92)

8    **BB.**    "In retrospective evaluation, off-label use of antipsychotics as a class

9        increased from 4.4 million treatments related visits in 1995 to 9 million in

10       2008."[39]

11   **CC.**    "Typical antipsychotics act primarily on the dopamine system through D2

12       receptor blockade, while atypical antipsychotics block both D2 receptors and

13       serotonin 5–HT2A receptors." [39]

14   **DD.**    "Results indicated that long-term use of benzodiazepines were significantly

15       impaired in all of the cognitive domains measured (Barker et, al., 2004a)

16       including <u>sensory processing</u>, <u>psychomotor speed</u>, <u>non-verbal memory</u>,

17       <u>visuospatial processing</u>, <u>speed of processing</u>, <u>problem-solving</u>,

18       <u>attention/concentration</u>, <u>verbal memory</u>, <u>general intelligence</u>, <u>motor</u>

19       <u>control/performance</u>, <u>working memory</u>, and <u>verbal reasoning</u>."[3, 10](emphasis

20       mine) *Off-label.* (Exh–92, Exh–67 O)

21   **EE.**    The Puget Sound VA continued their <u>chronic opioid therapy for 13</u>

22       <u>consecutive years</u> (2005-2017) (Exh–67 B) (Exh–92). The VA Puget Sound other

1   off-label drugs continued for 16 years of an SSRI aka antidepressant, only

2   changed from Paxil to Celexa in 2003 until 2010 for a condition that I did not

3   have. The Black Box Warning started in 2004 by the FDA. Many of these drugs

4   cross the blood-brain barrier. *Off-label.*

5   **FF.**   Drugs known to Cause Insomnia that Carolyn was prescribed;

6   anticonvulsants, antidepressants (insomnia initiated by drug-induced *Paxil*),

7   sedative/hypnotics, psychostimulants.[31] (Exh–92)

8   **GG.**   Tramadol, Depakote effects the Central Nervous System (CNS) acting as a

9   respiratory depressant. Causes impairment of attention, thinking, and

10   psychomotor skills become more impaired.[56] (Exh–92)

11   **HH.**   *Ativan*, and (Depakene) Valproic Acid shows evidence of benzodiazepine

12   toxicity (excessive sedation) when used in combination.[56] (Exh–71)

13   **II.** Medications inducting insomnia, cause significant disruptions, contribute to

14   insomnia, and known sleep disrupters.; Paroxetine (*Paxil*), Sertraline (Zoloft),

15   Citalopram (Celexa), Olanzapine (Zyprexa), by disrupting.[30]

16   **JJ.**   "Spanish researchers found why antipsychotics cause cognitive impairment.

17   Spanish researchers have identified inflammatory mechanisms in the brain

18   caused by antipsychotic drugs, which in turn origin difficulties in memory,

19   attention and task planning; contributing to the chronofication of mental

20   illness."[2] *Off-label.*

21   **KK.**   "Like many benzodiazepines, Ativan can elicit confusion, depression, and

22   memory loss, in those taking it. These dose-dependent effects can be quite

1    debilitating. ... Taking Ativan may also cause difficulty in maintaining body

2    balance, resuling in falls and other accidents—with varying degrees of resultant

3    bodily injury."[25]

4  **LL.**   *Ativan.* Ativan "can elicit confusion, depression, and memory loss...These

5    dose-dependent effects can be quite debilitating... Taking Ativan may also cause

6    difficulty in maintain body balance, resulting in falls and other accidents—with

7    varying degrees of resultant body injury."[49]

8  **MM.**   All psychotropic drugs cause dysfunctions of the central nervous system.

9  **NN.**   "An analysis of 11 studies examining physical morbidity and mortality in

10    patients receiving antipsychotics showed a shorter life expectancy in the patients

11    compared to others by 14.5 years. The researchers attributed this to growing life

12    expectancy overall, plus a gap in healthcare received by schizophrenia

13    patients."[4] *Off-label.*

14  **OO.**   "Drug company marketing has played a strong role in the increase in use of

15    antipsychotics in recent years. In the United States, two drug manufactures

16    settled out of court, after being charged with illegally promoting the off-label use

17    of olanzapine and quetiapine."[39] (Exh–63) (Exh–92)

18  **PP.**   Neurological damage is a toxic effect of psychiatric drugs.

19  **QQ.**   "Risperidone is metabolized and can contribute to numerous drug interaction

20    because it metabolized by CYP3A4, the most common drug-metabolizing

21    enzyme."[45] (Exh–92, Exh–72)

22  **RR.**   SSRIs antidepressants increase the risk and cause GI bleeding. (Exh–92)

1   **SS.**    Neuroleptic feature; psychomotor slowing (lacking speech). Both generations

2        are D2 antagonists. First generation are associated with higher risk of EPS

3        (Extrapyramidal syndrome). Second generation are associated with 5HT2A/D2

4        antagonist associated with higher risk for metabolic damaging effects.[44]

5   **TT.**    "Moncrieff's second point is that the psychiatric establishment, underpinned

6        by the pharmaceutical industry, has glossed over studies showing that

7        antipsychotics cause extensive damage- the most startling being permanent

8        brain atrophy (brain damage) or tardive dyskinesia."[5] *Off-label.*

9   **UU.**    Aspartame: "Every molecule of aspartame, when it reaches 86° degrees F,

10        releases one molecule of the excitotoxins aspartic acid and one molecule of

11        methanol [wood alcohol] which metabolizes into the known mitochondrial poison

12        formaldehyde [embalming fluid]..."[13, 15] Clonazepam (a benzo) contains

13        aspartame, as well as other drugs. (Exh–92)

14   **VV.**    Formaldehyde poisoning antidotes: "There are no specific antidote from

15        formaldehyde toxicity."[14] Clonazepam (a benzo) contains aspartame, as well as

16        other drugs. (Exh–92, Exh–67 O)

17   **WW.**   Listed here are only *some* of the synthetic drugs that are capable of causing

18        mitochondrial damage.

19   **XX.**    TOXICOKINETIC AND TOXICODYNAMIC

20        "Anticholinergic effects associated with many of these drugs may delay

21        absorption and cause delayed peak concentrations. The "initial" fall in serum

22        concentrations after overdose would be primarily due to distribution rather than

1   clearance. (3, 4, 22)... For example Risperidone & Haldol are metabolized by

2   CYP2D6. Poor Metabolizers and those taking drugs that inhibit this enzyme

3   may have drug concentrations that are up to TENFOLD HIGHER than those of

4   other individuals (22)."[11]

5   **YY.**   Neuroleptic Malignant Syndrome (NMS) 2003 Pathophysiology: "NMS is

6   caused by a relative lack of dopamine at central postsynaptic receptors (4). This

7   may result from dopamine receptor blockade or from inadequate dopamine

8   production. Support evidence for this concept includes the occurrence of NMS on

9   exposure to neuroleptic drugs whose prime mechanism of action is dopamine

10   blockade (4)." "Patients requiring restraint or secluding are at greater risk, and

11   there is an association with history of electroconvulsive risk ... [12]

12   Neuroleptic Malignant Syndrome (NMS) is a "drug induced" disorder.

13

14   ***ZZ.***   Death by drugs has become more common. In March 2020, a woman, Pauline,

15   walked in to receive help. She exited in a body bag eight days later. "They also

16   repeatedly increased her dose of Haldol–a powerful antipsychotic–and Benadryl

17   too." These drugs come with cardiovascular side effects. "About 90 minutes after

18   her last dose, she was dead." Pauline died under chemical restraints and in

19   seclusion." Haldol, the FDA put Haldol on the Black Boxed Warning label drug

20   late 2001. Paulines medication list: an antidepressant Nortriptyline 225 mg/day

21   (recommended max dose not to exceed 150 mg/day). Even with a "high doses

22   alert" warning of the dangers this facility increased the dose to 300 mg/day

1   (*double the rec dose*) while also failing to monitor the patient closely or at all.

2   "The medical examiner determined the effects of medications led to her death."[36]

3   **AAA.** "Both the prospective patient and the accused criminal are subjected to a

4      coercive process buttressed by the power of state which may result in loss of

5      liberty. The prospective patient, however, is afforded fewer procedural

6      protections than we give the accused of crime."[18]

7   **BBB.** "Antipsychotics are not a first-line treatment for anxiety and are not

8      recommended for post-traumatic stress disorder or insomnia"[38] Yet VA Puget

9      Sounds first-line treatment for insomnia was an antipsychotic instead of a sleep

10     study or consider the damaging effects of Paxil where the insomnia was

11     initiated.

12  **CCC.** The National Institutes of Health "does not recommend atypical

13     antipsychotics for treating chronic insomnia." [39]

14  **DDD.** Clinical Psychologist. Carolyn reported awakening in the morning feeling

15     "like I had rigor mortis." It was explained "to what had likely happened was a

16     dystonic side effect from the atypical antipsychotic..." "[Carolyn] fell asleep in

17     the bath tub twice the morning following the first dose" VA Puget Sound medical

18     notation regarding the off-label prescription of quetiapine

19     (antipsychotic).02/24/2006 These disastrous off-label inappropriately prescribed

20     drugs were to treat the drug induced insomnia caused initially by the drug Paxil

21     (an SSRI). (Exh 72) (Exh–71) (Exh–88) (Exh–92)

22  **EEE.** "Eventually involve impairments of all higher mental functions such as

1    judgement, insight, and abstract reasoning."[21]

2  **FFF.**  Benzodiazepines "attributed to sedation or impaired attention" "For example,

3      implicit memory (i.e., long term, unconscious memory requiring previous

4      experience to perform a task) has been reported to be impaired by lorazepam

5      (Ativan)..." [19]

6  **GGG.** Deliberate indifference is the conscious or reckless disregard of the

7      consequences of one's acts or omissions. Disregards an excessive risk to an

8      inmate's health or safety. "Deliberate indifference defined as requiring (1) an

9      "awareness of facts for which the inference could be drawn that a substantial

10     risk of serious harm exists" and (2) the actual "drawing of the inference." Elliott

11     v. Jones, 2009 U.S. Dist. LEXI 91125 (N.D. Fla. Sept. 1, 2009).

12  **HHH.** *Anatomy of an Epidemic* states, "Both psychomotor and cognitive functioning

13      may be impaired, and **amnesia** is a common effect of all benzodiazepines."[22]

14  **III.**    Veterans Suicide inflicted by the U.S. Department of Veterans Affairs is

15      clearly shown by their annual report of 2019: Suicide by year has increased with

16      those diagnosed in mental health. (Exh–88) (Exh–92)

17  **JJJ.**  "They are dying from cardiovascular ailments, respiratory problems,

18      metabolic illnesses, diabetes, kidney failure, many physical ailments tend to pile

19      up as people stay on antipsychotics (drug cocktails) for years on end"[20]

20

21          (EXH 65, 66, 67, 68, 69, 70, 71, 72, 74, 88, 92)

22          THE STATUTE OF LIMITATIONS SHOULD BE TOLLED (Fairness)

1    **11).      <u>AFFIDAVITS BY EXPERTS FOR DAMAGING</u>**

2    **<u>DRUG EFFECTS</u>**

3

4

5

6

7

8

9

10    ***<u>See</u>* <u>EXHIBIT 66</u>**

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

**12).**          **THE 6.7 Year PROCESS.**
          <u>**THE SHORT VERSION OF**</u>
    <u>**SIX–YEARS and SEVEN–MONTHS**</u>
              **(Exh–85)**

How did it start; the untwisting of documentation to make sense of it all? Of

what happened to her life for the last twenty plus years? It is beyond

comprehension what life is like without a functioning brain. Nearly impossible.

What some would consider an unusual process became a very slow delayed thought-

out placement of documents, whether tacked to a wall or carefully sorted on the

floor, in a disarray too. To know and understand what transpired.


On February 11, 2015, she started writing paragraphs about something in

what past that she could remember. A thought. A memory. The next paragraph or

sentence had nothing to do with the previous one or the paragraph written after.

Many pages of paragraphs followed with thoughts of memories. Each paragraph

was numbered, as I then sat on the hallway floor separating each paragraph in

strips, then putting them in order of when they happened, in time and place. Wrote

a new number for each paragraph to then go back to the computer to reorder them

in a new word document. Taken out of digital form to put into paper form, then back

to digital to paper, to process and solve. A long process.

Doing this process over and over again for a few years created two-books–my

story, about what the Lord has brought me through, as well as how to help heal her

brain-injury using writing as an outlet to process. Writing has greatly helped sort

1   her thought, put events in the correct order, as well as heal from violent trauma. It

2   takes time, research, and wise investments using your gifts and talents, however

3   tainted and distorted the drugs and violent trauma make them, which is disastrous,

4   God will bless the work of your hands. Use your gifts.

5        In October 2014, her liver started showing more signs of distress by not

6   processing protein, so, she spent a good part of 2015 sleeping. Her hair was falling

7   out, too. When she wasn't sleeping, she spent rationed time with beloved friends,

8   volunteered at the USO on occasion (eight hours shy of 300 hours all on torn right

9   ankle ligaments) due to masking drugs with some writing and healing along the

10   way. The drug-induced pancreatitis and bile duct issues showed up in 2016, and ran

11   past late 2019. Back to October 2014, that's where the coffee enemas started for

12   liver cleanses recommended by a couple of top-notch Naturopathic Doctors, Dr.

13   Andrew Iverson (*Dr. I the Herbal Guy*) and Dr. Cy Fisher. Liver cleanses helped rid

14   her body of cellular damage, heal her bile ducts and gallbladder, and to remove drug

15   toxins to help save her liver, and life. (Exh–65 pt3)

16

17        By the time January 2018 started, her somewhat organized house became

18   paper documents–incidents posted to her hallway walls instead of photography or

19   art. This process greatly helped me solve insurmountable problems. It was a matter

20   of using sheetrock instead of poster board. This entire process greatly helped,

21   especially when it came to solving and processing the violent traumas and horrors

22   of 2001.

1    By acting on her faith in God, her house hallways became a way to file and

2    sort as the process grew to consume more floor space, and her life. Since she didn't

3    transition like most of society, from paper to digital, this is what worked for me to

4    heal from extreme violent abuses and trauma from the medical and court systems;

5    both at the state and federal level. She started with digital back when it was code at

6    the Norwalk Auto Auction, in the eighties. Attempting to sort through a computer

7    screen digging in folders for documents wasn't helpful for cognitive processing.

8    (Exh–85)

9    More understanding came often, except her cognitive process took longer to

10   catch up. Sometimes that could be hours, days, weeks, or even months later. Since

11   she had a hard time talking well, even though a right thought would come, when it

12   came out of her mouth it was somewhat backwards, sometimes fragmented. Look,

13   when she was a young girl, she got in trouble for talking in third-grade. Made to sit

14   in the front of the class because of it. Being verbally restrained–with drugs for over

15   two-decades especially after the four-forced barbaric *chemical lobotomies*, in 2001.

16   (Exh–87)

17   In 2001, that was a near annulation all while she was still physically injured.

18   Carolyn doesn't take what transpired in 2001 lightly, nor 1994-1995 (Exh–74) (Exh–

19   63) of her mismanaged injury–saturated in drugs while drowning in pain, not

20   helped with procedural care, to then be honorably discharged still splitting at her

21   right hind-end seams (Exh–63). In addition, how does an 18-year sentence sound for

1   driving a little squirrely in 2001(Exh–87) (Exh–89). What happened to her could

2   happen to you.

3   The writing process has allowed me to process cognitively better, without judgments

4   and criticism of not being able to talk right. When you have been saturated with

5   drugs for over two-decades and *chemically lobotomized*, it takes a long while for

6   your memory to fill in the scattered parts of a memory in your brain, that make it a

7   whole thought to produce an accurate reflection instead of a badly skipped vinyl

8   record. A human being.

9        She did attempt to write when I lived in C4 at the Clover lake apartments in

10  the early 2000s, and boy, that was a real mishmash. Humorous too. God has used

11  laughter as a saving grace in her life, consistently, to heal and bring me to

12  wholeness. In the same complex, her N9 apartment was a good place for more

13  healing. The front room (dining and living room) were turned into her bedroom.

14  Then she used the bedroom as a storage area as well for a desk later on. She was

15  unable to get around a 700 sqft apartment in 2005. (*photos provided upon request*)

16  Same with C4 in 2002, which is the year she walked out of her entire life, the whole

17  thing, to live. 2002-2005 is where she became more of a recluse from the horrors of

18  2001 with barely a brain yet receiving medical care for her initial injury (1994).

19  Then with a very slow recovery.

20        In May of 2009, the Lord blessed her with a house off Butte Drive in

21  Lakewood, Washington to move forward to cognitively heal and from violent trauma

22  and criminal mistreatment.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES (CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1    Her Restoration of Rights legal process began August 2019, with two court

2    hearing; one in person September 20 (flew to WA from AZ); one telephonically from

3    Arizona on November 1, 2019 where her firearm rights were fully restored through

4    somewhat of the rigged type court system.

5    Washington State Superior Courts in Thurston and Pierce County have

6    somewhat of a dirty court system lacking in integrity. Over three-months to put

7    together, after much work from the previous years, time and money invested. This

8    was to have her rights restored in one-state–Washington state, out of 50. First part

9    of the process. She won. Then, it took another 5-months to gather, organize and file

10   formal complaints March 30, 2020 of which were mostly all incorrect in the process.

11   (Exh–85) (Exh–89)

12   Therefore, she filed lawsuits in October 2020 in Washington State. The first

13   two digits in front is the year, that include the *unlawful imprisonment*:

14
15

16   **JUSTICES, Honorable: Superior Courts; Thurston, Pierce, Mason, King**

17   **County, and the Western Washington District Court Tacoma & Seattle**;

18

19   1.  Thomas S. Zilly; Judge                          WAWD Seattle (C95–748Z)

20   2.  Donna Lynn Holt: Court Commissioner             *TCSC (01-6-97-9)*

21   3.  A male voice; Court Commissioner                *TCSC (01-6-97-9)*

22   4.  Mark L. Gelman; Court Commissioner              *PCSC (01-6-00742-4)*

23   5.  H. Edward Haarmann; Court Commissioner          *PCSC (01-6-00742-4)*

1    6.  John C. Skinder; Judge (*Restoration of Firearm Rights*) TCSC (19-2-04117-34)

2

3    7.  Monty Cobb: Judge              Mason County SupCt (20-2-0441-23)*

4    8.  Robert J. Bryant; Judge (state to federal) WAWD Tacoma (3:20-cv-06206)*

5

6    9.  Sharonda Amamilo; Judge     TCSC (20-2-02155-34) <u>Scheduled for Trial</u>

7    March 6, 2023.

8

9    10. James L. Robart; Judge (state to federal) WAWD Seattle (2:20-cv-01804)**

10                                removed by U.S. (20-2-15087)**

11

12    11. Elizabeth Martin; Judge       PCSC (20-2-07851-0) now in COA

13

14    12. Benjamin H. Settle; Judge WAWD Tacoma 3:20-cv-06112–BHS, state case (20-2-

15    07852-8). Plaintiff voluntarily withdrew her complaint. This case was dismissed

16    without prejudice on September 13, 2021. See Dkt 119 & Dkt 120.

17        *Plaintiff has respectfully motioned to have this matter brought back to Judge*

18    *Settle. (See Dkt 16; Dkt 2; Dkt 8, Dkt 12).*

19

20        The other thing that she did that made a huge difference to help her heal,

21    was she stopped updating her smartphone. Every time she updated the phone, it

1   presented her with more new learning curves which delayed her cognitively since it

2   took way to long for her to catch up and function.

3       *(Sometime in 2018, I noticed a large number of companies were updating their*

4       *privacy policies at once. This struck me at a deeper level that something else*

5       *was going on. The other benefit to not updating then, was recognizing how*

6       *technology changes, even now. How if you don't update, what companies do to*

7       *shade away parts of app features. Things you don't notice when you always*

8       *update. I went without email on my phone for over six-months, due to no*

9       *updates. However, recognizing and learning some AI functioning*

10      *abnormalities was fascinating, revealing too. Very telling of how differently*

11      *tech operates. What it takes; what it permits, shades away and changes with*

12      *an update.)*

13  It takes a tremendous amount of time, focus–mine was severely lacking due to drug-

14  induced–brain damage, while still structurally mending (*August 30, 2017, after a*

15  *life changing treatment with Dr. Adam Geiger, I cried two-solid days knowing the*

16  *extra exercises I had been doing while unknowingly on my torn up left-hind-end*

17  *tortured side. Weights at the gym, a half-marathon... etc. Things I know* not *to do.*).

18  The amount of energy, personal finances, proper nutrients, and with a deeper faith

19  in God to come this far, not crippled after being maimed, to have more of a brain to

20  function, to have another chance at *Life* in America, as she keeps moving forward to

21  obtain wholeness. It's been beyond heartbreaking.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   During 2019–2020 she lived in a substandard rental. For example, the indoor

2   temperatures reached between 88–95 degrees several times, in Arizona. The oven

3   gasket was useless. She did have at least a half a burn and a half of another stove

4   burner too cook on. That was after the stove caught on fire, leaving her without a

5   functional stove for almost the entire year. Microwave? Oh, that took a year-and-a-

6   half to replace since moving from Washington to Arizona.

7   As of September 2021, it has taken 6-years-7-months (6.7 years) to process

8   through the hallways and most rooms of her old Lakewood, Washington house to

9   then continue processing and sorting in Arizona, as a solutionist, and then an

10   exposer. Solving an enormous puzzle of her bodily injuries, medical and court

11   system failures, lawyers' misconduct, the enormous Dept of Veterans and other

12   drug problems, abuse by those in authority, as well as other body challenges. To

13   understand the facts, the solid undeniable truth of what happened and how, was

14   worth it.

15   For the 6.7 years of the previous investments with the additional

16   expenditures, letting go of whatever and whoever it took, this is where she is today

17   in 2021, knowing the truth backed with solid factual evidence. Others may see the

18   last 6-years-7-months of her living conditions as chaotic, with good reason if you

19   don't know her, or the truth.

20

21

22   *I know the truth and that is something that can never be taken from me.*

1    **13).        <u>EXCERPTS OF CAROLYN'S INJURIES,</u>**

2                            <u>**briefly**</u>:

3

4    **1.        *Right Hip***: <u>Exh–80 p. 3</u>, June 28, 2000, "During these episodes she

5    has a feeling that as if her right hip is "up" and out the socket. She states she and

6    her husband is experiencing with home therapy on this discovered that it was

7    sometimes helpful to pull sharply on the right leg causing a pop in the hip area and

8    then a relaxation of pain."; Mar. 26, 2002 <u>p. 10</u>, "...likes the upslip correction and

9    her husband actually has been doing it more or less in an unschooled fashion for

10   quite a while. Today she brings him to go over my [Dr. Paxon] method."

11   Feb. 24, 2006 <u>p. 76</u>, "Right hip girdle remains dysfunctional."; <u>p</u> Aug. 27, 2006

12   <u>p. 89</u>, "continues to have an unhappy dysfunctional right hip area."; Jul. 03, 2006 <u>p.</u>

13   <u>141</u>, "leg needs a yank."; Aug. 27, 2007 <u>p. 101</u>, "she always has a chronic bilateral

14   sacroiliac area pain with predominance of symptoms in the right buttock and lateral

15   hip."; <u>Exh–81 p. 3–4</u>, noted Jan. 3, 2005 with SI Dysfunction; "Chronic Recurrent SI

16   Dysfunction."

17   <u>Exh–95</u> (<u>Case No. 3:20-cv-06206 Mason General Hospital</u>), <u>p. 6</u> ¶¶21–22, <u>p. 7</u>

18   ¶¶1–3 in reference to Jul. 1–2, 2001, "Apparently, GB had forgotten to mention that

19   he had been yanking Carolyn's right leg out of her hip socket to reduce severe pain

20   due to the not fully attached leg riding up to the top of the hip socket of the patient.

21   Those leg yanking home pain relief procedures are noted in Plaintiffs VA Puget

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

1   Sound Health Care Systems medical record located in Dr. Charles Paxon's progress

2   notes.";

3         p. 7 ¶¶14–19, "The four-point restraints with CFM were 20-minutes from Old

4   Farm Road to Mason General. Then another round of four-point restraints on the

5   backside of the physically injured patient that lasted approximately (2-hour-5-min)

6   while at Mason General and without a physical examination pursuant to RCW

7   71.05.210. Then another round of four-point restraints for (1-hour-9-min) to

8   Western asylum, Western state.... For a physical injury with NO physical

9   examination." (*See* (Exh 1–61 va+western)). Initiated at Providence (Exh–106 pt1

10   Four-Point-Mechanical-Restraints for 7-hrs-50-mins plus "Thrashing" and with an

11   *altered four-point-mechanical-restraint-record* by Providence, see Exh–63 p. 20–21,

12   p. 27; Exh–106 pt1 p. 15 summary).

13

14   **2.**         ***Pelvic support***: Exh–65 pt1, pt2; SI Lock Belts to support Carolyn's

15   pelvic due to her physical injury, (pt1: p. 154, p. 155, p. 161, p. 176);

16   (pt2: p. 36, p. 37, p. 41 belts can be shown in uncropped photo). (*See* Exh–80 p. 3–4,

17   particularly the underlined portion of Jun. 28, 2000). Exh–80 p. 21 Oct. 16, 2002

18   "wearing two sacral belts, criss crossed, like Panch Villa.";

19   p. 56 Mar. 23, 2005 "using a sacral belt to help hold the pelvic corrections." etc.;

20   Exh–96 pt2 as shown on p. 46, a snap shot of what a great deal of 1996–2000 looked

21   like, lying down, without pelvic support or adequate treatment. Exh–80 p. 106 Mar.

22   24, 2008 "Currently [she's] attending school in the longer she has to sit the worse

1   her trouble. Her current semester she has either been studying or lying down."; p.

2   25 Jan. 8, 2003 "I [Carolyn] feel I am getting better tho very slowly: I am now stiff

3   in the morning until about 10 AM; it used to be until 3 PM" "Last time, I had a

4   brisk walk around the compound (apartment) without the sense that I am dragging

5   my right leg – the first time since my injury." Noted Jan. 8, 2003 injured Feb. 24,

6   1994. (*See* Exh–87 p. 32, p. 2–50); (Exh–87 p. 239).

7

8   **3.**          ***Underwear***: Exh–65 pt2 p. 3, p. 49: underwear; Exh–80 p. 3–4

9   (underlined portion) "She has never worn a belt to try to hold the iliac wings

10  together. In part, this maybe because she does not like any pressure there from any

11  tight waistband from any sort, and claims that she frequently spares underwear

12  because of that." (Exh–96 pt2 p. 10)

13

14          Exh–87 p. 90 starting at paragraph two through p. 91 paragraph two while at

15  VA Puget Sound, stated in part here, "S/O I can't understand why my underwear is

16  an issue. Apparently, the veteran was told on day shift that she should be wearing

17  underwear. Spoke to her privately and explained that it was not appropriate to go

18  underwearless because in some positions it was obvious she had none on." "Stated

19  that she [Carolyn] could only wear certain kinds secondary to her back condition."

20          "Furthermore, let me point out, I am most certainly informed about different

21  positions with underwear since I did attend (and was a part-time instructor) at

22  John Robert Powers (School of Personal Development and Modeling)..." (see Exh–96

1  pt2 p. 10 photo; p. 17 photo, p. 66 photo; Exh–65 pt2 p. 3 photo; p. 48–49 photo; p.

2  54–55 photo; p. 62 photo; Exh–80 p. 4 underlined section; Exh–87 p. 90–91;

3      Exh–65 pt1 p. 153, p. 165, p. 176, p. 177, p. 185).

4

5  **4.**      ***Right Ankle: right tibia***: Exh–82 are also the consequences of denial

6  of medical care and for not treating my initial injury that included my *right–tibia*,

7  thus eventually affecting my right ankle; Exh–65 pt2 p. 30–31; Exh–65 pt3 p. 49–

8  69; Exh–77; Exh–76 p. 300–301 09/16/2016, scroll to the beginning then Ctrl find

9  "ankle". Exh–127 p. 5 "...there was a question of tibialis anterior weakness on the

10  right..."

11      What she would point out here is prior to her catastrophic injury 21 Feb

12  1994, in 1991 she qualified for the American Gladiators as a contender prior to

13  entering the Military.

14

15  **5.**      ***Dangerousness***: Exh–104 p. 10 Providence noted "client was putting

16  herself and bystanders in danger when she was driving erratically on a gravel lot."

17  Exh–89 p. 30 Plaintiffs' Driving Record Abstract of Complete Driving Records

18  current as of 03/29/2018. (See pp. 31–35). Clean record.

19  Exh–90 p. 5 starting at Great Weight on to pp. 6–7, of which statements

20  can be verified in Exh–104 p. 14; p. 20, (the record is also false in that Carolyn was

21  *not*–arrested (see Exh–89 p. 35 "... not been arrested or booked."). No arrests. No

22  crime. No charges filed. Clean background. Clean driving record.

1    Exh–104 p. 21, "By the way she was driving prior to admissions she, put

2    people and herself in danger," is an absolute erroneous statement;

3    p. 36, a week later while in the States custody "pt. was driving her car in such a

4    bizarre and unsafe manner that she put herself and possibly others in grave harm."

5    (See Exh–104 p. 40 for the first 90-day filed on Jun. 8, 2001 after the groundless Ex

6    Parte was erroneously filed on Jun. 1, 2001 for a fourteen-day in the *one-minute Ex*

7    *Parte hearing*); p. 42 "patient was driving her car .... she put herself and others in

8    grave danger of serious harm." This statement was made while [Carolyn] was in the

9    States custody for eight-days plus the ER nightmare at Providence the night prior.

10   This is more perjury and falsity, especially while locked up, plus the fact that no

11   other people were in the vicinity of her driving the previous week.

12

13       (Exh 3 va+western p. 8) "According to CDMHP, she had been driving

14   dangerously..."; (Exh–10 p. 22 not dangerous); (Exh–15 p. 29 not dangerous); (Exh–

15   23 p. 42 not dangerous); (Exh–50 p. 97 likelihood of serious harm aka dangerous

16   while in the States custody); (Exh–51 p. 99 for a 90-day) that was (*premeditated*

17   Exh–5 p. 98).

18       Exh–102 p. 14, (**RCW 71.24.300(4)**) NEW SECTION. Sec. 4.

19   The legislature intends that, .... file a petition for a ninety-day (90 day) for a

20   *less restrictive alternative* in lieu of a petition for a fourteen-day (14 day)

21   commitment. (See Exh–63 va+western, then p. 25 refutes p. 24 regarding four-point

22   mechanical restraints use); (Exh–104 p. 40);

1    This also applies to the Providence Case No. 20-2-02155-34 (See <u>Exh–104</u>;

2    <u>Exh–63</u> p. 19). (See <u>Exh–102</u> p. 12 starting at line 21 though p. 14 lines 1–11).

3    <u>Weaponizing the litigation process</u> <u>then twisting case law to suit the</u>

4    <u>nefarious narrative bypassing all judicial processes</u>.

5

6    **6.**        ***In Reference***: posed with the question by the court to the effect of

7    asking how long it would take Carolyn to transfer her Jeep title after making the

8    final payment, paying it off. His [Mr. Lewis's] answer more than likely will be along

9    the lines of it would only take Carolyn same day or within a week, not very long

10   afterward. Where, in fact, it took the brain injured Plaintiff more than a decade to

11   transfer her title, in 2018. See <u>Exh–96 pt2</u> <u>p. 5–6</u> Mr. William "Bill" Lewis Sr.

12   Listed by photograph and writings in <u>Exh–96</u> of employers and friends from grade

13   and high school references about my conduct, personality and behavior throughout

14   the years. In my earlier years prior to my physical injury while active duty, where I

15   worked for very respected reputable professional honorable companies, with

16   responsibilities accounting for thousands of dollars in cash monies and with

17   responsibilities for millions of dollars in perishable product as an accounts payable

18   job paying millions of dollars to vendors.

19

20   **7.**        ***Firearm Rights***: <u>Exh–89</u> Restoration of Rights (Case No. 19-2-04117-

21   34 Aug. 11, 2019), <u>p. 8</u> see box four (4) not-checked.; <u>p. 24</u>, "I <u>Carolyn Sioux</u> never

22   had this condition," with the affidavit signed Oct. 9, 2019. *see* p. 27.; Previous and

1    while active-duty p. 68 National Defense Service Medal; M-16 Marksman, Pistol

2    Marksman. Exh–63 p. 38, "She states she is not mentally ill nor has she ever been."

3    Trauma is not a mental illness. Physical injuries are not a mental illness. Exh–80 p.

4    56, "She is annoyed we have bipolar disorder on her problem list. And that I [Dr.

5    Paxon] have used it. I pointed out I borrowed it from the existing database; she has

6    apparently had it stricken by April Gerlock (Exh–72) .... "Lastly, she asks for

7    treatments directed to hip and leg today..."

8         Exh–87 p. 55 "Ex Parte in civil commit cases, whether unlawful of lawful

9    instantly removes and makes an individual ineligible-barred from their Second

10   Amendment firearm right until restored by the State, and through a lengthy

11   process. Ex Parte, or a 14–day, is another form used for gun confiscation." Another

12   *unfair* process; (*See* Exh–104 pp. 46–48); (Exh 1–61 va+western p. 148 see # six;

13   Exh–63 p. 19).

14

15        Therefore, Plaintiff is requesting additional relief be granted in that this

16   Honorable Federal Court restore to Plaintiff her Restoration of Rights for the

17   remaining states in these United States of America. Especially in light of the

18   perjury evidence and with the grotesque miscarriage of justice, to restore to her

19   what was illegally and unlawfully taken from her, for years. She was even in

20   contempt of court a few times without her knowledge. (Exh–87 p. 226 "Not to

21   mention the *years* without her rights, and in contempt of court, unbeknownst to

22   me." See p. 300).

1       Exh–127 p. 7 "Denies knowledge of 90day CC" Jun. 12, 2001.

2    Jun. 8, 2001 was the only Court hearing Plaintiff attended and while on unlawful

3    forced injections of Haldol that included unlawful standing orders self-created by

4    Providence who bypassed all judicial processes. Plaintiff "Contested hearing" for 90

5    day; Then in Exh–63 p. 30 of some of the forced injections of Haldol by Providence.

6    (See Exh–109 Providence "recopied" drug record for the fraudulent concealment of

7    their drug records being recopied in their attempt to conceal their nefarious crimes.

8    RCW 4.16.350). (*See* Exh–106 pt3 p.3–8); (*See* Exh–108 pt2 for only a few of the

9    forced injections noted that conflict with Providence's "recopied" drug record p. 64,

10   p. 76, p. 88, p. 90, p. 94, Haldol *prior* to Court hearing and after with *no-right-to-*

11   *refuse* at any time. (*See* Exh–106 pt4 p. 5–8; Exh–110).

12

13   **9.**       ***Reproductive Rights, loss of***: Exh–34 va + western p. 58 states "She

14   questioned each of her meds and refused the Olanzapine saying "I'm trying get

15   pregnant and that med is not good for me." Each night she has held up the med line

16   with questions about her meds. She has refused some meds each night,"" Jul. 7,

17   2001. Exh–64 p. 38, "States she will not take medication it is against her religion

18   and she is currently trying to get pregnant," Jun. 12, 2001; Exh–80 p. 139 a 2006

19   notation on the bottom right corner ".....wiped out at end of day need naps unable to

20   hold a child pregnant or otherwise w/ this R hip." Exh–108 pt1 p. 101, "My husband

21   & I are planning/children..." (See Exh–102 p. 16 ¶30).

22   ///

**10.**　　　　***Drugs***: <u>Exh–67 pt1</u> <u>p. 44–45</u> Celebrex (Celecoxib) a NSAID aka an anti-inflammatory drug. The pharma data records are sparce at best and do not reflect the true dispensing and refills of this drug, either.

　　　　<u>Exh–80</u> <u>p. 131</u> Oct. 11, 2011 "...she is already taking full dose of Celecoxib." "... she would like to gradually wean away from morphine. She wonders about using ibuprofen to do that. Unfortunately, she is on full dose Celebrex already." (See Exh–67 all, particularly pp. 44–45; Exh–92)

　　　　Additionally, in regards to Aspartame. Under Title 21 § 201.58 Waiver of labeling requirements (law). There is no label of Aspartame in the drug effects literature nor is Aspartame listed on the bottle as an ingredient which is a violation under the Title. Accordingly, who gave the waiver? (Exh–67).

**11**.　　　　***Neck pain***: <u>Exh–75</u> <u>p. 3</u> First cervical (neck) pain recorded Jul. 22, 1992; "...comes in with headache and neck pain." "Somewhat painful ROM especially of the neck. Some tenderness and spasms at the base of the right side of the neck," while active duty. Years of reporting about my neck and pain. First treatment drugs. Then traction and physical therapy years later as referenced Jan. 31, 2017. This was after a long haul going through the bureaucratic gatekeeping with negligent and unreasonable delay in care by VA Puget Sound's Pain Clinic (see Exh–75 pt1, pt2); (Exh–67 pt1 pp. 39–40). Furthermore, <u>Exh–80</u> <u>p. 131</u> Oct. 11, 2011 "...she is already taking full dose of Celecoxib." "... she would like to gradually wean away from morphine...."

1   **12**.          ***Brain injury–damage***: Her debilitating brain-injury from the

2   defendants' [United States] actions by chemically lobotomizing her occurred in

3   2001, followed by years of excessive unnecessary drugs by the [United States] that

4   prevented her from exercising reasonable diligence prior to her filings which began

5   August 11, 2019. It is nearly impossible to function as a human being without a

6   proper functioning brain. It is scientifically proven by case studies with extensive

7   literature and with experts' affidavits in how psychotropic drugs damage a human's

8   brain functions effecting the frontal lobe, temporal lobe, parietal lobe, occipital lobe,

9   cerebellum, and brain stem, where much damage occurs.

10          _Drug prescriptions_ see Exh 67, 68, 69, 70, 71, 72, 74, 92) (Exh–63 pp. 30–31;

11   p. 36; p. 41–44; Exh–66; Exh–64)

12          _Drug side effects_ see Exh–66 p. 11–150; Exh–70; Exh–71; Exh–72 pp. 11–18;

13   Exh–74 p. 8).

14

15          "Opiates in combination with a Benzodiazepine carries a 5x increase risk for

16   adverse outcome including death," per [United States].

17

18                    CHRONIC OPIOID THERAPY FOR THIRTEEN YEARS

19                              + OTHER DRUG COMBINATIONS

20

21          Scientifically proven facts through peer reviewed literature, plus the fact that

22   medical experts have testified in courts of the harmful effects these forced drugs

1   have on mental functioning. Disrupting neuropathways making them inoperative.

2   Prescribed drugs create mental disfunctions in much of the same way, disrupting

3   the way the brain connects to the processing centers affecting the frontal lobe,

4   temporal lobe, parietal lobe, occipital lobe, cerebellum, and brain stem. Affidavits by

5   experts are included to solidify these claims (Exh–66) (Exh–65 pt2 pp. 6–17; Exh–65

6   pt1 pp. 158–160, p. 11; p. 17; p. 18; p. 48; p. 60; p. 71, pp. 123–141) Drug side effects

7   and drug interactions listed in the document bring more scientific evidence with

8   real life experience of the extraordinary circumstances and challenges the Plaintiff

9   has had to overcome in order to bring her claims to the Court.

10

11   12.        *Maiming*: Exh–63 see all; Exh–65 pt1 see all; Exh–65 pt2 a type of a

12   visual photographic summary version of maiming; Exh–63 pt3 see all; Exh–75 pt1

13   see all; Exh–75 pt2 see all; Exh–76 see all; Exh–77 see all; Exh–78 p. 3, see all;

14   Exh–79 p.3;

15          Exh–80 p. 3–4 "This has never been treated directly except by massage and

16   physical therapy. Low back pain is constantly present but not a major issue until

17   she feels the hip is out. The hip seems to develop this malfunction at times for no

18   apparent reason. At times she has had to treat the hop once every two or three

19   weeks at home. She has never worn a belt to try to hold the iliac wings together. In

20   part, this is maybe because she does not like any pressure there from any tight

21   waistband from any sort, and claims that she frequently spares underwear because

22   of that."; p. 136 noted in 2006: "pelvic upslip secondary to R buttock to include

1  ligaments, pyriformis muscle, sciatic nerves trunk level, ® attachments.... ®

2  shoulder arthritis.....SI dysfunction.... had I been treated when I was acute I

3  wouldn't be chronic." p. 137 "even with medication and a [Lidoderm] patch, my sit

4  bone required ice to sit longer periods." "Purchased the vehicle I'm currently in so I

5  can sit and drive." "When I was married it hurt to have intercourse." "drive w/ left

6  foot a lot.";

7     p. 138 "rectum muscles have to put sterile gloves on to push my stool out of

8  my rectum previously extraordinary athlete" "loss use of ® buttocks" "iliotibial band

9  release" "foot gets cold"; p. 139 "standin`g time less than one minute" "constantly

10  loose my balance" ® buttock & hip pain sitting – prolonged pains at different points

11  in time" "® foot – drop foot calf cold foot ®" "Only on meds baths gabapentin,

12  morphine, [Lidoderm], ethyl chloride, can function, wiped out at end of day need

13  naps unable to hold a child pregnant or otherwise w/ this ® hip"; p. 141 "Leg needs

14  a yank" noted Jul. 6, 2006;

15     Exh–80 p. 149 Jan. 21 May 17 2004 "piriformis syndrome and myofascial

16  pain syndrome, lumbopelvic dysfunction, right pelvic upslip with significant

17  lumbosacral spasm, severe right piriformis of syndrome (Jan. 1997) where I had an

18  electroceutical blockade of the sciatic, with poor results and considered a failed

19  treatment a month later, chronic musculoskeletal pain with piriformis syndrome,

20  pubic dysfunction, and should decreased range of motion. She has hypertonus to her

21  entire system. 10/16/02. Still has right pelvis upslip. Pelvis dysfunction/lumbopelvic

22  pain. Chronic, recurrent sacroiliac strain/dysfunction syndrome along with pelvic

1   upslip and hypertonus of the cervical/thoracic/lumbosacral spine mid and major in

2   kind.” “My last noted visit: well-managed chronic recurrent sacroiliac, strain/

3   dysfunction syndrome, May 17, 2004 (*after 10 years into the injury here*).”

4           <u>Exh–81</u> see all, “Chronic Recurrent SI Dysfunction”, “Cervicogenic

5   headache” “Sacroiliac strain/dysfunction syndrome” 2004, “Chronic musculoskeletal

6   pain with piriformis syndrome, pelvic dysfunction and shoulder decreased range of

7   motion” 1997, “Severe Piriformis Syndrome” 1997, “Piriformis syndrome and

8   myofascial pain syndrome” 1995,

9   1. “Myofascial pain”

10  2. “Lumbopelvic dysfunction”

11  3. “Right piriformis syndrome”

12  4. “Poor dynamic balance”

13  5. “depression secondary to #1-#4” 1995;

14      <u>Exh–82</u> right ankle congressional inquiry; <u>Exh–83</u> see all; <u>Exh–84</u> see all

15  “Prone Functional Short Leg – Right” 2007 and Chronic back pain, neck pain and

16  upper/ lower extremity...” 2016, Prone Functional Leg Length Discrepancy – right

17  2011; “Prone Functional Leg Length Discrepancy -right” 2013–2017; <u>Exh–92</u>; <u>Exh–</u>

18  <u>106 pt1</u> Four Point Mechanical Restraints;

19          <u>Exh–108 pt2</u> p. 50, and so forth.

20      <u>Exh–129</u> <u>p. 8</u> “1. Right posttraumatic piriformis syndrome with persistent

21  buttock and sciatic-pattern pain. 2. Chronic neck and shoulder pain with multilevel

22  cervical degenerative processes and secondary myofascial pain syndrome.” “Plaintiff

1    is only addressing the buttock hip injury here in this portion of the record, although

2    the neck very relevant here too: "The initial focus of discussion will be on the right

3    buttock complaint. The precipitating injury was a fall off a ladder in which she

4    slipped and struck her buttock repetitively, resulting in a very substantial buttock

5    hematoma. This occurred February 21, 1994." 1994.

6         p. 11 "Ms. Carolyn is beginning to develop some neuropathic pain with

7    hypersensitivity superficially, and clearly she is developing what may become, if not

8    definitively treated, a rather entrenched pain syndrome that could progress to

9    irreversible neuropathic elements." 1995. 1995.

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

# IN CONCLUSION

For all of the reasons stated above, this case should go to trial and relief should be granted for Plaintiff Carolyn Sioux Green. According to the rule of law with factual detail and solid evidence, the Plaintiff is entitled to relief.

THIS IS A LANDMARK CASE. Equitable tolling is an extraordinary remedy that allows a Court to resuscitate untimely claims. Plaintiff has set forth specific facts with an abundance of evidence showing that there exists a genuine issue for trial. Plaintiff respectfully requests this Court to resuscitate her claims. The Statute of Limitations Should be Tolled for justice and fairness.

Respectfully submitted,

CAROLYN SIOUX GREEN
CANDIDCAROLYN®
PO Box 2494, Scottsdale, Arizona 85252
(253) 588-8100, candidCarolyn@gmail.com
*Plaintiff*
DATED this 25th day of November 2021, in Phoenix, Arizona.
Thanksgiving in the United States of America.

///

///

///

///

///

# REFERENCES

1.  Schwartz LM, Woloshin S. Medical Marketing in the United States, 1997-2016. *JAMA*. 2019;321(1):80–96. doi:10.1001/jama.2018.19320 https://jamanetwork.com/journals/jama/fullarticle/2720029 (accessed February 18, 2019).

2.  B. Arts, N., E. Bora, M., MM. Kurtz, R., MC. Mann-Wrobel, J., V. Balanza-Martinez, G., K. Jamrozinski, O., . . . S. Karlsson, A. (1970, January 01). Antipsychotic medications and cognitive functioning in bipolar disorder: Moderating effects Of COMT VAL108/158MET GENOTYPE. Retrieved February 9, 2021, from https://bmcpsychiatry.biomedcentral.com/articles/10.1186/1471-244X-13-63.

3.  Barker, M.j. Greenwood, K.M., Jackson, M *et al*. Cognitive Effects of Long-Term Benzodiazepine Use. CNS Drugs 18, 37–48 (2004) https://link.springer.com/article/10.2165/00023210-200418010-00004.

4.  Is treating schizophrenia with antipsychotics worth the risk? (2018, July 13). Retrieved February 9, 2021, from https://www.hcplive.com/view/is-treating-schizophrenia-with-antipsychotics-worth-the-risk.

5.  Myth of the antipsychotic. (2008, March 02). Retrieved February 9, 2021, from https://www.theguardian.com/commentisfree/2008/mar/02/mythoftheantipsychotic.

6.  History of western state hospital. (n.d.). From https://www.dshs.wa.gov/bha/division-state-hospitals/history-western-state-hospital.

7.  The State of Queensland; Queensland Health; (2013, September 12). Brain map frontal lobes. Retrieved February 9, 2021, from https://www.health.qld.gov.au/abios/asp/bfrontal.

8.  Frequently asked questions about lobotomies. (2005, November 16). Retrieved February 9, 2021, from https://www.npr.org/templates/story/story.php?storyId=5014565.

9.  The State of Queensland; Queensland Health;. (2013, September 12). Brain map frontal lobes. Retrieved February 9, 2021, from https://www.health.qld.gov.au/abios/asp/bfrontal.

10. Barker, M., Greenwood, K., Jackson, M., & Crowe, S. (2003, September 13). Persistence of cognitive effects after withdrawal from long-term benzodiazepine use: A meta-analysis. Retrieved December 28, 2017, from https://www.sciencedirect.com/science/article/pii/S0887617703000969.

11. Dart, R. C., & Caravati, E. M. (2004). *Medical toxicology*. Philadelphia: Lippincott, Williams & Wilkins. Part I Section 8; Central Nervous System Agents pages 863-864.

12. Dart, R. C., & Caravati, E. M. (2004). *Medical toxicology*. Philadelphia: Lippincott, Williams & Wilkins. Part I Section 3; Diagnosis of the Poisoned Patient; pages 101-102, p. 103 Serotonin Toxicity/Syndrome.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES (CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

13. Kohls, Gary G. "Everything That Glitters Isn't Gold and Drug-Induced Dementia Isn't Alzheimers." https://duluthreader.com/articles/2015/02/25/4885 everything_that_glitters_isnt_gold_and_drug.(accessed February 09, 2018). Aspartame.

14. Dart, R. C., Hurlbut, K. M., Kuffner, E. K., & Yip, L. (2003). *The 5 minute toxicology consult*. Philadelphia: Lippincott Williams & Wilkins. Formaldehyde p. 394-395.

15. Dart, R. C., & Caravati, E. M. (2004). *Medical toxicology*. Philadelphia: Lippincott, Williams & Wilkins. Part IV Chemicals Section 3; Antiseptics and Disinfectants. Formaldehyde pages 1246-1250.

16. Pharmaceutical Rape. Dr David Healy. February 16, 2015. Accessed 2018. https://davidhealy.org/pharmaceutical-rape/.

17. Dart, R. C., Hurlbut, K. M., Kuffner, E. K., & Yip, L. (2003). *The 5 minute toxicology consult*. Philadelphia: Lippincott Williams & Wilkins. Bradycardia Toxidrome pages 22-23. Tachycardia pages 68-69.

18. Ennis, B. J., & Litwack, T. R. (1974). *Psychiatry and the presumption of expertise: Flipping coins in the courtroom*. Berkeley, CA: California Law Review.

19. Buffett-Jerrott SE, Stewart SH. Cognitive and sedative effects of benzodiazepine use. Curr Pharm Des 2002;8:45-58.

20. Whitaker, R. (2015). *Anatomy of an epidemic: Magic bullets, psychiatric drugs, and the astonishing rise of mental illness in America*. New York: Broadway Books. (secondary source).

21. M.D., P. (2017, July 21). Your drug may be your problem: Psychiatric drug facts. Retrieved March, 2018, from https://breggin.com/your-drug-may-be-your-problem/.

22. Whitaker, Robert. *Anatomy of an Epidemic: Magic Bullets, Psychiatric Drugs, and the Astonishing Rise of Mental Illness in America*. New York: Broadway Books, 2015.

23. Frontal Lobe Syndrome. https://pubmed.ncbi.nlm.nih.gov/30422576/ National Center for Biotechnology Information Retrieved March 29, 2021.

24. AttenGo: Frontal Lobes and Executive Functions. (n.d.). Retrieved March 28, 2021, from http://www.attengo.com/adhd-memory-articles/frontal-lobes-executive-functions/.

25. Written by: American Addiction Centers Editorial Staff Reviewed by: Eric Patterson, M. (2021, March 03). Ativan Effects: Short Term, Long Term & Side Effects. Retrieved from https://drugabuse.com/benzodiazepines/ativan/effects-use/

26. "Rosemary Kennedy: the Sad Life of President JFK's Sister." *IrishCentral.com*, 9 Nov. 2020, www.irishcentral.com/roots/history/rosemary-kennedy-jfk-sister April 21, 2021, and https://historycollection.com/10-horrifying-examples-people-subjected-lobotomies-tragic-results/2/.

27. "What to Know About Your Brain's Frontal Lobe. Retrieved March 28, 2021. https://www.healthline.com/health/frontal-lobe.

28. "Frontal Lobe: Function, Location, and Structure." *Spinal Cord Injury & Brain Injury Resources, Talk to Experts You Trust*, https://www.spinalcord.com/frontal-lobe. Accessed March 28, 2021.

29. Dr. Timothy C. Dawson noted this warning June 23, 2014 in Carolyn's VA Puget Sound Health Care System medical record.

30. "Could Your Medication Be Causing Insomnia" 2017, May 30. 12 Medications That Can Cause Insomnia and What You Can Do About It - GoodRx. Retrieved from https://www.goodrx.com/blog/could-your-medication-be-causing-insomnia/.

31. Pagel JF, Parnes BL. Medications for the Treatment of Sleep Disorders: An Overview. Prim Care Companion J Clin Psychiatry. 2001 Jun;3(3):118-125. doi: 10.4088/pcc.v03n0303. PMID: 15014609; PMCID: PMC181172.

32. Howard Dully –Lobotomy Survivor/Public Speaker accessed May 28, 2021 https://howarddully.com/about.

33. Healy, D., & Farquhar, G. (1998). Immediate effects of Droperidol. *Human Psychopharmacology: Clinical and Experimental*, *13*(2), 113–120.

34. Jones, N. (2012). Antipsychotic Medications, Psychological Side Effects and Treatment Engagement. *Issues in Mental Health Nursing*, *33*(7), 492–493. https://doi.org/10.3109/01612840.2012.686560.

35. Seeman, P., & Kapur, S. (2000). Schizophrenia: More dopamine, more D2 receptors. *Proceedings of the National Academy of Sciences*, *97*(14), 7673–7675. https://doi.org/10.1073/pnas.97.14.7673

36. Jones, R. (2020, March 12). *Questions surround patient's unexpected death in psychiatric hospital*. Medical Examiner Determined Effects of Medication Led to Her Death. https://www.wxyz.com/news/local-news/investigations/she-died-suddenly-in-a-psychiatric-hospital-state-watchdogs-still-havent-asked-why.

37. Haldol side effects via drugs.com.

38. B.P.J. (2011, November). *Prescribing atypical antipsychotics in general practice - BPJ Issue 40*. Https://Bpac.Org.Nz/BPJ/2011/November/Antipsychotics.Aspx#2. https://bpac.org.nz/BPJ/2011/november/antipsychotics.aspx#2.

39. A Bit About Atypical Antipsychotics. Opioids and Antipsychotics. www.qnada.org.au/news.

40. O'Shea, T. (2016, May 1). *10 Surprising Off-Label Uses for Prescription Medications*. Pharmacy Times. https://www.pharmacytimes.com/view/10-surprising-off-label-uses-for-prescription-medications. (Accessed 01 Jan 2018).

41. Jim, G. (2021). *The Zyprexa Papers*. Samizdat Health Writer's Co-Operative Inc,.

42. *Court-Ordered Insanity: Interpretive Practice and Involuntary Commitment (Sociology and Economics) by James A. Holstein (1993–12-31)*. (2020). Aldine Transaction.

43. A quote by Tony Stanton in psychotropic Part 12. www.JohnBergman.com.

44. Guzman, F. First vs second generation antipsychotics Psychopharmacology Institute.

45. Levine, A. (2017, October 18). *Hard Truths About Psych Drugs: What I Learned, Eventually, From My Mother's Death in a Psych Ward*. Newsweek. https://www.newsweek.com/psychiatric-drugs-overprescribed-americans-opioids-683628.

46. Levine, A. (2017a, October 12). *Opioid Crisis: Reckless Overprescribing of Antipsychotics is Killing Veterans*. Newsweek. https://www.newsweek.com/va-opioid-crisis-killing-us-veterans-682402.

47. Theoharides, T. C., & Asadi, S. (2012). Unwanted Interactions Among Psychotropic Drugs and Other Treatments for Autism Spectrum Disorders. *Journal of Clinical Psychopharmacology*, *32*(4), 437–440. https://doi.org/10.1097/jcp.0b013e31825e00e4.

48. *Parents of Justina Pelletier sue Boston Children's Hospital*. (2016, February 25). BostonGlobe.Com. https://www.bostonglobe.com/metro/2016/02/25/parents-justina-pelletier-sue-boston-children-hospital-for-negligence/jCrlgTQBVikJtokEnlFBmN/story.html.

49. What do benzo neurotransmitter acetylcholine. (2018)

50. *Prescription CNS Depressants DrugFacts*. (2020, July 24). National Institute on Drug Abuse. https://www.drugabuse.gov/publications/drugfacts/prescription-cns-depressants.

51. Martin's Homestead. (2019, January 11). *The Minds of Men - 2018 (Official Documentary by Aaron & Melissa Dykes)*. YouTube. https://www.youtube.com/watch?v=2ZEWKFDlWIQ&ab_channel=Martin%27sHomestead

52. Craig. (2019, September 6). *Dr COURTNEY CRAIG — Diet & Nutrition for Chronic Fatigue & Fibromyalgia*. Dr COURTNEY CRAIG. https://www.drcourtneycraig.com/blog/2014/11/29/medication-induced-mitochondrial-damage.

53. U.S. Department of Veterans Affairs. 2019 National Veteran Suicide Prevention Annual Report.

54. Unknown.

55. IMS, Vector One: National (VONA) and Total Patient Tracker (TPT) Database. Year 2013. Extracted April 2014.

56. Paxil, Depakote *Ativan*, (Depakene) Valproic Acid information www.drugs.com.

57. *Psychiatry Of Repressed Memories On Trial | The Seattle Times*. (1993). Psychiatry Of Repressed Memories On Trial | The Seattle Times. https://archive.seattletimes.com/archive/?date=19930709&slug=1710297.

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES
(CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC

58. Reference: 1. Ennis, B. J., & Litwack, T. R. (1974). Psychiatry and the presumption of expertise: *Flipping coins in the courtroom*. Berkeley, CA: California Law Review.

59. Biography. 2020. *Nellie Bly*. [online] Available at: https://www.biography.com/activist/nellie-bly [Accessed 2 January 2020].

60. Tappan, N. (2019, April 17). Pioneering Female Reporter Nellie Bly Went Undercover and Around the World in 72 days. Retrieved January 02, 2020, from https://www.historynet.com/nellie-bly-troublemaker.htm.

61. *The 5 minute toxicology consult* (cit. 14) pages 62-63, 66-67, 80-81, 130-131, 254-255, 394-395, 398-399, 530-531, 546-547, 626-629, 690-691, would be of further interest.

62. US Legal, Inc. "Reckless Endangerment Law and Legal Definition." Reckless Endangerment Law and Legal Definition | USLegal, Inc. Accessed 2019. https://definitions.uslegal.com/c/reckless-endangerment/.

63. US Legal, Inc. "Menacing Law and Legal Definition." Menacing Law and Legal Definition | USLegal, Inc. Accessed 2021. https://definitions.uslegal.com/c/reckless-endangerment/.

64. Veterans Gain Access to Naturopathic Physician Care (2019, August 14) https://bastyr.edu/news/general-news-home-page/2019/08/veterans-gain-access-naturopathic-physician-care

PLAINTIFFS FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES (CORRECTED PER DKT 29) Case No. 2:21-CV-1276–RAJ–DWC